**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

    Plaintiff,
v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, *et al.*,

    Defendants.
_____/

## ORDER ON MOTION FOR DEFAULT FINAL JUDGMENT

THIS CAUSE came before the Court upon Plaintiff Antonio Caballero's ("Plaintiff") Motion for Default Final Judgment Against Defendants Fuerzas Armadas Revolucionarias de Colombia ("FARC") and Norte de Valle Cartel ("NDVC") (collectively, "Defendants"). ("Mot.") (ECF No. 58). Defendants did not file a response to the Motion and the time to do so has passed. The Motion is now ripe for review.

**I.    BACKGROUND**

This is an action brought pursuant to 18 U.S.C. § 2333, which is part of the Anti-Terrorism Act ("ATA"). ("Compl.") (ECF No. 1) ¶ 1. Plaintiff is a national of the United States. *Id.* ¶ 3. Defendants are criminal narco-terrorist organizations in Colombia. *Id.* ¶ 5.

In 2012, Plaintiff brought an action in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida ("State Court Action") against Defendants and Ejercito de Liberacion Nacional ("ELN")[1] for, *inter alia*, Defendants' and ELN's extra-judicial kidnapping,

---

[1] Although ELN was named as a defendant in this action, Plaintiff voluntarily dismissed, without prejudice, ELN from the case. *See* (ECF No. 57).

torture, and killing of Plaintiff's father to facilitate the trafficking and distribution of illicit drugs throughout the United States. *Id.* ¶ 2. On November 18, 2014, because all three defendants failed to appear or respond, the state court entered final judgment, after a trial, in Plaintiff's favor against all three defendants jointly and severally. *Id.* ¶ 4. Therein, the state court found that Plaintiff, his father, and his family owned and operated farms and properties in the central regions of Colombia, in an area that was strategically located along the defendants' drug trafficking route. *Id.* ¶ 5. Further, the state court found that ELN forces kidnapped Plaintiff's father, who was the former Ambassador to the United Nations, a leading politician, and an outspoken critic of narcotics traffickers in Colombia, to send a message to other potentially uncooperative landowners in the region that resistance to the defendants' demands would not be tolerated and would result in them being targeted for kidnapping for ransom and/or assassination. *Id.* Then, ELN and FARC, abused and tortured Plaintiff's father over a period of approximately six months before brutally murdering him. *Id.* The defendants further threatened Plaintiff, causing him to abandon the family farm and flee Colombia to the United States. *Id.* Accordingly, after a non-jury trial, the state court awarded Plaintiff the following damages:

1. $45,000,000.00 for actual compensatory damages for non-economic damages, including without limitation, for emotional distress and for physical and psychological pain and suffering;

2. $5,189,001.00 for trebled actual compensatory damages for losses to his business and property;

3. $140,189,001.00 for punitive damages, which is equal to three times the Court's award of base actual compensatory damages; and

4. $1,055,483.56 for prejudgment interest.

*Id.* ¶ 6.

On December 19, 2018, Plaintiff filed the Complaint, seeking damages under the ATA for Defendants' acts of terrorism against him. *See id.* ¶¶ 12–14. Plaintiff served NDVC with a

summons and Complaint on January 17, 2019 and FARC with a summons and Complaint on March 11, 2019. (ECF Nos. 15, 25). Because NDVC and FARC failed to answer the Complaint or otherwise appear, Plaintiff filed Motions for Entry of Default by the Clerk against Defendants, and the Clerk of the Court entered Clerk's Entry Default against them. (ECF Nos. 22, 23, 30, 32). Now, Plaintiff moves for entry of final default judgment against Defendants. *See generally* Mot.

## II.     LEGAL STANDARD

A court may enter default judgment against a defendant pursuant to Federal Rule of Civil Procedure 55(b)(2). "The mere entry of a default by the Clerk of the Court does not in itself warrant the entry of a default judgment by the Court." *Garrido v. Linden Contracting Servs.*, No. 0:14-cv-60469-KMM, 2014 WL 12603170, at *1 (S.D. Fla. Aug. 21, 2014). "Rather, the Court must find that there is a sufficient basis in the pleadings for the judgment to be entered." *Id.* (citation omitted). "A party in default has admitted all well-pleaded allegations of fact." *Id.* (citation omitted).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default. Rather, the Court determines the amount and character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999) (citations omitted). Damages may be awarded without an evidentiary hearing "only if the record adequately reflects the basis for award via . . . a demonstration by detailed affidavits establishing the necessary facts." *Adolph Coors Co. v. Movement against Racism & Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (citations and internal quotation marks omitted). In other words, a court may award damages "as long as the record contains evidence allowing the court to ascertain damages from 'mathematical calculations' and

'detailed affidavits.'" *Holtz v. Bagel Mkt., Inc.*, No. 12-62040-CIV-ROSENBAUM, 2013 WL 12141515, at *2 (S.D. Fla. Apr. 29, 2013) (quoting *Adolph*, 777 F.2d at 1543–44).

### III.    DISCUSSION

#### A.    **Liability**

Plaintiff moves for default judgment of his claim for damages pursuant to the ATA. The ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The phrase "act of international terrorism" used in § 2333(a) is defined in 18 U.S.C. § 2331 as:

> activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

§ 2331(1). A "'national of the United States' means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(22).

Here, Plaintiff's allegations state a claim pursuant to § 2333. First, Plaintiff is a "national of the United States." Although Plaintiff was not a national of the United States at the time of the

injury, Plaintiff became a citizen following the filing of the State Court Action. *See* Compl. ¶ 3. Neither the United States Court of Appeals for the Eleventh Circuit nor any court in this District has opined whether a claimant under the ATA must be a U.S. national contemporaneously with the injury rather than at the time that the claim is filed. The statute provides that "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism" may state a claim. § 2333. Thus, the language of the statute does not explicitly require that the claimant be a U.S. national at the time of the injury, only that he is currently a U.S. national and that he was injured by an act of international terrorism at some time in the past.

Further, "Congress intended for the ATA to have a broad scope." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1338 (D. Utah 2006). For example, courts have held that U.S. nationals can state a claim under the ATA for the death of non-U.S. national family members. *See, e.g.*, *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (holding that "U.S. citizens suing for various non-physical injuries, such as emotional distress and loss of consortium, after their family members, who were not U.S. nationals, became victims of acts of international terrorism" could state a claim under the ATA); *Biton v. Palestinian Interim Self–Government Authority*, 310 F. Supp. 2d 172, 181–82 (D.D.C. 2004) (holding that a woman whose husband (a non-U.S. citizen) died in a Gaza Strip bus bombing could maintain an ATA suit even though she was not personally on the bombed bus or injured in the blast). And, courts have permitted survivors of U.S nationals who were killed by acts of international terrorism to state a claim under the ATA even if the survivors are not U.S. nationals. *See Weinstock v. Islamic Republic of Iran*, No. 17-23272-Civ-Scola, 2019 WL 1993778, at *4 (S.D. Fla. May 6, 2019).

In addition, "[the ATA's] purpose is 'to grant a remedy to U.S. nationals and their families who suffered from an injury to an individual or property as a result of international terrorism.'" *Morris*, 415 F. Supp. 2d at 1338 (citation omitted). Congress intended for the ATA to allow victims to "bring [] terrorists to justice in our courts of law" because they often elude justice and the civil remedy will allow victims to attack the resource that enables terrorists to stay in business—their money. 138 Cong. Rec. S17252, 17254 (1992) (Recommendations of Federal Courts Study Committee).

Moreover, when Congress desires to include a temporal requirement such that the claimant must be a U.S. national at the time of the harm, it has plainly stated it. For example, under the Crime Victims Fund, a "victim" of international terrorism "means a person who . . . as of the date on which the international terrorism occurred, was a national of the United States or an officer or employee of the United States Government." 34 U.S.C. § 20106. Accordingly, a reading of the ATA permitting individuals who were not U.S. nationals at the time of the injury but subsequently become U.S. nationals to state a claim is consistent with Congress' intention and furthers the ATA's purpose. Thus, Plaintiff qualifies as a "U.S. national" under the ATA.

Second, Defendants' conduct constitutes an act of international terrorism. Defendants kidnapped Plaintiff's father in Colombia, tortured him for approximately six months, and then killed him "to send a message to other potentially uncooperative landowners in the region that resistance to (or failure to comply with) Defendants' demands would not be tolerated and would result in them being targeted for kidnapping for ransom and/or assassination." Compl. ¶ 5. Third, Plaintiff "was, and continues to be, injured in his person and property and business by reason of Defendants' acts of international terrorism." *Id.* ¶ 14. Specifically, Plaintiff has suffered both

6

economic and non-economic harm. *Id.* ¶ 6. Accordingly, Plaintiff states a claim for damages under § 2333.

### B. <u>Damages</u>

In addition to entering default judgment on liability, a court must determine the amount of damages to be awarded. *See Holtz*, 2013 WL 12141515, at *2. The burden is on the plaintiff to prove the amount of damages owed. *Varela v. Innovating Wiring Sols., LLC*, No. 6:07-cv-165-Orl-28KRS, 2009 WL 1795044, at *4 (M.D. Fla. June 22, 2009).

Plaintiff argues that Defendants are precluded from re-litigating the issue of damages because the State Court Action previously determined the amount of the damages. Therefore, Plaintiff avers that he is entitled to:

1. the trebled amount of the following sums:
   a. Forty-five million dollars ($45,000,000.00) for actual compensatory, non-economic damages; and
   b. One million, seven hundred and twenty-nine thousand, six hundred and sixty-seven dollars ($1,729,667.00) for actual compensatory, economic damages;
2. pre-judgment interest on Plaintiff's economic and non-economic damages; and
3. post-judgment interest at the applciable rate on Plaintiff's non-economic and economic compensatory damages.

Mot. at 16–17. The Court first addresses issue preclusion, and then turns to the calculation of any damages and interest.

### i. *Issue Preclusion*

"Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001). Issue preclusion, along with

7

claim preclusion, "protect[s] against 'the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153–154 (1979)).

In issue preclusion, the court applies the preclusion law of the same legal system that determined the underlying case. *See CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1316 (11th Cir. 2003). Because the State Court Action was decided in Florida state court, Florida issue preclusion law applies.

Under Florida law, issue preclusion applies where the same parties, or their privies, have previously fully litigated an identical issue to a final decision by a court of competent jurisdiction. *See Cmty. Bank of Homestead v. Torcise*, 162 F.3d 1084, 1086 (11th Cir. 1998). Specifically, issue preclusion requires that: "(1) an identical issue must have been presented in the prior proceeding; (2) the issue must have been a critical and necessary part of the prior determination; (3) there must have been a full and fair opportunity to litigate that issue; (4) the parties in the two proceedings must be identical; and (5) the issue[] must have been actually litigated." *Felder v. State, Dep't of Mgmt. Servs., Div. of Retirement*, 993 So. 2d 1031, 1034–35 (Fla. Dist. Ct. App. 2008) (internal quotation marks omitted).

Here, issue preclusion bars Defendants from re-litigating the issue of damages. First, FARC and NDVC were defendants in the prior case, and Mr. Caballero was the plaintiff. *See* ("State Ct. J.") (ECF No. 1-1). Second, the precise issue here was presented in the State Court Action. Specifically, at issue here is whether Defendants "injured [Plaintiff] in his . . . person, property, or business by reason of an act of international terrorism," entitling him to "recover threefold the damaged . . . sustain[ed] and the cost of the suit, including attorney's fees." § 2333.

In the State Court Action, the court awarded Plaintiff $45,000,000.00 in "actual compensatory damages for non-economic damages, including, without limitation, for emotional distress and for physical and psychological pain and suffering" and $1,729,667.00 in actual compensatory economic damages for losses to Plaintiff's business and property because of Defendants' "(a) hostage-taking, (b) trafficking in-persons, (c) torture, (d) extra judicial killing, and (e) crimes against humanity." State Ct. J. at 89–91. Third, the determination of the damages was a critical and necessary part of the State Court Action determination. The state court explicitly ruled on the issue of damages and incorporated its ruling into the State Court Judgment. *See* State Ct. J. at 91–92. Indeed, as discussed *infra*, the state court held a non-jury trial and made specific findings as to damages.

Finally, Defendants had a full and fair opportunity to litigate the issue and the issue was actually litigated. Default was entered in the State Court Action because Defendants failed to respond or appear. Compl. ¶ 4. However, "even a pure default, where there is no participation by the defendant, triggers [issue preclusion]. Thus[,] a pure default satisfies the 'fully litigated' element of [issue preclusion] under Florida law." *In re Itzler*, 247 B.R. 546, 554 (Bankr. S.D. Fla. 2000); *see also Masciarelli v. Maco Supply Corp.*, 224 So. 329, 330 (Fla. 1969). Moreover, the state court held a non-jury trial before it entered final default judgment. State Ct. J. at 1. The state court concluded that "[b]ased on the substantial and uncontroverted evidence presented at trial . . . Mr. Caballero has met all applicable burdens relevant to the award of damages against" Defendants. *Id.* at 90. Thus, Defendants had a full and fair opportunity to litigate the issue and the issue was fully litigated. Accordingly, Defendants are precluded from re-litigating the issue of damages and the amounts of damages are sufficiently proven.

### ii. Trebled Damages

Plaintiff argues that the Court should treble Plaintiff's economic and non-economic damages. Mot. at 9. The ATA provides that a U.S. national injured by an act of international terrorism "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." § 2333. Although neither the Eleventh Circuit nor any court in this District has addressed whether both economic and non-economic damages are trebled under the ATA, the weight of authority in other courts has held that both economic and non-economic damages are trebled. *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 277 (D.R.I. 2004) [hereinafter *Ungar III*] (trebling the plaintiff's economic and non-economic damages); *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 2147, 233–34 (S.D.N.Y. 2003) (same); *see also Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 8:09-cv-2308-T-26MAP, 2010 WL 11507790, at *4 (M.D. Fla. June 14, 2010) (trebling non-economic damages to victim's family members); *Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 78 (D.D.C. 2018) (trebling non-economic damages). Thus, Plaintiff is entitled to trebling of his economic and non-economic damages.

### iii. Pre-Judgment Interest

Next, Plaintiff argues that the Court should award him pre-judgment interest for his economic and non-economic damages. Courts have discretion as to whether to award pre-judgment interest. *See In re Glob. Mfg. Corp.*, 567 F.3d 1291, 1300 (11th Cir. 2009). Neither the Eleventh Circuit nor any court in this District has determined whether pre-judgment interest should be awarded on damages pursuant to the ATA.

Other courts are split whether damage awards pursuant to the ATA are entitled to pre-judgment interest. *Compare Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d

216, 266 (D.D.C. 2008) (awarding pre-judgment interest on ATA economic and non-economic damages), *with Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 67–68 (D.R.I. 2004) [hereinafter *Ungar IV*] (declining to award pre-judgment interest on economic and non-economic damages pursuant to the ATA).

In *Pugh*, the court reasoned that "courts in [the District of Columbia Circuit] have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries—including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants. *Pugh*, 53 F. Supp. 2d at 263. Further, the court explained that pre-judgment interest furthers the ATA's deterrent purposes and is part of providing full compensation to the victims because "interest compensates for the time value of money and thus is often necessary for full compensation." *Id.* at 264 (internal quotation marks and citation omitted). Moreover, the court notes that pre-judgment interest is particularly appropriate where the remedy is meant to compensate a victim for harms sustained over a long period of time. *Id.* (citation omitted).

Thus, the *Pugh* court found that pre-judgment interested was warranted to fully compensate the plaintiffs, especially in light of the eighteen (18) year delay between the act of international terrorism and the judgment. *Pugh*, 53 F. Supp. 2d at 264–65. Further, the court noted that "prejudgment interest is particularly appropriate in this case because of the substantial delay in judgment for these plaintiffs caused by Libya's persistent delay tactics over the course of this litigation." *Id.* at 265.

In *Ungar IV*, the court relies upon its finding in its prior decision in *Ungar III* for the proposition that the plaintiffs are not entitled to pre-judgment interest. *See Ungar IV*, 325 F. Supp. 2d at 68. The *Ungar III* court applied the analysis outlined in *Rodgers v. United States*, 332 U.S. 371 (1947), which noted that "penalties imposed by an Act of Congress bear interest only if and

to the extent that interest is required by federal law." *Ungar III*, 304 F. Supp. 2d at 237. However, the *Rodgers* court further explained that "[a]bsent Congress' unequivocal prohibition of prejudgment interest, courts should grant or deny interest by looking to the congressional purpose underlying the particular statute." *Id.* at 237–38 (citing *Rodgers*, 332 U.S. at 373).

Finding that § 2333 does not directly address whether to award pre-judgment interest, the *Ungar* court turned to analyzing the congressional purposes. *Id.* at 238. The court examined Senator Grassley's, the bill's sponsor, statements during the floor debate of the bill and the testimony in the Subcommittee on Courts and Administrative Practice regarding the bill, which demonstrated "unequivocal congressional intent to deter acts of international terrorism and punish those who commit such acts against American citizens." *Id.* at 238–39. Thus, the court held that "[g]iven Congress' clear intent to deter and punish terrorist acts, this Court is unable to conclude that Congress also intended to add interest to the substantial penalties of treble damages, court costs, and attorney's fees that are already imposed by the statute." *Id.* at 239. Further, the court explained that "[p]rejudgment interest is also inappropriate in this case because the treble damages provision of Section 2333 is overwhelmingly punitive, and prejudgment interest does not apply to a punitive damages award." *Id.*

Here, the Court finds the *Ungar III* court's analysis persuasive. Although awarding pre-judgment interest would augment the deterrent effects of the ATA, the trebling of damages and extensive legislative history evidencing the statute's deterrent and punitive purposes counsel against awarding pre-judgment interest pursuant to *Rodgers*. Further, the Court agrees that § 2333 is punitive in nature and therefore pre-judgment interest does not apply.

Moreover, the instant case is distinguishable from *Pugh*. In *Pugh*, the court emphasized exacerbating factors which supported awarding pre-judgment interest. Specifically, the court

12

observed that the underlying act of terrorism occurred on September 19, 1989, resulting in an approximately eighteen (18) year period between the underlying act of terrorism and the entry of judgment. *Pugh*, 530 F. Supp. 2d at 216, 265. The court also noted that Libya's persistent delay tactics throughout the litigation further supported the award of pre-judgment interest. *Id.* at 265. Here, although the underlying acts of terrorism occurred in 1999, Plaintiff was not a citizen of the United States until after the filing of the State Court Action in 2012. *See* State Ct. J. at 6; Compl. ¶ 3. Therefore, the delay in obtaining a judgment pursuant to the ATA was not caused by Defendants' delay tactics but rather because Plaintiff appears to have lacked standing to assert a claim pursuant to the ATA until at least 2012. *See* § 2333 (requiring that a national of the United States be injured by an act of international terrorism to state a claim); *see also* 8 U.S.C. § 1101(22). Further, the time that elapsed between Plaintiff becoming a citizen and this Order is at most approximately eight (8) years, which is significantly less than the delay in *Pugh*. *See* State Ct. J. at 6; Compl. ¶ 3. Indeed, the period between Plaintiff becoming a citizen and this Order is approximately the same length as between the underlying act of terrorism and the entry of judgment in *Ungar IV*. *See Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 153 F. Supp. 2d 76, 82 (D.R.I. 2004) (providing that the underlying act of terrorism occurred on June 9, 1996); *see generally Ungar IV*, 325 F. Supp. 2d 15 (entering judgment on July 12, 2004).

Accordingly, because the Court finds the *Ungar III* reasoning persuasive and the instant case distinguishable from *Pugh*, Plaintiff is not entitled to pre-judgment interest.

### iv. Post-Judgment Interest

Finally, Plaintiff seeks post-judgment interest at the applicable rate on Plaintiff's economic and non-economic damages. Mot at 17. Section 1961, Title 28 of the United States Code provides that post-judgment "[i]nterest shall be allowed on any money judgment in a civil case recovered

in a district court." 28 U.S.C. § 1961. The statute further provides that "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.* Accordingly, Plaintiff is entitled to post-judgment interest at a rate equal to the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of final judgment.

## IV.     CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Plaintiff's Motion for Default Final Judgment Against Defendants FARC and NDVC (ECF No. 58) is GRANTED. Accordingly, it is hereby ORDERED AND ADJUDGED that:

   A.     Final Judgment is entered in favor of Plaintiff Antonio Caballero and against Defendants Fuerzas Armadas Revolucionarias de Colombia and Norte de Valle Cartel, for which sum let execution issue, in the amount of:

   i.     Forty-five million dollars ($45,000,000.00) in actual compensatory non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333;

   ii.    One million, seven hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729.667.00) in actual, compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; and

   iii.   Post-judgment interest at the rate of 0.15% per annum on the above-awarded trebled economic and non-economic damages;

   B.     The Court retains jurisdiction to hear any motion for costs of this suit, including attorney's fees; and

14

      C.      The Court retains jurisdiction to enforce this judgment.

The Clerk of the Court is instructed to CLOSE this case. All pending motions, if any, are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2020.

_____
K. MICHAEL MOORE
UNITED STATES CHIEF DISTRICT JUDGE

c: All counsel of record