# EXHIBIT 2

ANTONIO CABALLERO,

       Plaintiff,

vs.

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA,
a/k/a FARC-EP a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA; and
THE NORTE DE VALLE
CARTEL,

       Defendants.

_____/

## SWORN DECLARATION OF JOHN ROBERT MCBRIEN REGARDING AGENCIES AND INSTRUMENTALITIES OF THE FARC

I, John Robert McBrien, declare the following under oath:

### I.      Introduction

1.  My name is John Robert McBrien. I am a citizen of the United States and was

formerly the Associate Director for Global Targeting in the Office of Foreign Assets Control

("OFAC"), the U.S. Treasury Department's sanctions organization. I held that position from May

2005 to December 2011, when I retired from the Treasury Department. Furthermore, at all times

during my employment with OFAC, I was in charge of its designations operations. This covered

the period from November 1987 to and throughout the formal creation of OFAC's Office of

Global Targeting (OGT) in 2005.   Thus, I was in charge of the designations programs of OFAC

for more than 24 years. OFAC's Office of Global Targeting is charged with investigating and

identifying the foreign entities and individuals that are designated under OFAC's Specially

Designated Nationals ("SDN") programs directed against the principals, operatives, and

networks of sanctioned countries, regimes, and non-state foreign adversaries.

2.   I am an authority in the employment of U.S. economic sanctions programs and had a seminal role in the conception, design, and development of the Specially Designated Nationals list and targeted sanctions against non-state foreign adversaries. My initiatives have been a key factor in the development of economic sanctions as a major instrument of national security policy.   During my nearly 25 years with OFAC, I participated in the development of every sanctions Executive Order issued in that period and in the implementation of the resulting sanctions programs.

3.   I began my career as an attorney in Washington, D.C. in the United States Justice Department's Organized Crime and Racketeering Section. And, in addition to conducting grand jury investigations, I served as the executive secretary for the Attorney General's National Council on Organized Crime. Nearly 40 years later, I was involved in the development of President Obama's National Strategy on Transnational Organized Crime and the Executive Order imposing sanctions against transnational criminal organizations.

4.   Most of my career, including the nearly 25 years I worked with OFAC, was with the U.S. Treasury Department, where I handled a broad spectrum of cross-cutting national security, intelligence, and law enforcement issues.   Among these was the use of economic sanctions on both strategic and tactical levels.

5.   Subsequent to my service with the Treasury Department, I served, under contract, as a senior advisor in the Narcotics and Transnational Crime Support Center of the Department of Defense, advising on sanctions, illicit finance, and countering threat networks.   In addition, I am a member of the Board of Advisers of the Center on Economic and Financial Power of the

Foundation for Defense of Democracies, and I am a Fellow of the American College of National Security Leaders.

6. Moreover, I am an expert in the development, coordination, and implementation of inter-disciplinary and collaborative policies and programs affecting U.S. national security. As noted above, this includes the use of economic sanctions on both strategic and tactical levels. I have broad experience with the national security and defense, foreign policy, intelligence, law enforcement, and legal communities. I was a participant in the U.S. counter-terrorism program from its 1972 inception and in counter-narcotics programs since 1985. When I retired in December 2011, I held the position of Associate Director for Global Targeting at OFAC. In that position, I was responsible for targeting investigations, execution of designations, policy development, and interagency collaboration involving OFAC's designation programs.

## II.     Agency and Instrumentality

7. Historically, the FARC has dominated the Colombian cocaine trade. "[T]he FARC controls approximately 70% of the coca grown in Colombia." Indictment at ¶ 34, *United States v. Marin*, (Apr. 29, 2005 D.D.C.), (No. 04-446), attached hereto as **Exhibit A**. And, Colombia supplies 90% of the cocaine consumed in the United States. *See id.*; *see also Narco-Terror: the Worldwide Connection Between Drugs and Terrorism, Before the Subcomm. On Tech., Terrorism and Gov't. Info, Senate Comm. on the Judiciary*, 107th Cong., at 4 (2002), attached hereto as **Exhibit B**. "Therefore, the FARC is responsible for...more than approximately 60% of the cocaine sent to the United States." Indictment at ¶ 34, *United States v. Marin*, (Apr. 29, 2005 D.D.C.), (No. 04-446); *see also* U.S. Gov't Accountability Off., GAO-09-806, Drug Control: U.S. Counternarcotics Cooperation with Venezuela Has Declined, at 4, (2009), attached

hereto as **Exhibit C**.

8.    Recently, FARC factions (together with various "Armed Criminal Organizations") continue to dominate the Colombian drug trade. *See* Drug Enf't Administration, 2019 National Drug Threat Assessment at 104, (2019).

9.    According to the U.S. Drug Enforcement Administration , ". . . approximately 90% of samples [of cocaine in the U.S. market] analyzed in 2018 originated in Colombia." *See id*. at 69. *See also id*. at 60 (pie chart).

10.    Agents and instrumentalities of the FARC, include anyone or any entity that:

.....is or was ever involved in the cultivation, manufacture, processing, purchase, sale, trafficking, security, storage, shipment or transportation, distribution of FARC coca paste or cocaine, or that assisted the FARC's financial or money laundering network, . . . because it was either:
(1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC]; and/or
(2) owned, controlled, or directed by, or acting for or on behalf of, . . . [FARC]; and/or
(3) playing a significant role in international narcotics trafficking [related to coca paste or cocaine manufactured or supplied by the FARC].

*Stansell v. Revolutionary Armed Forces of Columbia*, 771 F.3d 713, 724 n.6 (11th Cir. 2014).

Alex Nain Saab Moran ("Saab") is an agent and instrumentality of the FARC.  Saab was designated as an SDN by OFAC under the Venezuelan Sanctions Program on July 25, 2019.[1] Saab is a fugitive of the law and a known money-launderer.[2]

11.    On the same day that Saab was designated as an SDN, the following individuals

---

[1] Office of Foreign Assets Control, *Venezuela Related Designations*, U.S. TREASURY DEPT., (Jul. 25, 2019), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20190725.aspx
[2] *See generally* Indictment, *United States v. Saab Moran*, (S.D. Fla. July 2019) (No. 19-20450) (charging Saab with conspiracy to commit money-laundering and laundering of monetary instruments); *see also* Kejal Vyas, *Key Financier of Venezuela's Maduro Regime Arrested*, THE WALL STREET JOURNAL, (Jun. 13, 2020), https://www.wsj.com/articles/key-financier-of-venezuelas-maduro-regime-arrested-11592078537
(noting that Saab was arrested in Cape Verde and is wanted by the U.S. government).

were designated by OFAC as part Saab's "network of corruption and nepotism" and were "determined to be responsible for or complicit in, or directly or indirectly engaged in, a transaction or series of transactions involving deceptive practices and corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela, or are immediate adult family members of such persons, or operate in the gold sector of the Venezuelan economy, or are current or former officials of the Government of Venezuela": Walter Jacob Gavidia Flores, Yosser Daniel Gavidia Flores, and Yoswal Alexander Gavidia Flores (Maduro's stepsons - "Los Chamos"); Cilia Adela Flores de Maduro; Carlos Erica Malpica Flores; Tareck Zaidan El Aissami Maddah; Illiana Josefa Ruzza Terán; Alvaro Enrique Pulido Vargas (Pulido); Emmanuel Enrique Rubio Gonzalez (Rubio); Jose Gregorio Vielma Mora (Vielma Mora); Shadi Nain Saab Certain (Shadi); Isham Ali Saab Certain; Mariana Andres Staudinger Lemoine. *See* Press Release, U.S. Treasury Dept., Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (Jul. 25, 2019).

12.   OFAC's July 25, 2019 press release detailing its designation of Saab and his "vast corruption network" states:

> ***Several individuals designated today played a role in establishing a global structure of front and shell companies to skim significant sums of money from commercial contracts and business activity created through the scheme.*** By utilizing such a structure of offshore entities to support CLAP operations, it makes it more difficult for U.S. financial institutions to identify corrupt activity related to CLAP-related food operations.
>
> ***The following companies were designated or blocked today for being owned or controlled by the aforementioned individuals, or for being responsible for or complicit in, or for being directly or indirectly involved in, any transaction or series of transactions involving deceptive practices or corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela.***

5

*Id.* (emphasis added).

13.     According to the OFAC July 25, 2019 Press Release, the following entities were designated by OFAC "for being owned or controlled by the aforementioned individuals [*see* para. 11 *supra*], or for being responsible for or complicit in, or for being directly or indirectly involved in, any transaction or series of transactions involving deceptive practices or corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela": Asasi Food FZE; Group Grand Limited; Group Grand Limited, S.A. de C.V.; Group Grand Limited General Trading; Mulberry Proje Yatirim Anonim Sirketi (Mulberry); Seafire Foundation; C I Fondo Global De Alimentos LTDA; Emmr & CIA S.AS.; Global Structure, S.A.; Multitex International Trading, S.A.; Sun Properties LLC; CLIO Management Corp.; Silver Bay Partners FZE (Silver). *Id.*

14.     Moreover, on September 17, 2019, OFAC designated the following "three individuals and 16 entities for their connections to Alex Nain Saab Moran (Alex Saab) and his business partner, Alvaro Enrique Pulido Vargas (Alvaro Pulido), who have enabled former President Nicolás Maduro (Maduro) and his illegitimate regime to corruptly profit from imports of food aid and distribution in Venezuela": Amir Luis Saab Moran ("Amir Saab"), Luis Alberto Saab Moran ("Luis Saab"), David Nicolas Rubio Gonzalez ("Rubio"). Press Release, U.S. Treasury Dept., Treasury Increases Pressure on Alex Saab and His Network in Venezuela, (Sept. 17, 2019). OFAC stated that such individuals "are immediate adult family members of, and had business ties to, Alex Saab or Alvaro Pulido, two individuals who are responsible for or complicit in, or have directly or indirectly engaged in, any deceptive or corrupt transaction or series of transactions with the Government of Venezuela or projects or programs administered by

the Government of Venezuela." *Id.* Regarding Amir Saab, Luis Saab, and Rubio, OFAC stated as follows:

> • **Amir Luis Saab Moran (Amir Saab)** has been involved in multiple business ventures with his brother, Alex Saab, most notably the Panama-based Seafire Foundation, which was designated on July 25, 2019, for its involvement in Alex Saab's corruption network. As of early 2018, Amir Saab was in charge of the administrations of various companies owned or controlled by Alex Saab. Four companies owned or controlled by Amir Saab in Colombia and Panama are being designated as a result of today's action.
>
> • **Luis Alberto Saab Moran (Luis Saab)** has been involved in multiple business ventures with his brothers, Alex Saab and Amir Saab. Eight companies owned or controlled by Luis Saab across Latin America and Europe are being designated as a result of today's action.
>
> • **David Nicolas Rubio Gonzalez (Rubio)** is the son of Alvaro Pulido and brother of Emmanuel Enrique Rubio Gonzalez, who were previously designated on July 25, 2019. Rubio is a Director at Global Structure, S.A. and an Assistant Manager at C I Fondo Global De Alimentos LTDA. Both of these companies were designated on July 25, 2019. Three additional companies owned or controlled by Rubio in Colombia and Panama are being designated today.

*Id.*

15.     The following companies were designated by OFAC as SDNs for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, Amir Luis Saab Moran ("Amir Saab"), Luis Alberto Saab Moran ("Luis Saab"), David Nicolas Rubio Gonzalez ("Rubio"), or Alex Saab: Fundacion Venedig (Panama); Inversiones Rodime S.A. (Panama); Saafartex Zona Franca SAS (Colombia); Venedig Capital S.A.S. (Colombia); AGRO XPO S.A.S. (Colombia); Alamo Trading S.A. (Colombia); Antiqua Del Caribe S.A.S. (Colombia); Avanti Global Group S.A.S. (Colombia); Global Energy Company S.A.S. (Colombia); Gruppo Domano S.R.L. (Italy); Manara S.A.S. (Colombia); Techno Energy, S.A. (Panama); Corporacion ACS Trading S.A.S. (Colombia); Dimaco Technology, S.A. (Panama); Global De Textiles Andino S.A.S. (Colombia); and Saab Certain & Compania S. En C.

(Colombia). *See Id.*

16.     It is my opinion that the individuals and entities referenced in paragraphs 11, 12, 13, 14, and 15 herein are agents and instrumentalities of the FARC.

17.     Saab has ties to and worked together with various FARC operatives, including, without limitation, the illegitimate occupant of the Venezuelan Presidency Nicolas Maduro ("Maduro"), Tareck Zaidan El Aissami Maddah ("El Aissami"), and Hizballah.  As such, Saab himself is an agent and instrumentality of the FARC.

18.     On July 31, 2017, OFAC designated Maduro as a SDN under Executive Order 13692.[3]   Throughout his regime, Maduro has made Venezuela a safe haven for the FARC.[4]   Moreover, Maduro has provided material support to the FARC.[5]   "Maduro helped manage, and ultimately, lead the Cartel of the Suns, a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials, as he gained power in Venezuela in a corrupt and violent narco-terrorism conspiracy with the Revolutionary Armed Forces of Colombia (FARC)." *See Nicolas Maduro Moros—New Target*, U.S. DEP'T OF STATE (Mar. 26, 2020), https://www.state.gov/nicolas-maduro-moros-new-target/.     "Maduro negotiated multi-ton

---

[3] *See* Office of Foreign Assets Control, *Venezuela Related Designations*, U.S. TREASURY DEPT., (July 31, 2017), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20170731.aspx
[4] *See* Venezuela Investigative Unit, *GameChangers 2019: As Venezuela Sinks, Maduro's Criminal Ties Keep Him Afloat*,     INSIGHT     CRIME,     (Jan.     18,     2020), https://www.insightcrime.org/news/analysis/gamechangers-venezuela-maduro-criminal-ties/ (discussing Maduro's welcome to the FARC and ELN into Venezuela); *see also* Venezuela Investigative Unit, *FARC Dissidents and the ELN     Turn     Venezuela     Into     Criminal     Enclave,* https://www.insightcrime.org/news/analysis/farc-dissidents-eln-turn-venezuela-criminal-enclave/ (Dec. 10, 2018) (detailing Maduro's support to the FARC and ELN "in states such as Apure, Amazonas, and Bolívar, now considered to be criminal enclaves").
[5] *See* Venezuela Investigative Unit, *GameChangers 2019: As Venezuela Sinks, Maduro's Criminal Ties Keep Him Afloat*,     INSIGHT     CRIME,     (Jan.     18,     2020), https://www.insightcrime.org/news/analysis/gamechangers-venezuela-maduro-criminal-ties/ (discussing how Maduro has allowed terrorist agencies such as the FARC and the ELN to dig up Venezuelan gold) ("Maduro has given these guerrillas, especially the ex-FARC mafia, a firm grip on transnational drug trafficking, creating numerous conduits to send cocaine from Colombia through Venezuela to the United States and Europe.").

shipments of FARC-produced cocaine; directed the Cartel of the Suns to provide military-grade weapons to the FARC; during his tenure as Foreign Minister coordinated foreign affairs with Honduras and other countries to facilitate large-scale drug trafficking; and solicited assistance from FARC leadership in training an unsanctioned militia group that functioned, in essence, as an armed forces unit for the Cartel of the Suns. " *Id.* Specifically, Maduro and his regime have facilitated FARC's drug trafficking through Venezuela and to Honduras as follows:

> A sizable fraction of the profits go to countries through which the drugs pass, from the jungles of Colombia through Venezuela and often to the Honduran coastline. A confidential 2018 US radar map of the plane routes seen by CNN shows their departure from northwestern Venezuela's Zulia region, their passage north to the Caribbean, and then their sharp turn West toward their destinations in the remote farmlands of Guatemala, on the Honduran coastline, and some in the Caribbean. From there, the drugs are shipped up to Mexico and then distributed to American cities.

> One US official estimated that in 2018 alone, 240 metric tons (265 tons for US readers) of cocaine crossed into Venezuela from Colombia to be flown out of the country. Other officials involved in combating the drug trade said that estimate was conservative. So much pure Colombian cocaine, when cut and distributed, could fetch around $39 billion on the streets of the US, according to an estimate by the United Nations Office on Drugs and Crime for CNN.

*Corruption in Venezuela has created a cocaine superhighway to the US*, CNN, (April 17, 2019),

https://www.cnn.com/2019/04/17/americas/venezuela-drug-cocaine-trafficking-intl/index.html.

*See also Dominican Republic and Venezuela: Cocaine Across the Carribean*, INSIGHT CRIME,

(May                                    24,                                    2018),

https://www.insightcrime.org/investigations/dominican-republic-venezuela-cocaine-across-carib

bean/.

Los Cachiros transport FARC cocaine in Honduras and Guatemala. "It is reported that [the] Los Cachiros controls 90 percent of the clandestine airstrips in Honduras, and it uses these

airstrips to facilitate the entry of drugs into Honduras and Guatemala."[6] Controlling 90% of the clandestine airstrips in Honduras for entry of cocaine from the FARC, the supplier of more than 50% of the world's supply of cocaine, means that the Los Cachiros is the transport arm for the FARC in Honduras. The U.S. government has identified the Los Cachiros and several of its members as Specially Designated Narcotics Traffickers (SDNTKs) pursuant to the Foreign Narcotics Kingpin Designation Act.[7] The Los Cachiros is an agency and instrumentality of the FARC as they transport FARC cocaine. They are in essence the FARC cocaine transporter in Honduras - controlling virtually all clandestine Honduran airstrips for transport of FARC cocaine, and otherwise materially assisting in, or otherwise providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of the FARC. Therefore, Maduro, by facilitating FARC's drug trafficking through Venezuela, to Honduras, and eventually to the U.S, materially assists and otherwise provides support to the FARC. Maduro is therefore an agent and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6.

---

[6] *"Treasury Targets 'Los Cachiros' Drug Trafficking Organization in Honduras,"* U.S. DEP'T OF TREAS. DEPT. (Sept. 19, 2013). https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx https://www.treasury.gov/press-center/press-releases/Pages/jl2168.aspx (emphasis added); *see also* THE WHITE HOUSE, *Presidential Letter-- Kingpin Designation Act*, EIN PRESSWIRE, (May 31, 2013), https://www.einpresswire.com/article/152311309/presidential-letter-kingpin-designation-act (explaining how the President named the Los Cachiros DTO as a "Tier I" drug kingpin ("Significant Foreign Narcotics Trafficker") in May 2013. OFAC began designations of Los Cachiros leadership and other key persons in September 2013. Those tier II designations and the earlier Tier I determination were all added to the OFAC SDN list as SDNTKs).

[7] 21 U.S.C.1901-1908, 8 U.S.C.1189; *see also* Los Cachiros Drug Trafficking Organization Chart U.S. TREAS. DEPT. (Sept. 2 013), https://www.treasury.gov/resourcecenter/sanctions/Programs/Documents/20130919_los_cachiros.pdf; OFAC, *Kingpin Act Designations; Foreign Sanctions Evaders Designations; Executive Order 13622 Designations; Iran Sanctions Designations; Non-proliferation Designations; Counter Terrorism Designations* https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20130531.aspx (May 31, 2013).

19.     Saab is "a frontman for Maduro," as well as a "key financier" for Maduro's illegitimate government. *See Alex Saab*, INSIGHT CRIME, (Jun. 14, 2020), https://www.insightcrime.org/venezuela-organized-crime-news/alex-saab/ (discussing how "Maduro would pay hundreds of millions of dollars to Saab," as well as Saab's money-laundering crimes related to the Venezuelan government); Kejal Vyas, *Key Financier of Venezuela's Maduro Regime Arrested*, THE WALL STREET JOURNAL, (Jun. 13, 2020), https://www.wsj.com/articles/key-financier-of-venezuelas-maduro-regime-arrested-11592078537 (discussing how Saab "stash[ed] hundreds of millions of dollars in proceeds from no-bid state contracts for projects ranging from housing construction to food distribution" and how he "created a vast financial network to move money on Caracas' behalf"). Saab "has been implicated in several corruption schemes involving the Maduro regime" and has assisted Nicolas Maduro and other Venezuelan government officials to "launder hundreds of millions of dollars in corruption proceeds." *See* Claudia Fernandez, Moises Rendon, *Corruption in Venezuela: The Alex Saab Case*, CENTER FOR STRATEGIC AND INTERNATIONAL STUDIES, (Jun. 24, 2020), https://www.csis.org/analysis/corruption-venezuela-alex-saab-case; *see also* Indictment, *United States v. Saab Moran*, at 9, ¶ 8 (S.D. Fla. July 2019 (No. 19-20450) (discussing how Saab and his co-conspirators made corrupt payments to Venezuelan government officials in exchange for approval of fraudulent invoices "for goods that were never imported into Venezuela"). Saab has been heavily involved in the Venezuelan government's Local Storage and Production Committees ("CLAP") aid program and illicit gold extraction program. Press Release, U.S. Treasury Dept. , Treasury Increases Pressure on Alex Saab and His Network in Venezuela (Sep. 17, 2019). Saab's activities have "enabled former President Nicolas Maduro (Maduro) and his

illegitimate regime to corruptly profit from imports of food aid and distribution in Venezuela." *Id.* (discussing Saab's involvement in the corrupt CLAP program); *see also* U.S. Dept. of the Treasury Financial Crimes Enforcement Network, UPDATED ADVISORY ON WIDESPREAD PUBLIC CORRUPTION IN VENEZUELA FIN-2019-A002 (May 3, 2019) (explaining how Maduro's regime received kickbacks from the CLAP program through inflated contract prices). Press Release, U.S. Treasury Dept. Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (Jul. 25, 2019) (discussing Saab's involvement in the gold extraction program, used by Maduro to keep his regime solvent); Venezuela Investigative Unit, *The Fall of Álex Saab, The Venezuelan Regime's Trusted Money Man*, INSIGHT CRIME, (Jun. 15, 2020), https://www.insightcrime.org/news/brief/fall-alex-saab-venezuela/ (discussing that, "[t]he arrest of Alex Saab not only takes away a key Maduro ally but is a blow to the government's ability to prop itself up through illicit proceeds). Moreover, Saab's illicit activity includes enriching Maduro's immediate family members by bribing the stepsons of Maduro, funneling money to them "in exchange for access to contracts with the Government of Venezuela, including its food subsidy program." Press Release, U.S. Treasury Dept., Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (July 25, 2019), https://home.treasury.gov/news/press-releases/sm741; *see also* Annie Todd, *Stepsons of Venezuelan President Sanctioned by the US*, ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT, (Jul. 29, 2019), https://www.occrp.org/en/daily/10333-stepsons-of-venezuelan-president-sanctioned-by-the-us (discussing how Saab leveraged his relationships with Maduro's stepsons to gain access to key officials such as Maduro and El Aissami and to Venezuelan governmental contracts).

20.     Because Saab laundered money, and engaged in other illegal activities, for Maduro – or otherwise provided material assistance to or coordinated with – Maduro who is an agent and instrumentality of the FARC, Saab is an agent and instrumentality of the FARC. Through his assistance and support for Maduro through the illicit activities referenced above (among others), Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

21.     El Aissami, current Venezuelan Minister of Industry and National Production, has been designated by OFAC as an SDNTK.[8]  El Aissami has played "a significant role in international narcotics trafficking." *See* Press Release, U.S. Treasury Dept., Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami And His Primary Frontman Samark Lopez Bello (Feb. 13, 2017). Specifically,

> [El Aissami] facilitated shipments of narcotics from Venezuela, to include control over planes that left from a Venezuelan air base and drug routes through the ports in Venezuela. In his previous positions, he oversaw or partially owned narcotics shipments of more than 1,000 kilograms from Venezuela on multiple occasions, including those with the final destinations of Mexico and the United States.

*See id.*

22.     El Aissami has collaborated specifically with Los Zetas, a Mexican cartel, and with Daniel Barrera Barrera, a known Colombian drug lord. *See id.*  Both Los Zetas and Daniel Barrera Barrera have been designated pursuant to the Kingpin Act for their narcotics trafficking dealings. *See id.* And, on November 18, 2014, the Eleventh Judicial Circuit Court found that Los

---

[8] *See* Press Release, U.S. Treasury Dept. Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello (Feb. 13, 2017)

Zetas and Daniel Barrera Barrera are agencies and instrumentalities of the FARC. *See* Final Judgment Ex. L at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014); *see also* Final Judgment Ex. 1 at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014). El Aissami has also collaborated with Hizballah, another known agency and instrumentality of the FARC [*see* par. 22, infra].[9] Thus, by collaborating with Los Zetas, Daniel Barrera Barrera, and Hizballah, El Aissami acted as an agency and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6.

23.      Saab has coordinated and provided material assistance to El Aissami regarding several illicit operations, including but not limited to, the CLAP program and the illicit operations involving the Venezuelan gold sector. *See* Press Release, U.S. Treasury Dept.Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, (July 25, 2019), https://home.treasury.gov/news/press-releases/sm741. Specifically,

> From early 2018, as the Government of Venezuela's shortage of foreign exchange became increasingly acute, ***the Government started using gold resources to pay some contracts, to include CLAP food contracts***, and Saab began working with Simon Alejandro Zerpa Delgado (Zerpa) to help the Government liquidate gold mined in Venezuela and convert it into foreign currency. Zerpa was designated on July 26, 2017 pursuant to E.O. 13692 for being a current or former official of the Government of Venezuela. ***Saab, in turn, worked with members of the Venezuelan government including El***

---

[9] *See also* Venezuela Investigative Unit, *Key Criminal Revelations From Former Venezuela Intelligence Chief*, INSIGHT                      CRIME,                      (Feb.                      25,                      2019) https://www.insightcrime.org/news/analysis/key-revelations-venezuela-intelligence-chief-maduro/      (referencing accusations by General Hugo Carvajal Barrios: "Carvajal also accused former Venezuela Vice President Tareck El Aissami of having significant links to the Lebanese terrorist group Hezbollah. He said that he accompanied El Aissami on a 2009 trip to Iran, which included a stop in Syria to invite Hezbollah militants to come and work with FARC fighters in Venezuela."

> ***Aissami, the current Minister of Industries and National Production and former Executive Vice President, to create a structure for the Government of Venezuela to sell gold to Turkey.*** As a result of the Government of Venezuela's corrupt operations in the gold sector, and to prevent Maduro and his corrupt associates from further exploiting Venezuela's people and resources, the gold sector of the Venezuelan economy was identified as subject to sanctions by Secretary Mnuchin in November 2018.

*See Id.* (emphasis added). Moreover, "Saab is alleged to have helped negotiate the Iran [gold] deal with Maduro's new Oil Minister Tareck el Aissami. The two had previously worked together to strengthen Venezuela's relationship with Turkey, which included shipments of at least $900 million in gold to the nation in 2018." Patricia Laya, *Maduro's U.S.-Charged Dealmaker Saab Detained in Cabo Verde*, BLOOMBERG, (Jun. 13, 2020), https://www.bloomberg.com/news/articles/2020-06-13/maduro-s-u-s-charged-dealmaker-alex-saab-detained-in-cabo-verde; *see also* Rico, *Nicolas Maduro's Main Front Man, Alex Saab, Is Arrested In Africa*, QCOSTA RICA, (Jun. 14, 2020), https://qcostarica.com/nicolas-maduros-main-front-man-alex-saab-is-arrested-in-africa/ (detailing how Saab and El Aissami worked together to implement the illicit gold extraction program). Alex Saab, "Tareck's key facilitator . . . profited off the regime's corruption, as he secured gold from miners at an inflated market rate and had close connections to many of the officials leading the state-run mining conglomerate in Venezuela." Joseph M. Humire, *Iran, Turkey, and Venezuela's Super Facilitator: Who is Alex Saab?*, CENTER FOR A SECURE FREE SOCIETY, (Jun. 30, 2020) https://www.securefreesociety.org/research/who-is-alex-saab/. As part of the illicit gold program:

> Miners extract gold from the Arco Minero in eastern Venezuela under the supervision of the Colombian guerilla groups ELN and FARC. The gold is then purchased by Venezuela's state-owned gold company, Minerven, through a joint gold venture with Turkey called Mibiturven, S.A. The gold is then turned over to CVG MINERVEN, the state-owned Venezuelan mining conglomerate that

> processes the gold and packages it for transport to Caracas. Once processed, the gold is transported by the Venezuelan National Guard to the Central Bank of Venezuela (BCV), who prepares it for international shipment. The gold is moved from BCV to Maiquetia International Airport using the private security firm Transporte Panamericano and loaded onto one of several, private airliners, or a commercial Turkish Airlines flight, with weekly service to Istanbul via Havana.

*Id.*

24.     In addition, Saab provided material assistance to El Aissami and the Maduro regime by jointly orchestrating a money scheme involving Venezuelan-origin crude oil with El Aissami. *See Press Release*, U.S. Treasury Dept., Treasury Targets Sanctions Evasion Network Supporting     Corrupt     Venezuelan     Actors     (June     18,     2020), https://home.treasury.gov/news/press-releases/sm1038. Specifically,

> Since at least 2019, the illegitimate Maduro regime and PdVSA have cooperated with U.S.-designated Alex Nain Saab Moran (Saab) and Leal to evade U.S. sanctions and assist in the sale of Venezuelan-origin crude oil. One of Saab and Leal's recent schemes to sell Venezuelan-origin crude oil was under the guise of an "oil-for-food" program that never resulted in food deliveries to Venezuela . . .

> In lieu of pre-payment for the contracted corn and water trucks, ***Libre Abordo agreed to lift and broker the sale of Venezuelan-origin crude oil supplied by PdVSA in a scheme orchestrated by Saab and El Aissami*** . . .

> Leal is the critical conduit between Libre Abordo, Schlager Business Group, and their owners, and PdVSA and Saab. . .

*See id.* (emphasis added). The Treasury press release discusses how "Libre Abordo is based in Mexico City, Mexico and had no prior experience in the global oil sector before entering into an agreement with the Government of Venezuela and PdVSA." *See id.*

25.     Because Saab has provided material assistance to El Aissami and coordinated with El Aissami who is an agent and instrumentality of the FARC, Saab is an agent and instrumentality of the FARC. Through his assistance and support for El Aissami, and through

(among others) the illicit activities referenced above, such as regarding the CLAP and illicit gold sector program—the latter of which involved direct supervision by the FARC and ELN, Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

26.     Hizballah is one of the most dangerous terrorist groups in the world and has been designated by the Secretary of State as a Foreign Terrorist Organization (FTO) and by OFAC as a Specially Designated Global Terrorist ("SDGT").[10] Hizballah has been involved in drug trafficking throughout South America, including with the FARC, and has used the proceeds from such trafficking to finance its terrorist activity worldwide.[11] In addition, Hizballah launders money from cocaine dealing on behalf of the FARC, oftentimes through a Hizballah-controlled money laundering infrastructure.[12] In testimony before the House Committee on Foreign Affairs in 2017, Donald Semesky, former Chief of DEA's Office of Financial Operations, discussing

---

[10] U.S. Dep't Treasury, ALPHABETICAL LISTING OF SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS ("SDN List"), https://www.treasury.gov/ofac/downloads/sdnlist.txt. See footnote 19 for definition references to FTO, SDGT, SDNTK and SDN.

[11] *See* Press Release, U.S. Drug Enforcement Administration, DEA And European Authorities Uncover Massive Hizballah Drug And Money Laundering (Feb. 1, 2016); *see also* Press Release, U.S. Treasury Dept., Treasury Targets Major Money Laundering Network Linked to Drug Trafficker Ayman Joumaa and a Key Hizballah Supporter in South America (Jun. 27, 2012) (discussing Hizballah's money-laundering enterprise in the Americas: "'The Joumaa network is a sophisticated multi-national money laundering ring, which launders the proceeds of drug trafficking for the benefit of criminals and the terrorist group Hizballah,' said under Secretary for Terrorism and Financial Intelligence David S. Cohen. 'We and our partners will continue to aggressively map, expose and disable this network, as we are doing with today's sanctions.'"); *see also* Vanessa Neumann, *E-Notes, Foreign Policy Research institute*, at 2 (Dec. 2011), https://www.fpri.org/docs/media/201112.neumann.narcoterrorism.pdf, (discussing Hizballah's facilitation of FARC cocaine shipments: "As the cocaine is transported through Africa and into Europe, its safe passage is guaranteed (much as it was in Latin America) by terrorist groups—most prominently, Al Qaeda and Hezbollah.")

[12] *See* Vanessa Neumann, *E-Notes, Foreign Policy Research institute*, (Dec. 2011, https://www.fpri.org/docs/media/201112.neumann.narcoterrorism.pdf at 3 (discussing Hizballah high-level officials who are directly involved in the South American cocaine trade and its most violent cartels, including the Mexican gang Los Zetas, a known agent and instrumentality of the FARC).

links between "many of the State Department's designated [FTOs] and Foreign Drug Trafficking Organizations" testified that, "as in the case of the ...FARC and Hezbollah, they become, to some extent, one and the same."[13]   The Hizballah-FARC relationship is described by other experts: "Hezbollah's involvement in Latin America's drug trade is significant and expanding.  The group -- often referred to as the 'A-Team' of international terrorism - has reportedly formed partnerships with several of the region's most notorious crime syndicates, including Mexico's Zetas [and] Colombia's FARC."[14] Hizballah is an agency and instrumentality of the FARC by ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab has coordinated with and provided material assistance to Hizballah by  "oversee[ing] 'illegal operations' aimed at providing funds to finance party activities." *tayyar.org – Urgent – "Hezbollah Man" Wanted by Washington Arrest of Alex Saab*, Saudi 24 News, (Jun. 14, 2020), https://www.saudi24.news/.sa/2020/06/tayyar-org-urgent-hezbollah-man-wanted-by-washington-arrest-of-alex-saab.html ("Information indicates that Saab is the Hizballah man in Latin America, where he oversees 'illegal operations' aimed at providing funds to finance party activities."), attached hereto as **Exhibit D**. Saab is currently being investigated for his "suspected nexus with the terrorist group Hezbollah, which is thought to have established relations with Venezuela through Tareck El Aissami." *Alex Saab*, Insight Crime, (Jun. 14, 2020),

---

[13] "Examining the Effectiveness of the Kingpin Designation Act in the Western Hemisphere," Testimony of Donald C. Semesky, Jr.,House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, November 8, 2017.

[14] Ottolenghi, E., and Stein, J.L., "Trump Should Cut Hezbollah's Lifeline in the Americas," Foreign Policy, December 13,2018.https://foreignpolicy.com/2028/12/12/trump-should-cut-hezbollahs-lifeline-in-the-americas//

https://www.insightcrime.org/venezuela-organized-crime-news/alex-saab/; *see also* Samir Salama, *Alex Saab, Hezbollah's money man in Latin America, Arrested in Cape Verde*, GULF NEWS, (Jun. 14, 2020), https://gulfnews.com/world/mena/alex-saab-hezbollahs-money-man-in-latin-america-arrested-in-cape-verde-1.72040582 ("Alex Saab, who is considered the conduit for the Hezbollah militia in Latin America"); *See also tayyar.org – Urgent – "Hezbollah Man" Wanted by Washington .. Arrest of Alex Saab*, SAUDI 24 NEWS, (Jun. 14, 2020), https://www.saudi24.news/.sa/2020/06/tayyar-org-urgent-hezbollah-man-wanted-by-washington-arrest-of-alex-saab.html.

27.     Because Saab has coordinated with and provided material assistance to Hizballah, which is an agent and instrumentality of the FARC, including by providing funding to Hizballah, and is considered the "conduit for the Hezbollah militia in Latin America" [*see* para. 22, supra.], Saab is an agent and instrumentality of the FARC. More specifically, Saab is an agent and instrumentality of the FARC through his assistance and support for Hizballah. Through the illicit activities referenced above (among others), Saab has engaged in: ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

28.     Saab's status as an agent and instrumentality of the FARC is further evidenced by his ties to the CLAP Program [*see* paras. 14, 18 *supra*]. The CLAP program is used by Mexican cartels to camouflage cash payments for drug shipments:

> Investigations by the United States Treasury Department and other Washington agencies warned that Venezuela used food shipments sent from Mexico, within the framework of its CLAP program, to receive camouflaged cash from Mexican

cartels as payment for drug shipments referred by the Chavista leaders.

*Cae testaferro de Maduro ligado a caso Alunasa*, Diario Extra, http://www.diarioextra.com/Noticia/detalle/421777/cae-testaferro-de-maduro-ligado-a-caso-alun asa[15]; Sabrina Martin, *Mexican Sinaloa Cartel Has Taken Over a Venezuelan City*, Panam Post, (Apr. 10, 2020), https://panampost.com/sabrina-martin/2020/04/10/sinaloa-cartel-venezuelan-city/.

Given the Sinaloa Cartel's heavy presence in the state of Zulia, Venezuela, its control over airstrips in Venezuela, and its ties to the Cartel of the Suns and the Maduro regime the drug money camouflaged in CLAP shipments are directly linked to illicit drug proceeds of the Sinaloa Cartel. *See id.* (discussing the Sinaloa Cartel's occupancy in Zulia and noting that "Mexican traffickers in Venezuela may have taken over about 400 clandestine airstrips in the state of Zulia alone, on the border with Colombia, with the help of the National Liberation Army (ELN) and Venezuelan armed forces.") ("The Suns and Sinaloa cartels reportedly move between 200 and 250 tons of Colombian cocaine a year to the United States."). Significantly, on November 18, 2014, the Eleventh Judicial Circuit Court found that the Sinaloa Cartel (or Sinaloa Federation) is an agency and instrumentality of the FARC. *See* Final Judgment Ex. L at 1, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 12-48803 (11th Judicial Fla. Cir. Ct. Nov. 18, 2014). The Sinaloa Cartel is FARC's main distributor of cocaine in Mexico.[16]

---

[15] The quoted material herein has been translated from Spanish to English. In its original form, the quotation is as follows: "Las Investigaciones del Departamento del Tesoro de Estados Unidos y otras agencias de Washington advertían que Venezuela utilizó cargamentos de alimentos enviados desde México, en el marco de su programa de CLAP, para recibir camuflado dinero en efectivo de carteles mexicanos como pago por los envíos de droga remitidos por los dirigentes chavistas."

[16] Sam Logan and Ashley Morse, *The FARC'S International Presence*, 13-14 (Dec. 2006), https://www.files.ethz.ch/isn/46399/The-FARCs-International-Presence.pdf; Jeremy McDermott, *Criminal Activities of the FARC and Rebel Earnings*, INSIGHT CRIME (May 20, 2013), https://www.insightcrime.org/investigations/farc-criminal-activities-income/; Elyssa Pachico, *Link Between Sinaloa*

29.     Given Saab's critical involvement in CLAP (which was used by Mexican drug cartels to camouflage and transport illicit drug payments to Venezuela), Saab is an agent and instrumentality of the FARC.   Through Saab's involvement in the CLAP program, which camouflages drug proceeds from Mexican Cartels, Saab has engaged in ". . . materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of . . . [FARC] . . . ." *Stansell*, 771 F.3d at 724 n.6. Saab is thus an agent and instrumentality of the FARC.

30.     Along with Alex Saab, Los Cachiros, Maduro, El Aissami, and Hizballah, (as well as the aforementioned persons and/or entities in paragraphs 11, 12, 13, 14, 15, 18, 22, and 29), all of which OFAC has designated as Specially Designated Nationals[17] and all of whom I have opined herein are agents and instrumentalities of the FARC (the "FARC Agents"), the following are also agencies and instrumentalities of the FARC: any entity owned in the

---

*Cartel and Colombia Arrested*, Insight Crime (Apr. 18, 2011), https://www.insightcrime.org/news/analysis/link-between-sinaloa-cartel-and-colombia-arrested/; *Computer Shows FARC Links to Sinaloa Cartel*, Insight Crime (Dec. 22, 2010), https://www.insightcrime.org/news/analysis/computer-shows-farc-links-to-sinaloa-cartel/; Marguerite Cawley, *Colombia Homicide Case Points to FARC-Sinaloa Cartel Links*, Insight Crime (Jun. 10, 2013), https://www.insightcrime.org/news/brief/colombia-homicide-case-points-to-farc-sinaloa-cartel-links/; *FARC's Cocaine Sales to Mexico Cartels Prove Too Rich to Subdue*, Bloomberg News, at 3 (Jan 20, 2010), attached hereto as **Exhibit E**; *Sinaloa Cartel Buys Cocaine Franchises From Colombia's FARC*, Fox News Latino (Mar. 12, 2013), https://www.foxnews.com/world/sinaloa-cartel-buys-cocaine-franchises-from-colombias-farc.amp; *Gangsters Eye Conquest of El Salvador*, Mafia Today (Mar. 15, 2013), attached hereto as **Exhibit F**; James Bargent, *FARC Selling Off Colombia Drug Franchises to Sinaloa Cartel*, Insight Crime (Mar. 11, 2013), https://www.insightcrime.org/news/brief/farc-selling-off-drug-franchises-sinaloa-cartel-in-colombia/.

[17] Other than the Cartel of the Suns, which is composed of government and military officials of Venezuela. Key to OFAC's implementation and enforcement of sanctions programs is the publication of a list of individuals, companies and other entities owned or controlled by, or acting for or on behalf of,targeted countries or foreign non-state actors such as narcotics traffickers and terrorists designated under dedicated programs that are not country specific. Collectively, such individuals, companies, and other entities and organizations are called "Specially Designated Nationals" or "SDNs." The assets of SDNs are blocked, and U.S. persons are generally prohibited from dealing with them. "Specially Designated National" is the general term for all designated persons, but program-specific variations relevant to this matter are used in the Kingpin Act sanctions program, "Specially Designated Narcotics Trafficker," and in the terrorism program, "Specially Designated Global Terrorist."The definition of "Specially Designated National" ("SDN") is found at 31 C.F.R. 595.306. "Specially Designated Narcotics Trafficker" ("SDNTK") is found at 31 C.F.R. 598.314. "Significant Foreign Narcotics Trafficker" (31 C.F.R.598.313) is covered by the definition at 598.314(a). "Specially Designated Global Terrorist" ("SDGT") is defined at 31 C.F.R.594.310. "Foreign Terrorist Organization" ("FTO") is defined at 31 C.F.R. 597.309.

aggregate, directly or indirectly, 50 percent or more by one or more of the FARC Agents, and each such entity (an "Owned Entity") is a blocked person. Further, each such Owned Entity that is listed as blocked by OFAC is also an agent and instrumentality of the FARC. *See* U.S. Dep't Treasury, Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked, (Aug. 13, 2014), attached hereto as **Exhibit G**. And further, the property and interests in property of any such an Owned Entity are blocked regardless of whether the entity itself is listed in the annex to an Executive order or otherwise placed on OFAC's list of Specially Designated Nationals ("SDNs"). *Id.*

31.    The assets of such aforementioned agents and instrumentalities of the FARC are "blocked assets" executable under TRIA, as are property of any entity in which such blocked persons own, whether individually or in the aggregate, directly or indirectly a 50% or greater interest. *See id.*

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

John Robert McBrien

Dated: July 14, 2020

22

# EXHIBIT A



FindLaw
WWW.FINDLAW.COM

SEALED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on April 29, 2005

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 04-446 (TFH) |
| v. | : | GRAND JURY ORIGINAL |

PEDRO ANTONIO MARIN,
    a/k/a
"Manuel Marulanda Velez,"
    a/k/a "Tirofijo,"
LUIS EDGAR DEVIA SILVA
    a/k/a "Raul Reyes,"
LUCIANO MARIN ARANGO,
    a/k/a "Ivan Marquez,"
GUILLERMO LEON SAENZ VARGAS,
    a/k/a "Alfonso Cano,"
MANUEL MUNOZ ORTIZ,
    a/k/a "Ivan Rios,"
VICTOR JULIO SUAREZ ROJAS,
    a/k/a "Jorge Briceno Suarez,"
    a/k/a "Mono Jojoy,"
RODRIGO LONDONO ECHEVERRY,
    a/k/a "Timochenko,"
    a/k/a "Timoleon Jimenez,"
MARCELINO TRUJILLO BUSTOS,
    a/k/a "Martin Villa,"
PEDRO ALDANA,
JORGE TORRES VICTORIA,
    a/k/a "Pablo Catatumbo,"
GUILLERMO ENRIQUE TORRES CUETER,
    a/k/a "Julian Conrado,"
FELIX ANTONIO MUNOZ LASCARRO,
    a/k/a "Jose Lisandro Lascarro,"
    a/k/a "Pastor Alape,"
MILTON DE JESUS TONCEL REDONDO,
    a/k/a "Joaquin Gomez,"
JOSE BENITO CABRERA CUEVAS,
    a/k/a "Fabian Ramirez,"
ABELARDO CAICEDO COLORADO,
    a/k/a "Solis Almeida,"
LUIS ANTONIO LOZADA,
    a/k/a "Carlos Antonio Lozada,"
SIXTO ANTONIO CABANA GUILLEN,
    a/k/a "Domingo Bioho,"

VIOLATIONS: 21 U.S.C. § 963
(Narcotics Conspiracy);
21 U.S.C. § 853
(Criminal Forfeiture)

FILED IN OPEN COURT

MAR 0 1 2006

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

HOGAN, C. J. TFH



SUPERSEDING

```
VICTOR RESTREPO,
     a/k/a "Victor Tirado,"
     a/k/a "Rigoberto Lozano,"
HERMILO CABRERA DIAZ,
     a/k/a "Bertulfo,"
ALVRO ALFONSO SERPA DIAZ,
     a/k/a "Felipe Rincon"
EDGAR LOPEZ GOMEZ,
     a/k/a "Miller Munar Munar,"
     a/k/a "Pacho Chino,"
MIGUEL ANGEL PASCUAS SANTOS,
     a/k/a "Sargento Pascuas,"
     a/k/a "Humberto,"
JORGE ENRIQUE RODRIGUEZ MENDIETA,
     a/k/a "Ivan Vargas,"
NOE SUAREZ ROJAS,
     a/k/a "German Briceno Suarez,"
     a/k/a "Grannobles,"
HENRY CASTELLANOS GARZON,
     a/k/a "Romana,"
GENER GARCIA MOLINA,
     a/k/a "John Hernandez,"
     a/k/a "Johnny 40,"
ELMER CAVIEDES,
     a/k/a "Albiero Cordoba,"
GERARDO AGUILLAR RAMIREZ,
     a/k/a "Cesar,"
MIGUEL SANTANILLA BOTACHE,
     a/k/a "Gentil Duarte,"
GILDARDO GARCIA CARDONA,
     a/k/a "Alviro Rojas,"
TOMAS MOLINA CARACAS,
     a/k/a "Negro Acacio,"
EFRAIN MENDEZ,
     a/k/a "Guillermo,"
     a/k/a "Cochornea,"
CARLOS ALBERTO GARCIA,
     a/k/a "Herimides Buitrago,"
     a/k/a "Oscar Montero,"
     a/k/a "Paisa,"
NORBEI CAMARGO,
     a/k/a "James Patapalo,"
ERASMO TRASLAVINA BENAVIDES,
     a/k/a "Ismardo Murcia Lozada,"
     a/k/a "Jimmy Guerrero,"
JOSE EPINEMIO MOLINA GONZALEZ,
     a/k/a "Danilo Garcia,"
JAIME COTRINO DIAZ,
     a/k/a "Arcesio,"
```

```
ALONSO OLARTE LOMBANA,
        a/k/a "Luis Eduardo Marin,"
        a/k/a "Rafael Gutierrez,"
FERNELLI RIZO CARRASCAL,
        a/k/a "Marco Fanfan,"
        a/k/a "Jurga Jurga,"
IGNACIO LEAL GARCIA,
        a/k/a "Camilo,"
        a/k/a "Tuerto,"
LUIS EDUARDO LOPEZ MENDEZ,
        a/k/a "Efren Arboleda,"
OMAR OYOLA ESTUPINAN,
        a/k/a "Jorge Humberto Cortes,"
        a/k/a "JH,"
GUSTAVO GONZALEZ SANCHEZ,
        a/k/a "Rambo,"
RAFAEL CEPILLO,
ERMINSO CUEVAS CABRERA,
        a/k/a "Mincho,"
EDGAR SALGADO ARAGON
        a/k/a "Rodrigo,"
        a/k/a "Cadete,"
JUAN JOSE MARTINEZ VEGA,
        a/k/a "Gentil Alvis Patino,"
        a/k/a "Chiguiro",
ERNESTO HURTADO PENALOSA,
        a/k/a "Negro Elecier,"
EMIRO DEL CARMEN ROPERO SUAREZ,
        a/k/a "Ruben Zamora," and
LUIS EDUARDO OYOLA DIAZ
        a/k/a "Esponja,"

                    Defendants.
```

# I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

1.  From in or about 1985 up to and including the present, in Colombia and elsewhere, PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," a/k/a "Tirofijo," LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," GUILLERMO LEON SAENZ VARGAS, a/k/a "Alfonso Cano," MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios," VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko," a/k/a "Timoleon Jimenez," MARCELINO TRUJILLO BUSTOS, a/k/a "Martin Villa," PEDRO ALDANA, JORGE TORRES VICTORIA, a/k/a "Pablo Catatumbo," GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian Conrado," FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida," LUIS ANTONIO LOZADA, a/k/a "Carlos Antonio Lozada," SIXTO ANTONIO CABANA GUILLEN, a/k/a "Domingo Bioho," VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano," HERMILO CABRERA DIAZ, a/k/a "Bertulfo," ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe Rincon," EDGAR LOPEZ GOMEZ, "Miller Munar Munar, a/k/a "Pacho Chino," MIGUEL ANGEL PASCUAS SANTOS, a/k/a "Sargento Pascuas," a/k/a "Humberto," JORGE ENRIQUE

-4-

RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles," HENRY CASTELLANOS GARZON, a/k/a "Romana," GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a "Johnny 40," ELMER CAVIEDES, a/k/a "Albiero Cordoba," GERARDO AGUILLAR RAMIREZ, a/k/a "Cesar," MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte," GILDARDO GARCIA CARDONA, a/k/a "Alviro Rojas," TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," EFRAIN MENDEZ, a/k/a "Guillermo," a/k/a "Cochornea," CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a "Paisa," NORBEI CAMARGO, a/k/a "James Patapalo," ERASMO TRASLAVINA BENAVIDES, a/k/a "Ismardo Murcia Lozada," a/k/a "Jimmy Guerrero," JOSE EPINEMIO MOLINA GONZALEZ, a/k/a "Danilo Garcia," JAIME COTRINO DIAZ, a/k/a "Arcesio," ALONSO OLARTE LOMBANA, a/k/a "Luis Eduardo Marin," a/k/a "Rafael Gutierrez," FERNELLI RIZO CARRASCAL, a/k/a "Marco Fanfan," a/k/a "Jurga Jurga," IGNACIO LEAL GARCIA, a/k/a "Camilo," a/k/a "Tuerto," LUIS EDUARDO LOPEZ MENDEZ, a/k/a "Efren Arboleda," OMAR OYOLA ESTUPINAN, a/k/a "Jorge Humberto Cortes," a/k/a "JH," GUSTAVO GONZALEZ SANCHEZ, a/k/a "Rambo," RAFAEL CEPILLO, ERMINSO CUEVAS CABRERA, a/k/a "Mincho," EDGAR SALGADO ARAGON, a/k/a "Rodrigo," a/k/a "Cadete," JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," ERNESTO HURTADO PENALOSA, a/k/a "Negro Elecier," EMIRO DEL CARMEN ROPERO SUAREZ, a/k/a "Ruben Zamora," and LUIS EDUARDO OYOLA DIAZ, a/k/a "Esponja," (hereinafter, "All

Defendants"), and others known and unknown to the Grand Jury, unlawfully, intentionally, and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2.   It was a part and an object of the conspiracy that All Defendants, and others known and unknown to the Grand Jury, would and did import into the United States from a place outside thereof a controlled substance, to wit, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Sections 812, 952, and 960(a)(1) and (b)(1)(A) of Title 21, United States Code.

3.   It was a further part and an object of the conspiracy that All Defendants, and others known and unknown to the Grand Jury, would and did manufacture and distribute a controlled substance, to wit, five kilograms and more of mixtures, compounds and substances containing a detectable amount of cocaine, and coca leaves, intending and knowing that such controlled substance would be unlawfully imported into the United States, in violation of Sections 959, 960(a)(3) and 960(b)(1)(B) of Title 21 of the United States Code.

### THE MEANS AND METHODS OF THE CONSPIRACY

## I. THE PRODUCTION OF COCAINE IN COLOMBIA

4.     Cocaine is derived from the coca plant, which is illegally grown in different areas throughout Colombia.  Coca leaves are harvested by farmers, or "campesinos," approximately four to five times a year.  The campesinos treat the harvested coca leaves with various chemicals, including gasoline, lime, cement, caustic soda, bleach, sodium carbonate and sulfuric acid. The coca leaves are mixed together with these chemicals, typically by the growers of the coca leaves themselves or their employees, and converted into a precursor of cocaine that is referred to by many different names, including coca base, cocaine base,[1] coca paste or cocaine paste (collectively, "cocaine paste").

5.     Cocaine paste is then sold by the campesinos and transported to laboratories in Colombia where it is subjected to a more complicated and lengthy chemical process, which results in its conversion to the end product, known as cocaine HCl, cocaine, powder cocaine or crystallized cocaine (collectively, "cocaine"). During this conversion process, additional toxic chemicals are added to the cocaine paste, including hydrochloric acid, ammonia, and sulfuric acid.  This conversion process occurs in jungle

---

[1] Although referred to as cocaine base, this substance is not "cocaine base" as defined in Title 21 of the United States Code, which is also known more commonly as "crack cocaine."

-7-

laboratories, also known as "kitchens," that operate 24 hours a day, seven days a week, and, depending on their size, can convert ton quantities of cocaine paste into cocaine in approximately eight days. The cocaine is dried, among other ways, through the use of microwave ovens which are present in these jungle laboratories.

6.    The cocaine is then typically pressed into kilogram sized bricks, which are frequently branded or stamped with markers, or "marquillas," to identify the source laboratory and supplier. The kilograms of cocaine are then packaged, at which time additional identifying markers may be attached to the individual kilogram bricks of cocaine. For example, identifying stickers (such as a three leaf clover) may be placed on the packaging or items may be inserted in the packaging (such as one dollar bills of United States currency). These stamps, stickers and inserts are used to identify the source laboratory and/or trafficker of the cocaine, and act both as a method to track inventory and as a marketing device. The kilograms of cocaine are then gathered and bound together in large sacks, which are then bundled into multi-kilogram bales. The cocaine is then provided or sold to narcotics transportation organizations that deliver the cocaine to different areas around the world, including the United States.

## II.   REVOLUTIONARY ARMED FORCES OF COLOMBIA (THE "FARC")

7.   The Fuerzas Armadas Revolucionarias de Colombia, or, translated into English, the Revolutionary Armed Forces of Colombia (the "FARC"), was created in or about 1964 as a left-wing guerilla group dedicated to the violent overthrow of the Government of Colombia, South America's longest standing, democratically elected government.  As discussed below, the FARC has evolved into the world's largest supplier of cocaine and cocaine paste.  The United States Secretary of State designated the FARC as a foreign terrorist organization pursuant to Title 8, United States Code, Section 1189, in October 1997, and, more recently, on October 2, 2003.

8.   The FARC controls large areas of land in Colombia, primarily in coca growing and cocaine processing regions.  In many such areas, the Government of Colombia is only able to exert minimal control.

## A.   The FARC Secretariat And Estado Mayor

9.   The FARC is a highly structured criminal organization.  At the top of the organization is the Secretariat, the top seven leaders who are the ultimate decision makers of the FARC.  Members of the Secretariat also have additional responsibilities, including acting as advisors to different regions of the FARC.  The Secretariat is currently led by PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," a/k/a "Tirofijo,"

-9-

the supreme commander of the FARC.  During the course of the conspiracy, the following individuals, among others, served on the Secretariat: LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," (whose duties have included being the FARC's lead spokesperson and advisor to the Southern Bloc), LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," (whose duties have included acting as the advisor to the Carribean Bloc), GUILLERMO LEON SAENZ VARGAS, a/k/a "Alfonso Cano," (whose duties have included acting as advisor to the Western Joint Command), MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios," (the newest member of the Secretariat), VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," (whose duties have included acting as the FARC's military leader and advisor to the Eastern Bloc), and RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko," a/k/a "Timoleon Jimenez," (whose duties have included acting as the advisor to the Middle Magdalena Bloc), the defendants.

10.  The central governing body of the FARC is the Estado Mayor, or general counsel, which is directly under the Secretariat.  It is comprised of the seven members of the Secretariat, and approximately 20 others.  Although the membership of the Estado Mayor changes, its members are comprised of Bloc Commanders, senior Front Commanders, and other individuals who have attained leadership positions within the FARC.  During the course of the conspiracy, the following

individuals, among others, were members of the Estado Mayor:
PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," a/k/a
"Tirofijo," LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," LUCIANO
MARIN ARANGO, a/k/a "Ivan Marquez," GUILLERMO LEON SAENZ VARGAS,
a/k/a "Alfonso Cano," MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios,"
VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a
"Mono Jojoy," RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko,"
a/k/a "Timoleon Jimenez," MARCELINO TRUJILLO BUSTOS, a/k/a
"Martin Villa," PEDRO ALDANA, JORGE TORRES VICTORIA, a/k/a "Pablo
Catatumbo," GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian
Conrado," FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro
Lascarro," a/k/a "Pastor Alape," MILTON DE JESUS TONCEL REDONDO,
a/k/a "Joaquin Gomez," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian
Ramirez," ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida," LUIS
ANTONIO LOZADA, a/k/a "Carlos Antonio Lozada," SIXTO ANTONIO
CABANA GUILLEN, a/k/a "Domingo Bioho," VICTOR RESTREPO, a/k/a
"Victor Tirado," a/k/a "Rigoberto Lozano," HERMILO CABRERA DIAZ,
a/k/a "Bertulfo," ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe
Rincon," EDGAR LOPEZ GOMEZ, "Miller Munar Munar, a/k/a "Pacho
Chino," MIGUEL ANGEL PASCUAS SANTOS, a/k/a "Sargento Pascuas,"
a/k/a "Humberto," JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan
Vargas," NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a
"Grannobles," and HENRY CASTELLANOS GARZON, a/k/a "Romana," the
defendants.

11.   The Secretariat and Estado Mayor set FARC policies for the entire organization, including policies related to the manufacture and distribution of cocaine paste and cocaine.

**B.    The FARC's Blocs, Fronts and Mobile Columns**

12.   The FARC is comprised of approximately 77 Fronts and Mobile Columns (collectively, "Fronts"). These are designated by number (e.g., the "16th Front") or by name (such as "Teofilo Forero Castro Mobile Column" ("TFMC")). The size of each Front varies, with between several dozen to more than hundreds of FARC members comprising a Front. Each Front is primarily responsible for all activities in the geographic area which it controls, including all activities relating to cocaine and cocaine paste manufacturing and distribution. Each Front is led by a Front Commander, who is primarily responsible for everything that occurs in the geographic area controlled by the Front. During the course of the conspiracy, the following individuals, among others, served as FARC Front Commanders: GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a "Johnny 40," ELMER CAVIEDES, a/k/a "Albiero Cordoba," GERARDO AGUILLAR RAMIREZ, a/k/a "Cesar," MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte," TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a "Paisa," ERASMO TRASLAVINA BENAVIDES, a/k/a "Ismardo Murcia Lozada," a/k/a "Jimmy Guerrero," JAIME COTRINO

-12-

DIAZ, a/k/a "Arcesio," ALONSO OLARTE LOMBANA, a/k/a "Luis Eduardo Marin," a/k/a "Rafael Gutierrez," FERNELLI RIZO CARRASCAL, a/k/a "Marco Fanfan," a/k/a "Jurga Jurga," LUIS EDUARDO LOPEZ MENDEZ, a/k/a "Efren Arboleda," OMAR OYOLA ESTUPINAN, a/k/a "Jorge Humberto Cortes," a/k/a "JH," GUSTAVO GONZALEZ SANCHEZ, a/k/a "Rambo," ERNESTO HURTADO PENALOSA, a/k/a "Negro Elecier," EMIRO DEL CARMEN ROPERO SUAREZ, a/k/a "Ruben Zamora," and LUIS EDUARDO OYOLA DIAZ, a/k/a "Esponja," the defendants.

13.   Front Commanders are typically assisted by one or more Finance Officers, who oversee all financial matters for the Front, including matters concerning narcotics manufacturing and distribution.  During the course of the conspiracy, the following individuals, among others, served as FARC Finance Officers: GILDARDO GARCIA CARDONA, a/k/a "Alviro Rojas," NORBEI CAMARGO, a/k/a "James Patapalo," IGNACIO LEAL GARCIA, a/k/a "Camilo," a/k/a "Tuerto," RAFAEL CEPILLO, JOSE EPINEMIO MOLINA GONZALEZ, a/k/a "Danilo Garcia," EFRAIN MENDEZ, a/k/a "Guillermo," a/k/a "Cochornea," and EDGAR SALGADO ARAGON, a/k/a "Rodrigo," a/k/a "Cadete," the defendants.

14.   FARC members are assisted by associates who work with the Fronts in the narcotics trade and who assist in the manufacturing of cocaine and the exchange of cocaine for weapons. During the course of the conspiracy, the following individuals, among others, were FARC associates: ERMINSO CUEVAS CABRERA, a/k/a

"Mincho," and JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro."

15.   Groups of Fronts and Mobile Columns are organized into geographical clusters, called Blocs or Joint Commands.  All of the Front Commanders report to the leadership of each Bloc, which is comprised of a small group of leaders which form the Estado Mayor of that particular Bloc.  The individual in charge of each Bloc Estado Mayor is known as the Bloc Commander for that Bloc.  The FARC Blocs include the Southern Bloc, Eastern Bloc, Northwestern Bloc, Carribean Bloc, Western Bloc (Western Joint Command), Central Joint Command and the Middle Magdalena Bloc.

16.   The FARC, which is comprised of approximately 12,000 to 18,000 members, populates its ranks through several methods.  There are some individuals who join the FARC on a voluntary basis.  Others are forced to join under threat to them or members of their families, or are kidnapped.

## III. THE FARC'S ROLE AS THE LARGEST SUPPLIER OF COCAINE TO THE UNITED STATES AND THE WORLD

### A.   The FARC's "Taxes" On Cocaine Manufacturing And Distribution

17.   The FARC initially involved itself in the cocaine and cocaine paste trade by imposing a "tax" on individuals involved in every aspect of cocaine and cocaine paste production that occurred within the territory it controlled, including, without limitation: coca farmers, cocaine lab operators, cocaine traffickers who received the finished cocaine for distribution,

-14-

and individuals who ran clandestine air strips through which the cocaine was transported. In return for these "taxes," the FARC protected the drug traffickers from theft, assisted the movement of cocaine paste within areas it controlled, and escorted loads of cocaine as they were transported out of the Colombian jungles to shipment points on the way to the United States and elsewhere.

18. The FARC's method of collecting the "taxes" on narcotics varied over time. Initially, the FARC required the coca farmers located within its territories to bring the cocaine paste to FARC controlled markets on a weekly basis. Cocaine and cocaine paste purchasers also arrived at the markets to purchase the cocaine paste. At such markets, the FARC oversaw the narcotics transactions, "taxing" both the farmer and the purchaser for each gram of cocaine paste sold. Similarly, operators of cocaine laboratories had to pay "taxes" for each kilogram of cocaine produced.

**B.** **The FARC's Role In Cocaine Manufacturing And Distribution**

19. Beginning approximately in the 1990s, and continuing to the present, while continuing to "tax" all aspects of the cocaine trade, at the direction of its leaders, the FARC took a more active role in the production of cocaine paste and cocaine, to increase its income from the manufacture and distribution of cocaine. The FARC developed into a broker between the cocaine paste producing campesinos and the cocaine

transportation organizations that distributed the cocaine to the United States and elsewhere.

20.   As it expanded its role, the FARC declared itself the sole buyer of cocaine paste in that Front or geographical area.  This practice was directed by the Secretariat and the Estado Mayor in order to increase the revenue the FARC derived from cocaine production in the areas that it controlled.

21.   The FARC leadership, having achieved a monopoly over cocaine paste purchases, then set the price at which it would buy cocaine paste from the campesinos.  Generally, the FARC required campesinos to bring the cocaine paste to markets that the FARC set up on a regular basis (e.g., once a week) where the campesinos would deliver the cocaine paste to the FARC.  The FARC either paid the campesino at the time of the sale, or, more often, gave them a receipt which promised future payment.  The receipt indicated, among other things, the amount of cocaine paste purchased, the total amount owed to the campesino, a stamp stating "FARC," and the name of the FARC Front that purchased the cocaine paste.

22.   Once the FARC purchased the cocaine paste, the paste was either: (a) sold to cocaine transportation organizations at a price set by the FARC; or (b) brought to a laboratory run, controlled, or under the supervision of the FARC, where it was converted to cocaine.

-16-

23.   When the FARC sold the cocaine paste directly to a transporter, it typically delivered the cocaine paste to a laboratory which was either run by the FARC or by an independent, who was heavily "taxed" by the FARC, either in currency or in finished cocaine.

24.   When the FARC brought the cocaine paste to one of its own laboratories, it converted the cocaine paste to cocaine, and then delivered the drugs to the cocaine transportation organizations that sent the cocaine out of Colombia to the United States and elsewhere.   To facilitate these transactions, the FARC built, secured and operated clandestine air strips in its territories, including, among other places, in the Amazonas Department of Colombia.

## C.   The FARC's Coordinated Cocaine Trafficking Activities And Strict Cocaine And Cocaine Paste Policies

25.   The various FARC Fronts coordinated their cocaine and cocaine paste manufacturing and distribution activities, depending on their geographical location and whether they had a local FARC cocaine conversion laboratory.   In addition, Fronts located on Colombia's borders were primarily responsible for transporting cocaine outside of Colombia, and facilitating the exchange of cocaine and cocaine paste for weapons and supplies that were used by the FARC to support their criminal activities.

26.   Beginning approximately in the late 1990s, the FARC also became directly involved in importation of cocaine into

-17-

the United States and Europe, using its international membership to develop contacts in those countries to facilitate the receipt of FARC cocaine. By directive of the Secretariat, the FARC increased the quality of its cocaine for export, and established direct ties with cocaine distribution organizations in the United States and Europe.

27. The FARC's cocaine policies were set by the Secretariat and the Estado Mayor and enforced throughout the FARC. FARC leaders stated that enforcement of FARC rules relating to cocaine and cocaine paste was of paramount importance, because the FARC was not able to finance its criminal operations without the money and weapons it earned through the cocaine and cocaine paste trade. FARC leaders imposed a series of often lethal punishments, termed "Revolutionary Justice," on those who violated its cocaine and cocaine paste policies.

28. For example, FARC leaders ordered vast numbers of campesinos murdered for selling cocaine paste to non-FARC buyers. Campesinos were also murdered for diluting the purity of the cocaine paste, or for other violations of FARC cocaine and cocaine paste policies. Campesinos were typically shot, stabbed, or dismembered alive. Frequently, the bodies of the murdered campesinos were cut open, filled with rocks, and sunk in nearby rivers. Other punishments of campesinos included the confiscation of their land and forced exile from the area where

they lived.  Frequently, once a coca plantation was confiscated from an offending campesino, the FARC took over that plantation and operated it as a FARC coca plantation.

29.  Similarly, buyers who came into FARC territory without authorization and who purchased cocaine paste were summarily executed upon orders of the FARC leaders.  The FARC also murdered its own members who were caught stealing cocaine paste or cocaine.

30.  By order of the Secretariat and Estado Mayor, and as memorialized in a 1997 publication that followed a FARC leadership meeting, each Front was primarily responsible for its own finances, and was required to pay tribute to the Secretariat and Estado Mayor.  The Secretariat required Fronts to finance themselves through cocaine and cocaine paste manufacturing and distribution.  FARC Fronts that were able to produce greater revenue through cocaine paste and cocaine production were responsible for contributing money and resources to support other Fronts that generated smaller revenues from the manufacture and distribution of cocaine paste and cocaine.  Narcotics proceeds were thus distributed throughout the FARC, for the enrichment of the Secretariat, Estado Mayor and Bloc commanders, and in order to purchase weapons and supplies for all members of the FARC.

D.   The FARC's Reliance On Illicit Income From Cocaine
     Manufacturing And Distribution

        31.   Members of the Secretariat frequently noted during

meetings that the FARC could not survive without the proceeds

generated from cocaine and cocaine paste manufacturing and

distribution.  The FARC leadership recognized the damage to its

finances caused by Colombia's government-sponsored fumigation

efforts.  The FARC leadership thus ordered its members to take

counter-measures against fumigation, including, among others,

shooting down fumigation aircraft; forcing campesinos to publicly

rally against fumigation; and attacking Colombian infrastructure

to force the Colombian Government to divert resources from

fumigation.  Recognizing that the United States has contributed

significantly to Colombian fumigation efforts, the Secretariat

and the Estado Mayor also ordered FARC members to kidnap and

murder United States citizens in order to dissuade the United

States from its continued efforts to fumigate and disrupt the

FARC's cocaine and cocaine paste manufacturing and distribution

activities.

E.   The FARC's Competition With The Autodefensas Unidas De
     Colombia (the "AUC") For Control Of Colombia's Cocaine
     Supply

        32.   In controlling the production of cocaine paste and

cocaine, the FARC competed with Colombia's right wing

paramilitary organization, the Autodefensas Unidas de Colombia,

(the "AUC"), for control over the purchase of cocaine paste from

-20-

the campesinos and the right to "tax" the cocaine transactions that occurred within its territory.  The FARC, through orders from the Secretariat, the Estado Mayor, Bloc Commanders and Front Commanders, thus imposed strict penalties, including death, on campesinos who sold cocaine paste to the AUC.  The United States Secretary of State has designated the AUC as a foreign terrorist organization pursuant to Title 8, United States Code, Section 1189.

33.  The FARC maintained a well-equipped army which it used to battle the AUC and the Government of Colombia.  The FARC used its military, to a significant degree, to advance its cocaine trafficking efforts, including, for example: (a) campaigns against the AUC in coca-rich regions in order to take control of the cocaine profits in those areas; (b) strategically defending areas of high coca production from advances of the Colombian military; and (c) attempting to shoot down counter-narcotics aircrafts, including fumigation aircraft sent to eradicate coca production.

34.  Currently, the FARC controls approximately 70% of the coca grown in Colombia.  Colombia produces approximately 80% of the world's supply of cocaine, and approximately 90% of the cocaine that is imported into the United States.  Therefore, the FARC is responsible for more than half of the world's supply of cocaine and more than approximately 60% of the cocaine sent to the United States.

-21-

## OVERT ACTS

35.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in Colombia and elsewhere:

a.   Throughout the conspiracy, the FARC leadership participated in a series of meetings during which they established FARC cocaine and cocaine paste manufacturing and distribution policies and directed the members of the FARC to implement these policies.  For example:

(i).    In or about 1985, in Colombia, PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," the defendants, and others, participated in a meeting in which the FARC discussed its enforcement of "taxation" on cocaine traffickers and the need to raise additional revenues.

(ii).    From in or about the mid 1980s through in or about the mid 1990s, the FARC leadership directed the collection of "taxes" on all aspects of cocaine production in the territories it controlled.

(iii).    In or about December 1997 or early 1998, in Colombia, LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida," HERMILO CABRERA DIAZ, a/k/a "Bertulfo," the defendants, and others, participated in a meeting of the leaders of the FARC's Carribean Bloc, where

-22-

they discussed and agreed, among other things, that: (i) the cocaine crystallization laboratories for the Carribean Bloc would be moved closer to the Venezuelan border; (ii) the delivery of cocaine paste and supplies to the laboratories would become more organized; and (iii) the Bloc would increase their exchange of cocaine for weapons.

(iv).    In or about the late 1990s, in Colombia, PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," a/k/a "Tirofijo," LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," GUILLERMO LEON SAENZ, a/k/a "Alfonso Cano, RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko," a/k/a "Timoleon Jimenez," MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios," VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," MARCELINO TRUJILLO BUSTOS, a/k/a "Martin Villa," PEDRO ALDANA, GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian Conrado," MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," SIXTO ANTONIO GABANA GUILLEN, a/k/a "Domingo Bioho," VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano," JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," the defendants, and others, participated in a FARC leadership meeting in which they voted unanimously in favor of the following resolutions, among others: (i) to expand coca production in areas of Colombia under FARC control; (ii) to expand the FARC's international distribution

-23-

routes; (iii) to increase the number of crystallization labs in which coca base would be converted into cocaine; (iv) to appoint members within each Front to be in charge of coca production; (v) to raise prices that the FARC would pay to campesinos from whom they purchased coca base; and (vi) to mandate that better chemicals be used to increase the quality of cocaine paste.

(v).    In or about 2000, PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda Velez," a/k/a "Tirofijo," VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno Suarez," a/k/a "Mono Jojoy," LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," LUIS EDGAR DEVIA SILVA, a/k/a "Raul Reyes," TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios," HENRY CASTELLANOS GARZON, a/k/a "Romana," MARCELINO TRUJILLO BUSTOS, a/k/a "Martin Villa,"  ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe Rincon," PEDRO ALDANA, NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a "Paisa,", GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian Conrado," SIXTO ANTONIO CABANA GUILLEN, a/k/a "Domingo Bioho," LUIS ANTONIO LOZADA, a/k/a "Carlos Antonio Lozada," and EDGAR SALGADO ARAGON, a/k/a "Rodrigo," a/k/a "Cadete," the defendants, and others, participated in a FARC leadership meeting in which they discussed, among other things, FARC cocaine and cocaine paste manufacturing and distribution policies.  At the conclusion of

-24-

the meeting, VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge Briceno
Suarez," a/k/a "Mono Jojoy," the defendant, announced the FARC
leadership's policies agreed upon during the meeting to a number
of Front Commanders and other FARC members.  The announced
policies included the following, among others: (a) the FARC would
increase the price it paid to the campesinos per gram of cocaine
paste the FARC purchased; (b) in areas controlled by the FARC,
the FARC would be the sole purchaser of cocaine paste, and the
Front Commanders "knew what to do" with those campesinos who
violated this policy (i.e., murder them); and (c) the Front
Commanders would increase coca production in order to purchase
more weapons.

          (vi).    In or about late 2001 or early
2002, in Colombia, PEDRO ANTONIO MARIN, a/k/a "Manuel Marulanda
Velez," a/k/a "Tirofijo," LUIS EDGAR DEVIA SILVA, a/k/a "Raul
Reyes," LUCIANO MARIN ARANGO, a/k/a "Ivan Marquez," GUILLERMO
LEON SAENZ VARGAS, a/k/a "Alfonso Cano," MANUEL MUNOZ ORTIZ,
a/k/a "Ivan Rios," VICTOR JULIO SUAREZ ROJAS, a/k/a "Jorge
Briceno Suarez," a/k/a "Mono Jojoy," MARCELINO TRUJILLO BUSTOS,
a/k/a "Martin Villa," PEDRO ALDANA, JORGE TORRES VICTORIA, a/k/a
"Pablo Catatumbo," GUILLERMO ENRIQUE TORRES CUETER, a/k/a "Julian
Conrado," FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro
Lascarro," a/k/a "Pastor Alape," MILTON DE JESUS TONCEL REDONDO,
a/k/a "Joaquin Gomez," JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian
Ramirez," ABELARDO CAICEDO COLORADO, a/k/a "Solis Almeida," SIXTO

ANTONIO CABANA GUILLEN, a/k/a "Domingo Bioho," VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano," ALVRO ALFONSO SERPA DIAZ, a/k/a "Felipe Rincon," MIGUEL ANGEL PASCUAS SANTOS, a/k/a "Sargento Pascuas," a/k/a "Humberto," JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles," HENRY CASTELLANOS GARZON, a/k/a "Romana," GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a "Johnny 40," ELMER CAVIEDES, a/k/a "Albiero Cordoba," GERARDO AGUILLAR RAMIREZ, a/k/a "Cesar," MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte," TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a "Paisa," JAIME COTRINO DIAZ, a/k/a "Arcesio,"ALONSO OLARTE LOMBANA, a/k/a "Luis Eduardo Marin," a/k/a "Rafael Gutierrez," LUIS EDUARDO LOPEZ MENDEZ, a/k/a "Efren Arboleda," and RAFAEL CEPILLO, the defendants, and others, participated in a FARC leadership meeting in which they voted unanimously in favor of the following cocaine and cocaine paste-related policies, among others: (i) to continue to increase cocaine trafficking routes overseas, including to the United States; (ii) to establish better ways to exchange cocaine and cocaine paste for weapons; (iii) to raise prices the FARC would pay to campesinos for cocaine paste; (iv) to apply "Revolutionary Justice," which included murder, to any campesino who failed to sell coca to the FARC; (v) to loan campesinos money to begin or increase coca production; (vi) to continue past efforts at

increasing the quality of the cocaine produced by using better chemicals in the conversion process; (vii) to continue to attack Colombian Government infrastructure to disrupt fumigation efforts; and (viii) to encourage the kidnapping of United States citizens in order to, among other things, deter the United States from supporting eradication efforts.

b.   During the course of the conspiracy, among other things, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, served as a member of the Estado Mayor of the FARC, the Front Commander of the 24th Front, a member of the Estado Mayor of the Middle Magdalena Bloc, and a special forces commander.   In these roles, he committed the following overt acts in furtherance of the conspiracy, among others:

(i).   From in or about 2000 through in or about 2003, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, sent billions of Colombian pesos, representing cocaine and cocaine paste proceeds, to the FARC Secretariat and to the Middle Magdalena Bloc Commander FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," the defendant, so that the FARC could purchase weapons and other supplies.

(ii).   In or about 2000, FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," and JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendants, reported to Front Commanders of the

-27-

Magdalena Medio Bloc that the Secretariat directed that: (1) the price paid to the campesinos for cocaine paste should increase; (2) coca producing lands that had been taken by the AUC should be retaken by force by the FARC; (3) the quality of the cocaine and cocaine paste had to improve to increase distribution to the United States; and (4) the FARC needed to establish direct drug contacts in the United States because of the high prices of cocaine available there.

(iii).    From in or about 1999 through and including in or about October 2004, as a Commander of the FARC's 24th Front, and as a special forces commander, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, repeatedly instructed FARC members to shoot down fumigation planes because of the economic impact fumigation of coca had on the FARC, and lectured FARC members that coca was "the lifeblood" of the FARC, and "the grains of gold."

(iv).    From in or about 2001 through in or about October 2004, as Commander of the FARC's 24th Front, approximately every week, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, provided money to FARC members and directed them to purchase between 1,000 and 2,500 kilograms of cocaine paste from campesinos located in areas controlled by the FARC.

(v).    From in or about 1999 through in or about October 2004, as Commander of the FARC's 24th Front, JORGE

-28-

ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, along with Middle Magdalena Bloc Commander FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," the defendant, set the price per kilogram that campesinos were paid by the FARC for cocaine paste in the area controlled by the 24th Front.

(vi). From in or about 1999 through in or about October 2004, as Commander of the FARC's 24th Front, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, sold hundreds of thousands of kilograms of cocaine paste to a cocaine transportation organization, for which he received currency in exchange, and provided FARC soldiers to guard and transport the cocaine paste.

(vii). From in or about 1999 through and including October 2004, as Commander of the FARC's 24th Front, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, collected "taxes" relating to the sales of cocaine paste for the benefit of the FARC.

(viii). In or about February 2003, as Commander of the FARC's 24th Front, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, possessed approximately 1,345 kilograms of cocaine and operated a cocaine laboratory in the Southern Bolivar region of Colombia.

(ix). In or about 2004, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," and Middle Magdalena

Bloc Commander FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," the defendants, spoke at a FARC Assembly meeting for the Middle Magdalena Bloc, where they ordered the murder of any campesino who sold cocaine paste to the AUC, and stressed the importance of militarily retaking coca fields that had been seized by the AUC.

(x). From in or about 1999 through in or about October 2004, as Commander of the FARC's 24th Front, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered the murder of campesinos who violated the FARC's narcotics laws, including the following:

(a). In or about 2001, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered that two campesinos who sold coca to the AUC be dismembered alive.

(b). In or about 2003, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered that two campesinos who sold cocaine paste to the AUC be murdered.

(c). In or about 2003, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered that four campesinos be murdered for violating FARC policies by selling cocaine paste to the AUC.

(xi). In or about 2003, JORGE ENRIQUE RODRIGUEZ

MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered that a fumigation plane should be shot down.

(xii).   In or about 2003, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, received a radio communication from Secretariat member and Middle Magdalena Bloc advisor RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko," a/k/a "Timoleon Jimenez," the defendant, in which LONDONO ECHEVERRY, as a representative of the Secretariat, directed RODRIGUEZ MENDIETA to launch military operations to reclaim areas of high coca production.

(xiii).   In or about 2003, JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendant, ordered a military assault to retake coca-rich land in Pozu Azul, Colombia, from the AUC.

(xiv).   From in or about August 2004 through in or about October 2004, FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," JORGE ENRIQUE RODRIGUEZ MENDIETA, a/k/a "Ivan Vargas," the defendants, and others, plotted to retaliate against United States law enforcement officers who were investigating the narcotics activities of the FARC.

c.   During the course of the conspiracy, among other things, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, was as a FARC associate who worked closely with the FARC's 16th Front, and assisted them

-31-

in procuring weapons and other materials in exchange for cocaine and cocaine paste.  In this role, he committed the following overt acts in furtherance of the conspiracy, among others:

(i).    From in or about 1996 through in or about February 2003, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, while operating in Colombia near the border with Venezuela, exchanged FARC cocaine for automatic rifles and explosives on behalf of TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," the defendant, and the FARC's 16th Front.

(ii).   In or about 1996, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, led a squad of FARC members that located four other FARC members suspected of stealing arms that the FARC purchased with cocaine, all of whom were immediately executed and buried.

(iii).  In or about 2003, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, delivered a shipment of rifles, explosives, uniforms and a suitcase full of money as payment for cocaine that he received from the FARC's 16th Front.

(iv).   In or about 2000, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, delivered fabric for military clothing, rifles, grenades, and blasting caps to the FARC's 16th Front.

(v).    In or about February 2002, JUAN

JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, delivered approximately 37 tons of weapons and ammunition to the FARC's 16th Front in exchange for a total of approximately 2,500 kilograms of cocaine paste and 750 million Colombian pesos.

(vi). On approximately 40 occasions from in or about 2002 through in or about October 2004, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, exchanged with TOMAS MOLINA CARACAS, a/k/a "Negro Acacio," the defendant, of the FARC's 16th Front, at least 1,000 AK-47, FAL, AR-15 and other rifles for kilograms of FARC cocaine. The exchange rate that MARTINEZ VEGA and MOLINA CARACAS agreed upon was 1½ kilograms of cocaine per rifle.  These weapons were brought by plane to airstrips in Colombia.

(vii). In or about 2004, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, delivered, by truck and by boat, rifles, ammunition and grenades to the FARC's 16th Front.  MARTINEZ VEGA delivered these rifles, ammunition and grenades to RAFAEL CEPILLO, the defendant.

(viii). On or about February 18, 2005, JUAN JOSE MARTINEZ VEGA, a/k/a "Gentil Alvis Patino," a/k/a "Chiguiro," the defendant, possessed approximately 700 kilograms of cocaine.

d.   From in or about 1999 through in or about 2004, ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant, was a FARC associate who managed cocaine laboratories for the FARC's 14th Front, oversaw the production and distribution of hundreds of thousands of kilograms of cocaine.  In this role, he committed the following overt acts, among others:

(i).   From in or about 1999 through in or about 2001, JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," the defendant, ordered FARC proceeds to be used to buy equipment for a cocaine laboratory operated by ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant.

(ii).   In or about 2000, the finance officer for the FARC's 14th Front stockpiled ton quantities of cocaine paste that she bought, on behalf of the 14th Front, and delivered the cocaine to ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant, to be converted into cocaine.

(iii).   From in or about 2001 through in or about 2004, as a cocaine laboratory operator for the FARC, ERMINSO CUEVAS CABRERA, a/k/a "Mincho," converted as much as 2.5 tons of cocaine paste into cocaine approximately several times a month.

(iv).   From in or about 2001 through in or about 2004, ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant, converted ton quantities of FARC cocaine paste in his laboratories and provided the finished cocaine to drug

-34-

transportation organizations identified by JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez," the defendant, who then sent the cocaine to the United States and elsewhere.

(v).    From in or about 2001 through in or about 2004, ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant, sent billions of Colombian pesos on a regular basis to the Finance Officer for the FARC's 14th Front to pay for cocaine paste.

(vi).    From in or about 2000 through in or about 2003, at the direction of the Finance Officer for the FARC's 14th Front and others, a coconspirator not named as a defendant herein ("CC-2"), on more than 50 occasions, transported ton quantities of FARC cocaine from laboratories controlled by ERMINSO CUEVAS CABRERA, a/k/a "Mincho," the defendant.

e.    In or about 1997, MANUEL MUNOZ ORTIZ, a/k/a "Ivan Rios," the defendant, lectured a group of FARC recruits on the importance of financing the FARC's activities through revenue earned from cocaine manufacturing and distribution.

f.    In or about 2000, RODRIGO LONDONO ECHEVERRY, a/k/a "Timochenko," a/k/a "Timoleon Jimenez," FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape," the defendants, and others, addressed FARC members in the Magdalena Medio Bloc, and that the Secretariat of the FARC had ordered them to: (1) retake coca-producing territory; (2) attempt

-35-

to shoot down fumigation aircraft; (3) increase coca production; and (4) kidnap United States citizens if the opportunity arose.

g.    From in or about 1999 through in or about 2005, EDGAR LOPEZ GOMEZ, "Miller Munar Munar," a/k/a "Pacho Chino," the defendant, as Commander of both the FARC's 29th Front and Western Bloc, oversaw the production and distribution of tens of thousands of kilograms of cocaine paste.

h.    From in or about 1995 through in or about 2003, ELMER CAVIEDES, a/k/a "Albiero Cordoba," the defendant, as Front Commander for the FARC's 44th Front, oversaw the production and distribution of tens of thousands of kilograms of cocaine paste.

i.    From in or about 1998 through in or about 2005, MIGUEL SANTANILLA BOTACHE, a/k/a "Gentil Duarte," the defendant, as Commander of the FARC's 7th Front, and GILDARDO GARCIA CARDONA, a/k/a "Alviro Rojas," the defendant, as Finance Officer for the 7th Front, oversaw the production and distribution of tens of thousands of kilograms of cocaine.

j.    From in or about 1998 through in or about 2005, EFRAIN MENDEZ, a/k/a "Guillermo," a/k/a "Cochornea," RAFAEL CEPILLO, and EDGAR SALGADO ARAGON, a/k/a "Rodrigo," a/k/a "Cadete," as Finance Officers and coca purchasers for the FARC's 16th Front, oversaw the production and distribution of thousands of kilograms of cocaine paste.

-36-

k.     From in or about 2000 through in or about 2005, FERNELLI RIZO CARRASCAL, a/k/a "Marco Fanfan," a/k/a "Jurga Jurga," the defendant, as Commander of the FARC's Julio Mario Tavera Mobile Column, oversaw the production and distribution of more than 1,000 kilograms of cocaine paste.

l.     From in or about 2001 through in or about 2005, JAIME COTRINO DIAZ, a/k/a "Arcesio," the defendant, as commander of the FARC's 10th Front, and IGNACIO LEAL GARCIA, a/k/a "Camilo," a/k/a "Tuerto," the defendant, as a Finance Officer of the FARC's 10th front, oversaw the production and distribution of hundreds of thousands of kilograms of cocaine paste.

m.     From in or about 1999 through in or about 2005, OMAR OYOLA ESTUPINAN, a/k/a "Jorge Humberto Cortes," a/k/a "JH," the defendant, as Commander of the FARC's 3rd Front, oversaw the production and distribution of thousands of kilograms of cocaine paste.

n.     From in or about 2000 through in or about 2005, CARLOS ALBERTO GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a "Paisa," the defendant, as Commander of the FARC's Teofilo Forero Castro Mobile Column ("TFMC"), and NORBEI CAMARGO, a/k/a "James Patapalo," as Finance Officer of the TFMC, oversaw the production and distribution of tens of thousands of kilograms of cocaine paste.

-37-

o.   On or about February 14, 2003, CARLOS ALBERTO
GARCIA, a/k/a "Herimides Buitrago," a/k/a "Oscar Montero," a/k/a
"Paisa," the defendant, authorized a member of the TFMC to shoot
down what he believed to be an aircraft that was conducting coca
eradication.

p.   From in or about 1998 through in or about
2005, ERASMO TRASLAVINA BENAVIDES, a/k/a "Ismardo Murcia Lozada,"
a/k/a "Jimmy Guerrero," the defendant, as Commander of the FARC's
33rd Front, and JOSE EPINEMIO MOLINA GONZALEZ, a/k/a "Danilo
Garcia," the defendant, as Finance Officer for the 33rd Front,
oversaw the production and distribution of thousands of kilograms
of cocaine paste.

q.   From in or about 1999 through in or about
2005, GUSTAVO GONZALEZ SANCHEZ, a/k/a "Rambo," the defendant, as
Commander of the FARC's 8th Front, oversaw the production and
distribution of thousands of kilograms of cocaine paste.

r.   From in or about 1998 up to and including in
or about 2005, GENER GARCIA MOLINA, a/k/a "John Hernandez," a/k/a
"Johnny 40," the defendant, as Commander of the FARC's 43rd
Front, oversaw the production and distribution of tens of
thousands of kilograms of cocaine.

s.   From in or about 2004 through in or about
2005, LUIS EDUARDO OYOLA DIAZ, a/k/a "Esponja," the defendant, as
Commander of the FARC's 14th Front, oversaw the production and
distribution of thousands of kilograms of cocaine, and ordered

-38-

the murder of at least ten individuals for violating the FARC's cocaine policies.

t.    On or about June 19, 2005, VICTOR RESTREPO, a/k/a "Victor Tirado," a/k/a "Rigoberto Lozano," the defendant, discussed, via radio communication, the distribution of approximately 2,500 kilograms of cocaine paste.

u.    From in or about 2002 through in or about 2005, ERNESTO HURTADO PENALOSA, a/k/a "Negro Elecier," the defendant, as a Commander of a Mobile Column in the Magdalena Medio Bloc, oversaw the distribution of at least 1000 kilograms of cocaine paste.

v.    From in or about 1999 through in or about 2005, EMIRO DEL CARMEN ROPERO SUAREZ, a/k/a "Ruben Zamora," the defendant, as a Commander in the Magdalena Medio Bloc, oversaw the distribution of thousands of kilograms of cocaine paste.

w.    From in or about 1998 through in or about 2005, GERARDO AGUILLAR RAMIREZ, a/k/a "Cesar," the defendant, as commander of the FARC's 1st Front, oversaw the distribution of more than one thousand kilograms of cocaine.

(**Narcotics Conspiracy**, in violation of Title 21, United States Code, Sections 952, 959, 960, and 963)

-39-

## FORFEITURE ALLEGATION AS TO COUNT ONE

36. The violations alleged in Count One of this Indictment are re-alleged and incorporated by reference herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 21, United States Code, Section 853(a).

37. As a result of committing the offense alleged in Count One of this Indictment, All Defendants shall forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituting or derived from any proceeds said defendant obtained directly or indirectly as a result of said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count One of this Indictment, including but not limited to a sum of money equal to $25 billion in United States Currency representing the amount of proceeds obtained as a result of the offense, violations of Title 21, United States Code, Section 963, for which each defendant is jointly and severally liable.

### Substitute Assets Provision

38. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

(a)   cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

other property of the defendant up to the value of the above
forfeitable property.

    (**Criminal Forfeiture**, in violation of Title 21,
     United States Code, Section 853)

        A TRUE BILL:

        FOREPERSON

Attorney of the United States in
and for the District of Columbia.

KENNETH L. WAINSTEIN
United States Attorney
District of Colombia

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

ALICE S. FISHER
Assistant Attorney General
Criminal Division
United States Department of Justice



CLERK'S OFFICE
UNITED STATES DISTRICT COURT

CO-931
New 3/78

SEALED

NOTICE OF DESIGNATION OF PENDING* RELATED CRIMINAL
CASE PURSUANT TO RULE 3-4, UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

Criminal Number: _04-446_
(To be supplied by the Clerk)

MAR 01 2006

**NOTICE TO PROSECUTOR:**

Pursuant to LCrR 57.12(a)(1) of this Court's Rules, you should prepare this form and submit it to the Clerk's Office along with the indictments in any related cases. One copy is needed for the Clerk's records, once for the Judge to whom the case is assigned, and one additional copy for each defendant. Therefore, in a one defendant case you should submit 3 copies, for a two defendant case you should submit 4 copies, etc. The Clerk will mail copies of this form to all defense counsel along with the arraignment notice.

**NOTICE TO DEFENDANT:**

Rule LCrR 57.12(b)(1) of this Court's Rules requires that any objection by the defendant to the related case designation shall be served on the U. S. Attorney and filed with the Clerk within 10 days after arraignment.

**NOTICE TO ALL COUNSEL:**

Rule LCrR 57.12(b)(3) requires, in part, that as soon as an attorney for a party becomes aware of the existence of a related case or cases, such attorney shall immediately notify in writing, the Judges on whose calendars the cases appear and shall serve such notice on counsel for all other parties.

The prosecutor will please complete the following:

1. Name of defendant:  Pedro Antonio Marin, et al.

2. Number of related case:  04-446

3. Name of Judge assigned to related case:  J.Hogan

4. Name of United States Court in which the related case is pending (if other than this Court:)

5. Relationship of new case to related case:

[Check appropriate box(es)]

    [ X ]  (a)    New case is a superseding indictment.

    [ ]   (b)    More than one indictment is filed or pending against defendant.

    [ ]   (c)    Prosecution against different defendant(s) arises from:

        [ ] a common wiretap

        [ ] a common search warrant

        [ ] activities which are a part of the same alleged criminal event or transaction

(*) A case is considered pending until a defendant has been sentenced. [Rule 3-4(a)(1)]

SUPERSEDING

# EXHIBIT B

S. Hrg. 107–885

# NARCO–TERROR: THE WORLDWIDE CONNECTION BETWEEN DRUGS AND TERRORISM

# HEARING

BEFORE THE

## SUBCOMMITTEE ON TECHNOLOGY, TERRORISM, AND GOVERNMENT INFORMATION

OF THE

## COMMITTEE ON THE JUDICIARY

## UNITED STATES SENATE

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

———

MARCH 13, 2002

———

**Serial No. J–107–66**

———

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

85–660 PDF                  WASHINGTON : 2003

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

## COMMITTEE ON THE JUDICIARY

PATRICK J. LEAHY, Vermont, *Chairman*

EDWARD M. KENNEDY, Massachusetts
JOSEPH R. BIDEN, Jr., Delaware
HERBERT KOHL, Wisconsin
DIANNE FEINSTEIN, California
RUSSELL D. FEINGOLD, Wisconsin
CHARLES E. SCHUMER, New York
RICHARD J. DURBIN, Illinois
MARIA CANTWELL, Washington
JOHN EDWARDS, North Carolina

ORRIN G. HATCH, Utah
STROM THURMOND, South Carolina
CHARLES E. GRASSLEY, Iowa
ARLEN SPECTER, Pennsylvania
JON KYL, Arizona
MIKE DeWINE, Ohio
JEFF SESSIONS, Alabama
SAM BROWNBACK, Kansas
MITCH McCONNELL, Kentucky

BRUCE A. COHEN, *Majority Chief Counsel and Staff Director*
SHARON PROST, *Minority Chief Counsel*
MAKAN DELRAHIM, *Minority Staff Director*

---

### SUBCOMMITTEE ON TECHNOLOGY, TERRORISM, AND GOVERNMENT INFORMATION

DIANNE FEINSTEIN, California, *Chairwoman*

JOSEPH R. BIDEN, Jr., Delaware
HERBERT KOHL, Wisconsin
MARIA CANTWELL, Washington
JOHN EDWARDS, North Carolina

JON KYL, Arizona
MIKE DeWINE, Ohio
JEFF SESSIONS, Alabama
MITCH McCONNELL, Kentucky

DAVID HANTMAN, *Majority Chief Counsel*
STEPHEN HIGGINS, *Minority Chief Counsel*

# CONTENTS

———

### STATEMENTS OF COMMITTEE MEMBERS

|  | Page |
|---|---|
| DeWine, Hon. Mike, a U.S. Senator from the State of Ohio | 59 |
| Feinstein, Hon. Dianne, a U.S. Senator from the State of California | 1 |
| Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah | 15 |
| Kyl, Hon. Jon, a U.S. Senator from the State of Arizona | 4 |

### WITNESSES

| | Page |
|---|---|
| Beers, Rand, Assistant Secretary of State for International Narcotics and Law Enforcement Affairs, Department of State, Washington, D.C. | 22 |
| Hutchinson, Asa, Administrator, Drug Enforcement Administration, U.S. Department of Justice, Washington, D.C. | 6 |
| Kamman, Curtis W., Former United States Ambassador to Colombia, Department of State, Washington, D.C. | 38 |
| Newcomb, R. Richard, Director, Office of Foreign Assets Control, U.S. Department of the Treasury, Washington, D.C. | 17 |
| Olcott, Martha Brill, Senior Associate, Carnegie Endowment for International Peace, Washington, D.C. | 47 |
| Shifter, Michael, Adjunct Professor and Program Director, Inter-American Dialogue, Center for Latin American Studies, School of Foreign Service, Georgetown University, Washington, D.C. | 41 |
| Smith, R. Grant, Former U.S. Ambassador to Tajikistan, Department of State, Washington, D.C. | 44 |
| Taylor, Francis X., Ambassador-at-Large for Counterterrorism, Department of State, Washington, D.C. | 23 |

# NARCO–TERROR: THE WORLDWIDE CONNECTION BETWEEN DRUGS AND TERRORISM

---

**WEDNESDAY, MARCH 13, 2002**

UNITED STATES SENATE,
SUBCOMMITTEE ON TECHNOLOGY, TERRORISM, AND
GOVERNMENT INFORMATION, OF THE COMMITTEE ON THE
JUDICIARY,
*Washington, D.C.*

The Subcommittee met, pursuant to notice, at 10:12 a.m., in room SD–226, Dirksen Senate Office Building, Hon. Dianne Feinstein, Chairperson of the Subcommittee, presiding.

Present: Senators Feinstein, Kyl, Hatch, and Sessions.

## OPENING STATEMENT OF HON. DIANNE FEINSTEIN, A U.S. SENATOR FROM THE STATE OF CALIFORNIA

Chairperson FEINSTEIN. The hearing will come to order.

I am very pleased to be joined by the ranking member, Senator Kyl, from the State of Arizona

The subject of this hearing is the worldwide connection between drugs and terrorism. We are here today to discuss what I think both Senator Kyl and I believe to be a key component in the war against terrorism, and that is the connection between drug trafficking and terrorism.

In some cases, terrorists may sell drugs for money, they may trade them for weapons. In others, organizations may protect drug traffickers for a fee or a tax. Either way, it has become increasingly clear that money spent to buy drugs on the streets of America may well eventually end up funding a terrorist attack on our country.

Let me give you a case in point: Afghanistan. We have seen in Afghanistan, for instance, that the Taliban essentially controlled or at least profited from the distribution of more than 70 percent of the world's heroin. In remarks last October, British Prime Minister Tony Blair referred to the Taliban as "a regime founded on fear and funded on the drug trades." The Prime Minister was correct.

According to the Department of State's International Narcotics Control Strategy it is issued last year, the Taliban controlled 96 percent of the territory where the opium poppy was grown, and promoted and even taxed the sale of this poppy to finance weapons purchased, as well as military operations. And there is little doubt that these operations, at least in part, supported and protected Al Qaeda and Osama bin Laden.

Although the Taliban reportedly banned poppy cultivation in late 1997, opium production in Afghanistan increased through the year

2

2000, eventually accounting for a staggering 72 percent of the world's illicit opium supply—72 percent from just one country.

On July 27, 2000, the Taliban issued a second decree banning opium poppy cultivation. By the time of the second decree, the Taliban had better control of the country, and this time, according to almost every source, the ban was almost completely effective. Opium declined from over 3,000 metric tons in 2000 to 74 metric tons through October 2001.

Now, some may say that it great, they succeeded. But the ban is just part of the story. In reality, all the ban did was artificially raise the price of heroin and allow the traffickers and the Taliban to reap record profits. This is because despite the ban on cultivation, there was no ban on storage and trafficking.

A British spokesman estimated late last year that 3,000 tons of opium were being stockpiled in Afghanistan, a significant portion of it by bin Laden personally and by his followers. So even though a ban on cultivation was in place, stored opium was still trafficked. More money was made than ever before and the Taliban continued to tax the opium trade at about 10 percent.

Estimates are that the Taliban made between $40 and $100 million per year from the drug trade. But United Nations suggested that the Taliban may have become increasingly involved in the drug trade, in which case they could derive even more money. The street value of heroin derived from Afghan opium is some $35 billion. The farmers get about $200 million of that, so there is a wide margin for additional money flowing to the Taliban.

According to our own Government and the United Nations, virtually all of Afghanistan's poppy fields have now been replanted, as much as 45,000 to 65,000 hectares, for a crop of between 2 and 3,000 metric tons of opium, with a full harvest due in just a few weeks. So one question I will ask the witnesses today is what can be done to prevent a return to an Afghanistan steeped in the drug trade, using drug money to fund terrorism.

Now, Colombia is another case in point, but I am going to save time and just put that part of the statement in the record.

But some of the questions I have are, for instance, should we expand the Coverdell–Feinstein drug kingpin legislation, passed over two years ago, to also go after major terrorists? Is there other legislation needed to clarify our ability to use anti-drug assets against terrorists? Are we developing the proper level of resources in Afghanistan, Colombia, and other nations to deal with increasingly violent and interconnected narcotics terrorists? Should we be conditioning aid to Afghanistan or other nations on their cooperation in the war against drugs?

These are questions I hope to ask of a very distinguished panel, and I will introduce them just as soon as we hear from my distinguished ranking member, Senator Kyl. Welcome.

[The prepared statement of Senator Feinstein follows:]

STATEMENT OF HON. DIANNE FEINSTEIN, A U.S. SENATOR FROM THE STATE OF CALIFORNIA

"We are here today to discuss what I believe to be a key component of the war against terrorism—that is the connection between drug trafficking and terrorism. The links between drugs and terrorism are often difficult to find, but they are there

3

and we ust dedicate ourselves to beaking those links, and to breaking the terrorists and drug cartels alike.

In some cases, terrorists may sell drugs for money or trade them for weapons. In others, terrorist organizations may protect drug traffickers for a fee, or "tax." Either way, it has become increasingly clear that money spent to buy drugs on the streets of America may eventually end up funding a terrorist attack on our country.

We have seen in Afghanistan, for instance, that the Taliban essentially controlled, or at least profited from, the distribution of more than 70% of the world's heroin. In remarks last October, British Prime minister Tony Blair referred to the Taliban as "a regime founded on fear and funded on the drugs trade." The Prime Minister was correct. According to the Department of State's *International Narcotics control strategy report* issued last year, the Taliban controlled 96 percent of the territory where poppy was grown in Afghanistan, and promoted and even taxed the sale of poppy to "finance weapons purchases as well as military operations." And there is little doubt that these operations, at least in part, supported and protected Al Qaeda and Usama bin Laden.

Although the Taliban reportedly banned poppy cultivation in late 1997, opium production in Afghanistan increased through the year 2000, eventually accounting for a staggering 72% of the worlds illicit opium supply—72% from just one country.

Incidentally, only about 15% of Afghan opium makes its way to the United States, with most of the heroin ending up on the streets of Europe. But the profits from those drug sales put us all at risk—for all we know, the September 11 attacks were funded, at least in part, by drug money.

On July 27, 2000, the Taliban issued a second decree banning opium poppy cultivation. By the time of this second decree, the Taliban had better control of the country, and this time, according to almost every source, the ban was almost completely effective—opium production declined from over 3,000 metric tons in 2000 to just 74 metric tons through October 2001.

Now some may say "that's great—the Taliban cracked down on drugs and they succeeded." But the ban on cultivation was just part of the story. In reality, all the ban did was to artificially raise the price of heroin and allow the traffickers, and the Taliban, to reap record profits.

So even though a ban on *cultivation* was in place, stored opium was still trafficked, more money was made than ever before, and the Taliban continued to tax the opium trade at about 10%. Estimates are that the Taliban made between $40 and $100 million per year from the drug trade, but the U.S. suggests that the Taliban may have become increasingly involved in the drug trade, in which case they could derive even more money. The street value of heroin derived from Afghan opium is some $35 billion and the farmers only get about $200 million of that, so there is a wide margin for extra money flowing to the Taliban.

There is also concern that the Taliban used income from the opium trade to fund extremists in neighboring countries such as the Islamic Movement of Uzbekistan (IMU) and the Chechen resistance.

Furthermore, some reports maintain that Al Qaeda earned cash by protecting Afghanistan's shipments of opium bound for the West. There are indications that bin Laden served as a middleman for the Afghan opium producers, using income derived from this role to run terrorist training camps in Afghanistan.

Even with the Taliban gone, there remains a strong risk that the drug trade in Afghanistan will be revived, and that money from the dug trade will make its way to terrorist groups just as it did before this war. According to our own government and the United Nations, much if not all of Afghan's poppy fields have been replanted—as much as 45,000 to 65,000 hectares for a crop of between 2,000 and 3,000 metric tons of opium, with a full harvest due in just a few weeks.

So one question I will ask the witnesses today is what can be done to prevent a return to an Afghanistan steeped in the drug trade, using drug money to fund terrorism.

In Colombia, the situation is similar. Both the FARC and the ELN (guerrilla groups within Colombia) allegedly fund their operations, at least in part, from income generated by the involvement in the illegal drug industry.

U.S. officials estimate that some two-thirds of the FARC fronts and one-third of the ELN fronts have some involvement with illegal narcotics. These groups are involved in protecting corps, laboratories, storage facilities, and airfields from government anti-narcotics efforts, and even collecting "taxes" from those who benefit from that protection.

Estimates of annual guerrilla income from drug trafficking have varied widely, but all estimates are in the hundreds of millions of dollars per-year—as much as $1, 2, or even 3 million dollars every day may be funneled from drug proceeds to the terrorist rebels.

4

The right wing paramilitaries in Colombia may be funneled from drug proceeds to the terrorist rebels.

The drug problem in Colombia is also our problem—according to 2001 figures, Colombia now supplies some 90% of the cocaine consumed in the United States, and 75% of the heroin consumed on the U.S. East Coast. This is one reason that I have strongly supported Plan Colombia, a funding and support initiative to assist the Colombian government in eradicating crops, interdicting traffickers, and eliminating the drug trade in the country.

In addition to the drug issue, however, the problem of terrorism is a problem that we must address around the world. In Colombia, that may mean assisting the government of Colombia in anti-terror, as well as anti-drug, operations. This is another issue I'd like to discuss today.

Finally, I always approach these hearings with one burning question—is there anything that Congress can do—that we can do—to assist our government or other governments in the global war against terrorism and drug trafficking.

- For instance, should we expand the Coverdell-Feinstein drug kingpin legislation passed two years ago to also go after major terrorists?
- Is there other legislation needed to clarify our ability to use anti-drug assets against terrorists?
- Are we devoting the proper level of resources in Afghanistan, Colombia, and other nations to deal with increasingly violent and inter-connected narco-terrorists?

I will not turn over the microphone to may colleague Senator Kyl. I look forward to hearing his statement, and then to hearing the first panel address some of these issues.

## STATEMENT OF HON. JON KYL, A U.S. SENATOR FROM THE STATE OF ARIZONA

Senator KYL. Thank you very much, Senator Feinstein, and thank you for holding this hearing. We have a great group of witnesses here and so I will be brief and put my statement in the record and focus just a little bit more on the Colombia problem that you referred to just to make one point.

My understanding is that bin Laden himself has significant connections to the poppy cultivation in Afghanistan, that he provided protection to heroin labs, processing labs there, that he was a part owner of some of those labs, part owner of at least one load that was shipped to the United States, and even tried to develop a stronger strain that would addict more people. To the extent any of our witnesses can talk about that, I think that would make interesting information for our citizens.

With regard to Colombia, we have there as well, and the connection between the FARC, and to some extent lesser the ELN, and narco-trafficking is very clear; it is well-established. We are trying to assist the government there in eradicating those crops, but you have the same tension in Colombia as you do in Afghanistan between eradication and replacement of the crops with something else that can be grown, on the one hand, versus the diminishment of local support for the government, on the other. It is a very difficult situation either in Afghanistan or in Colombia. We understand that. I also appreciate that there are some things that will have to be discussed in closed session, and we look forward to that opportunity as well.

I will put the remainder of my statement in the record as well, but it is very clear that because of the support for terrorism by the narcotics industry, all the way from the cultivation to the processing and smuggling of those products into Europe and into the United States—because of that connection between those drugs and

5

the support for terrorism, just as we are trying to close off all the other avenues of support for terrorists, all of their financing opportunities, their bank accounts and all the rest of it, we have got to get a hold of this problem from this angle, too.

That should never, however, confuse us to what the real issue is. The real issue is closing off the drug trade because of the people in the United States and the rest of the world that it damages and kills, what it does to our society. The war on terror is just another reason to deal with this very, very difficult problem.

So I think this is a hearing that needed to occur, and fortunately we have some great witnesses who can help to elucidate this for us and I appreciate that very much, Madam Chairman.

[The prepared statement of Senator Kyl follows:]

STATEMENT OF HON. JON KYL, A U.S. SENATOR FROM THE STATE OF ARIZONA

Senator Feinstein, thank you for calling todays hearings on the link between terrorism and the illegal drug trade. Even before September 11, this subcommittee has worked hard to root out the sources of terrorism both here and abroad. I know Senator Feinstein is just as committed as I am to eliminating terrorism.

Today we will focus on illegal drugs and their link to terrorism in two areas of the world—Afghanistan and Colombia (and their regions).

First, Afghanistan. Examining what can, and should, be done to eliminate the drug trade in Afghanistan is complicated. We know that in 2000, opium production in Afghanistan accounted for 72% of production worldwide. Over 3,000 metric tons of opium (to be turned into heroin) was produced there that years, seven to ten times more than humans consume annually. The Taliban benefitted from the opium traffic by taxing it—making upwards of $43 million. That's $43 million for an organization working for/with AL Qaeda. The Taliban used the funding to remain in power and shelter Osama Bin Laden and other AL Qaeda terrorists. Then in July 2000, the Taliban imposed a ban on poppy cultivation. Their profits, however, did not necessarily diminish. According to the International Narcotics Strategy Report 2002, the Taliban most likely benefitted from its own ban by dumping opium stocks at higher prices than could otherwise have been achieved. As William Bach, director of the Bureau of International Narcotics and enforcement Affairs, has said, the Taliban's share of revenues from opium "may be far greater" even than the widely cited figure of $43 million. In addition, we might not know the full extend of Bin Laden;s narco-terror connections—what we do know, however, is that he provided protection to heroin processing labs, was a part owner in numerous labs, part owner of one load shipped to the U.S., and tried to develop a stronger strain of heroin in order to addict more people here.

In the months after September 11, we have become aware that poppy cultivation is on the rise again in Afghanistan, and that another very large harvest is about to begin there. I will be interested to learn from the witnesses their assessment of Afghanistan's efforts, worldwide efforts, and the efforts of our own Administration in stopping this poppy from making its was to market. I am also interested in learning about other related areas of the world, such as Burma, where drug-trafficking and terrorism are presenting themselves as interrelated activities.

In the South American region-in Colombia—I believe we must take a hard look at what is truly needed to effectively eliminate the narceterrorist terror that has taken hold there. Colombia has been threatened by the FARC, and to a lesser degree the ELN, for the past forty years. In the past, the FARC's financing and narcotics trafficking were, to some degree, separate. Today, I believe that the FARC has completely integrated the drug trade into its terrorist activities. Jane's International Security News, for example, has reported that the FARC simplified its drug transactions by simply trading one kilo of highly pure cocaine for one AK–47 rifle, which can be parachuted into the jungle into FARC's territory. In addition, whether there has been an 11 percent reduction, as one source has reported, or a 25 percent increase, as another source has reported, in drug cultivation in Colombia, it is clear that the FARC's dependence on drug sales to finance its operations is not likely diminishing. I look forward to hearing the views of the witnesses today about what is needed to eliminate the serious and deadly narco-terrorist reality in Colombia.

We have a very distinguished group of witnesses before us today. I am interested in their overall views—I realize, however, that for security reasons, some of the explanations and information that will shed light in this area must be shared in a

6

classified manner. I appreciate the information I've received on these matters in the past, and look forward to gaining, in addition to the information made available today, additional classified information in order that I can to make the right determinations and decisions about terrorism and its link to illegal drug trafficking.

I would like to thank Senator Feinstein again for holding this hearing today. We have always had an excellent working relationship and I look forward to examining this issue with her, with the skillful assistance of these witnesses.

Chairperson FEINSTEIN. Thanks very much, Senator.

I will introduce the panel now. Mr. Asa Hutchinson is currently the Administrator of the Drug Enforcement Administration. He is a former Member of Congress from Arkansas and served on the House Judiciary Committee and the House Select Committee on Intelligence, just as Senator Kyl and I do in this House. Prior to his 6 years in Congress, Mr. Hutchinson practiced law for 21 years. He personally tried over 100 jury trials, ranging from cocaine distribution to securities fraud.

I think I will introduce each one seriatim, so if you would please proceed, Mr. Hutchinson. We are delighted to have you here.

## STATEMENT OF ASA HUTCHINSON, ADMINISTRATOR, DRUG ENFORCEMENT ADMINISTRATION, U.S. DEPARTMENT OF JUSTICE, WASHINGTON, D.C.

Mr. HUTCHINSON. Thank you, Madam Chairwoman. I appreciate the fact that you are holding this hearing and bringing attention to this important issue. Senator Kyl, thank you for your leadership as well.

I want to begin my testimony today by commenting on the recent advertisements during the Super Bowl sponsored by the ONDCP. These ads accurately depict the connection between drug use, drug trafficking money, and terrorism. As has been pointed out, we have to understand that by reducing the demand for drugs we will also reduce the financial structure that supports terrorist groups and violence against civil society and government.

In February of this year, less than a month ago, I was in Mexico and met Mario Roldom–Querro. He was a special prosecutor, and within one hour after I departed Mexico City this prosecutor was assassinated and the police reports show that he was shot 28 times. This prosecutor was not the first, nor will he be the last public official killed in Mexico for going after the drug traffickers.

In the first few months of 2002, 13 law enforcement officers have been murdered in Mexico. According to the Mexican press, during the first 30 days of this year 50 murders had occurred in one state, Sinaloa, which was reported to be the center of drug-related violence. And even though these acts of terror may not fit within the traditional concept of terrorism, they constitute some of the most vicious attacks on the judicial system and the rule of law, and are intended to intimidate and destroy legitimate government authority.

The arrest last weekend of Benjamin Arellano Felix shows that the law can triumph over lawlessness, and President Vicente Fox and his administration should be congratulated. I know this committee has been very instrumental in encouraging a higher level of cooperation with Mexico.

If you go to Colombia, since 1992 terrorist organizations in Colombia have kidnapped over 50 Americans and murdered at least

7

10 Americans. In the past 5 weeks, there have been more than 120 separate terrorist attacks committed by the Revolutionary Armed Forces of Colombia, or the FARC.

Seven members of the Colombian congress have been killed in the last four years. Most recently, Colombian presidential candidate Ingrid Bettencourt and her chief of staff were kidnapped by the FARC, and Congresswoman Martha Catalina Daniels was kidnapped, tortured and assassinated.

In Colombia, the drug traffickers, the terrorist groups and the illegal self-defense groups, some of which are terrorist organizations themselves, all carry out the most extreme attacks on society. The two major insurgency groups, the FARC and the National Liberation Army, or the ELN, have divided the territory and they are carrying out acts of violence against citizens and public officials.

Likewise, paramilitary members have raised funds through extortion or by protecting laboratory operations in northern and central Colombia. The Carlos Castano organization is directly involved in processing cocaine. In addition, the DEA has a credible body of reporting that the Castano organization, or the AUC, is involved in exporting cocaine HCL from Colombia. In recent years, DEA has characterized Carlos Castano as a significant drug trafficker in his own right.

Clearly, there are many links between the Colombian trafficking groups and the terrorist organizations. These groups—the FARC, the ELN, and the AUC—raise funds through extortion or by protecting laboratory operations. In return for cash payments, the groups protect cocaine laboratories in southern Colombia. They also encourage coca planting, and of greatest concern they discourage legal alternative development.

In 2001, three members of the IRA, the Irish Republican Army, were arrested in Colombia for collaborating with the FARC. Some terrorists groups apparently have assisted drug trafficking groups in transporting and storing cocaine and marijuana within Colombia. Particularly, they protect clandestine air strips in southern California.

We are very concerned about the 16th Front commander Thomas Molino, who has engaged in lab operations which are linked to Brazilian trafficker, Louis D'Acosta. So there is great concern about the connection, and overwhelming evidence of the connection between terrorist activities and drug trafficking activities.

But violent activities of the FARC and other groups are not limited just to Colombia. The information we have is that it is starting to destabilize along the northern border of Ecuador because of the violence in coca processing activities. Similarly, their activities have spread to Panama. Venezuela, too, has experienced increased violence, causing cattle ranchers to hire additional security personnel to counter the FARC's efforts.

Moving on to Peru, historically the Shining Path, the Sendero Luminoso, has been engaged in both drug trafficking as well as a separatist group that has been very violent in nature. Their influence has diminished, but they are still active and are continuing to extract a revolutionary tax from the cocaine base operators.

Senator Feinstein, you talked about Afghanistan and pointed out that it is a major source of heroin production for the world, and the

8

connection historically between the Taliban and the revenue that they have received from drug traffickers. As Senator Kyl pointed out, there is multi-source information that Osama bin Laden himself has been involved in the financing and facilitation of heroin trafficking activities.

With the removal of the Taliban as the controlling force in Afghanistan, the farmers, traffickers and other elements have resumed their activities. It is of great concern to the United States, and particularly to the DEA. The cultivation and production estimates indicate that Afghanistan has the capability to return and continue as one of the largest opium producers in the world.

Even though the chairman of the provisional government has supported the eradication of opium poppy cultivation and a ban on that cultivation, the estimates from the United Nations drug control program estimate that the area currently under cultivation could reach up to 65,000 hectares, potentially producing up to 2,700 metric tons of opium. This should send alarm bells to Europe particularly, but also to every nation that is impacted by the heroin trade.

If you move to the country of Turkey, we have the Kurdistan Workers' Party, which is involved in the taxation of drug shipments and the protection of drug traffickers through that country. Less than a week ago, I was in Bolivia at an international drug enforcement conference in which I met with General Director Kimal Onal, of the Turkish National Police. Both General Onal and Director Kalistan voiced their concerns regarding the PKK's drug trafficking activities, which includes the taxation of drug shipments and the protection of drug traffickers. Of course, this group is on the terrorist list as well.

In Burma, Southeast Asia, the United Wa State Army, an army of 16,000 armed combatants, is supported through methamphetamine production and heroin production. They are located in Myanmar, formerly Burma, and certainly are of great concern to us because of their massive production of illegal drugs.

I could talk about the tri-border area in South America, the Hizballah, and other areas of the world that reflect the combination between drug traffickers, money that is produced, and terrorist organizations.

One case I wanted to mention here in the United States was Operation Mountain Express. It was in three phases, resulting in the arrest of over 300 individuals involved in the pseudoephedrine trade that brought pseudoephedrine largely from Canada down into California for the production of methamphetamine.

Many of the individuals arrested—in fact, almost 100 of them— were of Middle Eastern origin, and we have determined that much of the drug profit generated from the pseudoephedrine trade has been sent back to the Middle East. The DEA continues to investigate this organization and where the proceeds have returned and how they are benefitting and to the extent they are benefitting terrorism.

I want to emphasize, in conclusion, the importance of our international operations. The international operations of the DEA are essential to our enforcement efforts here in the United States. It

9

is essential to our intelligence-gathering activities and reducing supply, which is a major goal.

In response to the concerns that have been expressed about Afghanistan and the connection between drugs and terrorism across the globe, our response is included in our budget submission to the United States Senate and to the Congress that asks for a reprogramming of funds that have been left over from previous years that will allow us to increase our operations in Afghanistan, in Uzbekistan, in Turkmenistan, and in Turkey, in these areas that are of greatest concern.

We have tried to build international support for interdicting the anticipated flow of heroin coming out of Afghanistan, and our presence there is needed to help in this coordinated international effort. This reprogramming will allow us to put resources there, as well as build the sensitive investigative units that will work with the national police organizations of these countries to interdict these drugs, and also to build a law enforcement community there in Afghanistan.

In conclusion, there is clearly a historic connection between drug trafficking and terrorist activities. It is destabilizing many regions of the world, and therefore any targeting of terrorist activities must also simultaneously go after the drug trafficking that supports that horrific impact of terrorist organizations.

Thank you, Madam Chairman.

[The prepared statement of Mr. Hutchinson follows:]

STATEMENT OF ASA HUTCHINSON, ADMINISTRATOR, DRUG ENFORCEMENT ADMINISTRATION

EXECUTIVE SUMMARY

As the tragic events that occurred on September 11, 2001 so shockingly demonstrated, terrorist organizations are a threat to the national security of the United States. One of DEA's priorities is to target the powerful international drug trafficking organizations. Some of these groups have never hesitated to use violence and terror to advance their interests, all to the detriment of law-abiding citizens. While DEA does not specifically target terrorists, we will target and track down drug traffickers and drug trafficking organizations involved in terrorist acts.

DEA employs a global approach to attacking drug organizations that fuel some terror networks. These drug organizations come from locations as far away as Afghanistan and as close as Colombia, but all utilize violence in order to achieve their goals.

Most recently, Colombian presidential candidate Ingrid Betancourt and her chief of staff, Clara Rojas were kidnapped by the Revolutionary Armed Forces of Colombia (FARC), and Colombian Congresswoman Martha Catalina Daniels was kidnapped, tortured and assassinated. Colombia continues to be plagued by complex crime and national security issues that are, in part, fueled by the drug trade.

DEA maintains offices around the world; these offices are in a unique position to direct human drug intelligence sources and contribute to the formation of more effective cooperative law enforcement relationships in that area. To improve the effectiveness of DEA, several initiatives have been proposed. These initiatives include Operation Containment, a proposed DEA initiative that includes opening a DEA office in Kabul, Afghanistan and the expansion of existing offices in Asian and European cities, as well as the growth of DEA's communications intercept and intelligence capabilities in support of agencies conducting counter-terrorism investigations in America.

Chairwoman Feinstein, Ranking Member Kyl, and distinguished members of the Subcommittee, it is a pleasure for me to appear before you for the first time in my capacity as the Administrator of the Drug Enforcement Administration (DEA). The Subcommittee's leadership and support in our fight against international drug trafficking and terrorism is deeply appreciated by DEA and all Americans. I look for-

10

ward to a successful, productive, and cooperative relationship with the Subcommittee on this most important issue.

I appear before you today to testify on the nexus between international drug trafficking and terrorism, commonly referred to as narco-terrorism. As the tragic events that occurred on September 11, 2001 so shockingly demonstrated, terrorist organizations and the dependence on and relation of some of these organizations to international drug trafficking poses a threat to the national security of the United States. Consequently, the DEA has directed enforcement and intelligence assets to identify, investigate, and dismantle all organizations, including terrorist groups, engaged in the drug trafficking trade. The degree to which terrorist organizations utilize drug profits to finance their horrific activities is of paramount concern to the DEA.

DEA defines narco-terrorism as a subset of terrorism, in which terrorist groups, or associated individuals, participate directly or indirectly in the cultivation, manufacture, transportation, or distribution of controlled substances and the monies derived from these activities. Further, narco-terrorism may be characterized by the participation of groups or associated individuals in taxing, providing security for, or otherwise aiding or abetting drug trafficking endeavors in an effort to further, or fund, terrorist activities.

One of DEA's priorities is to target the powerful international drug trafficking organizations that operate around the world, which employ thousands of individuals to transport and distribute drugs to American communities. Some of these groups have never hesitated to use violence and terror to advance their interests, all to the detriment of law-abiding citizens. While DEA does not specifically target terrorists, we will target and track down drug traffickers and drug trafficking organizations involved in terrorist acts.

My testimony will focus on the connection between drug trafficking organizations, terrorist groups and the illegal drug profits used to support their activity.

According to the U.S. Department of State, between 1996 and 2000, over 600 terrorist incidents occurred against the United States of America. Starting in October 1997 and continuing every two years thereafter, the U.S. Department of State designated approximately two dozen foreign terrorist organizations, or FTOs. As a result of the most recent round of designations, there are currently 28 FTOs. DEA has identified several of these terrorist groups that are associated with or directly engaged in drug trafficking. The events of September 11, 2001 graphically illustrate the need to starve the infrastructure of every global terrorist organization and deprive them of the drug proceeds that might otherwise be used to fund acts of terror.

SOUTHWEST ASIA

AFGHANISTAN, THE TALIBAN, AND OSAMA BIN LADEN

The DEA has not maintained a presence in Afghanistan since January 1980, when the office was closed for security reasons, as a result of the Soviet invasion in December 1979. Following the withdrawal of Soviet troops 10 years later, civil strife has ensued in Afghanistan. The Islamic State of Afghanistan is a major source country for the cultivation, processing and trafficking of opiate and cannabis products. Afghanistan produced over 70 percent of the world's supply of illicit opium in 2000. Morphine base, heroin and hashish produced in Afghanistan are trafficked worldwide. Due to the warfare-induced decimation of the country's economic infrastructure, narcotics are a major source of income in Afghanistan. Afghanistan is a party to the 1988 UN Drug Convention but lacks the governmental resources to implement the country's obligations.

U.S. intelligence confirmed a connection between Afghanistan's former ruling Taliban and international terrorist Osama Bin Laden and the al-Qa'ida organization. DEA has received multi-source information that Bin Laden has been involved in the financing and facilitation of heroin trafficking activities. While the activities of the two entities do not always follow the same course, we know that drugs and terror frequently share the common ground of geography, money, and violence. In this respect, the very sanctuary previously enjoyed by Bin Laden was based on the existence of the Taliban's drug state, whose economy was exceptionally dependent on opium.

According to the official U.S. Government estimates for 2001, Afghanistan produced an estimated 74 metric tons of opium from 1,685 hectares of land under opium poppy cultivation. This is a significant decrease from the 3,656 metric tons of opium produced from 64,510 hectares of land under opium poppy cultivation in 2000.

11

| | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|
| USG | 74 | 3,656 | 2,861 | 2,340 | 2,184 | 2,099 |
| UNDCP | 185 | 3,276 | 4,581 | 2,102 | 2,804 | 2,248 |

Opium prices in Afghanistan currently range from nine to eleven (9–11) times higher than in 2000 (February 2000: $30–43/kilogram, March 2002: $333/kilogram). Cultivation and production estimates for the spring 2002 opium crop differ widely, but even under the most conservative estimate, Afghanistan has the capability to return as one of the largest opium producers in the world.

The head of Afghanistan's provisional government, Hamid Karzai, supports the eradication of opium poppy cultivation. Interim president Karzai renewed the Taliban's ban on poppy cultivation and drug production in January 2002, and called upon the international community to support his efforts.

In 2001, the United States Government estimated that 74 tons of opium was produced, down from over 3,600 metric tons (75% of world production) in 2000. The U.S. Government and the UNDCP estimate that the area currently under cultivation could reach up to 65,000 hectares, potentially producing up to 2,700 metric tons of opium. Harvesting of the first poppy crop will begin in late April and early May 2002.



DEA sources have reported the observation of numerous inactive laboratory sites in Afghanistan and Pakistan, a number of significant opium dealers, large stockpiles of opium, and active opium markets in Jalalabad and Ghani Khel. The laboratories known to this point are concentrated in the regions bordering the Northwest Border Province of Pakistan, especially in Nangarhar, Laghman, and Konar Provinces in the Konduz and Badakhshan Provinces. As outlined below, the nexus between drugs and terrorism extends to other areas of Central and Southeast Asia as well.

*Kurdistan Workers Party (PKK)*

DEA information indicates that the PKK is involved in the taxation of drug shipments and the protection of drug traffickers throughout the Southeastern Region of Turkey.

*The United Wa State Army*

Methamphetamine and heroin trafficking finances the efforts of the 16,000-strong United Wa State Army (UWSA). The UWSA exists primarily as a separatist organization, seeking autonomy from the central government in Burma. It funds its sepa-

12

ratist activities by being the major international drug trafficking organization in the region,

## SOUTH AMERICA

### THE COLOMBIAN NARCO-TERRORIST THREAT

On February 23, 2002, Colombian presidential candidate Ingrid Betancourt and her chief of staff, Clara Rojas were kidnapped by the Revolutionary Armed Forces of Colombia (FARC). Other acts of terrorism include Colombian Congresswoman Martha Catalina Daniels' torture and assassination. Colombia continues to be plagued by complex crime and national security issues that are, in part, fueled by the drug trade.

In Colombia, drug traffickers, terrorist groups, and illegal self-defense groups all carry out attacks of the most extreme violence on society. Colombia's two major insurgent groups are the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia or FARC) and the National Liberation Army (Ejercito de Liberacion or ELN). The FARC controls large areas of Colombia's eastern lowlands and rain forest, which are the primary coca cultivation and cocaine processing regions in the country. The ELN operates primarily along Colombia's northeastern border with Venezuela and in central and northwestern Colombia, including Colombia's cannabis and opium poppy growing areas.



Right wing "self-defense groups" emerged in Colombia during the 1980s in response to insurgent violence. Hundreds of illegal self-defense groups—financed by wealthy cattle ranchers, emerald miners, coffee plantation owners, drug traffickers, etc.—conduct paramilitary operations throughout Colombia. The loose coalition known as the AUC (Autodefensas Unidas de Colombia), is the best known of these self-defense groups. Carlos Castano is the most well recognized leader of the AUC.

What DEA can show about the links between these terrorist groups and drug trafficking is identified below:

13

• Some groups raise funds through extortion or by protecting laboratory operations. In return for cash payments, or possibly in exchange for weapons, the groups protect cocaine laboratories in southern Colombia. They also encourage coca planting and discourage licit alternative development.
• In 2001, three members of the Irish Republican Army (IRA) were arrested in Colombia for collaborating with the FARC. The three men were charged with travelling on false passports and providing the FARC with weapons instruction.
• Some terrorist groups apparently have assisted drug trafficking groups in transporting and storing cocaine and marijuana within Colombia. In particular, some groups protect clandestine airstrips in southern Colombia.
• Elements of some FARC units in southern Colombia are directly involved in drug trafficking activities, such as controlling local cocaine base markets. At least one FARC front has served as a cocaine source of supply for one international drug trafficking organization.
• Although there is no evidence that the FARC or ELN have elements established in the United States, their drug trafficking activity impacts the United States and Europe.
• Several self-defense groups also raise funds through extortion, or by protecting laboratory operations in northern and central Colombia.

There is deep concern in DEA about the role that profits from the drug trade plays in financing the terrorist activities of the FARC and other armed groups in Colombia. The Colombian government is now engaged in responding to this armed challenge with its military and law enforcement assets.

The violent activities of the FARC and other groups have not been limited to the country of Colombia. DEA information indicates the FARC has become a destabilizing force along the northern border of Ecuador, where violence and coca processing activities have increased. Similarly, the FARC's violence and coca processing activities have also spread to Panama. Venezuela, too, is experiencing increased violence, causing cattle ranchers to hire additional security personnel to counter the FARC's efforts.

*Peru's Sendero Luminoso: The Shining Path*

Sendero Luminoso is an extremely violent armed group that sought to overthrow the Peruvian government and establish a communist agrarian state from the 1980's to the mid 1990's.

Sendero Luminoso operated from bases in remote regions of Peru that also held the main coca growing areas. DEA reporting indicates that the group probably extracted a revolutionary tax from the cocaine base operators.

*Drug-Related Money Laundering:*

Money laundering is the process used by drug traffickers, terrorist organizations and others to convert bulk amounts of illicit profits into legitimate money. In Afghanistan, the unsophisticated banking system that previously existed has been damaged by years of war. Money laundering activity is completely unregulated. The DEA has received credible information indicating drug traffickers also use the informal banking system used extensively in the region, referred to as the hawala or hundi system. This system is an underground, informal network that has been used for centuries by businesses and families throughout Asia. The hawala or hundi system leaves no "paper trail" for investigators to follow.

In South America, efforts to legitimize or "launder" drug proceeds by Colombian trafficking organizations are also subject to detection because of intense scrutiny by U.S. law enforcement and our financial system. Colombian drug trafficking organizations have also developed a number of money laundering systems that subvert financial transaction reporting requirements. One such form of money laundering is known as the Black Market Peso Exchange (BMPE). The BMPE is a complex system currently used by drug trafficking organizations to launder billions of dollars of drug money each year.

*The International Role of DEA:*

DEA maintains offices around the world; these offices are in a unique position to direct human drug intelligence sources and contribute to the formation of more effective cooperative law enforcement relationships in that area. In Pakistan, for example, DEA has established a Sensitive Investigative Unit (SIU) composed of officers from the country's Anti-Narcotics Force (ANF). These well-trained and highly motivated individuals are the bedrock of DEA's overseas initiatives and are painstakingly vetted through a stringent selection and review process that includes periodic polygraph examinations to ensure sustained integrity. The existence of a trust-

14

ed cadre of counterparts such as Pakistan's SIU is an invaluable asset for DEA in any arena of operations, and the concept appears to be one that is well suited for expansion in the region. These operations are best presented within the framework of DEA's overseas role.

With the support of the Congress, DEA has implemented its SIU program in nine countries to include Mexico, Colombia, Ecuador Peru, Bolivia, Brazil, Pakistan, Thailand, and the Dominican Republic. The SIU program has effectively enhanced international cooperation and institution building within the host government's infrastructure.

*DEA Program Initiatives:*

DEA has requested substantial increases to strengthen resources for drug related financial investigations to enhance assets of domestic field offices, with emphasis on the financial hubs of New York, Miami, and Los Angeles. Money laundering is becoming more sophisticated. DEA has been successful in investigating and dismantling money laundering organizations, but we are limited in our resources. DEA must improve its ability to monitor and track the financial holdings and transactions of drug trafficking organizations, especially with the demonstrated nexus between the profits from drug trafficking, terrorist activities, and violence.

The President's FY 2003 Budget Proposal also includes $35 million and 73 positions (including 12 Special Agents and 33 Intelligence Analysts) requested in the Attorney General's Counter-Terrorism Fund to enhance DEA's communications intercept and intelligence capabilities in support of agencies conducting counter-terrorism in America and overseas. An additional $7.7 million and 45 positions is also included in the FY 2003 Federal Bureau of Investigations' (FBI) Budget to reimburse DEA for its counter-terrorism support.

In the course of conducting daily investigations against international drug trafficking organizations, the DEA often uncovers information of other related crimes, including money laundering and the financing of terrorist activities. The DEA will continue to expand its efforts to target the telecommunications infrastructure of transnational narco-terrorist organizations; rigorously pursue Title III investigations; and provide intelligence in support of counter-terrorism efforts to other agencies, including the FBI and the Department of Defense (DoD).

The DEA Financial Investigations Section has personnel assigned as DEA liaisons to both the Financial Crimes Enforcement Network (FinCEN) and to the Federal Bureau of Investigation's Financial Review Group, responsible for tracing terrorist-related monies.

The DEA Intelligence Division has temporarily created a six-person Intelligence Response Team that can deploy worldwide to provide intelligence support related to narco-traffickers and other trafficking groups. This intelligence support includes but is not limited to, source debriefings, document exploitation, and site analysis. Efforts are underway to fully fund this unit.

Operation Containment is a proposed DEA initiative which includes opening a DEA office in Kabul, Afghanistan and the expansion of existing offices in Asian and European cities, as well as the growth of DEA's communications intercept and intelligence capabilities in support of agencies conducting counter-terrorism investigations in America. The collection of intelligence, examination of regional trafficking trends and the identification of host nation requirements will be paramount, as will the development of a Confidential Source program and the creation of a chemical control program.

The DEA Islamabad Country Office (ICO) has established a program to identify opium-to-heroin processing laboratories in Afghanistan and in the Northwest Frontier Province of Pakistan. The objective of the ICO program is the identification of laboratories and operators while they are reorganizing, following the cessation of hostilities. DEA is pursuing regional initiatives jointly with other countries to combat the heroin trade initiating in Afghanistan.

DEA is working with the governments of Russia, Germany, and Romania to connect three regional law enforcement networks and databases based in those countries, in order to create a region-wide communication and information-sharing network. When these are linked, the net effect will be to link all of Europe, Central Asia, and the states of the Former Soviet Union into a law enforcement information sharing network focused on combating drug trafficking in the regions surrounding Afghanistan.

CONCLUSIONS

The new breed of narco-terrorist will challenge the resilience of all law enforcement agencies, including DEA. The Drug Enforcement Administration will continue to identify, investigate, and build cases against criminal and terrorist groups in-

15

volved in drug trafficking wherever they may be found. DEA will continue to work with our law enforcement partners around the world to improve our cooperative enforcement efforts against international drug organizations.

Thank you for the opportunity to testify before the Subcommittee today. I will be happy to respond to any questions you may have at the appropriate time.

Chairperson FEINSTEIN. Thank you very much, Mr. Hutchinson. We have been joined by the ranking member of the full committee, Senator Hatch.

Senator if you would like to make a statement now or wait until after we finish with—

Senator HATCH. Well, if I could, because I have so many conflicts this morning.

Chairperson FEINSTEIN. Please, go right ahead.

## STATEMENT OF HON. ORRIN G. HATCH, A U.S. SENATOR FROM THE STATE OF UTAH

Senator HATCH. Thank you, Madam Chairperson. I want to commend you, Senator Feinstein and Senator Kyl, for the tremendous work you are doing on this subcommittee and on the Judiciary Committee as a whole. You are both key people on the committee and I just appreciate both of you, and especially holding this hearing to focus our attention on the nexus between narcotics trafficking and terrorism.

I applaud you and this subcommittee's ranking Republican, Senator Kyl, for your unfailing commitment to crime and drug issues both at home and abroad. Your support of judicial nominees who are anti-crime and pro-victim, Madam Chairman, demonstrates your dedication to these issues. I am committed to joining you, Senator Kyl, and all of our colleagues in continuing the fight to stem the growth of narcotics trafficking and terrorism throughout the world.

Since the end of the Cold War, analysts and policymakers have struggled to understand the challenges that affect our foreign policy. As we have learned, the challenges of today—drugs, terrorism, and international organized crime—are very different from the challenges that we have faced previously.

Today's problems are transnational, cross borders at will, and are not subject to control by nation states. The actors are sub-state actors; they are terrorists, they are criminal organizations. And these problems affect us at all levels, in our homes, in our streets, and in our communities. While our attention to narcoterrorism has been heightened by the September 11 attacks, we should all remember that virtually all our local communities have been suffering for years from the ill effects of illegal drugs.

I commend this administration for its prompt, creative and comprehensive response to the attacks of September 11. It has used this tragic event as an opportunity to reestablish our alliances throughout the world. I wish to compliment especially Mr. Newcomb, Director of the Office of Foreign Assets Control of the Department of the Treasury, for using the powers of his office, including those authorized by the USA PATRIOT Act, to pursue terrorist funds, and most importantly the sources of those funds.

Willie Sutton once said, when asked why he robbed banks, "because that is where the money is." We have heard of Yemeni honey producers and Saudi charities being sources of funds for terrorists,

16

but the real money is in narcotics. For that reason, it is appropriate that this hearing highlights the nexus between narcotics and terrorism.

As you all know, I passionately supported the confirmations of both Asa Hutchinson and John Walters. One of the reasons I so strongly supported their nominations was that I believed, in light of their accomplished records, that they would work closely with law enforcement and intelligence authorities to ensure that this Nation's international drug policy is designed not only to prevent drugs from being trafficked into America, but also to prevent drugs from being used to finance and further terrorist activities both here and abroad.

While we have learned that some countries have succeeded in reducing the production of certain types of narcotics, that is simply not enough. Unless governments take bold steps to eradicate narcotics of all types at every level of the trafficking chain, at the packaging, transportation and distribution, as well as the production stage, profits from narcotics dealings will continue to soar and be used to fuel and finance terrorists and other criminal organizations.

To counter the ever growing threat of narcoterrorism, we must take a proactive approach. As we have learned through our experiences in South America and Mexico, there are no short-term fixes. I have also learned recently that over the last few years, a new opium problem has arisen in Southern California, particularly in Los Angeles. I am told that Mexican traffickers are the source of this opium, and I would like to learn more about what the DEA is doing, if anything, to combat this new drug problem.

Madam Chairwoman, we need to continue to educate ourselves and build international coalitions as we have in the war against terrorism. If America and its allies want to halt terrorist activities, we must continue to expose the havens for money laundering and we must attack narcotics trafficking as well. Doing so will serve the dual purpose of cutting off a significant source of terrorist funding and preventing dangerous drugs from making their way into our communities.

We are all impressed with the steps the administration has taken in the war against drugs and terrorism. From the very beginning, the administration recognized that it needed to update stale policies and stiffen criminal laws, particularly with respect to money laundering. It fought for those changes, which are incorporated in the USA PATRIOT Act, and I have no doubt that these tools will prove useful in the fight against narcoterrorism.

I commend Mr. Hutchinson for the hard work that he is doing at the DEA and the relationships he is forging with our anti-drug partners in Mexico and South America, in particular. I look forward to learning more from him and our distinguished witnesses about how they believe we as a country can best combat narcotics trafficking and terrorism, and the clandestine link between them.

I am optimistic that we can, with assistance from our allies and greater intelligence, aggressively pursue and restrain these illicit activities. I am committed to working with the administration and my colleagues on both sides of the aisle to eradicate these interrelated threats to our Nation and to world peace.

17

I want to thank all three of you for being here today. Ambassador Taylor, I appreciate you as well, and I just want to commend you for the work you are doing and tell you we are going to back you in every way we possibly can, and hope that you will continue to press forward and let's win not only the war against terrorism but the war against narcotics trafficking as well.

Thank you, Madam Chairwoman.

Chairperson FEINSTEIN. Thanks very much, Senator Hatch.

I neglected to ask the witnesses if you could possibly confine your statements to about five minutes, summarize them, it will give us a chance to ask more questions, and I think we have a large number of questions.

Our next witness is Richard Newcomb, from the Department of the Treasury. He is Director of the Office of Foreign Assets Control at the United States Treasury Department. Mr. Newcomb was of great assistance to me and Senator Coverdell as we drafted and eventually passed the Coverdell–Feinstein drug kingpin legislation a couple of years back. He is an expert on the flow of money to and from narcotics traffickers.

Mr. Newcomb, we look forward to your testimony and whether you can tell us if there is anything we can do with the drug kingpin legislation that relates to the area of drugs and terror.

Thank you.

## STATEMENT OF R. RICHARD NEWCOMB, DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, U.S. DEPARTMENT OF THE TREASURY, WASHINGTON, D.C.

Mr. NEWCOMB. Thank you, Chairwoman Feinstein, Senators Kyl and Hatch. It is certainly my pleasure to be here this morning and have the opportunity to testify about the programs administered by Foreign Assets Control of the Treasury Department to respond to the threat posed by international narcotics trafficking.

We administer over 21 economic sanctions programs against target countries, regimes and grouped named as falling under these programs. We began administering international counterterrorism sanctions in January 1995 and now administer five counterterrorism sanctions programs. Sanctions against international narcotics traffickers centered in Colombia were first imposed in October of 1995. In 1999, the Coverdell–Feinstein legislation provided the opportunity to impose similar sanctions on a global basis.

Our implementation of the counterterrorism and narcotics trafficking sanctions programs has led to the identification and exposure of hundreds of individuals, businesses and other entities engaged in international narcotics trafficking and terrorism.

Economics sanctions program involving foreign narcotics traffickers rely principally on the President's broad authority under the International Emergency Economic Powers Act and the Coverdell–Feinstein Kingpin Act to prohibit commercial transactions involving specific individuals and entities. These powers are employed to freeze or block foreign assets by prohibiting transfers of those assets located in the United States or in the possession or control of U.S. persons, as well as prohibiting transactions such as bank lending, imports, exports and related transactions.

18

On October 21, 1995, then–President Clinton signed an executive order imposing sanctions on named narcotics traffickers centered in Colombia. The objective of this program was to identify, expose, isolated and incapacitate the businesses and agents of Colombia drug cartels, to deny them access to the U.S. financial system, and to deny them the benefits of trade and transactions involving U.S. businesses and individuals.

The principal tool implementing this EO is the OFAC's list of what are called SDNTs, developed in close coordination with the Justice and State Departments. Since the inception of this program in October of 1995, we have identified over 575 businesses and individuals, including 10 drug cartel leaders, 230 businesses, and 335 other individuals. Four of the most notorious Colombian drug cartel leaders were identified in the executive order itself.

We have designated six additional drug cartel leaders since that time, including four leaders of Colombia's powerful North Valle drug cartel in 2000 and 2001. United States persons are prohibited from engaging in financial transactions or business dealings with these 10 kingpins and the 565 other SDNTs.

Consequences of sanctions against Colombian drug cartels have been swift, clear and compelling. Other targeted front companies are forced out of business; others are suffering financially, and numerous targets have been isolated financially and commercially.

In May of 2001, more than 60 of these SDNT companies, with an estimated annual aggregate income of more than $230 million, have been liquidated or were in the process of liquidation. They have been denied the advantages of access to the U.S. financial infrastructure in the United States and the benefit of trade and transactions in the U.S. with U.S. businesses. They have been denied visas or have had their visas revoked.

This list, recently coined by one major daily as the "lista antimafia," has heightened the sensitivity in Colombia to the risks of doing business with these named parties. One prominent financial institution told us that this list has created a sort of iron curtain between the SDNTs and the banks. U.S. compliance with the requirements of the program has been excellent. U.S. businessmen in Colombia have called this program a good preventive measure to facilitate the avoidance of the drug cartels, fronts and agents.

We also administer the Foreign Narcotics Kingpin Designation Act, the Coverdell–Feinstein Kingpin Act, passed into law in December of 1999, modeled after the program I have must described. This Act's objective is two-fold. First, it is intended to in a sense decertify the foreign drug lords rather than the foreign governments and countries. Second, it is designed to deny significant foreign narcotics traffickers and their organizations, including related businesses and operatives, access to the U.S. financial system and all trade and transactions involving U.S. companies and individuals.

The Kingpin Act operates on a global scale and authorizes the President to impose sanctions upon a determination that a foreign narcotics trafficker presents a threat to the national security, foreign policy, or economy of the United States. All these assets of these foreign persons, both businesses and individuals, designated under the Kingpin Act subject to U.S. jurisdiction are then blocked.

19

This includes bank accounts, other financial property, any commercial or financial contracts, and any other real or personal property or interests in property.

On June 1 of last year, President Bush invoked the Kingpin Act to announce the names of 12 foreign persons that he determined were significant foreign narcotics traffickers or kingpins. President Clinton named the first group of 12 kingpins on June 1, 2000. President Bush is required by the Kingpin Act to designate additional kingpins June 1 of this year. Redesignations of kingpins are not required by the legislation.

On January 31 of this year, pursuant to this Act, the Office of Foreign Assets Control, in consultation with the Department of Justice, the FBI, the DEA, the Defense Department, the Department of State and the CIA, identified 12 foreign businesses and 15 associated foreign individuals in the Caribbean and Mexico, or so-called Tier II designees; that is, persons who act or provide assistance or support for a kingpin.

We determined that these 27 individuals and entities were acting as fronts or agents for kingpins previously named by the President. We have authority under this Act to make these so-called Tier II derivative designations of businesses under control by the kingpin or acting as their agent. The Act does not target a particular region or country. It is directed at significant foreign narcotics traffickers and their organizations and operatives wherever in the world they operate.

These 27 newly-designated Tier II businesses and individuals located in the Caribbean and Mexico include, for example, a drug store chain, a pharmaceutical distributor, an air courier service, a hotel, a resort complex, as well as real estate, economic security and consulting firms.

The drug store chain, Farmacia Vida, and associated pharmaceutical distributor Distribuidora Imperial de Baja California, 7 associated businesses and 12 associated individuals, comprise a network of front companies located in Mexico that have been under the control of the Benjamin and Ramone Arellano Felix organization, leaders of the Mexico Tijuana drug cartel named as significant foreign narcotics traffickers on June 1 of 2000; another network comprising Manuel Aguirre Galindo, also a member of Mexico's Tijuana drug cartel. The hotel and resort complex Oasis Beach Resort and Convention Center and one other associated individual were also designated. Finally, in the Caribbean, an air courier service and one associated foreign individual located in St. Kitts and Nevis were named because they were operated by the kingpin Gilroy Vingrove Matthews, named in 2000.

Implementation of the Coverdell–Feinstein Kingpin Act has produced results mirroring those of the Colombia SDNT sanctions programs. Companies under control by kingpins have been damaged and isolated financially and commercially. They have been denied access to banking services in the United States and to the benefits of trade and transactions in the U.S. or involving U.S. businesses.

Mexican and European companies have terminated business relationships with the Tijuana drugstore chain and related pharmaceutical distributors. It has been reported that some Mexican banks have canceled loans used for purchases of pharmaceuticals.

20

The United States Customs Service has assisted by notifying all travelers at the busy San Ysidro border crossing in California that all medicines purchased at the Farmacia Vida drugstore chain in Tijuana will be seized. Press accounts of the resort hotel designated indicate that its business has declined significantly. Finally, a recent Washington Post article described this Oasis Beach Resort, usually crammed with U.S. tourists, as practically deserted on a recent weekend.

Thank you, Madam Chairwoman, for giving me the opportunity to tell you about this program.

[The prepared statement of Mr. Newcomb follows:]

STATEMENT OF R. RICHARD NEWCOMB, DIRECTOR, OFFICE OF FOREIGN ASSETS CONTROL, DEPARTMENT OF TREASURY, WASHINGTON, D.C.

I. INTRODUCTION

Chairwoman Feinstein and members of the Subcommittee,

Thank you for inviting me to testify today on the programs administered by the Treasury Department's Office of Foreign Assets Control (OFAC) that respond to the threat posed by international narcotics trafficking.

OFAC administers economic sanctions and embargo programs against specific foreign countries, regimes, or groups of entities and individuals to further U.S. foreign policy and national security objectives. Sanctions are usually imposed pursuant to a Presidential declaration of national emergency under the authority of the International Emergency Economic Powers Act or the Trading with the Enemy Act, or may be imposed by Congress as in the case of the Foreign Narcotics Kingpin Designation Act (the Kingpin Act).

OFAC administers 21 economic sanctions programs against target countries, regimes, or named groups and individuals. OFAC began administering international counterterrorism sanctions in January 1995, and now administers five counterterrorism sanctions programs. Sanctions against international narcotics traffickers centered in Colombia were first imposed by the President in October 1995. In 1999, the Kingpin Act provided the authority to impose similar sanctions on a global basis. OFAC's implementation of the counterterrorism and narcotics trafficking sanctions programs has led to the identification and exposure of hundreds of individuals, businesses and other entities engaged in international narcotics trafficking or terrorism.

Economic sanctions programs involving foreign narcotics traffickers rely principally on the President's broad powers under the International Emergency Economic Powers Act (IEEPA) and the Kingpin Act to prohibit commercial transactions involving specific entities and individuals. These powers are employed to freeze, or block, foreign assets by prohibiting transfers of those assets located in the United States or in the possession or control of U.S. persons, as well as to prohibit financial transactions (such as bank lending), imports, exports, and related transactions.

II. SPECIALLY DESIGNATED NARCOTICS TRAFFICKERS (SDNT)

On October 21, 1995, President Clinton signed Executive Order (EO) 12978, imposing sanctions on named narcotics traffickers centered in Colombia. The objectives of this program are to identify, expose, isolate and incapacitate the businesses and agents of the Colombian drug cartels, to deny them access to the U.S. financial system, and to deny them the benefits of trade and transactions involving U.S. businesses and individuals.

The principal tool implementing EO 12978 is OFAC's list of SDNTs, developed by OFAC in close consultation with the Justice and State Departments. Since the inception of the program in October 1995, OFAC has identified 578 business and individuals as SDNTs, including ten Colombian drug cartel leaders, 231 businesses and 337 other individuals. Four of the most notorious Colombian drug cartel leaders were identified in the Executive Order itself. OFAC has designated six additional Colombian drug cartel leaders since 1998, including four leaders of Colombia's powerful North Valle drug cartel in 2000 and 2001. United States persons are prohibited from engaging in financial or business dealings with the ten drug kingpins and the 568 other SDNTs.

Consequences of the sanctions against Colombian drug cartels have been swift, clear, and compelling. Many targeted front companies have been forced out of busi-

21

ness, others are suffering financially, and numerous targets have been isolated financially and commercially. By May 2001, more than sixty SDNT companies, with an estimated annual aggregate income of more than U.S. $230 million, had been liquidated or were in the process of liquidation. SDNTs have been denied the advantages of access to the financial infrastructure of the United States, and the benefits of trade and transactions in the U.S. or involving U.S. businesses. SDNT individuals have been denied U.S. visas or had their visas revoked.

The SDNT list, recently coined by one major Colombian daily as the "lista antimafia" [anti-mafia list], has heightened sensitivity in Colombia to the risks of doing business with named SDNTs. One prominent financial institution told OFAC, the SDNT list has created an "iron curtain" between SDNTs and banks. U.S. compliance with the requirements of the SDNT program has been excellent. U.S. businessmen in Colombia call the SDNT program as "a good preventive measure" that facilitates avoidance of the drug cartels' fronts and agents.

OFAC's Bogota office coordinates the sanctions against narcotics traffickers in Colombia and conducts research on specially designated narcotics traffickers and their front companies and agents. The OFAC Attache in Bogota maintains excellent liaison with the U.S. Embassy, Colombian government agencies, and the Colombian banking and private sectors that has led to widespread compliance with the narcotics sanctions program. OFAC staff travel regularly to Colombia in support of the sanctions program, and have extensive knowledge of Colombian front companies and individuals. OFAC will continue to identify businesses and other property owned or controlled by the Colombian drug cartels and to expand the SDNT list to include additional drug traffickers and their organizations.

### III. FOREIGN NARCOTICS KINGPIN DESIGNATION ACT ("KINGPIN ACT")

OFAC also administers the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"), passed into law in December 1999 and modeled after OFAC's Colombia SDNT program. The Act's objective is twofold. First, it is intended to "de-certify" foreign drug lords rather than foreign governments and countries. Second, it is designed to deny significant foreign narcotics traffickers and their organizations, including related businesses and operatives, access to the U.S. financial system and all trade and transactions involving U.S. companies and individuals. The Kingpin Act operates on a global scale and authorizes the President to impose sanctions upon a determination that a foreign narcotics trafficker presents a threat to the national security, foreign policy, or economy of the United States.

All assets of foreign persons, both businesses and individuals, designated under the Kingpin Act and subject to U.S. jurisdiction are blocked. This includes bank accounts and other financial property, any commercial or financial contracts, and any other real or personal property or interests in property. U.S. persons and companies are prohibited from engaging in any transaction that evades or avoids the prohibitions of the Kingpin Act. Corporate criminal penalties for violations of the Kingpin Act range up to $10,000,000; individual penalties range up to $5,000,000 and 30 years in prison. Civil penalties of up to $1,000,000 may also be imposed administratively.

On June 1, 2001, President Bush invoked the Kingpin Act to announce the names of 12 foreign persons that he determined were significant foreign narcotics traffickers, or kingpins. President Clinton named the first group of 12 kingpins on June 1, 2000. President Bush is required by the Kingpin Act to designate additional kingpins by June 1 of this year. Redesignation of kingpins is not required.

On January 31, 2002, pursuant to the Kingpin Act, the Office of Foreign Assets Control, in consultation with the Department of Justice, Federal Bureau of Investigation, Drug Enforcement Administration, Department of Defense, Department of State, and the Central Intelligence Agency, identified 12 foreign businesses and 15 associated foreign individuals in the Caribbean and Mexico as derivative (or "Tier-II") designees, that is, persons who act for, or provide assistance or support to, a kingpin. OFAC determined that these 27 individuals and entities were acting as fronts or agents for kingpins previously named by the President.

OFAC has authority under the Kingpin Act to make derivative (Tier-II) designations of businesses owned or controlled by a kingpin and of those acting as a kingpin's agent. The Kingpin Act does not target a particular region or country; it is directed at significant foreign narcotics traffickers and their organizations and operatives, wherever located throughout the world.

The 27 newly designated Tier-II businesses and individuals, located in the Caribbean and Mexico, include a drugstore chain and pharmaceutical distributor, air courier service, a hotel and resort complex, as well as real estate, electronic security, and consulting firms. The drugstore chain, *Farmacia Vida*, an associated pharma-

22

ceutical distributor, *Distribuidora Imperial de Baja California*, seven associated businesses and 12 associated individuals comprise a network of front companies located in Mexico that have been under the control of Benjamin and Ramon Arellano Felix, leaders of Mexico's Tijuana drug cartel named as significant foreign narcotics traffickers on June 1, 2000. Another network comprising Manuel Aguirre Galindo, also a member of Mexico's Tijuana drug cartel, the hotel and resort complex *Oasis Beach Resort & Convention Center* and one other associated individual, were also designated. Finally, in the Caribbean, one air courier service and one associated foreign individual located in St. Kitts & Nevis were named because they were operated by Kingpin Glenroy Vingrove Matthews, named on June 1, 2000.

Implementation of the Kingpin Act has produced results mirroring those of the Colombian SDNT sanctions program. Companies owned or controlled by kingpins have been damaged and isolated financially and commercially. They have been denied access to banking services in the United States and to the benefits of trade and transactions in the U.S. and involving U.S. businesses. Mexican and European companies have terminated business relationships with the Tijuana drugstore chain and related pharmaceutical distributor. It has been reported that some Mexican banks have cancelled loans used for the purchase of pharmaceuticals. The U.S. Customs Service has notified all travelers at the busy San Ysidro border crossing in California that all medicines purchased at the Farmacia Vida drugstore chain in Tijuana, Mexico will be seized. Press accounts of the Mexican resort hotel designated by OFAC indicate that its business has declined significantly. A recent *Washington Post* article described the Oasis Beach Resort, usually crammed with U.S. tourists, as "practically deserted" on a recent weekend.

OFAC will continue to identify businesses belonging to significant foreign narcotics traffickers on a worldwide basis and to expand the kingpin list to include additional drug traffickers, their fronts and agents.

Chairperson FEINSTEIN. Thanks very much, Mr. Newcomb.

We will now turn to Mr. Rand Beers, of the State Department. Mr. Beers has been Director of the State Department's Office of Narcotics and Law Enforcement since he was confirmed by the Senate in 1998. He has been with the Department since 1971 and he served on the National Security Council three times, one of those three times as Director for Counternarcotics and Counterterrorism.

Mr. Beers is a familiar face, not quite with that necktie, but a familiar face before this committee. He has testified many times and we welcome him this morning.

**STATEMENT OF RAND BEERS, ASSISTANT SECRETARY OF STATE FOR INTERNATIONAL NARCOTICS AND LAW ENFORCEMENT AFFAIRS, DEPARTMENT OF STATE, WASHINGTON, D.C.**

Mr. BEERS. Thank you, Madam. The necktie is in honor of my team, D.C. United, which is playing a game this evening at RFK Stadium. I always wear it when they play.

Chairperson FEINSTEIN. Well, good luck.

Mr. BEERS. Madam Chairman, as you are aware, I had not known precisely when I was going to be arriving, and I appreciate your indulgence for my late arrival, as I had a diplomatic requirement to at least participate in the opening session of our cooperative talks with the Chinese which Ambassador Taylor undertook yesterday.

I had not prepared to make any opening remarks myself. I have a statement for the record which I have submitted and I look forward very much to answering any and all of your questions on this absolutely critical subject.

Thank you.

Chairperson FEINSTEIN. Thank you very much.

23

Ambassador Taylor, are you testifying?

Ambassador Taylor. Yes, ma'am.

Chairperson FEINSTEIN. All right, let me introduce you.

Francis Taylor was sworn in as coordinator for counterterrorism at the State Department last July. He is a retired Air Force general with 31 years' service and we welcome him.

Please proceed.

## STATEMENT OF FRANCIS X. TAYLOR, AMBASSADOR–AT–LARGE FOR COUNTERTERRORISM, DEPARTMENT OF STATE, WASHINGTON, D.C.

Ambassador TAYLOR. Thank you very much, Madam Chairwoman and Senator Kyl, for the opportunity. We are here in tandem with Rand, since we didn't know when he was going to come. So I have oral remarks, and as Rand mentioned, he has requested his statement be entered in the record as the statement from the State Department.

The attacks against the United States six months ago on September 11 stunned us all. It is now clear that to fight terrorism we must look at the spectrum of crime that supports terror to counter the criminal and narcotics-based support that some terrorists use.

In the past, state sponsors provided funding for terrorist groups, and their relationships with terrorists organizations were used to secure territory or provide access to arms networks. Lately, however, as state sponsorship of terrorism has come under increased scrutiny and greater international condemnation, terrorist groups have looked increasingly to other sources of funds, including drug trafficking.

Trafficking often has a two-fold purpose for the terrorists. Not only does it provide funds, it also furthers the strategic objectives of the terrorists. Growing pressure on state sponsors of terrorism has increased the likelihood that terrorists will become involved in the drug trade. Interdiction of terrorists' finances and shut-down of charitable and other non-governmental front organizations have also contributed to this convergence.

There is often a nexus between terrorism and organized crime, including drug trafficking. Links between terrorist organizations and drug traffickers take many forms, ranging from facilitation, protection, transportation and taxation, to direct trafficking by terrorist organizations themselves in order to finance their activities.

Traffickers and terrorists have similar logistical needs in terms of material and the covert movement of people, goods and money. Relationships between drug traffickers and terrorists benefit both. Drug traffickers benefit from terrorist military skills, weapons supplies and access to clandestine organizations. Terrorists gain a source of revenue and expertise in the illicit transfer and laundering of proceeds from the illicit transactions.

Both groups bring corrupt officials whose services provide mutual benefits, such as greater access to fraudulent documents, including passports and customs papers. Drug traffickers may also gain considerable freedom of movement when they operate in conjunction with terrorists who control large amounts of territory.

The methods used for moving and monitoring money for general criminal purposes are similar to those used to move and support

24

terrorist activities. It is no secret which countries and jurisdictions have poorly regulated banking structures, and both terrorist organizations and drug trafficking groups have made use of online transfers and accounts that do not require disclosure of the owners. Moreover, bulk cash smuggling methods and informal networks such as hawala and the Black Market Peso Exchange are easy and efficient ways to launder money.

The State Department has worked with the Departments of Justice and Treasury and with nations around the world to strengthen controls that will thwart drug traffickers' attempts to launder their funds and to investigate and prosecute those who are involved in moving criminal proceeds. These same law enforcement controls also help prevent the movement of funds of terrorist organizations.

We are working on the diplomatic front, both multilaterally and bilaterally, to strengthen our counternarcotics and law enforcement cooperation with governments, with a special focus on bringing these tools to bear in the fight against terrorism.

For example, in the G8 we have, since September 11, combined the efforts of the Lyon crime experts and Roma counterterrorism expert groups to enhance cooperation on a range of specific issues, including counternarcotics, in relation to Afghanistan.

Moreover, many of the skills and types of equipment needed to attack organized crime are applicable to combatting terrorism. In our prepared statement, we list by geographic region terrorist organizations that are known to have connections to drug trafficking. Most of these organizations have been officially designated as foreign terrorist organizations by the Secretary of State.

Madam Chairwoman, that concludes my oral remarks and we would welcome any questions that you or other Senators may have.

[The prepared statement of Mr. Beers and Mr. Taylor follows:]

STATEMENT OF RAND BEERS, ASSISTANT SECRETARY OF STATE FOR INTERNATIONAL NARCOTICS AND LAW ENFORCEMENT AFFAIRS, DEPARTMENT OF STATE, AND FRANCIS X. TAYLOR, AMBASSADOR-AT-LARGE FOR COUNTERTERRORISM, DEPARTMENT OF STATE, WASHINGTON, D.C.

Madam Chairperson and Members of the Committee, thank you for the opportunity to speak to you today on this important subject.

The attacks against the United States on September 11 stunned us all. They also made it very clear that the mission of the Bureau for International Narcotics and Law Enforcement Affairs (INL)—to provide support to counternarcotics and other anti-crime efforts worldwide—is more important now than ever.

While INL does not have the lead in the war on terrorism, we strongly support these efforts through our counternarcotics and crime control activities, which provide training, equipment and institutional support to many of the same host nation law enforcement agencies that are charged with a counter-terrorist mission. We are also working on the diplomatic front, both multilaterally and bilaterally, to strengthen our counternarcotics and law enforcement cooperation with other governments with a special focus on bringing these tools to bear in the fight against terrorism. For example, in the G8 we have since September 11 combined the efforts of Lyon (crime) and Roma (counterterrorism) experts groups to enhance cooperation on a range of specific issues, including counternarcotics in relation to Afghanistan.

### SYMBIOTIC RELATIONSHIP

There often is a nexus between terrorism and organized crime, including drug trafficking. Links between terrorist organizations and drug traffickers take many forms, ranging from facilitation—protection, transportation, and taxation—to direct trafficking by the terrorist organization itself in order to finance its activities. Traffickers and terrorists have similar logistical needs in terms of materiel and the covert movement of goods, people and money.

25

Relationships between drug traffickers and terrorists benefit both. Drug traffickers benefit from the terrorists' military skills, weapons supply, and access to clandestine organizations. Terrorists gain a source of revenue and expertise in illicit transfer and laundering of proceeds from illicit transactions. Both groups bring corrupt officials whose services provide mutual benefits, such as greater access to fraudulent documents, including passports and customs papers. Drug traffickers may also gain considerable freedom of movement when they operate in conjunction with terrorists who control large amounts of territory.

## SIMILARITY OF METHODS

Terrorist groups and drug trafficking organizations increasingly rely on cell structures to accomplish their respective goals. While there may be a strong central leadership, day-to-day operations are carried out by members of compartmentalized cells. This structure enhances security by providing a degree of separation between the leadership and the rank-and-file. In addition, terrorists and drug traffickers use similar means to conceal profits and fund-raising. They use informal transfer systems such as "hawala," and also rely on bulk cash smuggling, multiple accounts, and front organizations to launder money. Both groups make use of fraudulent documents, including passports and other identification and customs documents to smuggle goods and weapons. They both fully exploit their networks of trusted couriers and contacts to conduct business. In addition, they use multiple cell phones and are careful about what they say on the phone to increase communications security.

The methods used for moving and laundering money for general criminal purposes are similar to those used to move money to support terrorist activities. It is no secret which countries and jurisdictions have poorly regulated banking structures, and both terrorist organizations and drug trafficking groups have made use of online transfers and accounts that do not require disclosure of owners. Moreover, bulk cash smuggling methods and informal networks such as "hawala" and the black market peso exchange are easy and efficient ways to launder money. Criminal networks are in a perfect position to use methods that require doctoring of passports or customs declaration forms. These methods are unlikely to change in the near term. Though many countries have been quick to update their regulations, few have the law enforcement structure in place to carry out interdiction. If law enforcement capabilities improve globally, in the long term traffickers and terrorists may increasingly use trusted individual couriers, or more complex balance transfers in informal networks.

INL has worked with the Departments of Justice and Treasury and with nations around the world to strengthen controls which could thwart the drug traffickers' attempts to launder their funds and to investigate and prosecute those who are involved in moving criminal proceeds. These same law enforcement controls also help prevent the movement of funds of terrorist organizations.

Moreover, many of the skills and types of equipment needed to attack organized crime are applicable to combating terrorism. Much of INL's assistance—such as the provision of equipment for forensic labs; assistance with drafting asset forfeiture and money laundering legislation; and provision of basic training in investigation techniques, maritime enforcement and port security—applies to both counternarcotics and counterterrorism. Migrant smuggling, document fraud, arms trafficking, auto theft, smuggling of contraband, and illegal financial transactions are tools for terrorists as well as narcotics traffickers.

## FROM STATE-SPONSORSHIP TO DRUG TRAFFICKING

In the past, state sponsors provided funding for terrorists, and their relationships with terrorist organizations were used to secure territory or provide access to gray arms networks. Lately, however, as state sponsorship of terrorism has come under increased scrutiny and greater international condemnation, terrorist groups have looked increasingly at drug trafficking as a source of revenue. But trafficking often has a two-fold purpose for the terrorists. Not only does it provide funds, it also furthers the strategic objectives of the terrorists. Some terrorist groups believe that they can weaken their enemies by flooding their societies with addictive drugs.

Growing pressure on state sponsors of terrorism has increased the likelihood that terrorists will become involved in the drug trade.

Interdiction of terrorist finances and shutdowns of "charitable" and other non-governmental front organizations have also contributed to their convergence. Terrorist groups are increasingly able to justify their involvement in illicit activity to their membership and have largely abandoned the belief that it can damage the moral basis for their cause.

26

Listed below, by geographic region, are terrorist organizations that are known to have connections to drug-trafficking. Most of these organizations have been officially designated as Foreign Terrorist Organizations (FTOs) by the Secretary of State.

LATIN AMERICA

In the Western Hemisphere, there is an historic link between various terrorist groups and narcotics trafficking. The Shining Path cut a brutal swath through Peru from the 1980s to the mid-1990s, largely funded by levies the group assessed on cocaine trafficking. In Ciudad del Este, Paraguay, and along the loosely controlled region that it borders with Brazil and Argentina, members of radical Islamic groups are reported to be engaged in money laundering, intellectual property rights piracy, alien smuggling, and arms trafficking.

The Andean region is the source of virtually all the world's cocaine. Colombia, Peru and Bolivia, in that order, are the primary producers of coca and the final products. The presence of terrorist organizations in Colombia and Peru—and their need to finance operations—establishes a natural symbiotic relationship to exploit drugs as a revenue source.

The linkage between drugs and terrorism in Colombia is one that particularly concerns us and one that we watch carefully. In the 1990s, the international drug cartels operating in Colombia embarked on a campaign of violence that severely challenged the authority and even the sovereignty of the Colombian state. The September 11 attacks illustrate in graphic detail the serious threat posed by forces hostile to the United States operating under the cover and protection of a narco-terrorist state. In light of recent events in Colombia, the potential for increased violence between the government and terrorist groups, and the growing linkage between terrorism and drug trafficking, we are reviewing our policy options there. At present, there are three terrorist groups operating in Colombia including the FARC, ELN, and AUC.

*Revolutionary Armed Forces of Colombia (FARC)*

Although the FARC-controlled safe haven, or "despeje"—which is situated between two of Colombia's largest coca cultivation areas—is not considered a major area for coca cultivation or drug trafficking, many FARC units throughout southern Colombia raise funds through the extortion ("taxation") of both legal and illegal businesses, the latter including the drug trade.

Similarly, in return for cash payments, or possibly in exchange for weapons, some FARC units protect cocaine laboratories and clandestine airstrips in southern Colombia. In addition, some FARC units may be independently involved in limited cocaine laboratory operations. Some FARC units in southern Colombia are more directly involved in local drug trafficking activities, such as controlling local cocaine base markets. At least one prominent FARC commander has served as a source of cocaine for a Brazilian trafficking organization. There are strong indications that the FARC has established links with the Irish Republican Army to increase its capability to conduct urban terrorism. In July 2001, the Colombian National Police arrested three members of the IRA who are believed to have used the demilitarized zone to train the FARC in the use of explosives.

*National Liberation Army (ELN)*

The ELN operates primarily along Colombia's northeastern border with Venezuela and in central and northwestern Colombia. The territories under ELN influence include cannabis and opium poppy growing areas. Some ELN units raise funds through extortion or by protecting laboratory operations. Some ELN units may be independently involved in limited cocaine laboratory operations, but the ELN appears to be much less dependent than the FARC on coca and cocaine profits to fund its operations. The ELN expresses a disdain for illegal drugs, but does take advantage of the profits available where it controls coca producing areas.

*United Self-Defense Groups of Colombia (AUC)*

The AUC umbrella group, which includes many Colombian paramilitary forces, admittedly uses the cocaine trade to finance its counterinsurgency campaign. The head of the AUC, Carlos Castano, stated in 2000 that "70 percent" of AUC operational funding was from drug money and described it as an undesired but necessary evil. AUC elements appear to be directly involved in processing cocaine and exporting cocaine from Colombia. In 2001, the AUC claimed publicly that it was getting out of the drug business, but it will be very difficult for this umbrella group to keep its many semi-autonomous units from continuing in the lucrative drug business.

27

### Shining Path (Sendero Luminoso SL) (Peru)

The SL historically has operated in remote areas of Peru where central government authority is least prevalent—a condition conducive to drug producers, drug traffickers and terrorists. The geographic coincidence and reliance on violence to protect safe havens made the SL a natural to engage in protection and extortion rackets involving coca and cocaine. The SL cut a brutal swath through Peru from the 1980s to the mid-1990s, largely funded by levies it imposed on cocaine trafficking. As the SL waned in the late 1990s, so did its influence on the drug trade. But in 2001, the SL had a slight resurgence in areas like the Huallaga and Apurimac valleys where coca is cultivated and processed, indicating that the remnants of the group are probably financing operations with drug profits from security and taxation "services."

### Tri-Border Islamic Groups

In Ciudad del Este, Paraguay, and along the loosely controlled region that it borders with Brazil and Argentina, members of radical Islamic groups are reported to be engaged in drug trafficking, money laundering, intellectual property rights piracy, alien smuggling and arms trafficking. One such individual is Said Hassan Ali Mohamed Mukhlis, a suspected member of the Egyptian Islamic Group with possible ties to Osama bin Laden. This group is linked to the murder of 58 tourists in Luxor, Egypt, and Mukhlis himself was arrested in 1999 by Uruguayan authorities in connection with foiled plots to bomb the U.S. embassies in Paraguay and Uruguay.

#### SOUTH ASIA & FORMER SOVIET UNION

Throughout this region, proximity to cultivation and production, combined with the infrastructure provided by the traffickers, has encouraged mutually beneficial relationships between terrorist groups and drug trafficking organizations.

### Al-Qaida

Since it transferred its base of operations to Afghanistan, al-Qaida has been sustained by a government that earned a substantial part of its revenue through taxes on opium production and trafficking. Afghanistan's opiate trafficking, which accounts for more than 70 percent of the world's supply, was reportedly advocated by Osama bin Ladin as a way to weaken the West.

### Kashmiri militant groups

These groups likely take part in the drug trade to finance their activities given their proximity to major production and refining sites and trafficking routes.

### Liberation Tigers of Tamil Eelam (Sri Lanka)

Individual members and sympathizers worldwide traffic drugs—principally heroin—to raise money for their cause, but there is no evidence of official LTTE involvement in the drug trade. The LTTE reportedly has close ties to drug trafficking networks in Burma, and Tamil expatriates may carry drugs in exchange for training from Burma, Pakistan and Afghanistan.

### Islamic Movement of Uzbekistan (IMU)

The IMU has reportedly profited from the drug trade out of Afghanistan and trafficking through Central Asia to Russia and Europe.

#### MIDDLE EAST

### Hizballah

The Lebanese "Hizballah" group smuggles cocaine from Latin America to Europe and the Middle East and has in the past smuggled opiates out of Lebanon's Bekaa valley, although poppy cultivation there has dwindled in recent years. Its involvement in drug trafficking and other illicit activity may expand as state sponsorship declines.

#### EUROPE

### Kurdistan Workers' Party (PKK)

The PKK "taxes" ethnic Kurdish drug traffickers and individual cells traffic heroin to support their operations.

28

*Irish Terrorists*

Although there is some evidence linking the Real IRA to drug trafficking, the extent to which the Real IRA or other terrorist groups in Ireland engage in drug trafficking is unclear.

*Basque Fatherland and Liberty (ETA)*

Reporting indicates the ETA or its members have been involved in a variety of crimes from drug trafficking to money laundering.

SOUTHEAST ASIA

*United Wa State Army (UWSA) (Burma)*

The UWSA controlled major drug producing areas in Burma and used the proceeds to carry out an insurgency against the Burmese government until a ceasefire agreement that granted the UWSA enough autonomy to continue drug trafficking for profit. The Wa have also engaged in large-scale production and trafficking of synthetic drugs.

Thank you again, Madam Chairperson and Members of the Committee, for the opportunity to discuss these issues with you.

Chairperson FEINSTEIN. Thanks very much, General Taylor.

Let me quickly begin with you, Mr. Newcomb. I want to thank you for your remarks because I think you pointed out how the 1995 law and then Coverdell–Feinstein is really working to produce some very real dividends.

Do you believe that there is any additional legislation that would be necessary, that would be helpful, now that we have established the nexus between what is happening in the world today vis-a-vis terror and its supply sources, its funding from drugs either through hawalas or through other transfer agencies? Do you need anything else to get at that, to confiscate assets to shut them down?

Mr. NEWCOMB. We, as you know, are in the very early stages of still implementing the Coverdell–Feinstein legislation, and it has been a very effective way of identifying who the narcotics kingpins are worldwide and then moving in on those individuals and entities that are owned or controlled.

It is very broad legislation. It deals with narcotics trafficking affecting the United States; that is very broadly defined as well. And for at least this period of time, that, in conjunction with the executive order signed by President Bush on September 24 dealing with, first, the Al Qaeda organization and Osama bin Laden and bringing within its ambit all other 27 identified foreign terrorist organizations—it would be my opinion at this time that there is sufficient legislation to move forward.

But I think this is a question that we should continue to discuss over the years as we proceed to implement because as we move forward, these organizations and groups seek more surreptitious ways of dealing with their activity. So up to this time, we have done well, but we need to continue talking.

Chairperson FEINSTEIN. Thanks very much. I appreciate that.

Recent reports indicate that Afghan growers have replanted the 45,000 to 65,000 hectares of poppy fields which, if harvested, as I pointed out, would yield 2 to 3,000 metric tons of opium. As I understand it, this harvest is going to occur in a couple of weeks. Needless to say, this is very troubling. It is going to go on the world market. It is going to provide funds for the Afghan warlords, it is going to provide funds for former Taliban in the area, it is going to provide funds for the Al Qaeda insurgents. Is there any-

29

thing the United States or other nations are planning to do to interrupt this harvest?

I strongly believe that it is better to pay the farmers and confiscate the crop, that there is more, to use a colloquialism, bang for the buck in doing that than there is to see it grow to this $35 billion street market value.

Do you want to tackle that, Mr. Hutchinson?

Mr. HUTCHINSON. I have said before that I think this is a historical opportunity and responsibility to intervene in a country, as you pointed out, that provides 70 percent of the world's supply of heroin. It is very difficult to be able to get everything done in time to intercede with the next crop. We have worked with the State Department, and I know that Mr. Beers will have something to say in regard to that.

From the standpoint of the DEA, our short-term strategy has been to put personnel over there on a TDY basis. They are physically there. We are working our informants. We are gaining intelligence on the conversion laboratory locations, also in reference to the warehouses, and passing that on to have those addressed and destroyed. So that has been successful, working with our counterparts in other agencies, as well as the military.

On a long-term basis, our responsibility is to develop our law enforcement connections there, the infrastructure to help build that so that we can prosecute and interdict the heroin coming out of there. What you are addressing is the crop. That does not specifically fall within the province of the DEA, but we are urging as quick an action as we can to develop a strategy for eradicating and destroying that crop.

Chairperson FEINSTEIN. Well, let me press that question with Mr. Beers because it seems to me that we have an opportunity today to really change the farm processes in Afghanistan. If we can't do it today when our people are there, are never going to be able to do it anywhere, and I believe that very strongly. I mean, these farmers don't want to grow poppy. That is all they can make money from, and they make a considerable amount, but it is de minimis in terms of what it means to terror and what it means on the world market.

Would you like to say something?

Mr. BEERS. Yes, ma'am. Thank you very much. We as a Government, together with our allies, have been discussing this critical issue for several months now. We are in the final stages, I think, of putting together the very strategy that you have just described. However, I want to talk a little bit about some of the practical issues that are associated with it so that everyone understands that we will do as much as we can, but there may be some real tactical limits.

We have had some conversations, we the United States and we the international community, with Chairman Karzai over the last several months, and I think the clearest manifestation of those conversations was his January 17 announcement that he was banning poppy within Afghanistan, both the cultivation, the processing and the trafficking—an ironic continuation, actually, of the Taliban ban.

30

That represented the basis for operation within Afghanistan in order to be able to have the interim authority and clearly stating to both the people of Afghanistan and the international community that they recognized the problem and were prepared to do something about that.

Since then, we and others have had several other conversations with Chairman Karzai and members of his cabinet on this very issue, and he in turn has begun talking both within the government and to the governors of the provinces within Afghanistan because quite frankly Kabul is a very small place and they don't grow much poppy there. Unless we can get out to the governors and down to the local authorities, the ability to actually effect some kind of change is going to be limited.

He has just talked to those governors. He has made clear to them that they are going to have to take action in association with this, and now we have the second step, if you will, of a legal basis in order to go further into the field in order to deal with that.

We have also talked with the international community, including a meeting which I just came back from in Vienna, and I think we have general agreement that this short-term strategy is something that we are going to have to focus on right away and we are going to have to begin to effect that.

Having said that, the problem which remains is the actual security situation in the areas in which the opium poppy is being grown. The five major provinces in Afghanistan in which opium poppy is grown are Helmand, Nangarhar, Kandahar, Uruzgan and Badakhshan. Of those five provinces, the only one which is clearly secure today is Badakhshan, which was a northern Alliance stronghold, and that is the least significant area of cultivation. The greatest area of cultivation is Helmand, 50 percent of the overall crop, and that is the least secure province in Afghanistan today. So that gives you the range of the kind of issue we face.

Now, you are absolutely right to say we have an opportunity here because we have security forces there who can help us in some way to do that, and that is what we are, in fact, trying to do right now, both with our own forces there and with the international security assistance force, to look at ways in which the security umbrella that they provide will allow us to actually do something.

But there are two stages to that. The first stage is the voluntary eradication by the farmers in return for some kind of remuneration or other kinds of assistance. We have worked out some ideas in that regard. We have some money that is available either in the United States or in other donor pockets that we are looking to make available.

Where we are falling short at this point in time is what can we do after that, because the amount of money that can be paid on the first instance is relatively limited, and as soon as we begin to do that we are going to be competing with an ever rising price for that product within Afghanistan.

So the second half of that is to be able to follow that up with some significant development kinds of assistance, whether it is work programs to build roads or schools or clinics, or whether it is extended agricultural assistance to put crops in the ground that

31

can actually grow and return money to those farmers for that production. So I think that gives you the sense.

The international community is committed to following this kind of a strategy, but all of us have to also say this is only going to be the beginning. As you well know from your experience in this area, this is not going to happen overnight and it is not going to be a 100-percent successful effort with the current crop that is in the ground.

But we are going to do it; we are going to make some progress in this area and I hope by the end of May to be able to come back and tell you all exactly what kind of progress we have actually made in this area. We are very much seized with this issue.

Chairperson FEINSTEIN. I am very heartened by your comments. My time has expired. Since there are just a few of us, I am going to turn off the light so that you have a chance to ask your questions.

Senator Kyl?

Senator KYL. Thank you very much, Senator Feinstein.

In the opening statement that I wanted to include in the record, I had information that in 2000 opium production in Afghanistan was about 3,000 metric tons of opium to be turned into heroin, which would account for 7 to 10 times as much heroin as humans would consume annually.

If that is true, then it suggest that not only do we have a problem with the crops growing, but the storage of it, and that would be another opportunity for us to eradicate concentrated portions of this crop after it is harvested. If we can get the intelligence to find out where it is, we can destroy it there.

Either Asa Hutchinson or Secretary Beers, would you like to comment on that?

Mr. HUTCHINSON. Well, I would like to, and I think you, in combination with Mr. Beers, really struck the right chord that Chairman Karzai can put out a decree not to grow poppy, but it takes a law enforcement component to enforce that decree. Unless there is a significant eradication program—and I am delighted to hear that there is going to be a remuneration program for the farmers that are engaged in the cultivation. That is a critical part of it.

I am engaged in law enforcement, but we cannot have a successful operation in Afghanistan to reduce the warehouses, the supply, and the transportation of this heroin without building a good law enforcement component in Afghanistan and without the DEA being physically present there.

There are security concerns. This is an enormously dangerous neck of the woods, as we say in Arkansas, but we have DEA agents who are ready, willing and anxious to be there because this is so important to our Nation and to our efforts.

I can put individuals there on a TDY basis temporarily, but until we get all the hoops through in terms of having our personnel physically located, having our office in the embassy, having the sensitive investigative units trained, we are handicapped. So that is what we are really trying to move forward with very quickly.

I have met with the person who will be the new justice minister in Afghanistan. I am aware of the historic problems that we have, but we are ready to go there and I think that operationally we can

32

do a great deal there in cooperation with our international part-
ners. A great deal of the responsibility falls on Europe.

Like Mr. Beers, we have met with our international partners.
They are committed. We have a resource committee, because Ger-
many has a presence there and the Brits have a presence there and
we want to make sure we are not duplicating. So we are coordi-
nating with them in our enforcement efforts and in our sharing of
intelligence, and I am optimistic we can make a difference there.

Senator KYL. Mr. Beers, anything further?

Mr. BEERS. Yes, sir. The Administrator is absolutely correct. The
first critical element from the U.S. side specifically is to get some
DEA presence that be located there permanently in order to work
this issue, but I would also add that an area where we are making
some progress today is, in fact, in the police training area.

The Germans have sent several officers out there to conduct an
assessment of what is needed for the overall police force for Af-
ghanistan. We are having a meeting in Berlin at the end of this
week to talk about the results of that and a preliminary survey
which we have done. One of the key elements of that and one of
the key topics that will occur is what does the counternarcotics
subset of the overall police force look like within Afghanistan. The
Administrator is correct. What we are looking at is a special inves-
tigative unit of some form that will be devoted specifically to the
counternarcotics area that can do something about this.

I would add, sir, that not all of the stockpiles that necessarily
have been accumulated in the past are today in Afghanistan. So
there is a second critical area that we have been working on for
some time, and DEA has been one of the key participants in that,
and that is related to what DEA calls Operation Containment and
what we also call a regional action plan, which is to look at the
countries that surround Afghanistan and see what they can do in
terms of acting as an interdicting entity around Afghanistan.

The countries have all met on a number of occasions. We are
working in some of them individually; others are working in others
of them individually. It is no secret that Iran obviously represents
a particular issue for us, but others are working with the Iranians
as well. I think we have got the basis of a serious effort here that
can form sort of concentric rings around the Afghan problem on the
enforcement side to go after the flow out of Afghanistan. It won't
be perfect; it has never been, but we have got the building blocks
in place.

Senator KYL. Let me just make a suggestion, and that is Senator
Feinstein and I were both in Colombia as well and we found there
that through various means we were able to learn through good in-
telligence where the production facilities were and that it was
much more economical to strike those production facilities than to
try to spray crops.

Likewise, it seems to me that good intelligence in this part of the
world to locate where the centers of production are and then deal
with those appropriately—and I am not sure that police trained
forces are necessarily the most efficient way to deal with this. I
mean, a little cash and good intelligence can go a long way in that
part of the world.

33

Part of what we are trying to do here is to eliminate the underbrush and to figure out what we need to do to help you eliminate that. Senator Feinstein whispered to me a moment ago "what is holding them up?" We say we need DEA agents on the ground and that is the question: what is holding it up and what can we do to advance that process?

Mr. HUTCHINSON. May I respond?

Senator KYL. Sure.

Mr. HUTCHINSON. We are ready to go. The steps that are necessary to accomplish this are that Operation Containment, which is the DEA plan of action in Afghanistan and the surrounding region, has been submitted as part of the President's budget that has to be submitted as a separate reprogramming. So the funds are there that have been not spent in previous years. They are already appropriated funds, but they have to be reprogrammed by Congress.

So we need your assistance in signing off and encouraging the appropriators to sign off on that reprogramming. Once that is done, then we can put people there, but we really can't legally start that process until that reprogramming is signed off on. That is what we need help on.

Chairperson FEINSTEIN. All three of us would like to help you. If you would just tell us exactly where they are, we will go to work.

Senator KYL. You have got a chief appropriator right here, so she is ready to go.

Mr. HUTCHINSON. Thank you.

Senator KYL. Could I just ask one more question, then?

Chairperson FEINSTEIN. Yes.

Senator KYL. This is intended to be the slow curve that gets hit way out of the park, but there is a purpose for my asking the question. There are some who say, of course, that if you try to eradicate the crop of coca in Colombia, they will just raise it in Peru or Ecuador. Or if you try to eradicate the poppies in Afghanistan, they will be raised in Burma or wherever. Therefore, it is a useless exercise and there is no point in it.

I mean, some go off and say, therefore, let's just legalize drugs. Others say let's forget this part of the drug war. Others don't seem to have much of a positive suggestion as to what to do, but they do know what they think doesn't work, and this doesn't work and therefore let's just give up on the effort.

What is your view?

Mr. HUTCHINSON. Well, I usually miss slow curves, but I will take a swing at it. My experience is that obviously traffickers will try to move to another region where they can produce coca when we suppress it in one area, but that is exactly why you have to work in a broad context across the globe.

They are fairly limited in where they can go. Historically, Colombia, Peru, Bolivia is where the coca-producing regions have been. Bolivia has reduced coca production by over 70 percent—an extraordinary success story in Bolivia. In Peru, they have had a very successful operation there that has forced more of the activity into Colombia, and now we are working in Colombia.

I have the belief, and I think it is proven by history, that you can control that commodity market. We are not there yet, but both

34

in terms of heroin and in terms of cocaine it is in some ways not any different than corn. It all goes into the market basket and whenever you can reduce the production, it affects the price and purity here in the United States, which is our goal. We have had success in Peru and Bolivia. We want to bring that success to Colombia, and I think whenever we can engage in that we are limiting the places where the coca producers can go.

Chairperson FEINSTEIN. Thank you, Senator Kyl.

Mr. BEERS. Could I second what the Administrator just said?

Chairperson FEINSTEIN. Please.

Mr. BEERS. I couldn't agree more with what he just said. I think that that analysis that you just referred to, which we hear a lot, is just, one, wrong-headed, and, two, 10 to 20 years out of date.

I think that people could have said that 20 years ago because we were fighting in the macro sense a battle between the world being divided between those who produce drugs and those who use drugs, and it was a fight between us—it is your problem; it is your problem—and then nothing or not enough was getting done.

I think the world is significantly different today. I think that most nations recognize that this is an issue of shared responsibility, that we can't divide ourselves between producers and consumers. In the first place, every nation in the world has consumption, so it is ridiculous to say that some consume more than others and that is a division. We have also taken some steps internationally in terms of bringing about that cooperation, and I think that the levels of cooperation and the levels of action have just increased enormously over the last several years.

Senator Feinstein used to berate me regularly on Mexico, among other countries, and I think the Administrator would be among the first to say there is a different today, and the events of the last week are a clear indication of that in terms of going after traffickers.

On the issue of, well, they will just displace it somewhere else, of course that is a possibility and the traffickers are not going to sit back and simply accept our efforts to strangle them in the locations that they are currently operating out of. That is why I think it is essential that we approach each of these problems on a regional basis.

The Andean regional initiative that the Bush administration has submitted is a recognition of that. It builds on Plan Colombia. The security belt or the Operation Containment concepts that we are looking at in Afghanistan recognize that this is not just an Afghan problem or an Afghan issue. It is something that we have got to approach on a regional basis.

We are going to have to do roughly the same thing with respect to Southeast Asia because, yes, that is a potential area where production could increase if we are successful in other locations, and we will have to work with Burma's neighbors there in order to effect the same kind of approach. But I see it as something that we should be optimistic, not pessimistic about. I think this is a real time of opportunity to deal with this problem.

Senator KYL. Two homeruns.

35

Chairperson FEINSTEIN. Exactly, and I hope that you work with Treasury in terms of seeing that the Kingpin Act gets enforced. There has got to be a price for doing business with drug kingpins.

Mr. BEERS. It is a critical element absolutely, and I think the opening statement by Ambassador Taylor is absolutely representative of that. This merger of the Lyon group and the Roma group in the G8 context was a recognition that the folks who dealt with terrorism and the folks who dealt with crime ought to sit down together because the expertise that both had was contained and it ought to be merged. Money laundering is the absolutely clearest indication of an area where we can put our heads together and two plus two equals more than four.

Chairperson FEINSTEIN. Senator Sessions, welcome.

Senator SESSIONS. Thank you.

Chairperson FEINSTEIN. If you would like to make a statement or ask questions, it is your time.

Senator SESSIONS. Thank you. I will just start off with Mr. Beers. He has been at this so long. We have exchanged ideas and frustrations over the years.

Mr. Beers, isn't it basically true, first, that we expect nations to control their own borders and their own drug problem, and that we are not able to enter those countries routinely and enforce our laws in their sovereign territory? And is it a coincidence that with regard to Afghanistan and Colombia, both of those countries have large areas that are really not effectively under law enforcement?

Mr. BEERS. It is true that in the first instance we would like and hope that countries will control that which happens within their own borders. But to simply take the second part of the question, it is not always the case that every country is, in fact, able to do that, and that is why we have, together with other nations, tried to talk about this concept of shared responsibility and seek in what we could, with what funds we had, help countries who are prepared to take those actions but whose resource base is limited to expand their capabilities and to use the political will that they have to actually go ahead and do things like that.

I think Colombia is an area where the government was willing and the resources and capacity were limited. We had had a long-developed relationship with the police and we continued that, but it wasn't sufficient in terms of dealing with the problem. Afghanistan is another area. This is a very new area for us. We have got an enormous set of tasks there, but we are heading into that.

Senator SESSIONS. It strikes me that the greatest thing that could happen to us in being able to crack down on drug production in these two countries is that the governments of those countries could gain control of their territory and start effectively enforcing their own laws. I guess that is not in dispute. I mean, you would agree with that.

Mr. BEERS. Absolutely.

Senator SESSIONS. We would normally expect Colombia, for example, to stop drug trafficking, but here they have given an area the size of Rhode Island to communist drug-dealing, kidnapping terrorists, and they are using that territory there. Now, they have taken it away, I hope, and will be able to fight back. But we apparently accepted that action over the years, and now I believe if we

36

want to see Colombia cease to be the major production center for cocaine, we have got to help them reestablish control of their territory.

What do you say about that? Do you agree with that?

Mr. BEERS. I agree with you completely.

Senator SESSIONS. I will just add it is time for this administration—and I raised this with the previous administration—it is time for this administration to recognize that we need to quit couching all our help to Colombia solely on the matter that we are here to fight drugs and only drugs, and we really don't care who wins this war that is going on in the country.

Ambassador Pickering testified several years ago and he said that our sole goal—and I pressed him on it and he repeated it—is to fight narcotics there. Well, if they can't reestablish control over the country, the United States Government is not going to be able to go in and stop narcotics production.

I am a sucker for a slow curve and my batting average has never been very good, but the problem with eradicating drugs from around the world is—and there was an op ed in the Washington Post a year or so ago on this by some professor. He calculated that the coca leaf producers paid $.10 to produce sufficient cocaine to sell for $100 in the United States.

So the price being what it is in Colombia, South America, and those kinds of places, the farmers are paid a little bit for their coca leaf and we come along and we say, well, we want you to plant coffee or some other crop and you can make just as much. But that doesn't recognize the fact that there is tremendous potential elasticity in that price. It could go to $1.00, ten times easily, and it would not affect the price of cocaine in the United States.

Isn't this the problem that we have economically around the world in expecting that we can solve our drug problem—I know you don't believe this, but there are some people who believe we can solve our drug problem by just stopping production around the world, and it is an exceedingly difficult thing because of the potential for a rise in price.

I guess, Mr. Beers, I would start with you since you have been at this so many years. My first question is, isn't that a big problem?

Mr. BEERS. Yes, sir, it is, but let me start with the first—

Senator SESSIONS. Now, you are going to go off on some other discussion.

Mr. BEERS. I am not, sir. We have had this discussion over a number of years and I want to answer your first question first.

Senator SESSIONS. Okay.

Mr. BEERS. You won, okay? Yesterday, the Secretary of State said in a hearing before the C–J–S Subcommittee that the administration was going to be seeking additional authorities from the Congress in order to try to deal with the terrorism-drug nexus. He was talking specifically about Colombia in that particular instance.

The final forum of that authority has not been determined yet. It is still being discussed within the administration, but he was attempting to signal, as reported correctly I think in the Washington Post today, that we were going to look beyond the counternarcotics justification for our activities in Colombia in response to President

37

Pastrana's cessation of the DSPA and his clear intent to go much more actively and strongly after the terrorists who have inflicted the damage that they have on Colombia.

Senator SESSIONS. That is good news.

Mr. BEERS. So you and I and you and others have had this discussion before and I just wanted to make clear to you that that is the current view in this administration that we intend to move forward on that. And we will be coming up shortly with precisely what the actual intent of that expanded authority might look like.

Secondly, with respect to the issue of trying simply to curtail production, your points about price are absolutely right. There is a lot of flexibility there on the part of the trafficker to pay a whole lot more for any of the drugs that are produced or cultivated anywhere in the world and still have an enormous profit margin, and that represents one of the challenges.

Our own overall strategy over the years has always been that no single action, no single effort is going to by itself deal with this problem. This starts in the fields or where the precursor chemicals are produced that make amphetamine-type substances and goes through the whole enforcement spectrum, and every one of those parts is absolutely critical to this effort.

Likewise, on the demand reduction side, all of us need to do what we can in terms of trying to get the people who use drugs to stop using drugs, to seek treatment where that is an appropriate response, or to simply say no where that is an appropriate response. All of that has got to be part of this effort and no one particular part represents a solution. We sometimes talk about one part more than we talk about another, but I certainly hold the view that we have got to do all of these things.

Chairperson FEINSTEIN. Gentlemen, I would like to move this on. It is my desire to conclude the hearing at 12:00. We have a vote at 11:50. So are there other questions, or can we move to the second panel?

Then why don't we move to the second panel, and let me say thank you very much. It was excellent testimony and I think at least we are on a track that might produce some results. Thank you very much.

I will begin by introducing the second panel. The first person is Curtis Kamman. Curtis Kamman is the former United States Ambassador to Colombia. His career in foreign service spans 40 years, most recently serving as United States Ambassador to Colombia from 1997 to 2000. He previously served as Ambassador to Bolivia and Chile, and has served in numerous diplomatic positions around the world, from Mexico to Hong Kong.

I will introduce all of our witnesses at one time.

The next person will be Michael Shifter. Professor Shifter has been a Senior Fellow and Program Director at the Inter–American Dialogue since April of 1994. He has taught Latin American politics at Georgetown's School of Foreign Service since 1993 and has written and spoken widely on United States–Latin American relations and hemispheric affairs. He is also a member of the Council on Foreign Relations and the Latin American Studies Association.

R. Grant Smith is a former Ambassador to Tajikistan. He is an expert on Tajikistan society and politics, as well as regional affairs

38

in Central Asia, including relations with Afghanistan. He is currently a Senior Fellow at Johns Hopkins University's Central Asia Caucasus Institute.

Martha Brill Olcott is with the Carnegie Endowment for International Peace. She is a senior associate at the Carnegie Endowment, where she specializes in the problems of transition and security challenges in Central Asia and the Caucasus. She has spent over 25 years following inter-ethnic relations in Russia and the states of the former Soviet Union, and is also a professor of political science at Colgate, as well as an adjunct professor at Georgetown.

We will begin with you, Ambassador Kamman. Welcome.

### STATEMENT OF CURTIS W. KAMMAN, FORMER UNITED STATES AMBASSADOR TO COLOMBIA, DEPARTMENT OF STATE, WASHINGTON, D.C.

Mr. KAMMAN. Thank you, Madam Chairwoman. Since our time is limited, I will just make a few remarks and I have submitted a statement for the record.

I would like to make one point that it does identify me on your witness list as former ambassador. That is correct. It says below that "U.S. Department of State." I retired a year-and-a-half ago and I am speaking, therefore, as a private citizen.

Chairperson FEINSTEIN. Thank you.

Mr. KAMMAN. But I am also quite delighted that a statement I wrote last week has now been made into administration policy by Secretary Powell, and you have just heard that from Randy Beers. In other words, the thrust of my statement pertaining to Colombia is that we have had a constraint on what we can do in that country for several years.

All of our aid has gone for counternarcotics exclusively and I think that it is time to take some of those constraints off without, however, still allowing ourselves to become directly involved. I don't think we have to go in with our own troops to fight, as we had to do in Afghanistan. This is not another Vietnam, but this is a place where we can do more to help that country bring the narcotics problem under control.

With that I will conclude, and I hope we will have a little time for questions. Thank you, Madam Chairwoman.

[The prepared statement of Mr. Kamman follows:]

STATEMENT OF CURTIS W. KAMMAN, FORMER U.S. AMBASSADOR TO COLOMBIA, U.S. DEPARTMENT OF STATE

#### SUMMARY

Colombia is a prime example of the symbiotic relationship between narcotics trafficking and politically motivated violence perpetrated by three illicit groups on the State Department's international terrorist list. While the terrorist groups claim to act in pursuit of social justice and democracy, their viability depends on the money they receive for protecting the production and transportation of drugs destined for the overseas market.

The threat to U.S. interests from these groups is twofold. First, they make it possible for common criminals seeking illicit profits to produce and sell drugs that damage our society, especially our young people. Second, the vast profits of this illegal trade sustain a level of violence that undermines the legitimate government of Colombia, thereby risking the erosion of law and order throughout the country. Unlike the Islamist extremists in other parts of the world, the terrorists who operate in

39

Colombia have not explicitly declared the United States to be their target. But their political and economic objectives are incompatible with our values, and they could ultimately represent a force for evil no less troublesome than Al Qaeda or irresponsible forces possessing weapons of mass destruction.

Responsibility for combating terrorist groups in Colombia obviously belongs to the people and government of that country. But the recent termination of a political dialogue between the government and the largest leftist terrorist group poses a challenge to the United States. Should we continue to limit our assistance to Colombia to operations against narco-traffickers, or should we attempt to strengthen the Colombian capability to defeat guerrillas and paramilitary groups that work hand in hand with the drug criminals? I believe we can unshackle our existing assistance to the police and armed forces of Colombia and increase our material aid in ways that do not draw us into a combat role. We don't want to repeat the experience of Vietnam. But neither do we want to commit the error of neglect that allowed the Taliban to rise in Afghanistan.

### DISCUSSION

#### CRIMINALS AND TERRORISTS.

What is the fundamental distinction between narco-traffickers and terrorists? The drug merchant is a common criminal attracted by huge illicit profits, caring little for the damage to individual lives and whole societies as a result of drug addiction and peddling. The terrorist has a political or religious motive and deliberately targets innocent civilians as well as legitimate authority in order to advance his cause. In Colombia, the two kinds of antisocial elements have formed an alliance, a marriage of convenience, while retaining their separate basic goals. And neither group is especially reticent about its links with the other. FARC commanders have frequently acknowledged that they work with growers of coca, which they justify on grounds of providing economic support to the peasantry. They acknowledge when pressed that half or more of their income is derived from fees charged to narco-traffickers (the other major source is kidnapping). So-called self-defense groups, commonly referred to as paramilitaries, openly admit that they get a major share of income from protection money paid by narco-traffickers, along with money extorted from legitimate businesses.

#### FOCUS ON DRUGS.

For years, the United States has devoted funds and effort to fighting Colombian narco-traffickers, but has maintained a hands-off attitude towards leftist guerrilla groups and illegal rightist paramilitary forces. We have defined the problem largely in terms of criminal conspiracy, and our partnership with the Colombian Government has occurred within the framework of international narcotics treaties and bilateral law enforcement cooperation. To be sure, such joint successes as dismantling the Medellin and Cali cartels, extraditing kingpin traffickers and eradicating thousands of hectares of coca have placed significant obstacles in the way of drug dealers. But so long as the traffickers enjoy the protection of the FARC and ELN guerrillas and the AUC paramilitaries, they will not be forced to abandon their lucrative business.

#### FOCUS ON TERRORIST GROUPS.

The corrosive effect of narcotics money on Colombian society has distorted the economy, weakened the democratic political process and eroded confidence in the country's stability. But nowhere is this effect more damaging than in its continued fueling of violence by a tiny minority of radical insurgents, who in turn have stimulated the growth of right-wing groups organized as death squads. What began 40 years ago as protest movements against elite domination of political institutions, kept alive by ideological support from Moscow and Havana during the Cold War, have now evolved into organized armed units bent on controlling territory through intimidation of the civilian populace.

The Government of Colombia has attempted for the past three years to curtail the resources flowing into guerrilla and paramilitary groups by waging an all-out campaign against the drug trade, beginning with the eradication of industrial-scale cultivation of coca and extending to interdiction of the raw material and finished product at every stage of production and shipping. At the same time, it sought to reach a political settlement with the largest guerrilla group, the FARC, based on a common understanding of reforms consistent with the FARC's stated objectives. That effort came to an end last month with the FARC's kidnapping of two Senators, one of them a courageous woman whose candidacy for the Presidency was based on her

40

long record as an opponent of corruption. A third Senator, also a woman, was murdered by the FARC.

### THREAT TO U.S. INTERESTS.

Does the outcome of Colombia's struggle against internal terrorist groups matter to the United States? Strictly in the context of narcotics control objectives, it is important to us. But we should also consider the broader impact on our humanitarian, economic and political objectives. We should ultimately examine how the fate of democratic stable government in Colombia could affect our own security. The end of the Cold War may have lulled us into a complacency about insurgent movements abroad that we now recognize as dangerous.

The people of Colombia in recent years have lived with a murder rate seven times that of the United States, a kidnapping occurring on the average once every three hours, and a total of well over a million people displaced from their homes by guerrilla or paramilitary violence. The methods used by the terrorist groups are brutal—summary execution of men in front of their families, attacks with home-made mortars made from cooking gas cylinders filled with nails, and massacres of whole villages by paramilitary groups as "punishment" for alleged collaboration with guerrillas.

Quite apart from these outrages to our humanitarian values, the FARC, ELN and AUC terrorist organizations have already done direct harm to U.S. interests. About 100 U.S. citizens have been kidnapped in the past decade in Colombia. Some are held for months, while others, like three activists working with Colombia's indigenous peoples in 1999, have been deliberately murdered by the FARC. Even kidnappings by non-political criminals often result in the hostages being held by guerrilla groups, who take custody of the victims and negotiate a high ransom. FARC and ELN guerrilla units continue to inflict great damage on pipelines and exploration activities of multinational oil companies, seriously affecting U.S. economic interests. And AUC or guerrilla extortion demands raise economic costs to U.S. investors, even if the response is only to increase security measures.

Terrorist groups in Colombia have so far not chosen deliberately to target the United States, in part because they have a healthy fear of retaliation that was heightened by our missile attacks on Afghanistan and Sudan in 1998 and certainly by the current campaign against the Taliban and Al Qaeda. Nevertheless, the enormous financial resources derived from the narcotics trade have enabled guerrillas to smuggle in high potency weapons in large quantities, such as a shipment in 2000 that was brokered by the sinister Peruvian official Vladimiro Montesinos. The FARC hosted three men from the outlawed Irish Republican Army (IRA) for five weeks last year, demonstrating how the power of money reaches across international borders.

### U.S. POLICY.

We are thus faced with a witches' brew in Colombia that bodes ill for our counternarcotics goals and eventually could result in an even more powerful sanctuary for terrorist groups whose political objectives are contrary to our own. The overwhelming majority of the Colombian people reject both the illicit drug trade and the violence begotten by terrorist groups. It has proved difficult to win the fight against narco-trafficking by concentrating only on the producers and smugglers. The armed groups on which they rely are equally inimical to our interests. The situation has not become so alarming that we must contemplate direct U.S. military action, as we have had to do in Afghanistan. But we should broaden the objectives of our assistance to law enforcement and military forces in Colombia. In order to break the link between drug traffickers and illicit armed groups, we should relax restrictions on our material and training assistance, while continuing to avoid any direct combat role in Colombia's internal struggle.

### COLOMBIA A PRECEDENT?

Narcotics entrepreneurs are no strangers to organized crime. And terrorist groups often resort to criminal activity to fund their operations. But the unique combination of organized armed groups pursuing political power, funded by proceeds of the illicit drug trade, has reached a stage in Colombia that does not exist in the other Andean countries, nor for that matter in Central and South Asia. If the terrorist link to narco-trafficking can be broken in Colombia, it will be less tempting to terrorist groups elsewhere in the world to go the same route as the FARC, ELN and AUC.

Chairperson FEINSTEIN. Thank you.
Professor Shifter?

41

**STATEMENT OF MICHAEL SHIFTER, ADJUNCT PROFESSOR
AND PROGRAM DIRECTOR, INTER-AMERICAN DIALOGUE,
CENTER FOR LATIN AMERICAN STUDIES, SCHOOL OF FOR-
EIGN SERVICE, GEORGETOWN UNIVERSITY, WASHINGTON,
D.C.**

Mr. SHIFTER. Thank you very much, Madam Chairwoman, for
this opportunity. I also would like to submit my testimony for the
record.

If I could just make maybe a few opening comments about the
importance of the Colombia policy challenge for the United States,
there is, I think, a risk of spreading criminality not only in Colom-
bia but throughout the Andean region, in South America. We do
have a problem with terrorist acts that are fueled by the drug
trade and other criminal activity.

The core problem, I think, is that the Colombian state cannot
protect its citizens and does not have authority and control over its
own territory. Our objective of U.S. policy should be to defend that
democracy. It is the oldest democracy in South America. That
should be the overriding goal, I think, of U.S. policy.

The narcotics problem and the terrorism problem exist in Colom-
bia because of a weak state and weak governance. So our efforts
should be aimed, in my view, to try to help that government re-
assert its authority and its control so it can protect its citizens.

I will just go very briefly into perhaps four ways that concretely
we might be able to make progress in this area. The first, I think,
is to work with the Colombian government—and there will be a
new government coming in in Colombia on August 7—to try to
come up with a strategy and an end game to try to end that coun-
try's tragic conflict which has had enormous human costs and eco-
nomic costs for that country.

There needs to be a comprehensive plan, approach, that the
United States, with the new government, should try to outline to
try to reach a politically-negotiated settlement to that conflict. A
military solution, in my judgment, given the scale and the nature
of that conflict, is not a viable one.

Second is to undertake a systematic plan of military assistance
to the military and to the police to professionalize them, to enable
them to exercise their legitimate function to protect citizens more
effectively than they have up until now, which is also consistent
with human rights standards and human rights norms. There is no
contradiction between making them more effective and building
their capacity and adhering to human rights guarantees. All of
this, though, should be a function of the larger political objective
which was the first element of our strategy.

We should also bear in mind as the third element that there is
an importance to focus on the long-term social and institutional re-
form of Colombia. Colombia is a country where there are serious
problems of social justice, and the Colombians have to dem-
onstrate—and this should be the deal we should try to reach with
the Colombians—their commitment to do their part in terms of
generating the resources, paying taxes and all the rest, so that we
can work together to try to turn around this downward spiral.

Finally, the drug issue, which is a critical issue, is not just a Co-
lombian problem. This, as we know, is a global problem and we

42

need to focus greater cooperation within the region to try to reduce production and trafficking. I think the Andean Trade Preference Act should be seen as a piece of legislation that is important to try to strengthen the legal economy in Colombia and the Andean countries. I think one should give serious attention to the mechanism that is being developed in the Organization of American States to try to move toward a multilateral approach in dealing with the drug problem.

But Colombian can only be a good partner with the United States on all of these issues if it has effective governance and control over its territory. Otherwise, it is hard to see that.

Finally, if I can, I just want to say that Colombia, in my judgment, is not in a civil war, as is often described. Colombians are not divided. Colombians are united in their desire for peace, and what has happened is there are 30,000 or 35,000 violent actors that are well-funded and well-armed and it is making it very difficult, if not impossible, for the Colombian citizens to fulfill that desire. We should really do what we can to try to help them.

Thank you.

[The prepared statement of Mr. Shifter follows:]

STATEMENT OF MICHAEL SHIFTER, VICE PRESIDENT FOR POLICY, INTER-AMERICAN DIA-
LOGUE, CENTER FOR LATIN AMERICAN STUDIES, SCHOOL OF FOREIGN SERVICE,
GEORGETOWN UNIVERSITY, WASHINGTON, D.C.

I very much appreciate your invitation to appear before the Subcommittee today to talk about the connection between drugs and terrorism. I will focus my remarks on Colombia and what the United States should be doing in addressing the situation there. This is precisely the right moment to ask hard questions, and engage in an open, public debate about where US policy is heading, and ought to be heading, on these issues. Our interests and goals in Latin America's third largest country deserve serious discussion. That is why this hearing is so important.

Let me start with the question of what purpose we want to achieve in Colombia. The objective should be clear: we need to do all we can to defend Colombia's democracy by strengthening the government's capacity and authority to protect its citizens throughout its territory. Our efforts should go towards helping the government reach a political solution to the country's deep, internal conflict. Given the scale and nature of the conflict, a military solution is not a viable option. Colombia will only be able to deal effectively with its narcotics and terrorism problems if it moves in this direction.

By now, there is widespread agreement about the diagnosis of Colombia's crisis. The country is experiencing unprecedented lawlessness perpetrated by a host of violent actors. The problem is that violence and armed conflict exist because of the weakness and even absence of governance and effective authority in wide swaths of territory. There are three groups that appear on the State Department's list of terrorist organizations, all of which deserve the designation. These are the Revolutionary Armed Forces of Colombia (FARC), the National Liberation Army (ELN), and the United Self-Defense Forces of Colombia (AUC). The first and third groups, in conflict with one another, should particularly concern us. They are formidable forces that have expanded most dramatically in recent years and, together, have an estimated 30,000 combatants.

The Colombian conflict has old, historic roots, but is so virulent now because the insurgent groups have developed a system of financing themselves through kidnapping, extortion, and taxing the drug trade. Narcotics is not the cause of terrorist criminal activity, but it does fuel it. Although the FARC and AUC are no doubt strengthened from the drug trade, these groups would continue to pose a threat to Colombia even if the drug problem were somehow resolved. Drugs, coca and heroin production, is an important element or dimension of a much more profound and complex problem. Drugs and terrorism—though intimately related and mutually reinforcing—are distinct phenomena and should be treated as much.

For the United States, it is understandable why there is such a great temptation to fit Colombia under the framework of the war against drugs and, since September 11, the global campaign against terrorism. Drugs and terrorism are no doubt serious

43

problems, and both affect US interests. But in the Colombia case, both of these problems derive from a lack of state authority, control and capacity. That is what needs most urgent attention to turn around the country's dramatic deterioration. That should be the focus and guiding purpose of US policy. A Colombian state threatened by collapse—a democracy at serious risk—cannot be a very good partner in tackling the drug and terrorism problems.

In concrete terms, what does this mean? First, the United States should engage actively and in a sustained way with the Colombian government to formulate a comprehensive joint strategy and end game. High-level political attention should seek to support efforts aimed at forcing a negotiated political settlement. Until now, Colombia policy has been in the hands of operational policymakers. Peace talks have now broken down, and conditions are not ripe to move towards a settlement. But, perhaps unlike the goals in the war against terrorism in other parts of the world, the political objective in Colombia must be paramount.

Second, to help shape the conditions that will make an eventual negotiation with all three of Colombia's terrorist groups more realistic and feasible, it is crucial for the United States to undertake a long-term effort aimed at professionalizing Colombia's security forces. Our objective should be to help Colombia develop a professional, modern military, and police capacity to maintain public order. At present, the security forces cannot effectively protect Colombia's citizens. The US security aid provided to Colombia until now has been focused on equipment and training for eradication and interdiction of drugs. That the administration and Congress are now looking to go beyond this narrow emphasis is welcome news. But a plan of military assistance needs to be explicit about the importance of Colombia's security forces targeting all groups operating outside of the law, concerns and conditions related to human rights, and a clear eye on the ultimate political objective outlined above. This would mean a significant departure from what is now in place.

Third, although the security question in Colombia is most urgent, the United States government should make it clear that it is prepared to support the Colombian government over the longer-term on a wide range of badly needed reform efforts. Judicial and social reform particularly stand out. These may not be part of an eventual negotiation, but should be integral to an assistance package aimed at strengthening Colombia's key institutions. Such a commitment should be contingent on the Colombian government and business leaders demonstrating accountability and doing their share in contributing to such a rebuilding effort. Tax reform and greater enforcement, for example, should be part of such a deal.

Finally, the United States should intensify and improve current efforts to tackle the serious drug problem, not only in working with Colombia, but with our other partners in the region. This is a global problem, and the United States should seek to promote greater cooperation among the relevant countries in this hemisphere in an effort to reduce production and trafficking. The US government should give highest priority to supporting the region's legal economy; it can best do so by expanding the Andean Trade Preference Act (ATPA). A multilateral mechanism being developed in the Organization of American States is promising and deserves political support. To make an overall drug policy more effective, the US government needs to give greater attention to efforts aimed at reducing demand and consumption in the United States, as well as more vigorous law enforcement in this country.

Colombia will only be a good partner with the United States on these critical issues if its state is able to assert greater authority and better control its territory. That is the urgent priority that should frame US policy on questions related to drugs and terrorism.

The United States has an enormous stake in what happens in Colombia. This is not only because of the relentless, drug-fueled terrorist acts that are putting South America's oldest democracy at serious risk. It is also because of the potential for an even deeper crisis that affects the wider region. With the recent escalation of violence in Colombia, Peruvian, Venezuelan, Ecuadorian and Brazilian troops have been put on alert on their borders. Last week there was a confrontation between the FARC and Brazilian soldiers. There is tremendous political tension and uncertainty in Venezuela, and troubling institutional fragility in Ecuador. This is a region that is nervous and on edge. At least some of the trends are ominous. I believe US engagement in the ways outlined here is critical precisely to avert a deteriorating situation that would, down the road, be even more difficult to control.

Finally, it's important to remember that Colombia has important assets and advantages to work with. It has a long, democratic tradition, and prizes elections. In the last century, it had only four years of military rule. Contrary to what is often said, the country is not experiencing a civil war, but rather a war against society. It is not politically divided. On the contrary, it is politically united around the common desire to lead normal lives, in peace. Unfortunately, some of the country's ac-

44

tors, who commit barbarous, terrorist acts, are making it virtually impossible for the overwhelming majority of law-abiding Colombian citizens to fulfill that common desire. The US government should help them do so.

Thank you very much for this opportunity. I would be happy to clarify or expand on any of these points, or answer any questions you might have.

Chairperson FEINSTEIN. Thanks, Professor Shifter.

I would like to indicate that the hearing record will remain open for written comments, and I would like to submit the statement of Senator DeWine for the record.

Ambassador Smith?

### STATEMENT OF R. GRANT SMITH, FORMER UNITED STATES AMBASSADOR TO TAJIKISTAN, DEPARTMENT OF STATE, WASHINGTON, D.C.

Mr. GRANT. Thank you, Madam Chairwoman. I understand that my colleague, Dr. Olcott, will be focusing on Afghanistan and I am going to talk more about the link between terrorism and narcotrafficking in the former Soviet Union, specifically the link with the Islamic Movement of Uzbekistan.

I don't want to overplay that link. The Islamic Movement of Uzbekistan is not the main drug trafficking organization to the area and narcotics were not its sole source of income. However, there was a link and even a small percentage of narcotics trafficking through Tajikistan would produce a profit in the millions of dollars for the Islamic Movement of Uzbekistan.

Remnants of that group will, if they have not already, return to Tajikistan and are likely to go back to terrorism and narcotrafficking. They have the potential and there is a threat there. They have the means and knowledge to traffic, and they have the will to conduct terrorist operations with the means that would be provided by trafficking of narcotics.

While the reduced state of the Islamic Movement of Uzbekistan will make it easier to deal with it, the resumption of poppy growing in Afghanistan is going to ensure a continuing supply. I doubt that the trafficking networks thus far have really been damaged.

A full-spectrum program is necessary to attack this problem. Randy Beers has already spoken about the proposals for dealing with the problem in Afghanistan. I would add to that that one part or one aspect of dealing with the problem in Afghanistan is to stop the inflow of chemical precursors necessary for the processing of heroin, and that is an area where the Central Asian states can play an important role.

Another aspect of dealing with the problem is obviously going to be enforcement measures against both trafficking and terrorist groups, and finally doing something about the consumption, the demand, in developing countries. Of course, in the case of Afghanistan, most of the consumption of the heroin produced in Afghanistan is in Europe and the former Soviet Union.

On the interdiction side, enforcement side, in Central Asia there is a very real need for better cooperation among the countries of the area, both in fighting terrorism and in fighting narcotics trafficking. There really has not been very effective cooperation among the countries. They are very suspicious of each other. It is going to take a lot of outside pressure and support to get them to do this.

45

I would also mention very specifically that there is an example of the drug interdiction unit in Tajikistan which has been quite successful and has been cited by the United Nations as being successful. It has been supported by the United Nations, but that support is supposed to end and if it doesn't continue, I don't think that program is going to continue.

Finally, I think that there is another aspect here that is relevant in central Asia. When we talk about dealing with the problem of growing, we always talk about a combination of interdiction and crop substitution programs, or alternate employment programs might be a better term.

I think when you talk of dealing with trafficking, at least in the Central Asia area, the same concept is useful because the people who are doing the trafficking, the couriers, are in it not because they want to be in it, but because they do not have any money. The collapse of the economic system of the Soviet Union has driven them into this.

I am convinced that if you had a strong interdiction program, a lot of publicity—that is an important part of it—plus a program to reinvigorate those economies, particularly the rural economies, you would reduce the trafficking, and I think that this is something that the international community should be looking at.

I would note that it would also have the effect of reducing the number of recruits for the main terrorist organization in the area, the Islamic Movement of Uzbekistan. So here is a program which serves both purposes.

Thank you.

[The prepared statement of Mr. Smith follows:]

STATEMENT OF R. GRANT SMITH, SENIOR FELLOW, CENTRAL ASIA CAUCASUS INSTITUTE, SCHOOL OF ADVANCED INTERNATIONAL STUDIES, JOHNS HOPKINS UNIVERSITY, WASHINGTON, D.C.

I appreciate the opportunity to appear today to discuss a subject which I followed closely both when I was Ambassador to Tajikistan and subsequently. I understand that others will cover Afghanistan, so I will focus on former Soviet Central Asia, particularly Tajikistan and the Islamic Movement of Uzbekistan.

The connection between terrorism and narcotrafficking has several aspects. As we have seen in Colombia and Afghanistan, terrorist groups may profit directly or indirectly from the growing, processing and trafficking of narcotics. They may engage themselves in those activities, or provide protection for or tax the activities, without themselves engaging in the production or transport. In addition, terrorist groups can use existing narcotrafficking systems for their own benefit. For example, established drug smuggling routes can be adapted to move arms, explosives or even people, and narcotraffickers' money laundering channels can move terrorists' funds just as easily.

Former Soviet Central Asia has seen both aspects of the interaction between the two groups. Narcotics trafficking through the area began in earnest after the breakup of the Soviet Union and expanded dramatically with the steep rise in production in Afghanistan at the end of the 1990's. Whereas at the beginning of the decade, most of the opium production in Afghanistan exited to the south or west, by the end of the period an estimated half or more of what was not consumed in Afghanistan moved north, primarily through Turkmenistan and Tajikistan. As late as the mid-1990's, most of what transited Tajikistan was in the form of opium, representing the limited production of the Badakhshan province of Afghanistan, which has traditionally been only a few percent of the total production of Afghanistan. That opium moved through the eastern part of the country to the city of Osh, in Kyrgyzstan, and thence on to Russia, where there was a market for opium. In 1997 Tajikistan authorities seized their first heroin transiting the country. By 2000, the total for opiates transiting Tajikistan had risen to 300–500 tons of opium equivalent per year (30–50 tons of heroin), according to UN estimates quoted in the Department of

46

State's International Narcotics Control Strategy Report. Of that 80 per cent went through the western portion of the country, largely in the form of heroin and largely originating in Taliban-controlled areas of Afghanistan.

During this same period, the Islamic Movement of Uzbekistan, or IMU, began to move out from its bases in Tajikistan to conduct operations in Kyrgyzstan and Uzbekistan. Its military leader, Juma Namangani, had fled the Ferghana Valley portion of Uzbekistan during the Tajikistan civil war. An experienced fighter from his days with the Soviet Army in Afghanistan, Namangani fell in with the United Tajik Opposition (UTO). He rose to the level of deputy to the UTO chief of staff, Mirzo Ziyoev, operating out of Tavildara in eastern Tajikistan with a force of Uzbeks. He reportedly opposed the 1997 peace agreements that ended the fighting between the Government of Tajikistan and the UTO. With his men, he settled in the town of Hoit in the Karategin Valley of eastern Tajikistan, not far from the Ferghana Valley by way of mountain paths. The Government of Uzbekistan charged Muslim extremists with responsibility for attacks on security personnel in Ferghana in late 1997 and, later, for the assassination attempt against President Karimov in early 1999. With Uzbekistan pressing Tajikistan to act against Namangani, he led his men over the mountains into the Kyrgyzstan portion of the Ferghana Valley in August 1999 for what ended up as a series of kidnappings for ransom. They withdrew to Tajikistan in the fall. Finally, at the urging of their erstwhile allies of the UTO, who were then in the Government of Tajikistan, they moved on to Afghanistan, where they were warmly received by the Taliban. In 2000 they mounted more widespread attacks within Uzbekistan and Kyrgyzstan, some using the route of the previous year and some by other routes. The United States declared the IMU a terrorist organization in September 2000. By then, estimates put the strength of the IMU at up to 2–3000 fighters, most of whom were based at Mazar-i-Sharif in Afghanistan, but with contingents also supporting the Taliban in Qunduz and Taloqan. These contingents fought with the Taliban in 2001, with Namangani himself reportedly killed.

A portion of the income which enabled the IMU to operate into Kyrgyzstan and Uzbekistan came from moving heroin from Afghanistan across Tajikistan into those countries for onward shipment to Russia. The trafficking reportedly began before their hostage-taking forays but used the same route from their bases in Tajikistan into the Ferghana Valley portion of those two countries. While difficult and impassable by vehicles or by anyone in the winter, it had the advantage of avoiding the heavily monitored roads into Kyrgyzstan. The IMU experience in fighting with the UTO in eastern Tajikistan during the civil war there provided it with the bases, knowledge of the border crossings into Tajikistan from Afghanistan and contacts with the local field commanders necessary for such an operation.

How important were these narcotrafficking profits for the IMU? One observer, quoted in Ahmed Rashid's new book, Jihad, estimated that the IMU controlled 70 percent of the narcotics trafficking Tajikistan. This would appear unlikely, since there were established routes, controlled by major warlords in Tajikistan, both to the east and west of the IMU area. However, even a small share of the Tajikistan transit market would have produced significant returns for the IMU. Assuming a profit of $500 for carrying one kilo of opium or opium-equivalent across Tajikistan, which was the figure when I was there, even a share of two per cent of the Tajikistan transit trade would produce a profit of $3–5 million a year. When added to the IMU's reported income from other sources—gifts from Osama bin Laden and ransoms from hostage taking—it gave the organization the capability to outfit its fighters well and to pay for the food and other items it got from local populations.

While the IMU leadership may be destroyed and its fighters mostly killed or taken prisoner in Afghanistan, some remnants have probably found their way to the IMU bases in Tajikistan, where they joined cadre that remained there during the fighting in Afghanistan. They presumably still wish to achieve the IMU objectives and will have the ability to pursue those objectives through money obtained from narcotrafficking.

Preventing the resurgence of such an organization requires a multi-pronged approach not unlike that which the international community has pursued in trying to end the growing of opium and coca. A strong enforcement effort, targeting both the narcotraffickers and the terrorist organizations, needs to be a major component. This will require a degree of cooperation among the Central Asian states that they have avoided to date. However, there also needs to be a "carrot." The lack of other sources of income in the post-Soviet era has driven individual Tajiks to smuggle opium or heroin across the country and was a key factor aiding IMU recruitment in the Ferghana Valley. In rural areas, the old agricultural economy no longer works—particularly the cotton-growing collective farms—leading to large-scale unemployment and underemployment. While some reform has occurred in Tajikistan,

47

it has not revived the rural economy. In Uzbekistan, reform has not begun. Such reform will require commitment from both governments plus substantial international support. Only with such an effort, combined with a persistent, tough and well-financed program to eliminate poppy growing and terrorist groups in Afghanistan, can the international community hope to eliminate these twin scourges.

Thank you.

Chairperson FEINSTEIN. Thank you very much, Ambassador Smith.

Dr. Olcott, welcome.

### STATEMENT OF MARTHA BRILL OLCOTT, SENIOR ASSOCIATE, CARNEGIE ENDOWMENT FOR INTERNATIONAL PEACE, WASHINGTON, D.C.

Ms. OLCOTT. Thank you so much, and thank you for the opportunity to testify. I will read just a small portion of my previously submitted testimony.

I would argue that until we tackle Afghanistan's drug problem head on, we can't claim a victory in the war against terrorism. While it is true that the provisional government of Hamid Karzai has formally extended the ban on the cultivation of poppies, there is no Afghan security force that can be relied on to enforce his edicts, and no international security force in place whose mandate spans all of Afghanistan.

The effectiveness of the current ban depends on the willingness of local warlords to destroy the crop and discipline those who grow the poppies, but these are the very men who have no incentive to do so and currently tax the crop or its transit across their territory.

We should stand by and simply acquiesce to this restoration of Afghanistan's drug trade which we have heard about this morning. Allowing or tolerating Afghanistan's cultivation of poppies simply turns the tragedy of that country's poverty into one of regional security.

Afghanistan's narco mafia is committed to being a lasting force. They have already provided what I term "opium futures," not only providing seed for the crop that is in the ground, but having already pre-purchased it, which is going to make the problem of destroying the crop that much more difficult. By contrast, USAID projects that are designed to create seed banks necessary for crop substitution are still in their very earliest pilot stages. So the drug mafia is way ahead of us on the ground in Afghanistan.

I would like to suggest some things we could do to cut back on drug production in Afghanistan. One should not minimize the difficulty of this problem. The network of drug dealers is formally and fully intertwined with many parts of Afghanistan, including parts of Central Asia, and crop substitution programs alone will not eliminate drugs from this region. Economic incentives will only work if the country's leaders are forced to cease collecting tribute.

Pressing Hamid Karzai's government to punish Afghanistan's drug dealers will certainly cost it and us some friends, as, too, would a policy of the U.S. refusing the services of warlords who are known to profit from the trade or production of drugs. But this is precisely what we and they should do.

The effects of Afghanistan on the trajectories of development in many of the Central Asian states has been profound over the past decade. Tajikistan and Turkmenistan already meet some of the

48

definitions of narco states. Parts of the governments in both places
have been accused, and I believe do sift profits from the drug trade.
Kyrgyzstan, too, is at risk of becoming a narco state, as the low sal-
aries paid both local government and security officials make them
ripe for being suborned.

Most troublesome is what Ambassador Smith talked about, the
potential fate of the 200-odd men who serve as officers in
Tajikistan's National Drug Control Board whose salaries are way
larger than scale in the region and has been a very effective force.
But their salaries will run out at the end of 2002 when the UN pro-
gram comes to a halt.

Current U.S. programs have been increasing the amount of
money that is available to help facilitate interdiction in the Central
Asian states, but even the increased money still meets a fraction
of these countries' training needs and does not provide the salary
support, or has not to date provided salary support for law enforce-
ment officials.

As Afghanistan's drug trade increases, there is a real prospect
that Central Asia's security forces could be fully overwhelmed. This
demands what I would call a carrot-and-a-stock approach in Af-
ghanistan. The most effective strategy would be for the U.S. to seek
and destroy the current stores of opium and close down the heroin
factories throughout the country. Obviously, we have the intel-
ligence and military capacity necessary to help facilitate this
should we make this a priority.

Independent of this, the U.S. could take more aggressive steps to
halt the resumption of poppy cultivation in Afghanistan through a
multi-faceted approach of incentives and disincentives. Afghan
farmers should be offered cash subsidies for destroying the current
harvest in the field or for turning it over for destruction, and those
who refuse should really lose all priority for receiving future inter-
national development aid, while those who qualified should be put
at the top of any trial programs or pilot programs.

Since I am just about out of time, let me go to the conclusion.

In drawing lessons from the tragedies of September 11, U.S. pol-
icymakers should not confuse the temporary amelioration of secu-
rity challenges with rooting out their deep underpinnings. Our
timetable for rebuilding Afghanistan must reflect the realities of
how the risks in Afghanistan are generated and not simply those
of our annual budget or work cycle.

The administration should request an increase in supplemental
funds to fight against the return of drug cultivation in Afghanistan
and the trafficking of narcotics across the states of Central Asia.
More pressure must also be placed on the Russians to do a better
job. Finally, we must make it clear to our new friends in Kabul
that the government of Afghanistan must do more than simply re-
affirm the goal of ending drug production, that the U.S. will expect
them to introduce and implement a wide range of programs de-
signed to deal with drug interdiction, crop substitution, and cre-
ating a reliable network of intelligence to aid the international
groups in their efforts.

Thank you.

[The prepared statement of Ms. Olcott follows:]

49

STATEMENT OF MARTHA BRILL OLCOTT, SENIOR ASSOCIATE, CARNEGIE ENDOWMENT
FOR INTERNATIONAL PEACE, WASHINGTON, D.C.

The US is scoring a major victory against global terrorism by defeating the al-
Qaida network in Afghanistan, but until we tackle Afghanistan's drug problem head
on we cannot consider the victory to be a permanent one.

Too long the international community has ignored or downplayed the security
risks inherent in the drug trade, which derives from Afghanistan's poppy-crop. For
most of the past decade, Afghanistan was the world's largest single producer of
opium, and with every passing year it turned more and more of its opium into her-
oin. The drug traffic emanating from Afghanistan's poppy harvest, and the opium
and heroin manufactured from it, have undermined the security of all the states of
the region.

But prior to September 11, it was difficult to convince US policymakers that Af-
ghanistan's drug industry was a US problem, and even now we have no concrete
strategy to deal with renewed drug cultivation in Afghanistan.

Afghanistan is the source of less that 10 percent of all heroin consumed in the
US. By contrast, about 80 percent of Europe's heroin traces its origin to Afghani-
stan, leading a series of US administrations to conclude that it was the Europeans'
responsibility to take the lead in organizing and funding projects aimed at elimi-
nating Afghanistan's narcotics industry.

Even though this was not always admitted publicly, a quick look at the pattern
of US spending on international drug control measures quickly reinforces this con-
clusion. The US priority has been on eradicating production and interdicting drugs
originating in the Andean states, in Central America, and the Caribbean, and not
on those half a world away, in a seemingly ungovernable part of the world. Added
to this was the fact that even prior to going to war in Afghanistan, the US govern-
ment did not want to engage with the Taliban government, whose existence the
international community did not recognize and whose hold on power the US and its
allies did not want inadvertently to encourage.

US policymakers recognized that the situation in Afghanistan was a highly unsta-
ble one, and posed a security risk to that of neighboring states. But September 11,
US security was not seen as at risk. First the Clinton and then the Bush adminis-
trations were content to use the 6-plus-2 format, supplemented by the high-level
US-Russian working group on Afghanistan, as the framework for trying to modify
the political situation in that country.

The existing status-quo, though, was one which left many of the leaders of neigh-
boring countries very disturbed, and firmly convinced that their own national secu-
rity was thoroughly compromised. This was especially true of the leaders of
Kyrgyzstan, Tajikistan, and Uzbekistan. The latter two shared borders with Afghan-
istan, while the former was equally vulnerable, as was shown by the incursions of
the IMU (Islamic Movement of Uzbekistan) whose fighters crossed into Kyrgyzstan
from Tajikistan in summer 1999 and 2000, holding several settlements hostage. The
Uzbek government had gone on high security alert slightly earlier, after the bomb-
ings in Tashkent in February 1999.

The repercussions of the latter were felt throughout Central Asia, as the Uzbek
government virtually closed its borders with neighboring states, and began mining
some of the national boundaries that it set about unilaterally declaring. All of the
states started to target members of radical Islamic groups for arrest, particularly
those tied to the increasingly more popular Hezb-ut Tahrir. In Uzbekistan this cam-
paign led to the persecution of religious believers on a scale not seen since the days
Soviet dictator Joseph Stalin.

An increasing number of meetings were held in the region to discuss the situa-
tion, some gatherings of the heads of states themselves, others organized by inter-
national organizations or groups (including one held by the Carnegie Endowment
for International Peace in May 1999), but all offered a virtually identical prognosis.
Unless the growing opium and heroin trade through Central Asia were curbed, anti-
state groups would have a continual and ready source of funding. Russia and
Kazakhstan, both major transit points in the drug trade, shared the Central Asian
leaders preoccupation with drugs and with what the leaders of the region termed
"Islamic extremism." Given their escalating engagement in Chechnya, whose armed
forces they saw as partially supported through the sale of drugs, Russia's interest
was particularly keen. But many observers also saw the Russians as a part of the
problem, complaining that Russian troops based in Tajikistan helped organize and
facilitate the shipment of heroin out of the region.

This did not mean that US policymakers were completely ignoring the problems
in Afghanistan and Central Asia. The US encouraged international efforts to mon-
itor poppy cultivation in Afghanistan, and provided some support for improving the

50

capacity for the neighboring Central Asian states to interdict the crop. However, until September 11, the eradication of drug cultivation in Afghanistan remained of secondary concern to US policymakers.

### THE DRUG TRADE RETURNS TO AFGHANISTAN

Now everyone recognizes that it would be an oversimplification to cite Afghanistan's drug trade was only one source of financing for the al-Qaida network. Terrorist groups allied themselves with Osama Bin Laden received funding from a number of sources. Some of the money transfers they received came from legal income of their donors, but there was a highly beneficial symbiosis between Afghanistan's drug trade and those who preyed on the country's atmosphere of lawlessness to prepare "cadres" for their "global battle".

Ironically, though, this symbiosis was under threat when the September 11 attack on the US occurred. Before the 2001 harvest the Taliban banned the cultivation of poppies, and the rigor with which they enforced the new restrictions resulted in a poppy crop that was only about five percent the size of the previous year. The Taliban did not seize the country's considerable drug stores or destroy the small factories which produced the country's heroin. The stores of drugs in Afghanistan were so great that the actions of the Taliban government did little to staunch the flow of drugs through the country. It did, though, contribute to a rise in the price of heroin, which had been artificially lowered, it seemed, in order to raise the number of new addicts.

Cynics have argued that the Taliban would have allowed the 2002 crop to be planted, but obviously there is no way to know whether their ban on poppy cultivation would have continued to have been enforced. To speculate on this is to engage in the practice of writing alternative history, something which is of no real utility.

What is true, and of far more significance, is that the provision government of Hamid Kharzai is unable to enforce the ban on the cultivation of poppies which he called for shortly after being brought to power. Nor does he have an Afghan security force which can be relied on to enforce his edicts. The effectiveness of the current ban depends upon the willingness of local warlords, those in control of the country's irregular militia forces to destroy the crop and discipline those who grow the poppies. But these men have absolutely no incentive to do so, as they are able to tax the crop or its transit, depending upon what part of the country they are living in.

The US continues to regard the issue of Afghanistan's narcotics trade as of secondary importance, and has been pursuing a policy on not being distracted by secondary concerns until the Taliban and the al-Qaida network are defeated throughout the country.

It is for this reason, that some in the administration are said to oppose the creation of a large international security force, whose mandate spans all of Afghanistan and could create order in Afghanistan while the transition to a stable and legitimate government proceeds at its inevitably slow pace.

The transition in Afghanistan must inevitably be a slow one, but while it occurs we should not sit by and acquiesce to the restoration of Afghanistan's drug trade. That Afghanistan's heroin does not dominate the US market should not make it of secondary concern to US policymakers. Heroin is a global commodity; thus, a harvest which meets the need in one part of the world frees up supply for all other regions.

Moreover we have already seen how the atmosphere of lawlessness in Afghanistan, which the drug trade helped facilitate, was a direct threat to US security. Allowing or tolerating the Afghans cultivation of poppies once again simply transforms the tragedy of Afghanistan's poverty into a problem of regional security.

Some even argue that we should close our eyes to the restoration of poppy cultivation in Afghanistan. Afghans have traditionally grown poppies and used opiates, they remind us, as have all Central Asian nationals. Moreover, growing poppies is easy and profitable, regardless of the relatively small percentage of profit that remains with the growers. After all, it is not like the Afghans have lots of choices today.

### THIS LINE OF ARGUMENT THOUGH IS QUITE DANGEROUS

One cannot minimize the economic disruption that the Afghans have faced in the past two decades, when, among other things, there has been virtually no investment in agriculture. But this doesn't justify the return to the cultivation of opium poppies.

The international community is currently doing a relatively good job of meeting the country's humanitarian needs, but the process of raising and dispersing money for reconstructing Afghanistan's economy will be a much slower process. Moreover there is the real risk of donor fatigue; if the going gets difficult in Afghanistan the

51

international aid community may simply go home, or scale back their efforts. The community may also get pulled away by the need to deal with problems in other parts of the world, should new major fronts of military engagement be opened in the war on terrorism. Should this occur it would leave Afghanistan's drug lords in firm control.

Afghanistan's drug dealers are committed to being a lasting force. So as USAID is spending some $15 million on a pilot program to create a seed bank, to reintroduce into cultivation strains of crops that were once indigenous to Afghanistan, Afghanistan's drug dealers are already out there paying for opium futures. They distributed seed or the money to purchase it in the fall, and are now primed to buy up the country's crop when it is harvested in March.

For all of the Taliban's ban on opium cultivation, Afghanistan's drug dealers were not short on cash when the Taliban government collapsed. Moreover, although some of them may have died as the result of US bombing raids, Afghanistan's narco-mafia has undoubtedly survived the months of fighting relatively unscathed. While many of them worked with the Taliban, and accepted being tithed by the clerics, Taliban rulers never took over the drug trade, they simply sought to profit by it. Moreover, even when the Taliban banned poppy cultivation, it continued in the territory controlled by the Northern Alliance.

One should not minimize how difficult it would be to sharply cut back drug protection in Afghanistan. The network of drug dealers is fully intertwined with the traditional local elite in many parts of Afghanistan, as it is in parts of Central Asia. Moreover, they are not short on cash, as US bombing raids have yet to target Afghanistan's drug stores or heroin producing facilities.

Crop substitution programs alone will not eliminate drugs from Afghanistan. Economic incentives will work for the farmers, only if the country's elite is forced to cease collecting from this highly lucrative trade. As in all civilized countries, Afghanistan's drug dealers must be subject to arrest and lengthy incarceration, and a serious effort should be made to find them. Pressing Hamid Karzai's government to punish Afghanistan's drug dealers will certainly cost it and us some friends, as too would a policy of refusing the law-enforcement services of warlords who are known to trade or profit from the trade in drugs. But this is precisely what we and they should do.

Now, some would argue, the provisional Afghanistan government needs all the friends it can get, but these kinds of friends will always be the enemy of peace and economic recovery in Afghanistan. No cash crop will produce the same income that a farmer earns from opium cultivation, nor allow a rapacious elite the same easy riches.

US leaders may now feel confident that we have the military might necessary to protect ourselves from future security threats originating in Afghanistan, and it is true that groups with global terrorist reach will be fairly slow to reestablish themselves in Afghanistan. But a US policy of responding with surgical strikes to cauterize festering points around the globe does not address ways in which Afghanistan's drug trade will undermine that country's economic recovery and the economies of Afghanistan's weakest neighbors, putting these states at greater risk.

## AFGHANISTAN'S DRUGS ARE A REGIONAL PROBLEM

In recent years, more than half of Afghanistan's drugs have exited through Central Asia, and the amount of drugs flowing through Central Asia has increased dramatically over the past decade. Interdiction has improved, but Tajikistan's chief narcotics control official estimates that only about one tenth of the drug traffic across his country is successfully interdicted. Moreover, the blend of drugs traversing Central Asia has changed in recent years, as the amount of heroin being produced in Afghanistan increased exponentially.

Heroin interdiction is even more challenging than stopping the opium trade. During a January 2002 to Tajikistan, I had the opportunity to tour the vault of the National Narcotics Control Commission, where I was able to gain a greater appreciation of the magnitude of the task that Tajikistan's law enforcement officials face, as the vault was filled with small or otherwise cleverly disguised parcels all of which were filled with heroin. The skill displayed by Afghanistan's drug dealers in disguising their valuable packages was considerable. Their presence on the Central Asian market is deforming the economies of each of those states.

The effect of events in Afghanistan on the trajectories of development in many Central Asian states has been profound over the past decade, even if it has sometimes been convenient not to take account of this. The civil war in Tajikistan in the early 1990s was facilitated by the sanctuary and training in guerrilla warfare that Afghanistan offered to Tajik fighters, and to many who traveled there from

52

Uzbekistan as well. In turn Tajikistan's civil war provided fertile field for drug traf-
fickers, arms dealers and Islamic revolutionary thinkers to thrive. Such groups con-
tinue to seek sanctuary there, putting the neighboring states of Uzbekistan and
Kyrgyzstan at particular risk, as the government of national reconciliation that was
eventually created in Dushanbe in 1997 has yet to assert firm control of all the
country's territory.

If eyewitness reports are at all credible, then Tajikistan and Turkmenistan al-
ready meet some of the definitions of "narco-states" as the governments in both
places have credibly been accused of sifting profits directly from the drug trade. The
Turkmen profited from drugs transiting Taliban-held territories. The Tajiks worked
through the Northern Alliance, and their main drug routes went across Kyrgyzstan
and then into Kazakhstan and Russia. Kyrgyzstan too is at risk of becoming a
narco-state, as the low salaries paid to local government and security officials in the
southern part of the country make them ripe for being suborned. Of greatest con-
cern is the future of the approximately two hundred men who serve as officers for
Tajikistan's National Drug Control board, and whose salary, quite generous by re-
gional standards, is paid through funds provided by the UN Drug Control Program.
Since this program went into effect, interdiction of heroin increased sharply in
Tajikistan, but the funding for the project will run out in 2002. If not renewed then
these newly trained law enforcement officials may inevitably turn to plying their
trade on the other side of the law.

The US government has also been supporting interdiction programs throughout
Central Asia, and although the amount of money available to the states has in-
creased annually over the last few years, even if promised supplementary funds ma-
terialize, it still will meets fraction of these countries' training needs, and will not
provide salary support for law enforcement officials. Moreover, if Afghanistan's drug
trade increases, and it is likely that this will occur in the political vacuum of the
transition period, then Central Asia's security forces could rapidly be overwhelmed.

Unless we move quickly to help the Central Asian states better protect themselves
from the dangers emanating from Afghanistan—both directly through massively in-
creased assistance to these countries drug interdiction efforts, and indirectly
through efforts to end the cultivation of opium poppies in Afghanistan—then these
countries could become the breeding grounds for future terrorist networks of global
reach in much the same way Afghanistan did. Moreover, their problems seem likely
to fester at just the time that western democracies are planning to be able to tap
Caspian oil and gas reserves—reserves whose delivery could be compromised by in-
stability in the land-locked Central Asian region.

NEW INITIATIVES ARE NEEDED IN AFGHANISTAN

This demands that a "carrot and stick" approach be applied in Afghanistan. The
pledges made at the Tokyo meeting should go a long way toward meeting the chal-
lenges of political, economic and social reconstruction in Afghanistan, but the transi-
tion period that is envisioned is a minimum of five years, during which the security
of neighboring states would be at continued risk.

Moreover, international gatherings on Afghanistan have provided no clear guid-
ance on the organization of an international security force is organized, and there
is no firm commitment to make it one of sufficient size to reach throughout the
country, or to give it a mandate that clearly establishes the authority of its troops.
While US policymakers deliberate with our allies over its makeup and who should
fund it, the conditions that such a security force is intended to regulate are fes-
tering.

Nowhere is this clearer than in the area of narcotics control, as these forces will
have to deal with new and more dangerous realities on the ground. Having returned
to the cultivation of opium, Afghan farmers and traders alike have much greater
incentive to reject international interference with their livelihoods. Given that most
Afghans are armed, their opposition to international drug control efforts could lead
to further bloodshed.

Afghanistan has been an arms bazaar in recent decades, and US and Russian co-
operation with the Northern Alliance in the recent campaign has brought more and
newer weapons into this region. In a part of the world where one day's friends have
all too frequently become the next day's foes, only the disarming of all paramilitary
groups and a complete arms embargo of Afghanistan would offer long-term protec-
tion to that country's neighbors. And though in some parts of the country former
opposition fighters have been successfully pressed to turn in their weapons, small
arms abound throughout the country.

The presence of large stores of arms and markets for them in Afghanistan render
the region's burgeoning drug trade even more deadly. This in itself should be suffi-

53

cient incentive for the US to seek out and destroy current stores of opium and locate and then close down the heroin factories throughout the country, regardless of where they are found. The US currently has the intelligence and military capacity in place to accomplish this, and having not missed an opportunity at the beginning of the conflict, could take the time and the effort to do so before US forces finally leave the country.

The US should also take aggressive steps toward halting the resumption of poppy cultivation in Afghanistan, through a multi-faceted approach of incentives and disincentives. Afghan farmers should be offered cash subsidies for destroying the current harvest in the field, or for turning it over to authorities charged with its destruction. Those who comply should qualify for trial or target programs of agricultural reform, while those who refuse should lose all priority for receiving future international development assistance.

Anything less means that the opium and heroin trade through Afghanistan will quickly recover, as all the traders along these well established routes seek to maintain their profit levels. The drug trade feeds on the poverty of this region, and allows radical Islamic groups to become self-financing. Drug dealers and arms traders propagate each other, and have long been cooperating in this part of the world.

This is bad news for the Central Asian states. The point of contagion for them remains Afghanistan. As one senior government official in Kyrgyzstan recently described the situation, the flourishing drug trade insures that anyone can buy his or her way into Central Asia at a price. Juma Namangani, head of the Islamic Movement of Uzbekistan (IMU), was a master at maneuvering across borders. Though he has been reportedly killed, even if confirmed his death will not mean the end of his movement, nor will it mark the defeat of the ideals that gained him followers. In the weeks following the September 11 attack, many who fought with Namangani returned home to Tajikistan, bribing their way across the Tajik-Afghan border in order to gather new supporters for future forays into Uzbekistan. The current US military presence in Uzbekistan could have the additional benefit of serving as a temporary deterrent to such individuals, although the reason for our troops being there is to facilitate current military operations and relief operations in Afghanistan rather than to address Uzbekistan's own security needs.

The reestablishment of Afghanistan's drug trade through Central Asia is good news for those interested in the perpetuation of militant Islamic groups. The current religious ferment in the region is nothing new. It has persevered in much the same fashion for over a hundred years. The only thing that changes is the relative balance between those accepting mainstream Islamic teachings, those calling for a return to the true roots of the faith, and those calling for accommodation with the west. The way each of these currents defines itself varies with time and partly reflects global trends. Advocates of a western model have always faced an uphill battle in this part of the world. Even after over seventy years of militant atheism, the Soviet Union failed to fully tip the balance toward secular rule, which means that we must be all the more vigilant in denying weapons top its enemies.

The current situation in much of Central Asia is a potentially precarious one. Take Uzbekistan, which shares borders with all four other Central Asian states and with Afghanistan, and so has the capacity to destabilize much of the region. The government in Tashkent faces the challenge of educating, integrating and employing a new generation of Uzbeks—over half of the country is under 21—and given how little economic reform has occurred in the country it really still is the government's challenge, as there is only a tiny private sector to draw on for assistance. Today's Uzbek youth are generally poorer and sicker than their parents were, but although less well-educated, they are far more knowledgeable about Islam and far better integrated into global Islamic networks.

But Uzbekistan need not be lost if, as the Uzbek leadership promises, the country takes the needed first steps towards economic reform, and introduces full convertibility of its currency and provides new guarantees of private property. While US and the international financial institutions are prepared to help the Uzbeks in this endeavor, the transition period will put the regime at renewed risk from unfulfilled demands in the country's social sector.

The resumption of the drug trade simply adds new pressures. In Uzbekistan, as elsewhere, the social sector is under severe strain. Narcotics addiction is growing throughout the region, in all five Central Asian states and in Iran, and HIV/AIDS is on the rise as well. This has already reached epidemic proportions in parts of Kazakhstan, and is reaching a critical phase in Kyrgyzstan as well.

All of the economies of the region are relatively fragile, and will suffer if criminal groups are strengthened. We have already seen how narcotics trade has served to undermine the governments of some of the Andean region states, funding terrorist

54

groups. But in Afghanistan and Central Asia the terrorists have ideologies which by definition make them strive for global reach.

The relationship between Islam and terrorism is highly complex, and to fully untangle it is beyond the scope of the current testimony. Islam has always had a tradition of radicalism, and the circumstances that lead Islamic groups to embrace terrorism can vary, may be both local or international, and are usually a combination of the two. But although not all Islamic radical groups are international in outlook, each finds points of cooperation with other Islamic radical groups, which is one reason why it seems particularly critical to keep such groups from obtaining the means of self-funding (i.e., money to pay salaries to unemployed youths who leaflet, organize etc.).

Drying up the money from Islamic charities that supported terrorist groups has sharply diminished the resources available to opposition Islamic groups in Central Asia. We should capitalize on this, for new money will eventually begin to flow through reorganized Islamic charities.

### LET SOMETHING GOOD COME FROM OUR TRAGEDIES

The tragedies of September 11 have provided the US with an opportunity to rethink its strategies not just in Afghanistan, but in the neighboring states. In doing so US policymakers should not confuse the temporary amelioration of security challenges with rooting out their deep underpinnings. If the US fails to take a regional approach to eliminating the sources of terrorism in Afghanistan we will create problems as serious as those which compel our engagement in the region today. Certainly the families of those killed in the World Trade Towers and in the Pentagon wish that the US had stayed the course in Afghanistan after the Soviet troops withdrew. Let us not repeat our earlier mistakes. Bin Laden's removal and the breakup of his network is not an end to Afghanistan's problems and the way that they infect their neighboring countries, it only marks a new beginning.

As part and parcel of destroying the al Quaida network US policymakers must be prepared to engage in a serious way to sharply reduce—if not eliminate—the cultivation of opium poppies in Afghanistan. The administration should propose concrete projects designed to do this as well as to stop the trafficking in narcotics across the states of Central Asia, and Congress should signal its willingness to supply the necessary supplementary funding. While US policy-makers should pressure our European allies to actively engage in this effort with us, including to help pay the cost of increased interdiction and crop substitution programs, we must be prepared to act even if the US is forced to bear a disproportionate share of the burden.

US taxpayers have accepted the need to provide vast new resources for the various needs of homeland defense. But vigilance at home is only part of the solution. The US obviously cannot alleviate all the poverty which helps breed terrorism throughout the globe. But we can recognize places of particular vulnerability, as Afghanistan and its neighborhood is certain to be. Afghanistan continues to have all the elements of a terrorist breeding ground—poverty, drugs, conventional weapons and a population that is used to being permanently at war.

Our timetable for rebuilding Afghanistan has to coincide with the timetable of how risks are generated and not that of our own annual budget cycle. The US must help organize and fund an international security force capable of meeting Afghanistan's current security challenges, and must pressure other members of the coalition against terror to provide men and funds to support it as well.

The administration should request a dramatic increase in supplemental funds to fight the against the return of drug cultivation in Afghanistan, and the trafficking in narcotics across the states of Central Asia. More pressure must also be placed on the Russians to do a better job of combating the trafficking of narcotics across Russia as well.

But most importantly, we have to make it clear to our new friends in Kabul, that the government of Afghanistan must do more than simply reaffirm the goal of ending drug production, that we expect them with international assistance, to implement a wide range of programs to deal with drug interdiction, as an integral part of developing a new national police force and civil service. Part of the latter's task must be to work with the local communities on projects designed to lead to crop substitution, and to develop programs which offer financial incentives for turning in criminal groups that seek to encourage the perpetuation of the drug trade.

This raises the question of who will fund these activities. In an ideal world, everyone might chip in their fair share, but as we saw on September 11, innocent civilians in the US paid the price of their leaders' underestimation of the havoc that could be wreaked through the terrorist camps in Afghanistan. The fight against terrorism cannot hope to succeed unless we remain as alert to the challenges of pre-

55

venting tomorrow's terrorists from consolidating as we are to defeating those who already threaten us.

Chairperson FEINSTEIN. Thank you very much, all of you.

Let me begin with this question: I am just wondering whether—and I asked this question of Mr. Newcomb and I want to ask it of you—in these areas where there are new terrorist groups uprising, Uzbekistan, Tajikistan, and controlling drug trafficking, whether it would make any sense to have a key terrorist list of these individuals and groups and perhaps strive to work in concert with our allies in freezing these assets. They may be too removed from that, but I would like your comment on it.

Ambassador Smith?

Mr. SMITH. I think that in the case of the Islamic Movement of Uzbekistan, which I should say in the year 2000 was put on the State Department's list of terrorist organizations, I doubt that it has much in the way of assets that are attachable, concrete, identifiable, in contrast perhaps to groups elsewhere.

Chairperson FEINSTEIN. Colombia, Mexico, even Afghanistan. I appreciate that very much.

I am going to turn to Senator Kyl. If you have some questions, go ahead.

Senator KYL. Yes. One of the things that I was struck by in both the previous panel and also what several of you said—I think, Dr. Olcott, one of the points you made was that we shouldn't be caught up in our own budget cycles or parliamentary restraints or constraints.

This is a war on terrorism and we have established already that the drug trade helps to fund that war. In a war, you try to cut through red tape. You don't be bound by it, and it just seems to me that so many of you made points that relate to this. The fact that we have been hampered in Colombia by an overly restrictive policy that Senator Sessions pointed out really makes no sense.

It is a catch–22. You have to have control of an area if you are going to eradicate the crop, but you can't give the military there the ability to control the area because then you might be helping the government in its war against the terrorists, which is a catch–22. So it seems to me that we have to look at little more clear-eyed at what this is all about.

When it was just a war on drugs, we might have had the luxury of this sloppy thinking and sloppy action, but now that we know that, in addition to that, it helps to fund the terrorists who we are in a war with, we don't have that luxury anymore. And I think that to be bound by reprogramming problems and restrictions as we had in Colombia and some of the things that were referred to here is no longer acceptable to us. I hope that through hearings like this and suggestions that you all can give us, we can help to cut through a lot of that and begin to effectively deal with this problem.

I know that each of you has so much more to add here. In view of the time, let me terminate here, unless any of you would like to comment on what I said, and give Senator Sessions a chance as well.

Does anybody want to comment?

Thanks.

56

Chairperson FEINSTEIN. Senator Sessions?

Senator SESSIONS. Thank you.

Ambassador Kamman, where do you see Colombia now from your vantage point? It strikes me that this is a nation of 40 million people, the oldest democracy in South America, a good trading partner of the United States, an educated populace, but losing a lot of the educated people because of terrorism and brain drain, I guess, on the Colombian government. Is this a critical time in their history, and can we provide some assistance to put them over the hump?

I know Professor Shifter noted, and I think it is correct, that it is only about 35,000 guerillas, but they are violent, tough people out there. They probably are going to have to kill a lot of them to gain control of the country. Are they ready to do that and can we help?

Mr. KAMMAN. Well, Senator Sessions, I think it is a critical time. The problem is that the critical time began maybe 30 or 40 years ago and has gotten more and more critical, but now we do have an opportunity.

I think you have made the point that this area which was given over to control of the insurgents, the FARC, is no longer under their control. I think the government of Colombia waited too long to do that, but now they have at least done that. They have sent the military and the police back to the area that they had evacuated.

There is an election in Colombia this year. It is, I think, a pretty clear bet that the winner of that election is going to take a harder line. The effort to negotiate with the guerrillas has not worked. They have proved to be much too stubborn and politically insensitive, not to mention vicious and venal, and yet they have the money they get from the narcotraffickers. So we have an interest here in stopping the flow of narcotics. We also have an interest in trying to help a government, friendly and democratic, to stop a force that has bedeviled them now for, as I say, 30 years or better.

I think the other thing is that when this election is over and done with, there will be a major military effort. I don't think it requires U.S. military presence, but it does require training. It does require perhaps some additional budget for more equipment to go to the Colombian military and police, and it will require removing some of the restrictions on the use of that equipment.

But we will also find, I think, a controversy in the United States about whether this is necessary. I believe the government of President Pastrana has tried in good faith for three years to find a negotiated settlement that would be non-violent and it just has not worked. And so I think we need to gird ourselves psychologically for seeing very likely an upsurge in the violence, which I will certainly be sorry to see, but I think it is the only way that the government of Colombia can get control of their own territory.

Chairperson FEINSTEIN. Dr. Olcott?

Mr. OLCOTT. Can I say something about your terrorist list? I think that that is a very good idea, except I would point out one potential limitation, which is that the narcotics trade plays a critical role in allowing radical groups to make the transition to terrorist groups and the list itself would not really cope with that problem.

57

In a sense, the biggest argument for getting rid of the drug trade
is to keep groups from making that transition, to make it difficult
for potential terrorist groups to get their earliest financing and not
just cut off the financing of groups that are already in place.

Thank you.

Chairperson FEINSTEIN. I agree with you a hundred percent. The
question is how really to do that, and particularly in Afghanistan
and the countries to the north. I think it is very difficult. I mean,
I can see with the warlords now beginning to restore their domi-
nance in Afghanistan, being fueled off of the drug traffic, that you
create another scenario that makes the establishment of a legiti-
mate government extraordinarily difficult and could push Afghani-
stan the way of Colombia.

Ms. OLCOTT. Absolutely, I agree fully, and that is why even more
money for interdiction efforts than we are talking about is just ab-
solutely critical because we have to attempt to combat the drug
problem both at the level of cultivation and at the point where it
leaves Afghanistan and enters Central Asia. Otherwise, we risk not
just a narco state in Afghanistan reestablishing itself, but the fra-
gility of the Central Asian states really comes into question as well
and we could have "greater Afghanistan" in the worst sense of the
term in another 5 to 10 years if we are not careful now.

Chairperson FEINSTEIN. My main concern about Afghanistan is
around here everybody wants the mission defined and then get out
quickly. If we get out quickly, we leave it to chaos, and chaos will
be funded through the drug trade and I am very concerned about
that.

Does anybody have any other comments they would like to
make? Ambassador Smith?

Mr. SMITH. On the question of dealing with the warlords in Af-
ghanistan, my personal view is that in the short term there is not
going to be the will or the military force to take them on and they
are going to have to be dealt with in other ways.

The experience in Tajikistan was that the warlords could be
given positions and allowed to do things which kept them in the
fold. The additional factor that we have been discussing today,
though, is combined with that has to be a prohibition on traf-
ficking, which makes it doubly difficult.

There are other things that warlords can do in Afghanistan.
They can smuggle things to Pakistan, and according to at least one
academic analysis that was more profitable in the past than drugs.
So there are other avenues for them. Perhaps they could be encour-
aged to go into legitimate business. That is the kind of approach
that in the short term is necessary. I don't think it is going to be
possible to confront them militarily, certainly not the largest ones.

Chairperson FEINSTEIN. Professor Shifter?

Mr. SHIFTER. Yes, thank you. I just want to add that in the case
of Colombia we really have a special problem and a special chal-
lenge, which is that we have two groups that are in conflict with
one another that are on the terrorist list that are very formidable—
the FARC guerrillas and the AUC, which was put on that list on
September 10, and I think rightly so. The AUC is also a time bomb.

So the challenge, I think, for the United States is really to apply
pressure to the Colombian government, to the legitimate authority

58

of the Colombian government to deal with these violent threats that are in conflict with one another. It is very complicated. I am not sure whether that situation exists in other parts of the world, and both of them derive a lot of their income from the drug trade as well and they represent a serious threat to Colombian society.

Senator KYL. Might I just ask you on that point, Professor Shifter, wouldn't it be most useful for the United States to strongly support the military of Colombia to enhance its capabilities and get the political people to make the decisions necessary to use that against the guerrillas there as a means of undercutting the AUC's authority?

In other words, isn't its authority primarily a result of the ineffectiveness of the government? Granted, it uses many of the same tactics as FARC, for example.

Mr. SHIFTER. My concern, Senator, is that they have become so autonomous and so strong that it is sort of a frankenstein. And I think to assume that if we just deal with the FARC and contain them that that is going to take care of the paramilitary problem, I am afraid that may not happen.

Senator KYL. No, and I was not suggesting that either. What I was suggesting is that by making the government and the military of Colombia stronger, it can deal with the FARC. It can also deal with AUC or the other affiliated kinds of rightist organizations, but to some extent it will be less necessary to do so because the populace that has generally supported those groups is going to see that there is an alternative, namely the Colombian government.

Mr. SHIFTER. Absolutely. I think the focus should be on strengthening the Colombian government. I agree.

Chairperson FEINSTEIN. And also on the training of the military, because the allegations of human rights abuses by the military are legion and that is what really deters, I think, the strong support for a democratic government with an effective military. You can't have an effective military if they engage in gross human rights violations, and I think that has been one of the problems.

Mr. SHIFTER. I think you are right, Senator, and I think the concept of professionalization, including human rights guarantees, and also more effectiveness, is what has to be promoted in Colombia. The government of Pastrana has made some progress in that area, but I think not nearly enough and a lot more has to be done.

Chairperson FEINSTEIN. Ambassador Kamman, would you like to have a closing comment?

Mr. KAMMAN. Well, to agree with Michael, you do have a unique situation in that you have paramilitaries, right-wing people, who sprang up in a reaction to the left-wing guerrillas. And they are both on the terrorist list and they are both violent and they both get money from the narcos, which buys the narcos protection and they can therefore conduct their business.

But I think you have put your finger on the key thing, Senator Feinstein, to put our effort into training the military, make them more professional, including the human rights issues. Quite a bit has been done by our own U.S. military in the last few years, and I think going a little further on that would allow us to overcome the attraction of the paramilitaries to the population. I agree with Senator Kyl. So we have to continue and probably step up our ef-

59

fort, training and some equipment for the Colombian military, as
well as the police, which we traditionally have offered.
  Thank you.
  Chairperson FEINSTEIN. Thank you very much. Let me thank you
all. I have read your written statements. I think they are excellent,
and let me thank you for your verbal statements here.
  The record will remain open for further comments from Senators,
and the hearing is adjourned. Thank you very much.
  [Whereupon, at 12:05 p.m., the subcommittee was adjourned.]
  [A submission for the record follows.]

SUBMISSION FOR THE RECORD

**Statement of Hon. Mike DeWine, a U.S. Senator from the State of Ohio**

  Good morning. I appreciate you all taking the time to come here and discuss the
undeniable link that exists between acts of terror and illegal drugs. While most of
us have long recognized this close connection, recent events have made this link
more relevant in the daily lives of all Americans. In the past six months, more and
more people have come to the same simple conclusion: Terrorists and drug traf-
fickers are linked in a mutually-beneficial relationship by money, tactics, geography
and politics.
  I believe it is somewhat ironic that this issue has come into focus largely due to
the relationship between the Taliban reg9ime, which provided safe haven to Osama
bin Laden and his Al Qaeda network, and the opium and heroin trade in Central
Asia. According to some estimates, the Taliban made as much as $50 million a year
in revenue from the drug trade, and we know that Afghanistan supplies more then
70 percent of the world's heroin.
  However, many (if not most) people in the United States paid relatively little at-
tention to Afghan heroin because it only constitutes about 5 percent of the U.S. sup-
ply. Little notice was given to the fact that opium cultivation increased dramatically
when the Taliban came to power, rising from 52 percent of the world's total in 1996
to a high of 79 percent in 1999—4,581 metric tons, according to the United Nations.
The fact of the matter is that the Taliban was extremely dependent on opium sales.
Tragically, it took the events of September 11th to focus large scale international at-
tention on the nexus between drugs and terrorism.
  And so, we must do everything possible to prevent illegal drug income from being
used to finance regional instability or international terrorism. This is true whether
we are talking about the Taliban in Afghanistan or the FARC in Colombia. If we
fail to sever the ties between the drug money and terrorism, then we risk losing
fragile democracies and around the world—and right here in our own backyard in
countries like Haiti and Colombia.
  The reality is that democracy is being threatened in the Andean Region, in large
measure, because money generated by narcotics production and trafficking funds
well-armed terrorist groups. Nearly 90 percent of the cocaine and the majority of
the heroin arriving in the United States comes from Colombia, mostly originating
in southern Colombia where government control is weakest. The Revolutionary
Armed Forces of Colombia (FARC) receives about $300 million a year from drug
sales (six times the annual amount reaped by the Taliban). The right-wing para-
military United Self Defense Forces of Colombia (AUC) relies on the illegal drug
trade for 40 to 70 percent of its income. And, Peru's Shining Path is more dependent
on drug money than ever before.
  In October, the State Department designated 28 organizations in the world as
Foreign Terrorist Organizations. Twelve of those 28 listed organizations have been
identified as having links with drug trafficking, and four of these twelve reside in
the Andean Region.
  These groups routinely carry out political assassinations, murder innocent civil-
ians, trade drugs for weapons, and torture and murder judges and law enforcement
officials.
  In recent months, the FARC also has increased attacks in urban areas and
against electricity towers, water supplies, and other critical infrastructure. There
groups present a clear threat to regional security and, in fact, threaten our own na-
tional security. They rely on drug profits to do so. Whether they actively cultivate
and traffic the drugs or "tax" those who do, the financial windfall that the narcotics
industry guarantees is an adequate alternative to state sponsorship. Yet, ironically
enough, the fact that these groups wear two hats—the insurgent hat and the drug

60

hat—Actually affords them and some degree of protection under out current policy. We need to revisit this policy and ask ourselves if it really makes sense.

The blurring of the lines between the international drug trade, terrorism, and organized crime poses new challenges to the United States. Organized crime groups often run the trafficking organizations, while the terrorists and insurgent groups often control the territory where the drugs trade to finance their organizations and operations.

The magnitude of these profits almost guarantees financial independence from a state sponsor and allows these groups to operate with impunity. Any restraint that could, have been imposed by a state sponsor is non-existent, and "traditional" diplomatic and military measures are inapplicable in the absence of a state sponsor.

This is more than just a drug problem, a health problem, or a law enforcement problem. It is a national security issue. And so, our response needs to go beyond drug eradication to include intelligence collection, diplomatic efforts, law enforcement activities, and military action. For example, while I continue to support Plan Colombia and the Andean Regional Initiative, we must go beyond eradication and increase our efforts to pursue the people and organizations who enable the narco-traffickers to operate.

Thank you, and I look forward to hearing what you all have to say6 this morning.

○