UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ANTONIO CABALLERO,  :
Plaintiff,  :
  :
  v.  :   Case No.: 1:18-CV-25337-KMM
  :
FUERZAS ARMADAS  :
REVOLUCIONARIAS DE COLOMBIA,  :
and THE NORTH DE VALLE CARTEL,  :
Defendants.  :

**OPPOSITION OF**
**LEONARDO GONZÁLEZ DELLÁN TO**
**MOTION FOR TRIA TURNOVER JUDGMENT**

Leonardo González Dellán ("González"), by undersigned counsel, provides this

opposition to the motion of plaintiff Antonio Caballero for a TRIA Turnover Judgment (ECF

No. 99). Because González is not an agency or instrumentality of the Fuerzas Armadas

Revolucionarias de Colombia ("FARC"), Caballero is not entitled to a turnover judgment.

This Court's Order of January 28, 2021 (ECF No. 91) and the resulting Writ of Garnishment

(ECF No. 93), obtained *ex parte* by Caballero, should be set aside.

In sum, Caballero alleges close relatives to Venezuela's previous president Nicolás

Maduro are agencies or instrumentalities of the FARC, and that González is an agency or

instrumentality to these close relatives, and thus by extension is himself an agency or

instrumentality of the FARC. When Caballero's evidence is reviewed concerning allegations

specific to González, only the most sparce of allegations connect González to this strained

chain. Specifically, none of the allegations demonstrate that González—who has not lived

in Venezuela since 2010—has had any dealings or interaction with Maduro's regime or his

relatives, or even has ever met this group. None of the allegations establish that González

accepted any undertaking or was aware that he was assuming some role in terrorist

activities either with the Maduro relatives or the FARC.

This case is distinguishable in important ways from the leading Eleventh Circuit

authority in this area, *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713

(11th Cir. 2014).  González has never been designated by the Office of Foreign Assets

Control ("OFAC") as a Specially Designated Narcotics Trafficker ("SDNT"), unlike all of the

persons and entities addressed in *Stansell* who already had been found by OFAC to have an

agency relationship with the FARC money laundering operations.  *Id.* at 732 (agencies and

instrumentalities all "were, according to OFAC, part of FARC's money laundering

operations.").  Instead, OFAC designated González under a separate Venezuelan sanctions

program that does not require ***any*** showing of a connection to the FARC or the Colombian

narcotics trade.  As will be demonstrated, this critical difference is of key importance.

## I. <u>Background</u>

Caballero has obtained a default judgment against the FARC pursuant to the Anti-

Terrorism Act ("ATA") for conduct entirely unrelated to any act by González, who formerly

worked in the banking and investment sector in Venezuela in the early 2000s but left the

country for good in 2010 and has lived in England for over ten years.  Caballero seeks to

enforce part of the judgment against González pursuant to the ATA and the Terrorism Risk

Insurance Act of 2002 ("TRIA"), which provides:

> Notwithstanding any other provision of law, and except as provided in
> subsection (b), in every case in which a person has obtained a judgment against
> a terrorist party on a claim based upon an act of terrorism, or for which a
> terrorist party is not immune under section 1605(a)(7) of title 28, United States
> Code, the blocked assets of that terrorist party (***including the blocked assets of
> any agency or instrumentality of that terrorist party***) shall be subject to
> execution or attachment in aid of execution in order to satisfy such judgment to

the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added).  Caballero thus must establish that: (a) he has obtained a judgment against a terrorist party that is either for a claim based on an act of terrorism or for a claim for which a terrorist party is not immune; (b) the assets are blocked as that term is defined in TRIA; (c) the total amount of the execution does not exceed the amount of compensatory damages; and (d) González is an agency or instrumentality of FARC.  *Stansell*, 771 F.3d at 723.  Here, only the "agency or instrumentality" determination is at issue.

As is authorized by *Stansell*, Caballero presented an *ex parte* and under seal application to the Court, seeking to have González declared an agency or instrumentality of the FARC and to attach certain bank accounts belonging to González.  On January 28, 2021, the Court granted Caballero's *ex parte* motion seeking clarification (ECF No. 90) that González is an agency or instrumentality of FARC (ECF No. 91).  On February 1, 2021, the Clerk of Court re-issued a Writ of Garnishment to González's blocked assets held at Sunstate Bank in Florida (ECF No. 93).  On March 2, 2021, Caballero filed a Motion for TRIA Turnover Judgment (ECF No. 99).  On March 4, 2021, González appeared through counsel (ECF No. 100).  González sought an extension of time to respond to Caballero's motion for TRIA Turnover Judgement (ECF 102), which Caballero opposed (ECF 105).  Caballero also sought to strike González's papers, stating that the papers were too late under Florida law to contest the judgment.  *Id*.  In granting an extension, the Court also rejected Caballero's position that González was foreclosed from opposing his turnover judgment, finding such a result would not comport with due process under *Stansell* (ECF No. 111).

González also has advised OFAC of this litigation as the outcome of the proceeding may affect blocked property.  *See* 31 C.F.R. § 501.605(a).

## II. <u>Legal Analysis</u>

To obtain a TRIA turnover judgment, Caballero's burden is to make an

individualized showing that González is an "agency or instrumentality" of FARC.  *Stansell*,

771 F.3d at 723.  The TRIA does not define these terms of secondary liability, and courts

have found inadequate the terms' definitions in the Foreign Sovereign Immunities Act,

where the TRIA is codified.  *Id*.  Courts, including the Eleventh Circuit and district court in

*Stansell*, have rather taken guidance from the ordinary meanings of the words "agency" and

"instrumentality," as well as the statutory context.  *Id*.

For example, the Eleventh Circuit in *Stansell* affirmed the district court's definition

of the terms, drawn from the statutes, executive orders and regulations used to determine

if a person or entity is a Specially Designated Narcotics Trafficker ("SDNT"), and thus

someone who had accepted an undertaking as an agency or instrumentality of the FARC in

light of OFAC's express findings regarding the FARC's role in the Colombian drug trade.  *Id*.

at 731-32, 739 & n.6.  By its regulatory definition, a person designated by OFAC (in

consultation with the Justice Department and State Department) as an SDNT must have a

connection to the Colombian narcotics trade, according to the regulatory criteria:

> (b) foreign persons determined by the Secretary of the Treasury, in
> consultation with the Attorney General and the Secretary of State: (i) to play a
> significant role in international narcotics trafficking centered in Colombia; or
> (ii) materially to assist in, or provide financial or technological support for or
> goods or services in support of, the narcotics trafficking activities of persons
> designated in or pursuant to this order; and
>
> (c) persons determined by the Secretary of the Treasury, in consultation with
> the Attorney General and the Secretary of State, to be owned or controlled by,
> or to act for or on behalf of, persons designated in or pursuant to this order.

E.O. 12978 (1995).  Use of this designation for the definition was particularly appropriate,

as the *Stansell* plaintiffs suffered harm by the FARC, and each purported agency or

instrumentality had been found by OFAC through an inter-agency consultation and backed by a record of evidence, to be an SDNT with a connection to the Colombian drug trade and the FARC. *Stansell*, 771 F.3d at 732 (proposed debtors "were, according to OFAC, part of FARC's money laundering operations."); *id*. at 723 (all individuals and entities whose property is in jeopardy "had been designated SDNTs by OFAC").

The district court in *Stansell* had found that OFAC's direction under these programs was "consistent with the ordinary and plain meaning of the terms agency or instrumentality and should be applied to determine that any [SDNT] with a nexus to or past dealings with the FARC qualifies as an agency or instrumentality of the FARC." Order at 2-3, *Stansell v. Revolutionary Armed Forces of Colombia*, Case 9-cv-02308 (M.D. Fla. Apr. 25, 2013) (attached as Exhibit A). The court thus defined the term "agency or instrumentality" to include "[a]ny SDNT" that "is or was ever involved in the cultivation, manufacture, processing, purchase, sale, trafficking, security, storage, shipment or transportation, distribution of FARC coca paste or cocaine, or that assisted the FARC's financial or money laundering network." *Id*.; *see also Stansell*, 771 F.3d 713 & n.6 (approving definition).

A similar result is found in a key case cited by the district court in *Stansell*. The court in *Ungar v. Palestinian Authority*, 304 F. Supp. 2d 232 (D.R.I. 2004), addressed whether a charity, Holy Land Foundation for Relief and Development ("HLF"), was an agency or instrumentality of Hamas, designated like the FARC as a Foreign Terrorist Organization, as well as a Specially Designated Global Terrorist ("SDGT").[1] *Ungar*, 304 F.

---

[1] The United States designated Hamas as a Specially Designated Global Terrorist (SDGT) pursuant to E.O. 13224 and a terrorist organization under E.O. 12947. In December 2001, OFAC designated HLF as a Specially Designated Terrorist and a Specially Designated Global Terrorist (SDGT) based on the group's close links to Hamas, pursuant to E.O. 13224.

Supp. 2d at 241.  Similar to the FARC agencies and instrumentalities in *Stansell*, OFAC

designated HLF as an SDGT based on OFAC's findings that HLF accepted an undertaking to

join as an agency with Hamas, including "substantial evidence" that:

> (1) HLF has had financial connections to Hamas since its creation in 1989;
>
> (2) HLF leaders have been actively involved in various meetings with Hamas leaders in the United States;
>
> (3) HLF funds Hamas-controlled charitable organizations;
>
> (4) HLF provides financial support to the orphans and families of Hamas martyrs and prisoners;
>
> (5) HLF's Jerusalem office acted on behalf of Hamas;
>
> (6) eight FBI informants reliably reported that HLF funds and supports Hamas; and
>
> (7) evidence corroborated the FBI informants.

*Ungar*, 304 F. Supp. 2d at 256-57 & n.25; *see also Holy Land Found. for Relief & Dev. v.*

*Ashcroft*, 219 F.Supp.2d 57, 69 (D.D.C. 2002) (rejecting challenge to OFAC's designation of

HLF).  From these facts, the court found that HLF had a direct and close relationship with

Hamas, embraced its relationship with Hamas, and accepted an undertaking to advance the

causes Hamas endorsed.  These facts made plain that HLF was in fact an agency or

instrumentality of Hamas.  *Id.* at 241.

The courts in *Stansell* and *Ungar* both applied the definition of agency or

instrumentality in cases where OFAC previously had found that party was an SDNT closely

related to FARC (as in *Stansell*) or SDGT closely related to Hamas (as in *Ungar*), thus

respecting a reasonable boundary of liability as intended in the ATA and TRIA.  *See Fields v.*

*Twitter, Inc.*, 881 F.3d 739, 748 (9th Cir. 2018) (ATA liability is limited to avoid "seemingly

boundless litigation risks that would be posed by extending the ATA's bounds as far as

foreseeability may reach").  This application also is consistent with the authorities under

the ATA which approve imposition of secondary liability only where a party was "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (ATA does not premise secondary liability on knowledge of the specific attacks at issue, but rather requires that the party was "generally aware" that it was thereby playing a "role" in Hamas's violent activities).

A. OFAC Has Never Designated González as an SDNT.

Unlike in *Stansell* and *Ungar*, González has not been found by OFAC to have any relationship with the FARC or any other terrorist group.  Unlike the agencies and instrumentalities in *Stansell*, González was not designated by OFAC as an SDNT or found by OFAC to be involved with money laundering operations for the FARC.  Unlike the agencies and instrumentalities in *Ungar*, González was not designated by OFAC as an SDGT based on any alleged support provided to any terrorist group.  Instead, on January 8, 2019, OFAC designated González under a separate Venezuelan sanctions program as a Specially Designated National ("SDN").  This Venezuelan sanctions program does not require ***any*** showing of a connection to the FARC or the Colombian narcotics trade or any other terrorist group for that matter, but rather is based upon a finding of the designated person:

> (ii) to be responsible for or complicit in, or to have directly or indirectly engaged in, any transaction or series of transactions involving deceptive practices or corruption and the Government of Venezuela or projects or programs administered by the Government of Venezuela, or to be an immediate adult family member of such a person;
>
> (iii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any activity or transaction described in subsection (a)(ii) of this section, or any person whose property and interests in property are blocked pursuant to this order; or
>
> (iv) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

E.O. 13850 (2018).

Unlike in *Stansell*, nothing in this designation required OFAC to find that González had any role in the Colombia drug trade or otherwise had any link to or awareness that he was assuming some role in terrorist activities. *Linde,* 882 F.3d at 329. OFAC made no such finding with respect to González. Rather, OFAC alleged a scheme by former Venezuelan National Treasurer Alejandro Jose Andrade Cedeno—who left the Venezuelan government in January 2011 and fled Venezuela for the United States in 2012 before the Maduro regime assumed power in March 2013[2]—to accept bribes for access to the Venezuelan foreign exchange program, where embezzled funds generated from the different currency exchange rates were kept for the personal benefit of Andrade and his confidants, at the expense of the Venezuelan people. OFAC, *"Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders"* (Jan. 8, 2019).

The OFAC designation does not extend beyond its facts, or indicate that Andrade or others designated, such as González, thereby knew of and joined in other improper activities involving the Venezuelan regime. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 393-94 (7th Cir. 2018) ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute."). As the Seventh Circuit aptly observed, "purchasers of Iranian oil and natural gas contribute funds to Iran that Iran might use to support terrorism, but those purchasers are not liable for the attacks that Iran may facilitate with those funds." *Id*.

---

[2] *See* ECF No. 110 at Ex. A at 12-13 (*United States v. Andrade*, Case 17-cr-80242, Plea Agreement and Factual Proffer at ¶¶ 1, 3 (S.D. Fla. Dec. 22, 2017)).

González has and will face the fair consequences of his OFAC designation.  But nothing in the facts found by OFAC transforms González into an agency or instrumentality of the FARC.  No facts show that González accepted an undertaking as FARC's agency or instrumentality or had some awareness that he was assuming some role in terrorist activities.  As neither the ATA nor the TRIA are strict liability statutes, González thus has no liability to Caballero.  *See Twitter, Inc.*, 881 F.3d at 748; *Bank of Am. Corp. v. City of Miami*, __ U.S. __, 137 S. Ct. 1296, 1305 (2017) (courts may assume Congress is familiar with the "well established principle of the common law that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause" and does not mean to displace the principle *sub silentio* in defining federal causes of action).

Particularly where OFAC has not designated a person or entity as an SDNT, a plaintiff must do more than submit conclusory claims to demonstrate that the purported agency and instrumentality has assented to the role and agreed to act loyally on the principal's behalf.  *See Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("unwarranted factual deductions, or legal conclusions masquerading as facts" do not satisfy pleading burden); *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (at common law, agency requires loyalty by the agent to the principal's interests).  This is particularly so for a purported agency or instrumentality such as González who is on the periphery of a plaintiff's allegations, as the "further down the causal chain a defendant sits, the more diligent a plaintiff must be to plead facts that plausibly suggest that the defendant entered into an agreement to support terrorism."  *Kemper*, 911 F.3d at 395-96.

The absence of an SDNT finding by OFAC requires that Caballero's proof must individually establish in a non-conclusory manner that González accepted an undertaking

- 9 -

as an agency or instrumentality of the FARC or had some awareness that he was assuming

some role in terrorist activities.  *See Kemper*, 911 F.3d at 395-96 (while Deutsche Bank

"may have engaged in business dealings that incidentally assisted a separate terrorism-

related conspiracy involving Iran; they do not suggest that Deutsche Bank ever agreed to

join that conspiracy"); *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 522 (2d Cir. 2006)

("agency" is a well-defined common law relationship, including a requirement that a

principal manifests that the agent shall act for him and the agent's acceptance of the

undertaking).

As will be discussed in the next section, Caballero has not met this burden with

respect to González.

B.  <u>Caballero Fails to Make an Evidentiary Linkage Between González and the FARC</u>.

In his submissions, Caballero does not allege a direct relationship between González

and the FARC, but rather states that the Venezuelan currency exchange program existed to

launder and provide funds for FARC "agencies and instrumentalities" such as Maduro's

three stepsons and his wife.  ECF No. 81 at Ex. 1 at ¶ 33.  Supported by an affidavit from

John McBrien, a former OFAC employee, Caballero states in his key allegation:

> It is my opinion that the Venezuela currency exchange program existed to
> empower certain Venezuelan government officials and/or business associates
> selected by the Maduro regime to launder funds for FARC agents and
> instrumentalities, such as Maduro's three stepsons, Walter Jacob Gavidia Flores,
> Yosser Daniel Gavidia Flores, and Yoswal Alexander Gavidia Flores (collectively
> a/k/a "Los Chamos").  It is also my opinion that the currency exchange program
> was inextricably tied to financial support of FARC operatives such as Cilia Adela
> Flores de Maduro, the purported First Lady of Venezuela, who was designated
> by OFAC on September 25, 2018 pursuant to E.O. 13692, and who is a member
> of the Cartel of the Suns.  The example set by Raul Gorrín Bellisario ("Gorrín")
> and former National Treasurers of Venezuela - Alejandro Jose Andrade Cedeno
> ("Andrade") and Claudia Patricia Diaz Guillen ("Diaz") illustrate how their
> control over the Venezuela exchange program achieved these goals.

ECF No. 81 at Ex. 1 at ¶ 33.

Of particular note, Caballero does not claim any connection for González in the scheme alleged in this key allegation.  *Id*.

Moreover, Caballero provides no evidence of any direct link between González and Maduro, his stepsons, or his wife.  Of course, the Eleventh Circuit in *Stansell* stated that evidence can be sufficient to establish the required relationship with the FARC, even where that relationship is "indirect."  *Stansell*, 771 F.3d at 742.  The context of this statement, however, makes clear both that the SDNT status remains important to this analysis and that claims based upon speculation are insufficient to satisfy a plaintiff's burden.

Specifically, the "indirect" relationship addressed in *Stansell* related to two partnerships that also already had been found by OFAC to be SDNTs that OFAC previously linked to the North Valley Cartel ("NVC") but not to the FARC.  *Stansell*, 771 F.3d at 739 ("The [p]artnerships had not previously been directly linked to FARC by OFAC or any other executive or judicial authority.").  The partnerships were created to hold real estate and other assets in the United States for three partners who also had been designated as SDNT for their connection to the NVC, including two partners who were in the custody of Colombian authorities on money laundering charges.  *See* Order at 3-4, *Stansell v. Revolutionary Armed Forces of Colombia*, Case 9-cv-02308 (M.D. Fla. Apr. 19, 2013) (attached as Exhibit B).  Stansell submitted credible evidence that the NVC, including all of its "individual members, divisions, and networks," were an agency or instrumentality of FARC.  *Id*. at 10-11.  The partnerships also had notice of these OFAC SDNT designations dating back from 2005 to 2007, including of the principal NVC leaders, their corporate general partner, and the partnerships themselves as Florida general partnerships.  *Id*. at 6.

Under these circumstances, the Eleventh Circuit affirmed that the evidence "presented to the district court was sufficient to establish the required relationship between FARC and the Partnerships, even if that relationship was indirect." *Stansell*, 771 F.3d at 742.

No direct or indirect connection has been demonstrated concerning González, who is not alleged directly or indirectly to ever have dealt with Maduro's stepsons or wife. Moreover, even putting aside the lack of any connection to González, neither Maduro's stepsons nor his wife have been designated by OFAC for any connection to FARC. Rather, their OFAC designations relate to helping Maduro to maintain his grip on power in Venezuela.[3]

The lack of any mention of FARC by OFAC in listing Maduro's wife and stepsons is relevant because, as Caballero's documents indicate, OFAC has designated other Venezuela government officials for providing assistance to FARC where the evidence merits such a designation. *See* ECF No. 81 at Ex. 1 at Ex. C at 14 ("Numerous Venezuela government officials have been designated by the OFAC as providing assistance to the FARC in the trafficking of cocaine and the purchasing of weapons."). That has not happened with respect to González or Maduro's relatives.

OFAC also has not specifically targeted the Venezuelan currency exchange program for sanctions, as it has other financial sectors of the Venezuelan economy like cryptocurrency. The currency exchange program is a recognized and accepted process utilized each day by persons and companies around the globe so as to conduct business in Venezuela and to send money to families. The U.S. State Department recognizes the centrality of the currency exchange program to the Venezuelan economy and provides

_____

[3] E.O. 13692 (2015).

guidance for those looking to make currency exchanges for trade in Venezuela.  *See* ECF No. 110 at Ex. E at 21-22.  Yet the theory of McBrien's affidavit would hold anyone who participated in Venezuela's currency exchange liable as an agency or instrumentality of the FARC, a result plainly never intended with the passage of the ATA and TRIA.  *See Bank of Am. Corp.*, 137 S. Ct. at 1305–06 (absent a clear indication, Congress does not "provide a remedy wherever th[e] ripples [of harm] travel."); *Kemper*, 911 F.3d at 394 (rejecting ATA liability and observing "purchasers of Iranian oil and natural gas contribute funds to Iran that Iran might use to support terrorism, but those purchasers are not liable for the attacks that Iran may facilitate with those funds.").

Caballero gets no relief from these defects with the two substantive mentions of González in McBrien's affidavit, both taken from a single paragraph from a January 2019 OFAC press release.  ECF No. 81 at Ex. 1 at ¶ 35.  In over 400 pages of McBrien's affidavit and supporting materials, there are ***no other substantive references to González***.  The mention of González cited in McBrien's affidavit states:

> While Andrade was National Treasurer, he awarded the [Office of the National Treasury ("ONT")] exchange business to a limited number of individuals, including Gorrín and [***González***].  In return for their selection as the only currency exchange houses approved by the ONT, Gorrín and [***González***], another Venezuelan businessman, paid hundreds of millions of dollars in bribes to Andrade. Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT. Gorrin compensated Andrade for introducing him to Diaz, and as a result, allowed the bribery scheme to continue, undeterred. From at least 2011 to 2013, Gorrin paid bribes to Diaz, wiring money to her and her husband, Adrian Jose Velasquez Figueroa (Velasquez), and purchasing assets on their behalf, to include a residence in Cap Cana, Dominican Republic, and an aircraft.

*Id*.  Andrade left the Office of the National Treasury in January 2011.[4]

---

[4] *See* ECF No. 110 at Ex. A at 12-13 (*United States v. Andrade*, Case 17-cr-80242, Plea Agreement and Factual Proffer at ¶ 3 (S.D. Fla. Dec. 22, 2017)).

OFAC is precise in its factual claims, stating that Gorrín and González paid bribes "to Andrade," who "facilitated the continuation of the bribery scheme by introducing *Gorrín* to Andrade's successor, Diaz, when he left the ONT" in January 2011.  *Id.* (emphasis added). "*Gorrín* compensated Andrade for introducing him to Diaz, and as a result, allowed the bribery scheme to continue, undeterred."  *Id.* (emphasis added).  OFAC mentions González *only* in relation to Andrade, while OFAC separately links Gorrín to *both* Andrade and his successor Diaz.

OFAC's distinction between González and Gorrín is important, demonstrating that OFAC evaluated each person individually based upon the developed factual record.  It also is important because Caballero's allegations link only Gorrín to Maduro's stepsons and wife.  Thus, in other paragraphs not involving González, McBrien cites evidence of meetings in 2016 and 2017 among Gorrín, Matthias Krull and Maduro's stepsons.  *Id.* at ¶ 36.  In this discussion, McBrien studies recent criminal prosecutions in this District linking Gorrín to a scheme from 2016 to 2017 for steering $600 million from PdVSA bond proceeds to enrich himself and the three stepsons of Maduro.  *Id.*  McBrien further presents evidence of unspecified gift giving by Gorrín to Maduro's wife, Cilia Adela Flores de Maduro, at an unspecified date.  *Id.* at ¶ 38.

McBrien does not provide any evidence indicating that Gonzalez participated in any way in any meeting with Maduro's stepsons or in the $600 million PdVSA transaction, which has been thoroughly studied in U.S. criminal cases and press accounts.  The papers in

the criminal cases in this District for Gorrín[5] and Krull[6] make no mention of any role or involvement by González, who has not been charged in the matter and who had left Venezuela in 2010, years before the 2016 and 2017 meetings concerning the PdVSA transaction.

Further, no other facts presented by Caballero suggest that González knew Gorrín or Krull, or participated in any business venture with them. Similarly absent is any mention that González knew or interacted in any way with Maduro's stepsons or wife. McBrien's affidavit similarly provide neither a direct nor indirect connection between González and Maduro's stepsons or his wife.

The Eleventh Circuit's observation that certain "indirect" relationships may satisfy the agency and instrumentality test does not provide license to speculate or push the liability beyond reasonable bounds. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (factual claims "must be enough to raise a right to relief above the speculative level"); *Twitter, Inc.*, 881 F.3d at 748 (ATA liability is limited to avoid "seemingly boundless litigation risks that would be posed by extending the ATA's bounds as far as foreseeability may reach").

The "indirect" relationship in *Stansell* was thoroughly documented by tracing the involvement of the partnerships and their members in the Colombian narcotics trade and showing that the partnerships themselves had notice of their agency relationship through

---

[5] *See* ECF No. 110 at Ex. B (*United States v. Gorrín*, Case 18-cr-80160, Superseding Indictment (S.D. Fla. Dec. 16, 2020)).

[6] *See* ECF No. 110 at Ex. C (*United States v. Krull*, Case 18-cr-20682, Information (S.D. Fla. Aug. 16, 2018)). Originally sentenced to 120 months imprisonment on October 29, 2018, Krull recently received a reduction in his criminal sentence to 42 months based upon his cooperation with federal prosecutors pursuant to Fed. R. Crim. P. 35. *See* Order, *United States v. Krull*, Case 18-cr-20682 (Sept. 3, 2020) (ECF No. 94).

OFAC's actions connecting their members, their general partner, and ultimately the partnerships themselves specifically to the Colombian drug trade. *See* Order at 3-4, *Stansell v. Revolutionary Armed Forces of Colombia*, Case 9-cv-02308 (M.D. Fla. Apr. 19, 2013) (ECF No. 711). The "indirect" link approved in *Stansell* concerned the connection of the NVC to the FARC, which again was made on a substantial record of evidence. *Id.* Each link in the chain was supported by a record of proof. Nothing in this analysis relieves Caballero from setting forth similarly well-pled facts specific to González to establish each link in a chain to between González and the FARC.

Caballero's two references to González in over 400 pages of material stands in stark contrast to a case like the partnerships in *Stansell* or as in *Ungar*, where the proof of agency or instrumentality came from a voluminous record linking the HLF through domestic meetings, long-standing financial support and corroborated FBI informants to Hamas, a terrorist group no less clandestine than the FARC. *Ungar*, 304 F. Supp. 2d at 256-57 & n.25. As with Hamas, U.S. regulators and law enforcement have made vigorous investigations of the Maduro regime in Venezuela, the FARC, and the connection between these entities. Federal criminal cases against Maduro regime leadership have been brought in judicial districts across the country.[7] Federal prosecutors even have filed a criminal indictment against Maduro himself.[8] Yet Caballero points to no facts in this record that support his proposed conclusion of a connection specific to González.

---

[7] *United States v. Giuseppe Luciano Menegazzo Carrasquel*, Case No. 2:10-CR-01462 (D. Az.); *United States v. Vladimir Padrino Lopez*, Case No. 1:19-CR-176 (D.D.C.); *United States v. Maikel Jose Moreno Perez*, Case No. 20-2407 (S.D. Fla.); *United States v. Luis Alfredo Motta Dominguez*, Case No. 1:19-CR-20388 (S.D. Fla.); *United States v. Nestor Luis Reverol Torres*, Case No. 1:15-CR-20 (E.D.N.Y.); *United States v. Vassyly Kotosky Villaroel Ramirez*, Case No. 1:11-CR-247 (E.D.N.Y.); *United States v. Tareck Zaidan el Aissami Maddah*, Case No. 1:19-CR-144 (S.D.N.Y.); *United States v. Luis Carlos de Leon-Perez*, Case No. 1:17-CR-514 (S.D. Tex.).

[8] *United States v. Nicolas Maduro Moros*, Case No. 1:11-CR-205 (S.D.N.Y.).

González is not alone in noting the conclusory nature of Caballero's evidence.  Other courts have found the general allegations of McBrien's affidavit to lack specific and concrete linkage between the FARC and the purported agency and instrumentality.  A recent opinion in the Northern District of California reflects this position, stating that "[t]here is no clear connection in [Caballero's] application between Montelongo, the Flores Drug Trafficking Organization, and FARC.  Attached to McBrien's declaration are many general articles about drug trafficking, but there is no specific, concrete evidence linking Montelongo or the Flores Drug Trafficking Organization to FARC."  Report & Recommendation at 5, *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, Case 20-MC-80146 (N.D. Cal. Oct. 8, 2020) (ECF No. 11) (attached as Exhibit C).

The same is true with respect to González.  This flaw cannot be cured with hundreds of pages of irrelevant research materials.  Caballero has not presented non-conclusory evidence to establish that González accepted any undertaking or was aware that he was assuming some role in terrorist activities either with the Maduro relatives or the FARC.  This is particularly true here, where González has not been designated by OFAC as an SDNT and where González already was on the periphery of Caballero's allegations.  In such a case, Caballero must be diligent in presenting proof and not rest on the hope that conjecture and speculation will substitute for a valid evidentiary basis for liability.  *Kemper*, 911 F.3d at 395-96 (the "further down the causal chain a defendant sits, the more diligent a plaintiff must be to plead facts that plausibly suggest that the defendant entered into an agreement to support terrorism.").

Caballero has not met this burden with respect to González.

### III. **Conclusion**

Caballero substitutes conclusory claims for demonstrable facts supporting an individualized finding that González materially supported the FARC as an agency or instrumentality.  The Court should find that Caballero has not carried his burden of establishing that González was an agency or instrumentality of FARC, set aside and vacate the Order of January 28, 2021 (ECF No. 91) and resulting Writ of Garnishment (ECF No. 93), deny Caballero's motion for a TRIA Turnover Judgment (ECF No. 99), and grant such further relief as may be appropriate.

Dated:  April 12, 2021                                  Respectfully submitted,

                                                        O'NEILL LAW GROUP, LLC


                                                        /s/ Robert E. O'Neill_____
                                                        Robert E. O'Neill
                                                        Florida Bar Number- 105155
                                                        O'Neill Law Group, LLC
                                                        1305 Jumana Loop
                                                        Apollo Beach, Fl 33572
                                                        Tel.:  305-205-8228
                                                        roneill@oneilllawgroup.com

                                                        Counsel for Leonardo González Dellán

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 12, 2021, I caused the filing of foregoing document with the Clerk of Court and all counsel of record by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert E. O'Neill
Robert E. O'Neill