UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 18-cv-25337-KMM

ANTONIO CABALLERO,

     Plaintiff,

vs.                                              **UNDER SEAL**

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA, a/k/a
FARC-EP a/k/a REVOLUTIONARY ARMED
FORCES OF COLOMBIA; and THE NORTE
DE VALLE CARTEL,

     Defendants.

_____/

## PLAINTIFF ANTONIO CABALLERO'S EX PARTE, EXPEDITED MOTION FOR AGENCY OR INSTRUMENTALITY DETERMINATION WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff, Antonio Caballero (hereinafter "Caballero"), by and through undersigned counsel, respectfully moves, *ex parte*, for an expedited determination that the individuals listed on **Exhibit 1**[1] are each an agency or instrumentality ("A/I") of Defendant FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA, a/k/a FARC-EP a/k/a REVOLUTIONARY ARMED FORCES OF COLOMBIA ("FARC"), so that Caballero can file a lis pendens against and start the execution process upon the blocked assets listed on **Exhibit 3** of the FARC A/I listed on **Exhibit 1** in order for Caballero to enforce his Final Judgment [D.E. 63] (the "ATA Final Judgment") entered pursuant to: (i) the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333(e); (ii) section 201(a) of the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note); (iii) Fed. R. Civ. P. 69; and (iv) *Stansell v. Revolutionary Armed Forces of Columbia [sic]*, 771 F.3d 713, 729-730 (11th Cir. 2014) ("factors weigh in favor

---

[1]      Which are among the individuals and entities designated/blocked by OFAC on January 8, 2019, *see infra* Section D.1.c.i.

of immediate attachment").[2]

**MEMORANDUM OF LAW**

**A.      Brief Procedural Background**

On May 20, 2020, this Court entered the ATA Final Judgment in favor of Caballero and against Defendants FARC and THE NORTE DE VALLE CARTEL, a/k/a NDVC, a/k/a NORTH VALLEY CARTEL ("NDVC") for an amount of forty-five million dollars ($45,000,000.00) in actual, compensatory non-economic damages, which is further trebled pursuant to 18 U.S.C. § 2333; one million, seven hundred and twenty-nine thousand, six-hundred and sixty-seven dollars ($1,729,667.00) in actual, compensatory economic damages, which is further trebled pursuant to 18 U.S.C. § 2333 for a total trebled compensatory damage award of $140,189,001.00 and post judgment interest at the rate of 0.15% from May 20, 2020, on the awarded trebled economic and non-economic damages. D.E. 63. The ATA Final Judgment further provided that execution may issue. *Id.* The Clerk of this Court subsequently issued such execution on July 10, 2020. D.E. 65.

**B.      Brief Factual Background**

As recounted by a Florida state court and accepted by this Court, the "Plaintiff, his father, and his family owned and operated farms and properties in the central regions of Colombia, in an area that was strategically located along the defendants' drug trafficking route." Order on Motion for Default Final Judgment (the "ATA Final Order"), D.E. 62 at 2. "ELN forces kidnapped Plaintiff's father, who was the former Ambassador to the United Nations, a leading politician, and an outspoken critic of narcotics traffickers in Colombia, to send a message to other potentially uncooperative landowners in the region that resistance to the defendants' demand would not be

---

[2]      Caballero notifies this Court that he will be filing a similar motion in the Southern District of New York because some of the individuals and/or entities respectively listed on Exhibit 1 and Exhibit 2 which were designated/blocked pursuant to E.O. 13850 have real property within that court's jurisdiction. Caballero is doing so due to there being other judgment creditors, who may also seek to execute upon such blocked assets.

tolerated and would result in them being targeted for kidnapping for ransom and/or assassination." *Id.* "Then, ELN and FARC, abused and tortured Plaintiff's father over a period of approximately six months before brutally murdering him." *Id.*

After reviewing Caballero's Complaint filed under the ATA in this case, the relevant portions of the record, and a final judgment entered after a non-jury trial in Florida state court under the Alien Tort Statute ("ATS"), this Court entered the ATA Final Order [D.E. 62] on Plaintiff's Motion for Default Final Judgment Against Defendants FARC and NDVC [D.E. 58], and the ATA Final Judgment [D.E. 63] in favor of Caballero and against FARC and NDVC.

**C.      Collections of ATA Judgments Under the ATA and TRIA**

As explained more fully below, Congress has recognized that it is difficult for terrorism victims to recover on their judgments. By passing TRIA and amending the ATA, Congress has allowed terrorism victims to satisfy the compensatory damages portion of their judgments from the blocked assets of the terrorist defendants ***and*** from the blocked assets of any A/I of the terrorist defendants. Indeed, this Court noted as much in its previous Orders. D.E. 79 at 2; D.E. 91 at 3.

Through Treasury press releases and public records, Caballero has learned that the individuals listed on **Exhibit 1** own and/or control the entities listed on **Exhibit 2**. In accordance with the law and evidence discussed below, Caballero respectfully requests that this Court determine that the individuals listed on **Exhibit 1** are each an A/I of Defendant FARC, and that the entities listed on **Exhibit 2**, as well as the real properties listed on **Exhibit 3** held by such entities listed on **Exhibit 2** are all blocked assets of such A/I of the FARC listed on **Exhibit 1**.

**D.      The Terrorism Risk Insurance Act**

As noted by this Court in its previous Order dated November 10, 2020 [D.E. 79 at 2], in 2002, Congress enacted TRIA to govern certain post-judgment attachment proceedings for cases

3

involving terrorist attacks. Congress sought to "deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." 148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin). Section 201(a) states:

> ***Notwithstanding any other provision of law***, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) . . . , the blocked assets of that terrorist party **(including the blocked assets of any agency or instrumentality of that terrorist party)** shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a) (emphasis added).

In other words, a victim holding an unsatisfied judgment against a terrorist party can collect so long as the following requirements are met: first, the victim "has obtained a judgment against a terrorist party." *Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006). Second, "the judgment is either (a) for a claim based on an act of terrorism, or (b) for a claim for which a terrorist party is not immune under § 1605(a)(7)." *Id.* Third, "the assets are 'blocked assets' within the meaning of TRIA." *Id.* Lastly, the "execution is sought only to the extent of any compensatory damages." *Id.* All elements are satisfied here.

Additionally, to execute against a terrorist party's "agency or instrumentality," the victim "must further establish that the purported agency or instrumentality is actually an agency or instrumentality." *Stansell*, 771 F.3d 713, 723. The A/I standard was created to reach beyond the terrorists' efforts to stay in the shadows by using "straw persons" or other layers of affiliated companies and persons as fronts. As the Eleventh Circuit put it, "[o]n the other hand, terrorist organizations such as FARC operate in the shadows out of necessity. For example, a corporation

organized under Florida law will almost certainly not list FARC as a shareholder of record. Instead, it will operate through layers of affiliated individuals and front companies." *Id.* at 732. The Eleventh Circuit has also recognized that terrorist and money laundering operations are "clandestine" such that a plaintiff can even establish the A/I relationship as being indirect. *Id.* at 732, 742. In fact, the standard can be met even if the blocked party has never previously been linked to the terrorist party. *Id.* at 739 ("The Partnerships had not previously been directly linked to FARC by OFAC or any other executive or judicial authority.").

Per the Eleventh Circuit's holding in *Stansell*, a terrorist victim may apply *ex-parte* for an A/I determination by a court because the alleged A/I is not entitled to a hearing before the issuance of a writ of attachment, but only before turnover. *Stansell*, 771 F.3d at 729. In its extensive due process analysis, the Eleventh Circuit concluded that "[m]ere attachment is a minimally intrusive manner" of reducing the risk of fleeting assets. *Id.* Thus, Caballero has moved *ex-parte* for the issuance of the A/I determination so that Caballero can file lis pendens against the relevant properties and seek issuance of writs of execution in accordance with the procedures previously used before this Court. *See e.g.*, D.E. 79 at 6; 135; 138; 140; 141; 145; 146; 147; and 149*; see also id*. ("Because the factors weigh in favor of immediate attachment, Claimants were not constitutionally entitled to a hearing before the writ issued. In sum, Claimants were entitled to notice and to be heard before execution, though not necessarily before attachment.").

### 1. The ATA Final Judgment is Against a Terrorist Party Within the Meaning of TRIA

The first element under TRIA—that "a person has obtained a judgment against a terrorist party"—is met. *Weininger*, 462 F. Supp. 2d at 479. FARC is a "terrorist party" as defined under TRIA. *See* ATA Final Order, D.E. 62 at 1. TRIA defines a "terrorist party" as a "terrorist" or as a "terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality

Act [("INA")] (8 U.S.C. 1182(a)(3)(B)(vi)) . . . ." TRIA § 201(d)(4). Under the INA, a "terrorist organization" includes: (1) any organization designated as a Foreign Terrorist Organization under 8 U.S.C. § 1189, see 8 U.S.C. § 1182(a)(3)(B)(vi)(I); (2) any organization designated, upon publication in the Federal Register, as a terrorist organization for engaging in terrorist activities, see 8 U.S.C. § 1182(a)(3)(B)(vi)(II); and (3) any organization "that is a group of two or more individuals, whether organized or not, which engages in, or that has a subgroup which engages in, [terrorist activities as defined in 8 U.S.C. § 1182(a)(3)(B)(iv)(I)–(VI)] . . . . " *See* 8 U.S.C. § 1182(a)(3)(B)(vi)(III).

In 1997, the United States designated the FARC a Foreign Terrorist Organization (FTO) pursuant to the Immigration and Nationality Act.[3] In 2001, the United States designated the FARC as a Specially Designated Global Terrorist (SDGT) under Executive Order 13224, and in 2003, the President designated the FARC as a Specially Designated Narcotics Trafficking Kingpin (SDNTK) pursuant to the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. §§1901–1908. Significantly, Caballero's ATA Final Judgment further encompasses designated, terrorist Dissident FARC Forces and/or Dissident FARC Groups, FARC-EP[4] and Segunda Marquetalia[5]—

---

[3]     *See* Press Release, *Treasury Sanctions Members of Revolutionary Armed Forces of Colombia Drug Trafficking and Money Laundering Network* (Aug. 27, 2015), accessed at: https://co.usembassy.gov/treasury-sanctions-members-revolutionary-armed-forces-colombia-drug-trafficking-money-laundering-network/; *see also* U.S. Dep't of State, Designated Foreign Terrorist Organizations, accessed at: https://www.state.gov/foreign-terrorist-organizations/.

[4]     "FARC-EP" refers to FARC-EP (a.k.a. FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA - EJERCITO DEL PUEBLO; a.k.a. REVOLUTIONARY ARMED FORCES OF COLOMBIA - PEOPLE'S ARMY; a.k.a. "FARC DISSIDENTS FARC-EP"; a.k.a. "FARC-D FARC-EP"; a.k.a. "GAO-R FARC-EP"; a.k.a. "GRUPO ARMADO ORGANIZADO RESIDUAL FARC-EP"; a.k.a. "RESIDUAL ORGANIZED ARMED GROUP FARC-EP"; a.k.a. "REVOLUTIONARY ARMED FORCES OF COLOMBIA DISSIDENTS FARC- EP"). *See* OFAC SDN List, available at: https://www.treasury.gov/ofac/downloads/sdnlist.txt.

[5]     "Segunda Marquetalia" refers to SEGUNDA MARQUETALIA (a.k.a. LA NUEVA MARQUETALIA; a.k.a. NEW MARQUETALIA; a.k.a. SECOND MARQUETALIA; a.k.a. "ARMED ORGANIZED RESIDUAL GROUP SEGUNDA MARQUETALIA"; a.k.a. "FARC DISSIDENTS SEGUNDA MARQUETALIA"; a.k.a. "FARC-D SEGUNDA MARQUETALIA"; a.k.a. "GAO-R SEGUNDA MARQUETALIA"; a.k.a. "GRUPO ARMADO ORGANIZADO RESIDUAL SEGUNDA MARQUETALIA"; a.k.a. "RESIDUAL ORGANIZED ARMED GROUP SEGUNDA MARQUETALIA"; a.k.a. "REVOLUTIONARY ARMED FORCES OF COLOMBIA DISSIDENTS SEGUNDA MARQUETALIA"). *See* OFAC SDN LIST, available at: https://www.treasury.gov/ofac/downloads/sdnlist.txt.

both of which have been designated as FTOs and as SDGTs such that they qualify as "terrorist parties" under Section 201 of TRIA.[6]

### a.   The Law Provides a Broad Definition of Agency or Instrumentality

In *Stansell*, the Eleventh Circuit adopted the District Court's definition of "agency or instrumentality" for TRIA purposes. 771 F.3d at 724 n.6. An "agency or instrumentality" is any person, entity, drug cartel, or organization that: (1) "materially assist[ed] in, or provid[ed] financial or technological support for or to, or provid[ed] goods or services in support of the international narcotics trafficking activities of a specially designated narcotics trafficker . . . [FARC]"; "and/or" (2) was "owned, controlled, or directed by, or acting for or on behalf of, a specially designated narcotics trafficker . . . [FARC]"; "and/or" (3) "play[ed] a significant role in international narcotics trafficking [related to coca paste or cocaine manufactured or supplied by the FARC]." *See id.*

### b.   This Motion is Supported by the Sworn Declarations of a Highly Qualified Former OFAC Official

This Motion is supported by the sworn declarations of John Robert McBrien ("McBrien") regarding FARC A/I.[7] By way of background, McBrien was formerly the Associate Director for Global Targeting in the Office of Foreign Assets Control ("OFAC"), the U.S. Treasury Department's sanctions organization. *See* D.E. 73-2 at ¶ 1. He held that position from May 2005

---

[6]   As Caballero explained in his Unopposed Mot. for Issuance of Writ of Execution and Incorporated Mem. of Law (the "Unopposed Mot. for Writ"), D.E. 138 at ¶¶ 38-44—FARC-EP (i.e., FARC narco-terrorism forces) continues to be blocked. The Clerk of this Court subsequently issued the requested writ [D.E. 140], which is significant because the writ's issuance is premised upon that the FARC-EP (i.e., FARC narco-terrorism forces, which is a named defendant in this action) continues to be blocked as argued in Caballero's Unopposed Mot. for Writ. Of note, Caballero also argued the Look-Back Rule in his Unopposed Mot. for Writ, which rendered the delisting of any FARC component as irrelevant. *See* D.E. 138 at ¶ 49. Moreover, on January 27, 2022, a Florida state court entered an order distributing certain blocked assets to Caballero, which further concluded that "Caballero's ATA Final Judgment further encompasses designated, terrorist Dissident FARC Forces and/or Dissident FARC Groups, FARC-EP and Segunda Marquetalia…" Amended Turnover Order at 3-4, n.4, *Murano at Portofino Condo. Assoc., Inc. v. Murano 808, Corp.*, Case No. 2020-000110-CA-01 (Fla. 11th Cir. Ct. Miami-Dade Cnty. Jan. 27, 2022).

[7]   *See* Sworn Declaration of John Robert McBrien Regarding Agencies and Instrumentalities of the FARC dated July 14, 2020, D.E. 73-2; and Supplemental Sworn Declaration of John Robert McBrien Regarding Agents and Instrumentalities of the FARC dated September 8, 2020, D.E. 81-1 through 81-2.

to December 2011, when he retired from the Treasury Department. *Id.* At all times during his employment with OFAC, Mr. McBrien was in charge of its designations operations. *Id.* This covered the period from November 1987 to and throughout the formal creation of OFAC's Office of Global Targeting (OGT) in 2005. *Id.*

McBrien was in charge of the designations programs of OFAC for more than 24 years. *Id.* OFAC's Office of Global Targeting is charged with investigating and identifying the foreign entities and individuals that are designated under OFAC's Specially Designated Nationals ("SDN") programs directed against the principals, operatives, and networks of sanctioned countries, regimes, and non-state foreign adversaries. *Id.* McBrien is also an authority in the employment of U.S. economic sanctions programs and had a seminal role in the conception, design, and development of the Specially Designated Nationals list and targeted sanctions against non-state foreign adversaries. *Id.* at ¶ 2. His initiatives have been a key factor in the development of economic sanctions as a major instrument of national security policy. *Id.* During his nearly 25 years with OFAC, McBrien participated in the development of every sanctions Executive Order issued in that period and in the implementation of the resulting sanctions programs. *Id.*

### c. The January 8, 2019 OFAC Designated/Blocked Individuals and Entities are Each a FARC A/I

As discussed below, the individuals listed on **Exhibit 1** meet the standard—referenced in Section D.1.a.—and are thus each a FARC A/I.

#### i. *The January 8, 2019 OFAC Designated/Blocked Individuals and Entities*

On January 8, 2019, OFAC, pursuant to Executive Order (E.O.) 13850 designated or blocked individuals and entities "involved in a significant corruption scheme designed to take advantage of Venezuela's currency exchange practices, generating more than $2.4 billion in

corrupt proceeds."[8] OFAC's findings (and U.S. Attorney's indictment) evidence Raul Gorrin Belisario's ("Gorrin") "money laundering…[of] embezzled government funds." Jan. 8, 2019 Treasury Press Release; *see also* D.E. 81-1 at ¶ 39 (discussing Gorrin's money laundering activities and citing to Department of Justice publications and indictment concerning Gorrin); Superseding Indictment, *U.S. v. Gorrin, et al.*, Case No. 9:18-cr-80160-WPD (S.D. Fla. Dec. 15, 2020), D.E. 44 (discussing Gorrin's money laundering activities in various counts). The Jan. 8, 2019 Treasury Press Release, relied upon by McBrien in his Supplemental Declaration [D.E. 81-1 - 81-2], provides detail regarding the corrupt wealth generated for FARC operatives such as former Venezuelan National Treasurers Alejandro Jose Andrade Cedeno ("Andrade") and Claudia Patricia Diaz Guillen ("Diaz"):

> …[the] designations target individuals who took advantage of a corrupt system within the Venezuelan ONT [Office of the National Treasury], stealing billions of dollars from the Venezuelan people since 2008, under the watch of two Venezuelan National Treasurers, Alejandro Jose Andrade Cedeno (Andrade) and [former Venezuelan National Treasurer Claudia Patricia Diaz Guillen] Diaz. Andrade was sentenced by the United States District Court for the Southern District of Florida on November 27, 2018, to 10 years in prison for accepting over $1 billion in bribes for his role in the below scheme.
> ….
>
> The below former Government of Venezuela officials and individuals enriched themselves by capitalizing on favorable foreign exchange transactions through casas de bolsa, concealing their profits in European and U.S. bank accounts and investments. Both Andrade and Diaz, while occupying the role of National Treasurer, used their official positions to give ***[Raul] Gorrin [Belisario], a prominent Venezuelan businessman, access to the ONT's preferred exchange rates to maximize profits on currency transactions moving through the casas de bolsa, which Gorrin, amongst a select few others that were approved by the ONT, controlled….***
>
> ***In return for their selection as the only currency exchange houses approved by the ONT, Gorrin and Gonzalez, another Venezuelan businessman, paid***

---

8       U.S. Treasury Dep't, Press Release, *Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders* (Jan. 8, 2019) (the "**Jan. 8, 2019 Treasury Press Release**"), accessed at: https://home.treasury.gov/news/press-releases/sm583#:~:text=%E2%80%9CVenezuelan%20regime%20insiders%20have%20plundered,Mnuchin.

*hundreds of millions of dollars in bribes to Andrade. Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT. Gorrin compensated Andrade for introducing him to Diaz, and as a result, allowed the bribery scheme to continue, undeterred. From at least 2011 to 2013, Gorrin paid bribes to Diaz, wiring money to her and her husband, Adrian Jose Velasquez Figueroa (Velasquez), and purchasing assets on their behalf, to include a residence in Cap Cana, Dominican Republic, and an aircraft.*

<u>*Gorrin and Gonzalez controlled the corrupt wealth that was generated on Andrade's behalf, holding the money in offshore bank accounts and reinvesting in properties, aircraft, and other luxury assets at the direction of Andrade.*</u> Andrade's portion of the illicit profits were never sent directly to Andrade; instead these individuals would purchase assets for Andrade, at his direction, or on his behalf. <u>*Gorrin, Gonzalez, and Gorrin's brother-in-law and business partner, Gustavo Adolfo Perdomo Rosales (Perdomo), purchased assets and paid expenses for Andrade related to numerous aircraft and yachts, properties in the United States and abroad, multiple championship horses, and numerous high-end watches. The purchase of all of these goods and wiring of payments was hidden behind a sophisticated network of U.S. and foreign companies that hid the individuals' beneficial ownership. All individuals involved in the scheme spent their portions of the resulting profits on properties in the United States as well as through maintaining significant accounts in U.S. banks, and purchasing boats and planes that were registered in the United States. Gorrin later mimicked this structure in controlling Diaz's assets generated as a result of the currency exchange scheme*</u>.
….

<u>*Raul Gorrin Belisario was indicted by the United States Attorney's Office for the Southern District of Florida in August 2018*</u> for conspiring to violate the Foreign Corrupt Practices Act, and <u>*for conspiring to bribe Venezuelan officials and commit money laundering by hiding embezzled government funds, totaling more than $1 billion, in Florida and New York*</u>. Gorrin was also being investigated for misappropriating billions of dollars from Venezuela's state-owned oil company, Petroleos de Venezuela, S.A. (PDVSA). <u>*Gorrin is also thought to have paid several officials to have access to Venezuelan politicians and government officials, and was believed to hold funds on behalf of these individuals in the same way he held funds for Andrade*</u>….<u>*Gorrin also purchased gifts for Cilia Adela Flores de Maduro, the First Lady of Venezuela*</u>, who was designated by OFAC on September 25, 2018 pursuant to E.O. 13692.
….

<u>*Gustavo Adolfo Perdomo Rosales is the brother-in-law and a business partner of Gorrin. As Gorrin's business partner, Perdomo — on Gorrin's instruction — made wire transfers and held property on behalf of Andrade*</u>. Additionally, Perdomo beneficially owns an aircraft that Andrade would use, N133JA.

Emphasis added. A companion OFAC chart, cited to by the Jan. 8, 2019 Treasury Press Release, further augments the conclusions of such press release and depicts Gorrin paying bribes to Andrade, Diaz, and Diaz's husband (for Diaz).[9]

Specifically, OFAC designated (amongst others), the following individuals (determined to be FARC A/Is, *see infra* Section D.1.c.ii): (1) **Raul Gorrin Belisario**; and (2) **Gustavo Adolfo Perdomo Rosales** ("Perdomo"). Jan. 8, 2019 Treasury Press Release (emphasis in original); *see also* Notice of OFAC Sanctions Actions, 84 Fed. Reg. 2946-49 (Feb. 8, 2019). On the same day, the following companies were designated or blocked by OFAC for being owned or controlled by the aforementioned individuals:

- **Globovision Tele C.A.** is a television station located in Caracas, Venezuela, and is owned or controlled by Gorrin and Perdomo.
- **Globovision Tele CA, Corp.** is registered in Miami, Florida, and is owned or controlled by Gorrin and Perdomo.
- **Seguros La Vitalicia** is located in Caracas, Venezuela, and is owned or controlled by Gorrin.
- **Corpomedios GV Inversiones, C.A.** is located in Caracas, Venezuela, and is owned or controlled by Gorrin and Perdomo.
- **Corpomedios LLC** is registered in Miami, Florida, and is owned or controlled by Gorrin and Perdomo.
- **RIM Group Investments, Corp.** is registered in Miami, Florida, and is owned or controlled by Gorrin….
- **RIM Group Investments I Corp.** is registered in Miami, Florida, and is owned or controlled by Gorrin….
- **RIM Group Investments II Corp.** is registered in Miami, Florida, and is owned or controlled by Gorrin….
- **RIM Group Investments III Corp.** is registered in Miami, Florida, and is owned or controlled by Gorrin….
- **RIM Group Properties of New York, Corp.** is registered in New York, New York, and is owned or controlled by Gorrin.
- **RIM Group Properties of New York II Corp.** is registered in New York, New York, and is owned or controlled by Gorrin.
- **Magus Holdings USA, Corp.** is registered in Miami, Florida, and is owned or controlled by Perdomo….

---

[9]    *See* OFAC Chart, available at:
https://home.treasury.gov/system/files/126/gorrin_network_chart_20190108.pdf.

- **Magus Holding LLC** is registered in Miami, Florida, and is owned or controlled by Perdomo.
- **Magus Holding II LLC** is registered in Miami, Florida, and is owned or controlled by Perdomo.
- **Tindaya Properties Holding USA Corp.** is registered in New York, New York, and is owned or controlled by Perdomo.
- **Tindaya Properties of New York, Corp.** is registered in New York, New York, and is owned or controlled by Perdomo.
- **Tindaya Properties of New York II Corp.** is registered in New York, New York, and is owned or controlled by Perdomo.
- **Posh 8 Dynamic Inc.** is registered in Delaware, and is owned or controlled by Gorrin.
- **Constello No. 1 Corporation** is registered in Delaware, and is owned or controlled by Perdomo….
- **Constello Inc**. is registered in St. Kitts and Nevis, and is owned or controlled by Perdomo….
- **Windham Commercial Group Inc.** is registered in Delaware, and is owned or controlled by Gorrin and Perdomo.
- **Planet 2 Reaching Inc.** is registered in Delaware, and is owned or controlled by Gorrin.
- **Potrico Corp.** is registered in Delaware, and is owned or controlled by Perdomo.

Jan. 8, 2019 Treasury Press Release (emphasis in original).[10]

As a result of OFAC's action detailed above, "…all property and interests in property of those designated…[on January 8, 2019] subject to or transiting U.S. jurisdiction are blocked, and U.S. persons are generally prohibited from engaging in transactions with them." *Id*.

> ii. *McBrien Determines Gorrin and Perdomo to be FARC A/Is*

In his Supplemental Declaration, ***McBrien opines that Gorrin and Perdomo (along with other individuals and entities designated or blocked by OFAC on January 8, 2019) are each an A/I of the FARC*** "for their involvement and activities regarding the Venezuela currency exchange

---

[10]     *See* also Notice of OFAC Sanctions Actions, 84 Fed. Reg. 2946-49 (Feb. 8, 2019); Notice of OFAC Sanctions Actions, 84 Fed. Reg. 23162-63 (May 21, 2019) at 23163 (regarding OFAC's March 19, 2019 updates to the SDN List for the following entities, whose property and interests in property continue to be blocked under the relevant sanctions authority indicated in such notice: Constello Inc.; Constello No. 1 Corporation; Magus Holdings USA, Corp.; RIM Group Investments I Corp.; RIM Group Investments II Corp.; RIM Group Investments III Corp.; RIM Group Investments, Corp.).

program, which served as a primary vehicle for money laundering for, and which was inextricably

tied to the bribery of, FARC operatives within or surrounding the Maduro regime (such as his three

stepsons, Los Chamos), while such FARC operatives were acting in support of Maduro's grip on

power which enabled his vast international narcotics trafficking of FARC cocaine (with impunity

in Venezuela)."[11]  McBrien further concludes that "…Andrade, Diaz, and Gorrin are each agents

and instrumentalities of the FARC, as their activities materially assisted in, and provided financial

---

[11]      *See* D.E. 81-1 at ¶34; and ¶40 (citing Alexia Campbell, Drug money laundered in South Florida fuels U.S.-Venezuela trade, Sun Sentinel (Dec. 18, 2011) ("Sun Sentinel Article"), available at: https://www.sun-sentinel.com/news/fl-xpm-2011-12-18-fl-venezuelan-money-laundering-20111217-story.html). Notably, the black-market exchange and money laundering of proceeds from the sale of FARC cocaine mentioned in the Sun Sentinel Article was born out of and accomplished, at least in part, by the Venezuela currency exchange program's corrupt, preferential rate setting and the desperation it caused among Venezuela business owners who lacked access to the currency exchange program and the essential U.S. dollars (which were controlled by the Venezuelan government and its currency exchange program's operators – e.g., Andrade and Gorrin):

> A money-laundering task force in Broward and Miami-Dade counties has traced millions of illicit dollars to international heroin and cocaine traffickers, who rely on South Florida brokers to sell the cash to desperate business owners in Venezuela. Otherwise, those businessmen have no access to enough U.S. currency to import American products.
>
> ***The black-market currency exchange ballooned after Venezuelan President Hugo Chavez placed tougher restrictions on the availability of U.S. dollars in May 2010***, the drug control office report said.

Sun Sentinel Article (emphasis added). Thus, by engaging in corrupt and preferential rate setting, the Venezuela currency exchange program scheme placed rocket fuel on FARC cocaine drug dealing in the manner described in McBrien's declaration at D.E. 81-1 at ¶ 40 n. 6. Put another way, by controlling access to the Venezuela currency exchange program, those operating such program incentivized money launderers to take advantage of Venezuelan business owners' plight resulting in the latter partnering with drug dealers and brokers such that their bills would be paid in dollars offshores, while they would be depositing massive amounts of Bolivars at a highly inflated rate in Venezuela banks. *Id*. What is more, other black-market schemes to money launder drug proceeds arose out of the Venezuela currency exchange program scheme. *See e.g.*, First Superseding Indictment, *U.S. v. Lustgarten Acherman*, No. 1:15-mj-02465-CMM (D. Mass. Apr. 1, 2015), D.E. 1 at ¶ 1("Since at least 2007, and continuing until the present time, ***the government of Venezuela has maintained strict control over the availability of U.S. dollars in Venezuela, which has led to the creation of an unregulated black or parallel market for U.S. dollars in Venezuela….The demand for U.S. dollars in Venezuela is often met by money brokers who obtain U.S. dollars generated from illegal sources including the importation and sale of illegal drugs into the United States from Colombia and Mexico***.") (emphasis added); *see also* Jay Weaver and Antonio Maria Delgado, How a Venezuelan money launderer became a US informant, Miami Herald (last updated Oct. 4, 2020 8:53 AM), accessed at: https://www.miamiherald.com/news/nation-world/world/americas/article245623340.html (discussing Lustgarten's "usage of the Venezuela foreign exchange market to launder drug and corruption proceeds," his relationship with Gorrin, among others, and how those involved in the scheme enriched themselves under the Chavez and Maduro regimes). And although the charges brought against Lustgarten have been dismissed, such dismissal was based on procedural grounds (i.e., the "'speedy trial' rule").

or technological support for or to, or providing of goods or services in support of, the international

narcotics trafficking activities of the FARC." *Id*. McBrien goes on to describe that:

> [f]rom 2003 to 2019, the Venezuelan regime enacted currency
> controls. The currency control program that began as a counter-
> measure against the effects of a two month strike that decimated
> the oil exports from Venezuela, devolved into a primary vehicle for
> money laundering for FARC operatives within or surrounding the
> Maduro regime (including immediate family members of FARC
> agent and instrumentality Maduro).

D.E. 81-1 at ¶ 32.[12]

Moreover, McBrien opines that "the Venezuela currency exchange program existed to

empower certain Venezuelan government officials and/or business associates selected by the

Maduro regime to launder funds for FARC agents and instrumentalities, such as Maduro's three

stepsons, [and]… was inextricably tied to financial support of FARC operatives such as Cilia

Adela Flores de Maduro, the purported First Lady of Venezuela, who was designated by OFAC

on September 25, 2018 pursuant to E.O. 13692, and who is a member of the Cartel of the Suns."[13]

In his Supplemental Declaration McBrien explains how "[t]he example set by Raul Gorrin

Bellisario…and former National Treasurers of Venezuela - Alejandro Jose Andrade Cedeno…and

Claudia Patricia Diaz Guillen…illustrate how their control over the Venezuela exchange program

achieved these goals." D.E. 81-1 at ¶ 33, and 34-36 (citing and quoting the Jan. 8, 2019 Treasury

Press Release).

---

[12]    Citing Erin Fletcher, *Bolívar Distorted: The Effects of Exchange Controls on the Venezuelan Economy Or "Perhaps Chávez spent too much time reading Machiavelli and not enough time reading Adam Smith."* Fall 2004. Duke Journal of Economics (available at: https://sites.duke.edu/djepapers/files/2016/08/Fletcher.pdf).

[13]    D.E. 81-1 at ¶ 33, and n.4 (quoting *Press Release,* U.S. Treasury Dept., Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), https://home.treasury.gov/news/press-releases/sm495 ("OFAC designated Nicolas Maduro on July 31, 2017.  Today's designations target key current or former officials of the Venezuelan government.  Maduro has relied on key figures, such as previously designated Cabello and El Aissami, and those officials being designated today, to maintain his grip on power."); and declaring that "Cilia Adele Flores is also herself a member of the Cartel of the Suns." (citing *Venezuela: A Mafia State*?, Insight Crime (available at: https://es.insightcrime.org/wp-content/uploads/2018/05/Venezuela-a-Mafia-State-InSight-Crime-2018.pdf) (last visited September 8, 2020)).

Additionally, McBrien opines that Gorrin is "Conspirator 7" referenced in the Affidavit of Homeland Security Investigations Special Agent George F. Fernandez ("Special Agent Fernandez") dated July 23, 2018 ("Fernandez Aff."), submitted with the Criminal Complaint filed in *U.S. v. Francisco Convit Guruceaga, et al.*, Case No. 18-mj-03119-EGT, (S.D. Fla. Jul. 24, 2018), D.E. 3, wherein Special Agent Fernandez described the role of Mathias Krull (a German national who was banker to Gorrin) and Conspirator 7 in the money laundering of PDVSA proceeds on behalf of FARC A/I Los Chamos (Maduro's three step-sons). D.E. 81-1 at ¶ 36.

McBrien states that "Gorrin used his involvement in the Venezuela currency exchange program to launder funds for members of Maduro's inner circle. He at times worked with Mathias Krull to accomplish the task. Mathias Krull is a German national who was banker to Gorrin." D.E. 81-1 at ¶ 36 (citing Fernandez Aff. at ¶ 12) ("Matthias KRULL is a German national and Panamanian resident. KRULL was a high level banker at a large Swiss bank, specializing in Venezuelan clients. KRULL is the personal banker of CONSPIRATOR 7 and others. KRULL manages 'banking' activities for numerous Venezuelan officials and kleptocrats."). McBrien goes on to highlight paragraphs of the Fernandez Aff., wherein Special Agent Fernandez described the role of Krull and Conspirator 7 in the money laundering of PDVSA proceeds on behalf of FARC A/Is Los Chamos (Maduro's three step-sons). *Id* (quoting Fernandez Aff. at ¶¶ 96-105). McBrien further states that "…although 'Conspirator 7' is unidentified, footnote 12 of the Fernandez Affidavit states that 'CONSPIRATOR 7 is another reported billionaire member of the 'boliburgues' and owner of a television network in Venezuela." D.E. 81-1 at ¶ 36 (citing Fernandez

Aff. at ¶ 27, n. 12). McBrien's conclusion that Gorrin is "Conspirator 7" from the Fernandez Aff. is also supported by credible news articles that covered the Criminal Complaint.[14]

***iii.***      ***The Gorrin, et al. Superseding Indictment Further Supports McBrien's FARC A/I Determination as to Gorrin***

The Superseding Indictment returned by a federal grand jury in the Southern District of Florida for Gorrin, *et al*. recounts how Gorrin paid bribes in support of other individuals that support FARC A/I Maduro in order to secure his power over the Venezuela currency exchange program. The Superseding Indictment (in part) alleges:

> From in or around 2008 through in or around 2017, RAUL GORRIN BELISARIO, CLAUDIA PATRICIA DIAZ GUILLEN, ADRIAN JOSE VELASQUEZ FIGUEROA, and their co-conspirators engaged in a corrupt scheme in connection with foreign currency exchanges conducted for the Venezuelan government. In total, RAUL GORRIN BELISARIO paid hundreds of millions of dollars in bribes to secure the rights to engage in over $1 billion in foreign currency exchange transactions that resulted in profits to RAUL GORRIN BELISARIO of hundreds of millions of dollars.
> …
>
> Specifically, beginning in or around 2008, ***RAUL GORRIN BELISARIO offered, promised, authorized, and paid bribes to Alejandro Andrade Cedeno in order to, among other things, influence and induce Alejandro Andrade Cedeno to permit RAUL GORRIN BELISARIO to conduct foreign currency exchanges for the Venezuelan government and secure an improper advantage in acquiring the right to conduct such exchange transactions***.
> …
>
> Beginning in or around 2011, ***RAUL GORRIN BELISARIO offered, promised, authorized, and paid bribes to CLAUDIA PATRICIA DIAZ GUILLEN, including through ADRIAN JOSE VELASQUEZ FIGUEROA, for purposes of influencing and inducing CLAUDIA PATRICIA DIAZ GUILLEN to permit***

---

[14]     *See* D.E. 81-1 at ¶ 36 (citing Jay Weaver and Antonio Maria Delgado, *Media Mogul with Miami Mansion Emerges as Key Suspect in Venezuela Corruption Case,* Miami Herald (August 24, 2018), https://www.miamiherald.com/article217285655.html; Brian Bandell, *Luxury Miami Condo Linked to Alleged Billion-dollar Money Laundering Scheme,* South Florida Business Journal (June 26, 2018), https://www.bizjournals.com/southflorida/news/2018/07/26/luxury-miami-condo-linked-to-allegedbillion-dollar.html; and *Swiss banker gets 10 years for Venezuela graft case,* Associated Press (October 29, 2018), https://apnews.com/ba0d18b4c16b4567a1832d98cb64bdaa.

> *RAUL GORRIN BELISARIO to conduct foreign currency exchanges for the Venezuelan government and securing an improper advantage in acquiring the right to conduct such exchange transactions*.

Superseding Indictment, *U.S. v. Gorrin, et al.*, Case No. 9:18-cr-80160-WPD (S.D. Fla. Dec. 15, 2020), D.E. 44 at ¶¶ 10, 12, and 15 (emphasis added). Additionally, the Department of Justice announced that as part of Andrade's guilty plea "*Andrade admitted that he received over $1 billion in bribes from Gorrin and other co-conspirators in exchange for using his position as Venezuelan national treasurer to select them to conduct currency exchange transactions for the Venezuelan government.*"[15]

Thus, Caballero has established through ample competent evidence submitted to this Court that the individuals listed on **Exhibit 1** are each an A/I of the FARC, whose assets are subject to execution under TRIA and the ATA. *See* D.E. 81-1 at ¶¶ 40-42.

### 2. The ATA Final Judgment is Based on an Act of Terrorism

The ATA Final Judgment satisfies the second element of TRIA because it is "for a claim based on an act of terrorism." *Weininger*, 462 F. Supp. 2d at 479. This Court found that the Defendants' conduct constituted an act of international terrorism. *See* D.E. 62 at 6. This Court further found that the Defendants' kidnapped Caballero's father in Colombia, tortured him, and then killed him to "send a message to other potentially uncooperative landowners in the region that resistance to (or failure to comply with) Defendant's demand would not be tolerated and would result in them being targeted for kidnapping for ransom and/or assassination." *See id*. (quoting Compl. at ¶ 5).

---

[15]     *See* Department of Justice News, *Venezuelan Billionaire News Network Owner, Former Venezuelan National Treasurer and Former Owner of Dominican Republic Bank Charged in Money Laundering Conspiracy Involving Over $1 Billion in Bribes* (Nov. 20, 2018) (emphasis added), accessed at: https://www.justice.gov/opa/pr/venezuelan-billionaire-news-network-owner-former-venezuelan-national-treasurer-and-former*; see also* Plea Agreement and Factual Proffer, *U.S. v. Andrade*, Case No. 9:17-cr-80242-RLR (S.D. Fla. Dec. 19, 2017), D.E. 9, accessed at: https://www.justice.gov/criminal-fraud/file/1120281/download.

### 3.   The Assets are "Blocked Assets" of An Agency or Instrumentality of the FARC

To satisfy the third element of TRIA, the assets must be "blocked" assets within TRIA's meaning. *Weininger*, 462 F. Supp. 2d at 479. This is the case here.

As a preliminary matter, OFAC administers various economic sanctions programs authorized by the IEEPA. *See* 50 U.S.C. §§ 1701–1706.[16] OFAC's power includes the authority to "designate" persons and entities to thus "block" that person or entity's assets. Only assets that are "blocked" are executable under TRIA. TRIA defines "blocked assets" as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) [("TWEA")] or under sections 202 and 203 of the [IEEPA]." TRIA § 201(d)(2)(A). Importantly, the individuals and entities respectively listed on **Exhibit 1** and **Exhibit 2** were designated/blocked pursuant to E.O. 13850,[17] which derives its authority from the IEEPA.[18] Thus, the assets of the individuals listed on **Exhibit 1** (which are among the individuals and entities designated/blocked by OFAC on January 8, 2019) are "blocked assets" under TRIA and are executable.  Moreover, the entities listed on **Exhibit 2** were designated by OFAC because they were owned or controlled by Gorrin and/or Perdomo who are listed on **Exhibit 1**. The entities listed on **Exhibit 2**, as well as their real properties listed on **Exhibit 3**, are all blocked assets of such A/I of the FARC listed on **Exhibit 1**. Indeed, McBrien has opined that the assets of the

---

[16]      In 2001, the President issued Executive Order 13224 ("E.O. 13224") under the IEEPA, authorizing the Secretary of Treasury to block certain assets and to promulgate related rules and regulations. The Secretary of Treasury delegated that authority to OFAC. *See* 31 C.F.R. § 594.802. E.O. 13224 also gives the Secretary of State blocking power.

[17]      *See* 84 Fed. Reg. 2946-49 (Feb. 8, 2019), available at https://www.govinfo.gov/content/pkg/FR-2019-02-08/pdf/2019-01643.pdf; *see also* OFAC SDN List, available at https://www.treasury.gov/ofac/downloads/sdnlist.txt (evidencing that the individuals listed on **Exhibit 1** and entities listed on **Exhibit 2** remain designated/blocked pursuant to Executive Order 13850).

[18]      *See* Executive Order 13850, 83 Fed. Reg. 55243 (Nov. 2, 2018), available at: https://www.govinfo.gov/content/pkg/FR-2018-11-02/pdf/2018-24254.pdf ("By the authority vested in me as President by the Constitution and the laws of the United States of America, including ***the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) (IEEPA)…")*** (emphasis added).

individuals and entities respectively listed on **Exhibit 1** and **Exhibit 2** are all considered blocked assets "executable under TRIA, as are property of any entity in which such blocked persons own, whether individually or in the aggregate, directly or indirectly a 50% or greater interest." *See* D.E. 81-1 at ¶¶ 41-42.

Here, Caballero has learned that the individuals listed on **Exhibit 1**, through the respective entities listed on **Exhibit 2**, own and/or control real property located in Florida, including but not limited to the real properties listed on **Exhibit 3**. Because the entities listed on **Exhibit 2** were designated by OFAC pursuant to section 1(a)(iv) of E.O. 13850 for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Gorrin or Perdomo (the persons on **Exhibit 1** whose property and interests in property are blocked pursuant to E.O. 13850) the assets listed on **Exhibit 3** of such entities listed on **Exhibit 2** are also subject to execution under TRIA and the ATA. *See* D.E. 81-1 at ¶¶ 41-42; *see also* 84 Fed. Reg. 2946-49 (Feb. 8, 2019), and 84 Fed. Reg. 23162-63 (May 21, 2019) at 23163.

### 4.   Execution Helps Satisfy Caballero's ATA Final Judgment

The last element for execution under TRIA requires that "execution is sought only to the extent of any compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.  On March 29, 2022, Magistrate Judge Netburn issued a Report and Recommendation that the ATA's treble damages provision awards compensatory damages for the purposes of collections under TRIA. *See* Report and Recommendation, *Stansell v. FARC, et al.*, Case No. 16-mc-00405-LGS-SN (S.D.N.Y.), D.E. 443 at 27-36. Although Caballero has argued otherwise, unless such Report and Recommendation is rejected by Judge Schofield or the Second Circuit Court of Appeals, Caballero will seek turnover of assets up to the full amount of his outstanding trebled ATA Final Judgment.

**E.      Request for Expedited Relief to Attach TRIA Blocked Assets**

As discussed above, the subject blocked entities listed on **Exhibit 2** and the real property listed on **Exhibit 3**, are owned and/or controlled by a FARC A/I listed on **Exhibit 1**. Given the fleeting nature of these blocked assets, Caballero has filed this expedited motion in order to place lis pendens on such blocked assets listed on **Exhibit 3** pending application for and issuance of writs of execution in accordance with the procedures previously used with this Court.[19] Significantly, the Eleventh Circuit has opined that TRIA favors "immediate attachment" and that "[m]ere attachment is a minimally intrusive manner" of reducing the risks of fleeting assets. *See Stansell,* 771 F. 3d at 729-30. Accordingly, Caballero respectfully requests expedited review under SDFL Local Rule 7.1(d)(2) and relief by certain—April 22, 2022 (14 days after filing) to promptly attach these assets and perfect his judgment lien under Florida law.

**F.      Conclusion**

Plaintiff Antonio Caballero respectfully requests expedited review and relief and that his motion be granted in the form of the proposed Order attached hereto as **Exhibit 4,** and that this Court enter an Order:

     i.    Determining that each individual set forth on **Exhibit 1** is an agency or instrumentality of the FARC; and

    ii.    Determining that each entity listed on **Exhibit 2** is a blocked asset of such A/I of the FARC listed on **Exhibit 1**, and that the real properties listed on **Exhibit 3** are blocked assets executable under TRIA towards satisfaction of the ATA Final Judgment.

---

[19]      Caballero has become aware that MAGUS HOLDING II, CORP.  listed on **Exhibit 2** has transferred the real property located at 140 Paloma Drive, Coral Gables, Florida 33143 listed on **Exhibit 3** on or around March 12, 2021. Caballero will be placing a lis pendens on such real property nonetheless as such entity was blocked long before such transfer and remains so blocked today.

**DATED this 8 day of April 2022.**

Respectfully submitted,

*/s/ Joseph I. Zumpano*
Joseph I. Zumpano
Fla. Bar. No. 0056091
jzumpano@zplaw.com
Leon N. Patricios
Fla. Bar No. 0012777
lpatricios@zplaw.com
ZUMPANO PATRICIOS, P.A.
312 Minorca Ave.
Coral Gables, FL 33134
Tel: (305) 444-5565

*Attorneys for Plaintiff Antonio Caballero*

## SDFL LOCAL RULE 7.1(a)(3) CERTIFICATION

SDFL Local Rule 7.1(a)(3) is inapplicable at this time.

*/s/ Joseph I. Zumpano*
Joseph I. Zumpano

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of April, 2022, the undersigned electronically filed the foregoing document with the Clerk of the Courts by using the CM/ECF system.

*/s/ Joseph I. Zumpano*
Joseph I. Zumpano