UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-cv-25337-KMM

ANTONIO CABALLERO,

       Plaintiff

v.

FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA, et al.,

       Defendants.

_____/

## THE INTERESTED PARTIES' CORRECTED MOTION FOR SUMMARY JUDGMENT[1]

    Caballero's attempt at establishing a connection between the Interested Parties[2] and the FARC by cobbling together layers upon layers of unsubstantiated inferences based upon hearsay is the type of "attenuated link" that the Eleventh Circuit cautioned "common sense indicates" will not be sufficient. *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1346 (11th Cir. 2022) ("Common sense indicates, however, that the more attenuated the link the more difficulty it will be to prove agency/instrumentality status … [T]he mere associations used in the game 'Six Degrees of Kevin Bacon' … would not suffice under § 201 of the TRIA.").[3]

---

[1] The Interested Parties inadvertently filed their Motion for Summary Judgment without the attached exhibits. This corrected motion is filed solely for the purpose of attaching the exhibits.

[2] For ease of reference, the "Interested Parties" refers Raul Gorrin Belisario ("Gorrin"), Gustavo Adolfo Perdomo ("Perdomo") and the twenty-three entities listed in ECF No. 150-2. The "Interested Party Entities" refers to the twenty-three entities listed in ECF No. 150-2. The "Subject Properties" refers to the real properties listed in ECF No. 150-3.

[3] To be sure, Gorrin and Perdomo both deny ever conducting any transaction with a member of the FARC, being involved in a narcotics transaction, being a front man for the FARC, laundering proceeds for the FARC or anyone associated with the FARC, engaging in any financial transaction with the FARC or anyone associated with the FARC, or ever supporting the FARC in any way (logistically, financially, or otherwise). ECF Nos. 207-1 and 207-2. But even a person who would have committed the conduct Caballero alleges against Gorrin Perdomo would not be rendered an A/I of the FARC because Caballero's theories are insufficient to establish any connection, direct or indirect, to the FARC. *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1346 (11th Cir. 2022).

1

Caballero's needlessly convoluted theories, directed almost exclusively at Gorrin, lack any actual supporting evidence, and do not raise an issue of fact warranting a jury determination on whether Gorrin, Perdomo, or the Interested Party Entities are agencies or instrumentalities of the FARC. Caballero does not even claim the existence of any relationship whatsoever between the Interested Party Entities, who own the Subject Properties, and the FARC.

In fact, Caballero's theories are so attenuated that they define agency or instrumentality of the FARC as any individual or entity that ever exchanged Venezuelan currency for U.S. Dollars or participated in a Venezuelan government program. If past is prologue,[4] to hold that Caballero has mustered enough evidence here to create an issue of fact as to the Interested Parties being FARC A/Is would open the floodgates and trigger multiple other lawsuits by Caballero and his judgment competitors against U.S. currency users or Venezuelan government program participants. Caballero's theories should be rejected, and summary judgment should be entered in favor of the Interested Parties.[5]

## ARGUMENT

### I.    Summary Judgment Standard.

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

"Speculation cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment." *Ministerios El Camino v. Scottsdale Ins. Co.*, 587 F. Supp. 3d 1194, 1200 (S.D. Fla. 2022). "A court need not permit a case to go to a jury when the

---

[4] In discovery, Caballero disclosed 44 cases nationwide, which he has filed or in which he has intervened. *See* Caballero's Supplemental Responses to the Interested Parties' Requests for Production, attached hereto as Exhibit 1.

[5] The Interested Parties reserve the right to assert that because Caballero has failed to effectuate service of process on the Interested Parties, which is required to establish personal jurisdiction, and failed to establish general or specific jurisdiction, the Interested Parties cannot be designated as A/Is of the FARC in this matter. Personal jurisdiction issues were raised by the Interested Parties in their Expedited Motion dated December 23, 2022. ECF No. 207 at 15. The Interested Parties have subsequently raised personal jurisdiction issues in subsequent pleadings before this Court and in discovery.

inferences drawn from the evidence, upon which the non-movant relies, are 'implausible.'" *In re Chiquita Brands Int'l, Inc. Alien Torts Statute & S'holder Derivative Litig.*, 2022 WL 18957608, at \*16 (S.D. Fla. Dec. 15, 2022) (citing *Cuesta v. School Board of Miami-Dade County, Fla.,* 285 F. 3d 962, 970 (11th Cir. 2002). And even when other inferences are not impossible, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Mize v. Jefferson City Bd. of Educ.*, 93 F. 3d 739, 743 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted).

## II.   Legal Standard to Establish Agency or Instrumentality ("A/I") Status.

Section 201(a) of the Terrorist Risk Insurance Act of 2002 ("TRIA"), provides that "[n]otwithstanding any other provision of law ... the blocked assets of [a] terrorist party [against which a judgment is obtained] (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment." *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1346 (11th Cir. 2022) (quoting 28 U.S.C. § 1619 (note)). A party seeking to execute against the assets of a terrorist party's agency or instrumentality must "establish that the purported agency or instrumentality is actually an agency or instrumentality." *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 723 (11th Cir. 2014).[6]

An OFAC designation does not itself require or justify a finding of agency or instrumentality status. *Stansell,* 771 F.3d at 726 (Agency or instrumentality "is a separate determination in addition to blockage not dispositively decided by OFAC designation"); *See Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, 2020 WL 7230664, at \*2 (N.Y. Sup. Ct. Dec. 04, 2020) (denying Plaintiff's motion to declare other parties A/Is of the FARC based on their OFAC designation because "even if plaintiff established that [OFAC] blocked

---

[6] Apart from establishing the agency or instrumentality element of a TRIA claim, a party wishing to execute under TRIA "must first establish that she has obtained a judgment against a terrorist party that is either for a claim based on an act of terrorism or for a claim for which a terrorist party is not immune. The party must then show that the assets are blocked as that term is defined in TRIA. Finally, the total amount of the execution cannot exceed the amount of compensatory damages." *Stansell*, 771 F.3d at 723 (citing *Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006)); *Stansell*, 45 F.4th at 1346. Pursuant to this Court's June 28, 2023 Order, (ECF No. 329 at 10), the Interested Parties limit the instant motion "solely on the agency/instrumentality issue."

Montelongo and Marquez, their associated entities, or their assets, no evidence indicates that such a designation originated from a connection to FARC, rather than for an entirely separate reason.")

TRIA does not define "agency or instrumentality." Using the "plain and ordinary meaning of those terms," the Eleventh Circuit adopted the following definition:

> [A]ny SDNT ... that is or was ever involved in the FARC's narcotics trafficking operations or that assisted the FARC's financial or money laundering network because it was either
>
> (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the FARC's international narcotics trafficking activities; and/or
>
> (2) owned, controlled, or directed by, or acting for or on behalf of the FARC; and/or
>
> (3) playing a significant role in the FARC's narcotics trafficking.

*Stansell*, 45 F.4th at 1350 (quoting *Stansell*, 771 F.3d at 724) (emphasis in original). An "agency" relationship exists when there has been a manifestation by the principal that the agent may act on his account and consent to do so by the agent. *Stansell*, 45 F.4th at 1353. Thus, "to be an agency of a terrorist party under § 201(a) of the TRIA one must know the identity of the terrorist party with whom the agent-principal relationship exists." *Id*. at 1353-54.[7] "[A]n instrumentality is a person or thing through which or by which some end or purpose is achieved." *Id*. at 1354. For purposes of TRIA, it is not necessary, according to the Eleventh Circuit, to establish that the instrumentality was aware of the terrorist party or parties involved. *Id*. at 1354.[8]

While an indirect relationship can suffice to meet this standard, "[c]ommon sense indicates, however, that the more attenuated the link the more difficult it will be to prove agency/instrumentality status." *Id*. at 1357. As an example, the Eleventh Circuit used the following pop culture analogy:

---

[7] There is no evidence, source or document supporting the existence of an agent-principal relationship between any of the Interested Parties and the FARC, or that there was ever "a manifestation by the [FARC] that [any Interested Party] may act on [it's] account" or that any Interested Party ever consented to do so, or that any Interested Party had knowledge of any agent-principal relationship with the FARC. SMF at ¶ 10-19. Thus, there is not even a claim of an "agency" relationship here. Caballero's theories necessarily would fall under the "instrumentality" category, although they are wholly defective in that regard.

[8] The Interested Parties submit that the Eleventh Circuit's binding definition is too broad; still, summary judgment is appropriate for the reasons expressed in this memorandum.

> [T]he mere associations used in the game "Six Degrees of Kevin Bacon"—which involves linking American actor Kevin Bacon to other actors via their roles in six film titles or less—would not suffice under § 201 of the TRIA. *Cf.* David Colker, "Six Degrees of Bacon Separation," *L.A. Times* (June 18, 1996) ("One of [Elvis] Presley's films was 'Viva Las Vegas' (1964), which also featured Ann-Margret. Ann-Margret appeared in 'Carnal Knowledge' (1971) with Jack Nicholson. And Nicholson was in 'A Few Good Men' (1992) with Bacon. It took three films to make the connection, so Presley can be said to have a Bacon number of 3.").

*Stansell*, 45 F.4th at 1357.

## III.   Caballero's A/I Theories Lack Factual Support and Consist of Inadmissible Summary Judgment Evidence.

Caballero presents his various theories purporting to establish an A/I relationship between Gorrin, Perdomo, and the FARC through the opinions of his so-called experts, William Luther ("Luther") and Robert Zachariasiewicz ("Zach"), and through anecdotal hearsay statements in declarations of two lay witnesses, Leamsy Salazar ("Salazar") and Martin Rodil ("Rodil"). Caballero previously relied upon a declaration of Robert McBrien (ECF No. 81-1), but he has since abandoned reliance upon McBrien by excluding him from his disclosed experts. *Ministerios El Camino v. Scottsdale Ins. Co.*, 587 F. Supp. 3d 1194, 1200-01 (S.D. Fla. 2022) (Moore, J.)

Luther offers "three schemes that [he claims] were employed to provide material assistance to, or financial or technological support for, the international narcotics trafficking activities of the [FARC] or its agencies or instrumentalities" – the first A/I prong addressing narcotics trafficking – thus rendering Gorrin (according to Luther) an A/I of the FARC. ECF No. 287-1 at 1. Luther offers no opinion whatsoever on Perdomo, the Interested Party Entities, or the Subject Properties. Zach, in turn, parrots the three Luther "schemes,"[9] and adds a few allegations of bribes or gifts by Gorrin to individuals whom Zach opines are FARC A/Is. ECF No. 288-1. Zach also offers no opinion whatsoever on the Interested Party Entities or the Subject Properties. As to Perdomo, Zach opines that he was Gorrin's "front man" in allegedly bribing FARC A/Is, thus rendering Perdomo an A/I himself. ECF No. 288-1 at 8.

As explained in the Interested Parties' *Daubert* Motions to Exclude the Testimony and Opinions of Luther and Zach, which are incorporated herein, these "experts" should be stricken

---

[9] At his deposition, Zach acknowledged he is not qualified to render expert opinions on the dollar shortage scheme or the bond scheme. ECF No. 288-2 at 79: 18-19, 183: 16-21, 184: 11-18. Thus, his reiteration of Luther's opinions concerning these "schemes" should not be considered on summary judgment.

because their theories are inadmissible as they are entirely lacking in any reliable basis or methodology and often consist of wholesale interpretive commentary of hearsay within documents. ECF Nos. 287, 288, 312 and 319. Nevertheless, their theories do not even rise to the level of "the mere associations used in the game 'Six Degrees of Kevin Bacon,'" because they fail to provide even the basic information needed to play the game or make any connection between any of the Interested Parties and the FARC. Thus, their inadmissible theories are insufficient to establish an A/I relationship.

Similarly, the remaining "evidence" relied upon by Caballero (the declarations by Salazar and Rodil) consists almost entirely of hearsay or rank speculation, which is inadmissible summary judgment evidence under Fed. R. Civ. P. 56(c)(2). Even so, they do not connect any of the Interested Parties to the FARC, directly or indirectly, sufficient to create an issue of fact on the A/I issue.

## A. The "Dollar Shortage Scheme" is Entirely Speculative and Far Too Attenuated to Establish an A/I Relationship.

According to Luther, in the years 2010 through 2015, the Venezuelan government implemented currency controls establishing an "official exchange rate" between the United States Dollar ("USD") and the Venezuelan Bolivar. ECF No. 281-1 at 1-2. At the same time, currency exchanges were taking place in a parallel market at a different exchange rate that was not controlled by the Venezuelan government. *Id*. at 2. This created a "gap" between the official USD-Bolivar exchange rate and the parallel "market exchange rate." *Id.* According to Luther, this "gap" was indicative of a scarcity of USD in Venezuela. With that background, the "Dollar Shortage Scheme" can be broken down into the following series of inferences:

(1) the FARC sells cocaine in the United States for USD. The FARC then needs to transfer its proceeds to Colombia;[10]

---

[10] According to Luther, the FARC must transfer its USD proceeds to Colombia because it is based in Colombia and "has significant financial obligations in Colombia (*e.g.*, paying guerrillas, coca farmers, transporters, etc.)." ECF No. 287-1 at 5. However, in his deposition, Luther admitted: (1) he does not hold himself out to be an expert on the FARC or on international narcotics trafficking or on international diplomacy; (2) he had never researched the FARC, and (3) he has never written any articles concerning the FARC. ECF No. 287-2 at 13: 5-7; 13: 11-17; 15: 24-25; 16:1; 117: 2-4. Instead, Luther claims his opinions concerning the FARC are "general information" he obtained as an "informed citizen." *Id*. at 59: 4, 117: 25. Given Luther's admitted lack of qualification or experience to render opinions concerning the FARC or its activities, the initial inference in his opinion concerning the Dollar Shortage Scheme is baseless and should be stricken.

(2) some unidentified Venezuelan business owners needed USD to purchase goods in the United States from American businesses, but could not access *sufficient* USD due to "Venezuelan government restrictions;"[11]

(3) because of the alleged USD scarcity, *some* Venezuelan business owners who needed USD were "*encouraged*" or "more *inclined* to work with the FARC or it's [A/Is], who would *not have been willing* to do so if it were not for the USD shortage;"

(4) the FARC engaged in currency exchanges with these unidentified Venezuelan business owners who needed USD as follows:

    a. the unidentified Venezuelan business owners would transfer Bolivars to the FARC or to it's A/Is in Venezuela or Colombia in unidentified transactions;

    b. the FARC or it's A/Is in Venezuela or Colombia would "arrange" for the FARC or it's A/Is in the United States to issue payment on behalf of the Venezuelan business to the American business for the goods in the United States sought to be purchased by the Venezuelan business;

    c. the FARC then spent the Bolivars it received or exchanged them for Colombian pesos.

(5) Venezuela's currency exchange program, therefore, benefited the FARC by making Venezuelan US dollar users more likely to exchange currency with the FARC;

(6) "[T]he Chavez and Maduro regimes adopted and/or continued an exchange rate regime that resulted in USD shortages." Therefore, they are FARC A/Is.[12]

(7) Gorrin is an A/I of the FARC because he participated in the Venezuelan currency exchange program by purchasing bonds from the Venezuelan Treasury; and

---

[11] Luther does not explain what "Venezuelan government restrictions" he refers to. In fact, during the trial in the matter of *United States v. Claudia Patricia Diaz Guillen, et.al.*, No. 18-cr-80160 (S.D. Fla.), Luther disavowed any knowledge concerning any restrictions. D.E. 287-3 at 87: 24-25, 88: 1-5 ("I am not aware of that. I only have access to the official rate that is presented by the Central Bank of Venezuela.").

[12] According to Luther, Venezuela's currency exchange program was purposefully *designed* to benefit the FARC or it's A/Is because Chavez and Maduro "have acted as [A/Is] of the FARC" and, even if not initially *designed* to benefit the FARC, "one should presume the consequences of the Venezuelan exchange rate regime were foreseen by the relevant decisionmakers" and, even if they were not foreseen, "they quickly became apparent." ECF No. 287-1 at 6. It is axiomatic that experts may not give opinion testimony regarding the motives, state of mind, or intent of a party. *See In re Trasylol Prod. Liab. Litig.*, 2010 WL 4259332, at *8 (S.D. Fla. Oct. 21, 2010).

(8)  Gorrin is an A/I of the FARC because he allegedly paid bribes to Andrade and Diaz Guillen, which helped ensure that they all would "continue to support Venezuela's exchange rate regime."

ECF No. 287-1 at 5-6, 17.

As an initial matter, the hypothetical scenario by which Luther claims the Venezuelan currency exchange program benefitted the FARC – unidentified Venezuelan businesses becoming "more inclined" to "work with" unidentified FARC A/Is – is entirely speculative. *See Mize v. Jefferson City Bd. Of Educ.*, 93 F. 3d 739, 745 (11th Cir. 1996) ("Although this is not an impossible scenario, it is not one that is supported by the facts presented to the district court."). Other than parroting hearsay statements he found in a newspaper article, Luther has no knowledge whatsoever concerning the motivations or actions of Venezuelan business owners or of the FARC.[13] In his report and at his deposition, Luther could not identify a single business owner or real-life account of this occurring and had no idea how often this supposedly occurred. ECF No. 287-2 at 60: 3-7 ("I'm not able to provide a frequency statistic."), 61: 19-25 ("I don't have an account of a single business owner."), 62: 1-4 ("I am not able to name a business owner by name.").

Regardless, followed to its logical conclusion, the "Dollar Shortage Scheme" theory renders everyone who participated globally in the Venezuelan currency exchange program an A/I of the FARC by supposedly depleting the available USD in Venezuela, which unknowingly "encouraged" others to "work with" the FARC or it's unidentified A/Is. The method by which these individuals and businesses obtained the right to participate in the currency exchange program (whether via alleged bribes or perfectly legal means) is irrelevant to Luther because the participation, in and of itself, would render them FARC A/Is.

Moreover, by Luther's own admission, his theory renders all Venezuelans who needed USD for international trade A/Is of the FARC. When asked whether his theory would "make every business owner in Venezuela an [A/I] of the FARC," Luther testified, "I think that the currency controls that existed during this exchange rate regime made criminals out of many Venezuelans[.]"

Q:    The Venezuelan currency exchange program made all the business owners in Venezuela criminals?

---

[13] "[N]ewspaper articles and web pages are not proper summary judgment evidence because they constitute hearsay and it is not apparent how these printouts could be 'reduced to admissible evidence at trial.'" *Smart v. City of Miami*, 107 F. Supp. 3d 1271, 1278 n.3 (S.D. Fla. 2015) (quoting *Hetherington v. Wal–Mart*, Inc., 511 Fed. Appx. 909, 911 (11th Cir. 2013)).

> A:     Again, not all of the business owners, but those who were acquiring dollars to engage in international business, those who are business owners or otherwise who are acquiring dollars to protect themselves from significant devaluation of the bolivar, that may of those Venezuelans were made criminals by this exchange rate regime which significantly limited their access to legal dollars.

ECF No. 287-1 at 62: 19-25, 63: 1-25, 64: 1. By this logic, if the Venezuelan business that needed USD to engage in international trade were A/Is of the FARC, that would render the American businesses that transacted with them A/Is of the FARC, as well.

**B.  The "Bond Scheme" is Entirely Speculative and Far Too Attenuated to Establish an A/I Relationship.**

Luther's "bond scheme" can be broken down to the following inferences: (1) the Venezuelan Treasury sold bonds, "typically" at a premium; (2) Chavez *may have* used *some* of the alleged but unidentified premiums obtained by the government from the sale of these bonds to fund unidentified government public works projects; (3) *some* of the unidentified public work projects were never completed and *may have* involved contractors with FARC connections; (4) "the FARC or it's A/Is benefitted from the additional revenues earned by the [Venezuelan Treasury]" in an unexplained way from the sale of the government bonds; (5) an entity called Bellsite Capital Group, which Gorrin supposedly "controlled," purchased two government bonds from the Venezuelan Treasury in 2011;[14] (6) therefore, Gorrin is an A/I of the FARC. ECF No. 287-1 at 7.

> By participating in the bond scheme, Gorrin or companies controlled by Gorrin or associates working on behalf of Gorrin with Gorrin's knowledge paid a premium to the [Venezuelan Treasury], which Chavez—an [A/I] of the FARC—used to fund projects, some of which were never completed and provided material assistance to, or financial or technological support for, or goods or services to the FARC or its agencies or instrumentalities. Hence, Gorrin provided material assistance to, or financial or technological support for, the international narcotics trafficking activities of the FARC or its [A/Is].

*Id*. at 17.

---

[14] Notably, Bellsite Capital Group is not one of the Interested Party Entities. Thus, even assuming for the sake of argument that Gorrin controlled Bellsite Capital Group and purchased two bonds in 2011 through Bellsite Capital Group, these transactions are entirely unrelated to the Interested Party Entities.

Again, the hypothetical scenario by which Luther claims the bond scheme benefitted the FARC – an unknown amount of bond premiums going towards unidentified public works projects involving unnamed FARC-related entities – is entirely speculative. At deposition, Luther did not know the number of bonds sold by the Venezuelan Treasury or any other entity, how often bonds were sold, the amount of premiums earned from the sale of those bonds, the amount of public works projects funded with those premiums, or how those premiums somehow benefited the FARC. ECF No. 287-2 at 85: 3-6, 86: 2-16, 87: 25, 88: 4-8, 94: 17-23, 95: 24-25, 95: 1. With respect to Gorrin, Luther did not know the number of bonds he purchased, the premiums earned from those bonds, or how much of those premiums somehow benefitted the FARC. *Id.* at 91: 8-20. Lastly, while Luther opined that the bond profits somehow aided the FARC, he could not identify a single beneficiary of the government bond profits, nor any beneficiary being related to the FARC. *Id.* at 95:2-7, 106: 7-13 ("I do not know who the individual beneficiaries of the funds were."). The *only* possible example Luther offers is an aluminum plant construction project. Luther admitted he has no evidence of any connection between Gorrin and this project, and he suspected the FARC's project involvement due to the "large FARC presence" in the same province even though he never saw any contracts pertaining to this project and did not know who the contractors involved in this project were. ECF No. 287-2 at 95: 8-25, 96: 1-5, 97: 1-5, 97: 11-14; *Compare Carrizosa v. Chiquita Brands Int'l, Inc*., 47 F.4th 1278, 1321 (11th Cir. 2022) (upholding exclusion of expert opinion that assassinations committed by paramilitary because of geographical location murders in Colombia).

Followed to its logical conclusion, Luther's "Bond Scheme" theory renders any individual or business, whether Venezuelan or foreign, that ever purchased a bond from the Venezuelan Treasury an A/I of the FARC. Moreover, Luther further claimed that the alleged but unidentified premiums earned through the sale of separate bonds by other entities, such as the Fondo de Desarollo Nacional, S.A. ("FONDEN") and the Central Bank of Venezuela, were commingled with the premiums earned from the Treasury bonds, thus rendering *those* bond purchasers FARC A/Is, as well. ECF No. 287-2 at 82: 1-25, 83: 1-2. Moreover, Luther's report notes that bond purchases were made "directly or through an intermediary," (ECF No. 287-1 at 7), which would render any intermediaries also A/Is of the FARC. Finally, while Luther alleges that Gorrin paid bribes in order to purchase bonds, the method by which any bond purchaser's bid was selected is irrelevant because the bond purchase, in and of itself, would render them A/Is of the FARC.

### C. The "Loan Scheme" is a Recycled Inadmissible Hearsay and Insufficient to Confer A/I Status.

The crux of the loan scheme[15] is that Gorrin allegedly funneled profits from a supposedly fake PDVSA loan contract to Maduro's stepsons, who then transferred the funds to Maduro's wife for Maduro's "disposition," which "helped Maduro to maintain his grip on Venezuela, which in turn allowed him to [somehow] continue to protect and support the FARC and to help [somehow] partake in their drug trafficking activities. Thus, Gorrin is an [A/I] of the FARC." ECF No. 288-1 at 66-67; *See* ECF No. 287-1 at 12-14.[16]

Zach speculates that Maduro's stepsons "were the recipients of the funds, and having known and studied how the Maduro clan works – those funds would have flowed up to Cilia [Maduro's wife] for Maduro's disposition." ECF No. 288-1 at 79. How Maduro "disposed" of the funds or how that "disposition" benefitted the FARC or allowed Maduro to "partake" in FARC activities is unstated. As the Southern District of Texas court remarked when faced with a similar theory, "[t]he only missing link in this convoluted chain is some relationship to Kevin Bacon." *Caballero v. Vitol, Inc.*, 2023 WL 125240, at *12 (S.D. Tex. Jan. 6, 2023), *appeal withdrawn* (July 7, 2023).

All in all, this theory would render anyone who ever provided a benefit to anyone remotely connected to the Venezuelan government a FARC A/I. By extension, Caballero might as well say that every Venezuelan citizen who participated in, or supported, the sovereign activities of the Venezuelan government under either Chavez or Maduro is an A/I of the FARC for helping them "maintain their grip on power."

### D. Alleged Bribe Payments to Venezuelan Treasurers Are Unrelated to the FARC and Do Not Establish A/I Status.

Caballero advances, through his experts, who in turn rely on the Declaration of Leamsy Salazar, the theory that Gorrin is an A/I of the FARC because he allegedly paid bribes to Andrade

---

[15] As explained in the Interested Parties' *Daubert* Motions to Exclude the Testimony and Opinions of Luther and Zach, there is no methodology whatsoever to the loan scheme. Every single "opinion" rendered by Luther and Zach with respect to the loan scheme is wholesale transmittal of hearsay from an affidavit and proffer, with their added improper interpretation and commentary, and should be stricken. ECF Nos. 287, 288, 312 and 319; *See United States v. Hawkins*, 934 F.3d 1251, 1262–63 (11th Cir. 2019).

[16] In a similar vein, Zach alleges that Gorrin, at some unknown time, gave unspecified "gifts" to Maduro's wife, who is a FARC A/I because she helps "Maduro maintain his grip on power." ECF No. 288-1 at 8, 28-29, 69.

and Guillen, who are themselves alleged FARC A/Is for their participation in the bond scheme (by simply issuing bonds in fulfilling their duties as former Venezuelan treasurers) that was somehow utilized by Chavez to benefit the FARC. ECF No. 288-1 at 55.

Specifically, Salazar, who asserts he was Chavez's bodyguard for three years, claims that Chavez "embezzled" money from the Venezuelan government and then laundered it to the FARC. ECF No. 301-4 at ¶¶ 4, 40. Salazar does not, however, claim that Gorrin, or any Interested Party, was involved in any way in the embezzlement of Venezuelan government funds by Chavez. The only reference to Gorrin that Salazar makes is the allegation that Gorrin paid bribes to Andrade and Guillen in connection with the "Permuta scheme," which resulted in profits to the Venezuelan government. ECF No. 301-4 at ¶ 40. But Salazar does not claim that Gorrin was involved in any way in Chavez's subsequent embezzlement of those profits from the government, or the subsequent laundering of the money to the FARC. In fact, Salazar identifies four individuals who "received profits for their assistance in moving FARC cocaine," none of which are any of the Interested Parties. *Id*. at ¶ 41.[17] Caballero's missing link in this sequence of FARC events is best demonstrated by the fact that the United States Government, in both its Gorrin indictment and its OFAC designation, has never claimed that these alleged bribery acts were related in any way to the FARC. *See* Indictment in the matter of *United States v. Claudia Patricia Diaz Guillen, et.al.*, No. 18-cr-80160-WPD (S.D. Fla.) (ECF No. 44); 84 Fed. Reg. 1946 (Feb. 8, 2019). Caballero admits that "[t]he U.S. government did not charge Gorrin with being an A/I of the FARC[.]" ECF No. 184 at 14, n.6.

**E. McBrien Was Not Disclosed in Accordance with Fed. R. Civ. P. 26(a)(2) and Cannot Supply Evidence on Any Motion.**

Given the numerous shortcomings in the opinions rendered by Luther and Zach, Caballero has attempted to "resurrect" his prior expert, Robert McBrien, and rely upon a 2020 declaration of his (ECF No. 81-1), even though Caballero did not identify McBrien as an expert or otherwise comply with the requirements of Fed. R. Civ. P. 26(a)(2). Under Federal Rule of Civil Procedure 26, a party must disclose all witnesses "that the disclosing party may use to support its claims or defenses" in the case. Fed. R. Civ. P. 26(a)(1)A)(i). A party must also timely supplement its Rule

---

[17] Salazar also claims that "it was well known [Gorrin] was a person who could assist members of the Venezuelan government move funds to offshore accounts." *Id*. at ¶ 15. Again, such rank speculation is inadmissible, and, regardless, this does not establish any nexus between Gorrin and the FARC.

26(a) disclosures, its responses to interrogatories, and its responses to request for productions. *Id*. at 26(e)(1)(A). A party that fails to meet its Rule 26 obligations "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Id*. at 37(c)(1). The same holds true for expert disclosures, which "must be made at the times and in the sequence that the court orders," *De Fernandez v. Seaboard Marine, Ltd.,* 2022 WL 2869730, at *2 (S.D. Fla. July 21, 2022), or be excluded. *Griffin v. United States*, 2021 WL 4947180 (M.D. Fla. July 30, 2021) (excluding post-discovery expert affidavit), *adopted*, 2021 WL 4935546 (M.D. Fla. Aug. 2, 2021).

This Court has held that the proper disclosure of expert testimony within the meaning Fed. R. Civ. P. 26(a)(2) "contemplates not only the identification of the expert, but also the provision of a written report containing a complete statement of all opinions and the basis and reasons therefor." *Ministerios El Camino v. Scottsdale Ins. Co.*, 587 F. Supp. 3d 1194, 1200-01 (S.D. Fla. 2022) (Moore, J.) (quoting *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008)) (internal quotations omitted). Therefore, a "[p]laintiff [who] has failed to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2) … may not use its expert witnesses to supply evidence on any motion, at a hearing, or at trial." *Id*. at 1201.

Here, there is no question that Caballero failed to even list McBrien as a witness in his initial Rule 26 disclosures (Exhibit 2), his two subsequent supplemental disclosures (Exhibits 3 and 4), or his expert disclosures (Exhibit 5), much less comply with the remaining requirements of the rule. In fact, counsel for Caballero advised that "McBrien will not be a testifying expert at trial[.]" Exhibit 6. Caballero also failed to produce an expert report from McBrien. Therefore, Caballero "may not use [McBrien] to supply evidence on any motion, at a hearing, or at trial," and any declaration should be stricken from consideration on summary judgment. *Ministerios*, 587 F. Supp. 3d at 1200-01.

Moreover, McBrien's opinions and declaration are inadmissible anyway. Indeed, before Caballero presented McBrien's opinions to this Court as his sole evidence, another district court had rejected them as insufficient to support an A/I finding. *Caballero v. FARC*, 2020 WL 11571726, *3 (N.D. Cal. Oct. 8, 2020) ("Attached to McBrien's declaration are many general articles about drug trafficking, but there is no specific, concrete evidence linking [Respondent] or the Flores Drug Trafficking Organization to FARC."). McBrien's declaration in this case follows the same pattern, citing to hearsay which does not link the FARC to any of the Interested Parties.

In particular, McBrien relied upon the Treasury Department designation, and the Gorrin indictment, neither of which alleged any connection between Gorrin, Perdomo, or the Interested Parties and the FARC or with FARC narcotics trafficking.

### B. The Declaration of Martin Rodil is Inadmissible Summary Judgment Evidence and Does Not Establish an A/I Relationship.

Rodil's declaration does not reference Perdomo, any of the Interested Party Entities, or any of the Subject Properties. *See* ECF No. 301-3. Rodil claims to have served as a consultant to the United States Drug Enforcement Administration ("DEA"). ECF No. 301-3 at ¶ 4. With respect to Gorrin, Rodil describes three interactions, all of which are inconsistent with aiding FARC. First, Rodil claims that, in 2013, Gorrin asked him to "work with Andrade regarding [Andrade's] potential cooperation with the DEA." *Id*. at ¶ 25. Rodil proceeded to strike a cooperation agreement with Andrade. *Id*. at ¶ 27. Rodil provides his improper "impression" that Gorrin "wanted Andrade out of Venezuela because of the potential exposure of his unlawful activity involving" Guillen, Velasquez, and Chavez during Guillen's term as Treasurer. *Id*. at ¶ 26. Rodil does not specify what led to his "impression" or identify to what "unlawful activity" he refers. Second, Rodil claims that, in 2014, he received a call from Gorrin inquiring whether he "could work with Leamsy Salazar regarding cooperation with the DEA." *Id*. at ¶ 26. According to Rodil, "Gorrin had a rival also in the inner circle of Hugo Chavez" named Diosdado Cabello, and Gorrin's "agenda regarding Leamsy Salazar" was to have Leamsy Salazar cooperate with the DEA "to provide information regarding the narco-trafficking activities of Diosdado Cabello." *Id*. at ¶¶ 30-32. Third, Rodil claims that, in 2016, he received a telephone call from Gorrin regarding moving Guillen out of the Dominican Republic, and that Gorrin ultimately funded the flights for Guillen and her family to travel to France. *Id*. at ¶¶ 7-8, 16. Rodil proceeds to improperly provide his "impression" as to why Gorrin wanted Guillen out of the Dominican Republic by vaguely stating that "the Venezuelan government had so much influence in the island and this could represent a risk for him" and "because of the potential exposure of his unlawful activity[.]" *Id*. at ¶¶ 9-11.

As an initial matter, Rodil does not purport to make any connection in his entire declaration between Gorrin and the FARC. In any event, it is unclear how Gorrin's alleged efforts to assist individuals in cooperating with the DEA could possibly render him an A/I of the FARC. Zach, who relied upon Rodil's declaration in rendering his opinions, reiterated that Gorrin contacted Rodil "to attempt to extricate members of Chavez's and Maduro's inner circle to the United States." D.E. 288-1 at n.7. Just as Rodil, Zach provided his own spin on Gorrin's motives by

claiming that Gorrin was "curry[ing] the favor of the DEA," (*Id*. at 97: 4-5, 98: 17-19, 105: 5-6), "double dealing," (*Id*. at 98: 3), "trying to pick a winner," (*Id*. at 98: 5), "playing both sides of the fence," (*Id*. at 103: 4-5, 105: 4-5), and trying to get a "get out of jail free card" (*Id*. at 100: 2-4). Whether submitted as lay or expert testimony, Rodil and Zach's "speculation and unfettered, wholesale interpretation of the evidence" is inadmissible. *United States v. Hawkins*, 934 F. 3d 1251, 1262–63 (11th Cir. 2019) ("[A] case agent testifying as a lay witness may not explain to a jury what inferences to draw from recorded conversations involving ordinary language. At that point, his testimony is no longer evidence but becomes argument."); *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004). Thus, the three interactions between Rodil and Gorrin (and Rodil and Zach's interpretation of them) do not establish that Gorrin is an A/I of the FARC.

The remainder of Rodil's declaration deals with matters wholly unrelated to Gorrin or any of the Interested Parties, about which Rodil is not competent to testify, and which consist entirely of inadmissible hearsay. For example, he devotes eight paragraphs to detail the "peculiar interactions" between Guillen, her husband, and their son, and to speculate that Chavez fathered Guillen's son because, according to Rodil, they looked "virtually identical" in a picture and because "it is common knowledge" that Guillen and Chavez were lovers. *Id*. at ¶¶ 17-24. A large portion of the Rodil's declaration relays hearsay statements made to him by a Venezuelan governor's chief of staff concerning "false state contracts provided to the FARC." *Id*. at ¶¶ 40-64; *See e.g., Id*. at ¶ 44, 46 ("COS Alvarado relayed to me …"), ¶ 50 ("COS Alvarado described …"), ¶ 54, 56, 57 ("COS Alvarado informed me …"), ¶ 55 ("COS Alvarado also told me …"). Rodil does not reference Gorrin at all in this portion of his declaration or attempts to connect Gorrin to the alleged "false contracts" in any way.

Regardless, his recitation of hearsay statements is inadmissible. "An affidavit or declaration used to support or oppose a motion [for summary judgment] *must be made on personal knowledge*, set out *facts* that would be *admissible in evidence*, and show that the affiant or declarant is *competent* to testify on the matters stated." Fed. R. Civ. P. 56(c)(4) (emphasis added); *Am. Heritage Life Ins. Co. v. Johnston*, 2022 WL 30175, at *2 (11th Cir. Jan. 4, 2022); *Ferreira-Silva v. AW Pro. & Maint. Serv., Inc.*, 2022 WL 2438156, at *8 (S.D. Fla. June 5, 2022) (Moore, J.)

(stating "affidavits cannot be conclusory and must be based on personal knowledge, not speculation").[18]

Lastly, Rodil was not disclosed as an expert witness in this case, such that he is precluded from offering opinions concerning the Venezuelan government's allocation and expenditure of funds received from various sources or his interpretation of financial records. *See Ministerios*, 587 F. Supp. 3d at 1201 (As a result of the plaintiff's failure to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2), the plaintiff "may not use its expert witnesses to supply evidence on any motion, at a hearing, or at trial.").

## IV.   The Lack of Evidence Against Perdomo Precludes an A/I Relationship, Such That Perdomo and His Entities Are Entitled to Summary Judgment.

The only allegation against Perdomo is that he somehow assisted Gorrin in paying bribes (in unidentified ways) and that a company Perdomo owned jointly with Gorrin, which is not an Interested Party Entity in this case, purchased bonds from the Venezuelan government. ECF No. 288-1 at 81. Tellingly, the United States Government did not indict Perdomo in the criminal matter against Gorrin based upon the alleged bribe payments. *See United States v. Claudia Patricia Diaz Guillen, et.al.*, No. 18-cr-80160 (S.D. Fla.). And, regardless, as stated above, the United States Government, in both its indictment and its OFAC designation, has never claimed that these alleged bribery acts were related in any way to the FARC. *Id.*; 84 Fed. Reg. 1946 (Feb. 8, 2019). Caballero admits as much. ECF No. 184 at 14, n.6. ("The U.S. government did not charge Gorrin with being an A/I of the FARC[.]"). All in all, while Caballero has not established any link whatsoever between Gorrin and the FARC, his "theory" against Perdomo is *even more* attenuated (as if that were even possible). Therefore, Perdomo, and by extension his entities (listed in ECF No. 172-3 at 3), are entitled to summary judgment.

## V.   Caballero Does Not Even Claim That Any of the Interested Party Entities are FARC A/Is, Which Must be Proven in Order to Seize Their Assets.

With respect to the Interested Party Entities, Caballero has elicited *zero* evidence that they (i) materially assisted FARC in its laundering activities, (ii) were owned or controlled by FARC; or (iii) played any role, much less a significant role, in FARC's drug trafficking or money

---

[18] *Benjamin v. Thomas*, 766 F. Appx 834 (11th Cir. 2019) (rejecting reliance on hearsay account of shooting where proponent did not identify eyewitness regarding events who could corroborate plaintiffs' accounts of event proffered by affidavit); *In re Chiquita Brands Int'l, Inc. Alien Torts Statute & S'holder Derivative Litig.*, 2022 WL 18957608, at *27 (S.D. Fla. Dec. 15, 2022).

laundering activities. *Stansell*, 45 F. 3d at 1356-57 & n.7. In fact, he claims he does not have to and takes the position that the assets of twenty-three corporate entities can be seized with a mere showing that either Gorrin or Perdomo hold some sort of ownership interest in these entities. As stated above, Caballero cannot prove that Gorrin or Perdomo are A/Is of the FARC in the first place, thus rendering any interest they hold in the entities irrelevant.

And contrary to Caballero's mistaken belief, the Eleventh Circuit also requires Caballero to prove that the Interested Party Entities individually are A/I's of the FARC. *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1360 (11th Cir. 2022) (Reversing summary judgment for the plaintiff and noting that the plaintiffs' experts "had not reviewed the financial statements or transactions of any of Mr. Lopez's companies. So even if Mr. López were individually characterized as an agency or instrumentality of the FARC, it is not apparent that the companies also had that status."). This is consistent with well-settled "basic tenet of American corporate law … that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75, (2003). "An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets[.]" *Id.*

Caballero is well aware of the need to prove the independent A/I status of each corporate entity because the issue was discussed at length in the final judgment entered against him in the Southern District of Texas. *Caballero v. Vitol, Inc.*, 2023 WL 125240, at *12 (S.D. Tex. Jan. 6, 2023), *appeal withdrawn* (July 7, 2023). There, Caballero argued that, because an entity's subsidiary (Petrocedeño, S.A.) had previously been found to be an A/I of the FARC, its parent company (PDVSA) should also be found to be an A/I of the FARC. *Id.* at *3. Caballero then further argued that another entity (RTSA) should be deemed an A/I of the FARC because it "previously conducted business" with the parent company whose subsidiary had been found to be an A/I. *Id.* The Texas court was compelled to draw a diagram illustrating "how Plaintiff construed the alleged link between" the FARC and the entities. *Id.* at *3. The court went on to deconstruct and reject Caballero's "leaps of logic" by noting that, while Petrocedeño (the subsidiary) was found to be an A/I of the FARC, "it is important to note that PDVSA [the parent company] was not a subject of either finding." *Id.* at *12. With respect to the third entity that merely "conducted business" with PDVSA, the court remarked that "[t]he only missing link in this convoluted chain is some relationship to Kevin Bacon." *Id.* at *3, *12.

Here, Caballero's similar attempt to reach an entity's assets based solely on some ownership interest by an alleged A/I should be rejected on the same principles. Caballero does not claim that the Interested Party Entities are FARC A/Is, and there is not a shred of evidence of any conduct whatsoever involving the Interested Party Entities that would render them FARC A/Is. Notably, Luther's bond theory is based upon two bonds purchased by an entity named "Bellsite Capital Group," (ECF No. 287-1 at 7), and Zach vaguely states (with no supporting evidence) that an entity named "Vineyard Ventures" participated in the bond scheme (ECF No. 288-1 at 81). These entities are not among the Interested Party Entities in this case. Moreover, the Subject Properties owned by the Interested Party Entities are designated as "substitute assets" by the United States Government, which means that the Government has not alleged that the Subject Properties are traceable to the purported Venezuelan currency exchange charged conduct and classified them as "other property of the defendant" unrelated to the alleged crime. 21 U.S.C. § 853(p)(2); *See Honeycutt v. United States*, 581 U.S. 443, 452 (2017) (construing substitute asset forfeiture as limited to property untainted by offense). Therefore, summary judgment should be granted in favor of the Interested Party Entities.

**<u>CONCLUSION</u>**

In total, Caballero's combined evidence does not establish that any of the Interested Parties assisted in, provided support to, were controlled by, or acted for the FARC or its international narcotics trafficking activities, to qualify as its agencies or instrumentality under TRIA.

Dated: July 14, 2023                                       Respectfully submitted,

*/s/Lisandra Guerrero*
Howard Srebnick (FL Bar No. 919063)
Lisandra Guerrero (FL Bar No. 98521)
**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131
Tel. (305) 371-6421
E-mail: HSrebnick@RoyBlack.com
LGuerrero@RoyBlack.com

*Counsel for the Interested Parties*