## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-cv-25337-KMM

ANTONIO CABALLERO,

     Plaintiff,

v.

FUERZAS ARMADAS REVOLUCIONARIOS
DE COLOMBIA, *et al.*,

     Defendants.

_____/

## **ORDER**

THIS CAUSE came before the Court upon the Interested Parties'[1] ("Interested Parties") Motion for Summary Judgment ("Motion") (ECF No. 342).   Plaintiff Antonio Caballero ("Plaintiff") filed a response in opposition ("Resp." or "Response") (ECF No. 351), and the Interested Parties filed a Reply ("Reply") (ECF No. 357).  The Motion is now ripe for review.  For the reasons discussed below, the Motion is GRANTED.

## I.    BACKGROUND

Though the Parties are surely familiar with the background of the instant Action, the Court nonetheless finds it valuable to provide necessary context for its decision.

---

[1] The Interested Parties are Raul Gorrin, Gustavo Perdomo, and all entities in which they maintain a beneficial ownership interest.  *See* ECF No. 207 at 2 n. 1.  Those entities include: (1) Globovision Tele C.A., (2) Globovision Tele Ca, Corp., (3) Seguros La Vitalicia C.A., (4) Corpomedios GV Inversiones, C.A., (5) Corpomedios LLC, (6) RIM Group Investments Corp., (7) RIM Group Investments I Corp., (8) RIM Group Investments II Corp., (9) RIM Group Investments III Corp., (10) RIM Group Properties of New York, Corp., (11) RIM Group Properties of New York II Corp., (12) Magus Holdings USA, Corp., (13) Magus Holding LLC , (14) Magus Holding II, Corp., (15) Tindaya Properties Holding USA Corp., (16) Tindaya Properties of New York, (17) Tindaya Properties of New York II Corp., (18) Posh 8, Dynamic, Inc., (19) Constello No. 1 Corporation, (20) Constello Inc., (21) Windham Commercial Group Inc., (22) Planet 2 Reaching, Inc., and (23) Potrico Corp. *See* ECF No. 150-2.

This case arises out of an underlying action in which Plaintiff sued the Fuerzas Armadas Revolucionarias de Colombia (FARC) pursuant to 18 U.S.C. § 2333, part of the Anti-Terrorism Act (ATA) (the "Underlying Action").  *See* ECF No. 1 ¶ 1.  The district court in the Underlying Action entered final default judgment against the FARC.  *See* ECF No. 63.  The district court awarded Plaintiff $135,000,000 in non-economic damages, and $5,189,001 in economic damages, plus interest.  *Id.*

A.  Plaintiff's Collection Efforts

As part of Plaintiff's collection efforts, Plaintiff filed an *Ex Parte* Expedited Motion for Agency or Instrumentality Determination (the "A/I Motion") (ECF No. 150).  Therein, Plaintiff argued he could collect the final judgment from the Interested Parties under the ATA and the Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297, § 201(a), 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note).  *See generally* ECF No. 150.

This Court granted the A/I Motion on April 25, 2022 (the "A/I Order") (ECF No. 151), finding that the individuals listed in Exhibit 1 of the A/I Motion and the Entities listed in Exhibit 2 of the A/I Motion—including the Interested Parties—were agencies or instrumentalities ("A/Is") of the FARC and the properties listed in Exhibit 3 of the A/I Motion were subject to attachment in satisfaction of the judgement.  *See* A/I Order.

B.  The Motion to Vacate and Subsequent Scheduling Order

Subsequently, the Interested Parties filed a Motion to Vacate the A/I Order.  (ECF No. 175).  Therein, the Interested Parties argued that "because the agency and instrumentality designation was made without any notice or opportunity to be heard whatsoever," as is required by Eleventh Circuit precedent, "it should be vacated for voidness pursuant to Rule 60(b)(4), and the Interested Parties should then have the opportunity to litigate the agency and instrumentality

determination through the adversary process." *Id.* at 5.  The Interested Parties "also demand[ed] a right to a jury trial on the agency and instrumentality and liability determination." *Id.*

After issuing another Order concluding that the Interested Parties are entitled to—and that due process requires—an opportunity to be heard on the A/I determination,[2] this Court entered an Order scheduling trial on the issue of the A/I determination.  (ECF No. 216).

Now, the Interested Parties filed the instant Motion arguing that Plaintiff fails to establish that they are A/Is of the FARC.  *See generally* IPs' Mot.

## II.    LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).  Speculation cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In assessing whether the moving party has met this burden, a court must view the movant's evidence and all

---

[2]  *See* ECF No. 214.

factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to present evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *see also* Fed. R. Civ. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). But if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B. <u>Agency or Instrumentality Determinations Under Eleventh Circuit Precedent</u>

"Because of the difficulty inherent in the direct execution of a judgment against a terrorist organization," the TRIA permits parties holding a judgment against a terrorist organization to collect that judgment from A/Is of the terrorist organization. *Stansell v. Revolutionary Armed Forces of Colombia* ("*Stansell II*"), 771 F.3d 713, 722 (11th Cir. 2014). Section 201(a) of the TRIA provides that "[n]otwithstanding any other provision of law . . . the blocked assets of [a] terrorist party [against which a judgment is obtained] (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment." *Id*. (emphasis added). In other words, a party holding a judgment against a terrorist organization can execute on that judgment by seizing the assets of A/Is of that terrorist organization. *Id*.; *see also Stansell II*, 771 F.3d at 726. If a plaintiff wishes to execute against the assets of a terrorist party's A/I, "he must further establish that the purported agency or instrumentalist is actually an agency

4

or instrumentality of the terrorist party." *Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, No. 1:18-CV-25337, 2021 WL 3927826, at *2 (S.D. Fla. Aug. 24, 2021).

The TRIA does not define "agency or instrumentality." The Eleventh Circuit has adopted the legal understanding of the terms, finding that, under the TRIA, "agency" refers to "[a] fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that party by words or actions." *Stansell v. Revolutionary Armed Forces of Colombia* ("*Stansell V*"), 45 F.4th 1340, 1352 (11th Cir. 2022) (citing Black's Law Dictionary 62 (7th ed. 1999)). Under the TRIA, "instrumentality" refers to "[a] thing used to achieve an end or purpose." *Id.* The Eleventh Circuit held that "to be an agency of a terrorist party under § 201(a) of the TRIA one must know the identity of the terrorist party with whom the agent-principal relationship exists," but to be an instrumentality of a terrorist party under the TRIA such knowledge is not required. *Id.* at 1353–54.

Considering the aforementioned definitions, the Eleventh Circuit adopted the following standard to determine if an individual or entity is an A/I of the FARC:

> Any [specifically designated narcotics trafficker] . . . , including all of its individual members, divisions and networks, that is or was ever involved in the cultivation, manufacture, processing, purchase, sale, trafficking, security, storage, shipment or transportation, distribution of FARC coca paste or cocaine, or that assisted the FARC's financial or money laundering network, is an agency or instrumentality of the FARC under the TRIA because it was either:
>
> (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the international narcotics trafficking activities of a specially designated narcotics trafficker [FARC]; and/or
>
> (2) owned, controlled, or directed by, or acting for or on behalf of, a specially designated narcotics trafficker [FARC]; and/or
>
> (3) playing a significant role in international narcotics trafficking [related to coca paste or cocaine manufactured or supplied by the FARC].

*Stansell II*, 771 F.3d at 724 n.6.

5

While a plaintiff often will prove A/I status via a direct relationship between the A/I and the terrorist organization, the Eleventh Circuit has held that an "indirect" relationship can be sufficient to meet the A/I standard. *See id*. at 742. The court added that "[c]ommon sense indicates, however, that the more *attenuated the link* the more difficult it will be to prove [A/I] status." *Id*. (emphasis added). While a party may demonstrate A/I status through an indirect relationship, not any indirect relationship will suffice.

## III.   DISCUSSION

The Interested Parties aver that Plaintiff fails to establish that they are A/Is of the FARC. *See generally* Mot. In response, Plaintiff argues there is "overwhelming evidence" supporting the A/I determinations. *See generally* Resp.

Namely, Plaintiff avers that Gorrin and Perdomo materially assisted the FARC directly and indirectly. *See generally id*. As to the direct assistance, Plaintiff avers that the Interested Parties directly aided the FARC itself. For the indirect assistance, Plaintiff asserts that several individuals—Hugo Chavez[3] ("Chavez"), Nicolas Maduro[4] ("Maduro"), Celia Adela Flores de Maduro[5] ("Cilia Flores"), Los Chamos[6] ("Los Chamos"), Victor Aular[7] ("Aular"), Alejandro Andrade Cedeno[8] ("Andrade"), Claudia Diaz Guillen[9] ("Diaz Guillen"), and Adrian Jose

---

[3] Hugo Chavez is the former president of Venezuela. *See* Expert Report of William Luther at 6 ("WL Report") (ECF No. 287-1).
[4] Nicolas Maduro is the former president of Venezuela. *See id*.
[5] Cilia Adela Flores de Maduro is Maduro's wife. *See* Expert Report of Robert Zachariasiewicz at 23 ("RZ Report") (ECF No. 288-1).
[6] Los Chamos are Maduro's stepsons. *See* WL Report at 13.
[7] Victor Aular is the former Vice President of Petróleos de Venezuela, S.A. ("PDVSA"). *See id*.
[8] Alejandro Andrade Cedeno is the former National Treasurer of Venezuela. *See id*. at 7.
[9] Claudia Diaz Guillen is the former National Treasurer of Venezuela. *See id*.

Velasquez Figueora[10] ("Velasquez")—are A/Is of the FARC,[11] and that Gorrin and Perdomo materially assisted those individuals, who, in turn, materially assisted the FARC. *Id.*

Plaintiff makes four general arguments as to how Gorrin and Perdomo provided material assistance, directly and indirectly, to the FARC and the FARC A/Is: (1) involvement in the "loan scheme"; (2) involvement in the "dollar shortage scheme"; (3) involvement in the "bond" scheme and (4) general assistance including laundering money, paying bribes, and acting as an undefined "testaferro." *See generally id.* The Court addresses each argument in turn.

A. The Loan Scheme

Plaintiff alleges that Gorrin materially assisted the FARC by "participating in the 'fake loan' scheme involving PDVSA that paid bribes and/or kickbacks to Maduro (who is the FARC) through FARC A/Is Los Chamos." Response-SOMF ¶ 1. Plaintiff also alleges that Gorrin bribed Aular through the fake loan scheme. *Id.*

Once again, Plaintiff provides no explanation regarding the "fake loan" scheme and instead merely cites to RZ's Report. *Id.* (citing RZ Report at 28, 66–79, Ex. U, Ex. Y). RZ describes the loan scheme as follows:

> A loan was prepared by which a Venezuelan shell company agreed to loan 7.2 billion Bolivars to PDVSA. The shell company then assigned its contract to a second company, and PDVSA was granted the right to cancel the contract for a payment of the equivalent of $600 million U.S. dollars. Krull and other members of the conspiracy controlled the second company and received approximately 511 million Euros for having lent PDVSA the equivalent of 35 million Euros in Venezuelan Bolivars.
>
> Approximately half of the 511 million Euro profit went to Raul Gorrin, who in turn transferred approximately 159 million Euros to Celia Flores' sons - the three stepsons of Maduro known as "Los Chamos". The other half was transferred to multiple other members of the conspiracy—including FARC Agency or

---

[10] Adrian Jose Velasquez Figueora is Diaz Guillen's husband. *See id.* at 8.
[11] *See* Response in Opposition to Statement of Material Facts ¶ 1 ("Response-SOMF") (ECF No. 352).

Instrumentality Victor Aular. Gorrin's support of Maduro and Maduro's family enriched Maduro as a FARC leader and helped Maduro to maintain his grip on Venezuela, which in turn allowed him to continue to protect and support the FARC and to help partake in their drug trafficking activities. Thus, Gorrin is an agency or instrumentality of the FARC.

RZ Report at 66–67.

Without any actual knowledge as to the flow of money, RZ states, "Los Chamos were the recipients of the funds, and having known and studied how the Maduro clan works – those funds would have flowed up to Cilia for Maduro's disposition." *Id*. at 79. While RZ connects a payment from Gorrin to Los Chamos, the connection from Gorrin to Celia Flores and Maduro is entirely speculative and unsupported by fact.[12]

A district court in the Southern District of Texas rejected a similar argument made by Plaintiff in a parallel proceeding. *See Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, No. 4:21-CV-00140, 2023 WL 125240, at *1 (S.D. Tex. Jan. 6, 2023). In that case, Plaintiff was also attempting to collect on his judgment against the FARC through another alleged A/I of the organization. The district court explained the attenuated relationship between the interested party and the FARC in that case as follows: "[The interested party] is allegedly named because it has a relationship with PDVSA (who according to the record, had not been found to be an agent or instrumentality prior to the Registration Action) and because PDVSA had a parent-subsidiary relationship with Petrocedeño who in turn apparently had a relationship with FARC." *Id*. at 12. Determining that the alleged connection was insufficient to establish that the interested

---

[12]  Plaintiff alleges that "RZ described how money flowed among the Maduro clan, including through credit cards and other specifics," Resp. at 16, yet RZ plainly connects the money from Gorrin to the FARC because he "know[s] and studied how the Maduro clan works." RZ Report at 79. Even if RZ knows how money typically is handled in the Maduro family, such knowledge is insufficient to support his proposition that the money from Gorrin to Los Chamos materially benefitted FARC.

party was an A/I of the FARC, the court stated, "The only missing link in this convoluted chain is some relationship with Kevin Bacon." *Id.*

Plaintiff's argument in the instant Action is likewise too far removed. Plaintiff seems to allege that Gorrin, for an unstated reason, gave money to Los Chamos. Without any factual evidence, Plaintiff suggests that Los Chamos gave the money to Celia Flores and Maduro, who used the money to benefit the FARC. Thus, Plaintiff concludes that Gorrin materially assisted the FARC and is an A/I of the FARC.

When considering Plaintiff's argument, the Court finds instructive an example the Eleventh Circuit provided in *Stansell V*. In holding that "nothing . . . suggests . . . an instrumentality relationship with a terrorist party needs to be direct," the court gave the following example:

> Imagine, for example, that the FARC hires A to oversee and coordinate the laundering of its narcotics proceeds in different parts of the world. Then A subcontracts, hires, or uses other individuals or entities (B, C, and D) to carry out the money laundering operation in other countries. In that example, B, C, and D could be (depending on the nature of the arrangement, agreement, or understanding) instrumentalities of the FARC notwithstanding their lack of a direct contractual relationship with the FARC.

*Stansell V*, 45 F.4th at 1351.

Here, Plaintiff does not allege that Maduro subcontracted, hired, or used Gorrin to carry out a money laundering or narcotics trafficking operation. Rather, Plaintiff relies on five degrees of separation (Gorrin to Los Chamos to Celia Flores to Maduro to the FARC) to connect Gorrin to the FARC. Under the Eleventh Circuit example, it is as if the FARC hires (A) Maduro, who uses (B) Celia Flores to carry out some operation, who uses (C) Los Chamos for help in the alleged operation, who (D) receive money from Gorrin for an unstated reason, and the money somehow, based solely on speculation, makes its way up to the FARC and *materially* benefits them. If the

Eleventh Circuit had intended such a broad interpretation of the A/I relationship, it well could have provided a broader example.

Plaintiff cites to no analogous case law suggesting that such a tenuous connection is sufficient to create an A/I relationship.  Nor is the Court willing to stray from the Eleventh Circuit's example, which implies a much stronger link is required to be the basis of an A/I determination. *See Stansell V, 45 F.4th at 1357* (While an indirect relationship can be the basis of an A/I determination, "the more attenuated the link the more difficult it will be to prove [A/I] status.").

Other courts have also relied on a less attenuated relationship when determining that an entity or individual is an A/I of a terrorist organization.  *See e.g., Ests. of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) ("The HLF is an agency and instrumentality of Hamas because it acts 'for or on behalf of' Hamas as Hamas' fund-raising agent in the United States."); *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 8:09-CV-2308-RAL-MAP, 2015 WL 13325432, at *3 (M.D. Fla. Feb. 17, 2015) ("Foreign Terrorist Organization Hezbollah, a/k/a Hizbullah, including its individual members . . . are all agencies or instrumentalities of the FARC, because they are or were involved in the purchase, sale, trafficking, security, storage, shipment or transportation, distribution of FARC coca paste or cocaine, or assisted the FARC's financial or money laundering network and materially assisted or played a significant role in the FARC's cocaine manufacturing and international cocaine trafficking."); *Levin v. Bank of New York Mellon*, No. 09-CV-5900 (JPO), 2019 WL 564341, at *2 (S.D.N.Y. Feb. 12, 2019) ("[I]t is undisputed by the parties: (1) that Hezbollah is an agency and instrumentality of Iran, to which Iran provides substantial support and over which Iran exercises significant control. . . .").

Further, nothing about Gorrin's payment to Los Chamos suggests that Gorrin was (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the FARC's international narcotics trafficking activities, and/or (2) owned, controlled, or directed by, or acting for or on behalf of the organization, and/or (3) playing a significant role in the organization's narcotics trafficking. *See Stansell V, 45 F.4th at 1357* (*citing Stansell II*, 771 F.3d at 724 n.6, 732).[13]  Because the Court finds that Plaintiff fails to establish that Gorrin's involvement in the "loan scheme" materially benefitted the FARC, the Court finds that Gorrin's alleged involvement in the "loan scheme" is insufficient to support an A/I determination.

B. Dollar Shortage Scheme

Plaintiff alleges that Gorrin "offered, promised, authorized, and paid[] bribes to Andrade and Diaz Guillen to allow Gorrin to conduct foreign currency exchanges and secur[e] an improper advantage in acquiring the right to conduct such exchange transactions."  Response-SOMF ¶ 1. Plaintiff further alleges that Gorrin paid the bribes to Diaz Guillen through Velasquez.  *Id*.  Once again Plaintiff fails to explain what the "dollar shortage scheme" consists of or provide any explanation of Gorrin's involvement in the scheme.  Instead, Plaintiff points the Court to another 20 pages of RZ's Report, which describes the "permuta" scheme as follows:

> Gorrin had offered, promised, authorized, and paid bribes to FARC agents and instrumentalities such as Andrade to allow Gorrin and his companies to conduct foreign currency exchanges and securing an improper advantage in acquiring the right to conduct such exchange transactions. This permuta scheme allowed very few individuals, such as Gorrin, to have currency exchange houses that were permitted access to the lower official government bolivar exchange rate to purchase dollars and then would sell dollars for bolivars at the higher black market exchange resulting in massive profits.

---

[13] The Court notes that the only argument Plaintiff makes is that loan scheme materially benefitted the FARC, thus the Court does not find it necessary or appropriate to consider whether the loan scheme falls within any other prong of the A/I test.

> It is this system that aided Chávez to directly benefit the FARC because the permuta scheme by design created a dollar shortage resulting in Venezuelans have to seek dollars from the illicit sources that were flush with them – the FARC and its narco-traffickers. Gorrin was a critical player in this system through his influence and financial strength, and Diaz Guillen (through, for example, illicit bond sales pegged to just above the lower government official exchange rate discussed herein) was a vehicle for his funds to flow to the FARC through her position as National Treasurer and Executive Secretary of FONDEN.[14]

RZ Report at 39.

In other words, Plaintiff alleges that Gorrin materially assisted the FARC by allegedly paying bribes to Andrade, the National Treasurer of Venezuela, which allowed Gorrin to purchase U.S. dollars from the Venezuelan government at a lower exchange rate. Once Gorrin purchased these U.S. dollars, at a lower rate, there was a shortage of dollars in Venezuela. Then, Venezuelans at large were forced to look elsewhere if they wanted to buy U.S. dollars. One of the places Venezuelans at large could look, was the FARC.

Plaintiff's argument suffers from the same infirmities that his loan argument suffered from. While paying bribes and purchasing dollars from the Venezuelan government may have incidentally benefitted the FARC, Plaintiff fails to allege that Gorrin provided any material assistance to the FARC. Plaintiff provides no facts suggesting that funds from the sale of bonds under the permuta scheme were utilized for the FARC. Plaintiff provides no evidence from which a reasonable jury could conclude that Gorrin's purchase of U.S. dollars from the Venezuelan government provided any material assistance to the FARC. Once again, Plaintiff's multi-link argument vaguely connecting Gorrin's actions to the FARC fails to establish that Gorrin *materially* assisted the FARC.

C. The Bond Scheme

---

[14] "FONDEN" refers to Fondo de Desarrollo Nacional FONDEN, S.A. (National Development Fund FONDEN, S.A.).

Plaintiff alleges that Gorrin and Perdomo are A/Is based on their material assistance to Chavez, Maduro, Andrade, Diaz Guillen, and Velazquez through participation in a bond scheme. *Id*. ¶¶ 1, 4. Instead of explaining the alleged "bond scheme," or providing any analysis as to Gorrin or Perdomo's alleged involvement in such a scheme, Plaintiff cites to the reports of two experts. *Id*. (citing RZ Report and WL Report). The WL Report explains the bond scheme as follows:

> [K]ey Venezuelan decisionmakers would receive bribes in exchange for the right to purchase foreign currency bonds with bolivars from the Office of National Treasury (ONT) at an overvalued exchange rate. After receiving the foreign currency bond, the purchaser would sell the bond for foreign currency. The foreign currency proceeds would then be exchanged for bolivars at the market rate.

WL Report at 7.

As to Gorrin's involvement, the WL Report alleges that Gorrin paid bribes to Andrade, and Diaz Guillen, both former National Treasurers of Venezuela, as well as Velasquez, Diaz Guillen's husband, so that he would have the opportunity to purchase the bonds at a special rate. *Id*. at 10.

The RZ Report provides another explanation of the scheme, stating that "[u]nder the bond scheme, bonds would be purchased from ONT[15] or FONDEN just above the lower government exchange rate but also at a premium above the face value, and the premium amount would go to fund Chavez's projects." RZ Report at 39.[16]

Both expert reports allege that ONT would receive a premium on the bond sales, a portion of which would go to Chavez's "projects." *Id*.; WL Report at 7. WL opines that some of these projects "provided material assistance or goods or services to the FARC or its agencies or instrumentalities." WL Report at 7.

---

[15] "ONT" refers to the Oficina Nacional del Tesoro (National Treasury Office) in Venezuala.

[16] RZ relies heavily on a trial transcript from *United States of America v. Claudia Patricia Diaz Guillen, Adrian Jose Velasquez Figueroa*, No. 18-CR-80160 (S.D. Fla.) (the "Diaz Guillen Trial Transcript") to support his findings.

Essentially, RZ and WL—and by proxy, Plaintiff—alleges that Gorrin and Perdomo materially assisted the FARC by purchasing government bonds, the alleged proceeds of which may have been used by Chavez to funnel money to the FARC and to enrich himself.  And, Gorrin allegedly materially assisted Andrade, Diaz Guillen, and Velasquez by paying bribes to them to "secure an improper advantage" in acquiring the right to buy government bonds.  *Id*. at 38.

Muddled in RZ's 81-paged single spaced report, RZ states that "[t]he [Diaz Guillen] trial transcript is rife with examples of Gorrin's companies being corruptly 'awarded' bonds with no up-front payment to the ONT, whereby Gorrin's entities made enormous financial gains by obtaining the bonds from Diaz Guillen's ONT, selling them for bolivars at a high market exchange rate, and then repaying the bonds to the ONT at a low official government exchange rate – a rate available only to Gorrin and a select few."  RZ Report at 43.  Yet the testimony and evidence RZ cites to plainly does not support such a characterization.

While the testimony RZ relies on demonstrates that entities owned by Gorrin and Perdomo purchased at least one bond from the ONT[17] and Gorrin and Perdomo paid bribes to Diaz Guillen, *id*. at 43, 46, nowhere does RZ cite to any testimony suggesting that Gorrin or Perdomo (or any entity owned by either of them) "purchased bonds from ONT or FONDEN just above the lower government exchange rate but also at a premium above the face value, and the premium amount would go to fund Chavez's projects."  RZ proffers no facts suggesting that the bonds purchased by Gorrin or Perdomo were different than any other bond sold by the Venezuelan government, or that any premium from the bond sale went to Chavez and/or the FARC.

---

[17]   The Court notes that the RZ Report identifies only one bond from 2011, quoting testimony stating that a document "shows a U.K treasury bond coming into [an entity owned by Gorrin and Perdomo] in July 2011 from the [ONT]."  RZ Report at 43.  Yet, the RZ Report does not identify any specific information about the bond.

In support of his argument that the Interested Parties materially assisted the FARC, Plaintiff also cites to the WL Report.  Therein, Luther explains the bond scheme.  *See* WL Report at 7–16. The WL Report provides more detail as to the premium ONT generated from a purchase of one bond by Bellsite Capitale Group, an entity owned by Gorrin.  *Id*. at 9–10.  Then, WL quotes a declaration from Leamsy Salazar ("Salazar"), Chavez's former bodyguard, who stated that "[t]hrough [his] personal observations [he] learned that portions of the profits from the sale of bonds . . . were paid to President Chavez."  *Id*. at 11.  Salazar also stated that he was "personally present when President Chavez would inquire from Claudia Diaz Guillen about the amount of funds available in the ONT and FONDEN accounts, and instruct that funds from the sale of bonds under the 'permuta' scheme be utilized for the FARC."  *Id*.

Considering the evidence, these facts at best suggest an inference that:  (1) an entity owned by Gorrin purchased one government bond at a special rate; (2) ONT made a premium on the bond sale; (3) portions of profits from the sale of bonds were, at least at times, paid to Chavez; and (4) Chavez instructed that the funds from the sale of bonds—but not necessarily this exact bond—be utilized for the FARC.

As previously stated, under the TRIA, an "agency" or "instrumentality" is any specially designated narcotics trafficker that is or was ever involved in the FARC's narcotics trafficking operations or that assisted the organization's financial or money laundering network because it was either:  (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, the FARC's international narcotics trafficking activities, and/or (2) owned, controlled, or directed by, or acting for or on behalf of the organization, and/or (3) playing a significant role in the organization's narcotics trafficking.  *See Stansell V*, 45 F.4th at 1357 (citing *Stansell II*, 771 F.3d at 724 n.6, 732).

To prevail, Plaintiff "must establish" that Gorrin "is actually an agency or instrumentality" of the FARC.  *Caballero*, 2021 WL 3927826, *2.  Thus, Plaintiff must establish that Gorrin materially assisted the FARC.[18]  However, Plaintiff offers no evidence that the proceeds of this specific bond—purchased by Gorrin—materially benefitted the FARC.  While Plaintiff offers evidence suggesting that generally "portions of profits" from the sale of bonds went to Chavez and the FARC, Plaintiff offers no specific evidence that proceeds from *this* bond sale went to Chavez and/or the FARC.  A reasonable jury could not find, by a preponderance of the evidence, that the purchase of a single bond materially benefitted the FARC because Plaintiff offers no specific evidence tying the sale of this specific bond directly to the FARC.[19]

The Court also notes that both expert reports and Plaintiff's briefings only identify two bonds that Gorrin or Perdomo (or their Entities) purchased in 2011.   RZ Report at 43; WL Report at 9.  To the extent Plaintiff seeks to demonstrate that the Interested Parties provided *material* assistance to the FARC, Plaintiff might identify more specifically the dollar amount (or an approximate dollar amount) that FARC received based on this scheme.  Yet, Plaintiff provides zero evidence as to how this money benefitted the FARC, let alone whether it materially benefitted the FARC.

And, to take it a step further, Plaintiff makes no argument that these government bond purchases materially assisted FARC in its *international narcotics trafficking activities*, as is required in the A/I definition the Eleventh Circuit applied in *Stansell V.  See Stansell V*, 45 F.4th

---

[18] As previously discussed, the Eleventh Circuit provided three ways to demonstrate A/I status, see Stansell V, 45 F.4th at 1357.  Here, Plaintiff only argues under the "material assistance" prong, so the Court only considers whether Plaintiff has established an A/I relationship under that standard.

[19] To the extent Plaintiff argues that the Interested Parties materially assisted the FARC because the Interested Parties bribed Andrade, Diaz Guillen, and Velasquez, Plaintiff fails to proffer evidence tying those bribes to materially assisting the FARC.

at 1357 (citing *Stansell II*, 771 F.3d at 724 n.6) (defining A/I relationship as "materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of, *the FARC's international narcotics trafficking activities*") (emphasis added).  Even assuming *arguendo* that the FARC benefitted from the government bond purchases, no evidence suggests that benefit related to international narcotics trafficking.[20]  The Court finds no factual evidence supporting the conclusion that Gorrin and Perdomo are A/Is of the FARC because they bought alleged bonds from the Venezuelan government.  Accordingly, Plaintiff failed to establish that the Interested Parties' involvement in the bond scheme either:  (1) materially assisted the FARC; or (2) materially assisted the FARC in its narcotics operation.

In addition to finding that Plaintiff's theory lacks factual support, the Court finds that accepting Plaintiff's argument would have sprawling consequences.  It cannot be that simply purchasing a bond[21] from the Venezuelan government supports a finding that the purchaser is an A/I of the FARC.  Such a finding would potentially subject any person who bought a government bond to an A/I designation, making the person liable to pay for judgments against the FARC.  Under such a theory, Plaintiff may as well collect from anyone who did business with the Venezuelan government.

And, to the extent Plaintiff alleges that Gorrin or Perdomo had "primary participation in the bond scheme," Plaintiff merely states that Gorrin was one of a limited group of individuals

---

[20]  The Court also finds that the 'bond scheme' evidence does not demonstrate that Gorrin or Perdomo: (1) owned, controlled, were directed by, or acted for or on behalf of the FARC, and/or (2) played a significant role in the FARC's narcotics trafficking.

[21]  While Plaintiff avers that the Interested Parties received a special rate and did not *simply* purchase a government bond, Plaintiff provides no facts suggesting the number of people who bought government bonds at this rate.  As stated, Plaintiff does not allege the rate at which the Interested Parties purchased the alleged bonds, nor does Plaintiff compare that rate to the normal bond rate in Venezuela.  Thus, the Court need not conclude that the Interested Parties bond purchase differed from that of an average bond purchase.

who had access to the bonds.  Yet Plaintiff fails to cite to any record evidence suggesting the number of people who had access to buying bonds from the Venezuelan government, let alone that Gorrin or Perdomo had any "primary participation" in such a scheme.  Plaintiff alleges that Gorrin and Perdomo were involved in the purchase of two identified bonds.

In sum, the Court finds that Plaintiff fails to establish that Gorrin or Perdomo were A/Is of the FARC based on their alleged involvement in the bond scheme.

D.  Other Allegations

Plaintiff alleges that Gorrin materially assisted the FARC by:  (1) serving as a "testaferro" for Maduro; (2) bribing Maduro through gifts to his wife; (3) laundering money for Maduro, *see* Response-SOMF ¶ 1, and Perdomo materially assisted the FARC by serving as a "testaferro" for FARC A/Is including Andrade, Diaz Guillen, and Velasquez, *see id*. ¶ 4.

In support of his argument that Gorrin and Perdomo materially assisted the FARC, Plaintiff cites to the RZ report, which states:

> As further expanded upon below, Raul Gorrin Belisario is Maduro's testaferro. Gorrin and his brother in-law Gustavo Perdomo have bribed a litany of FARC agencies – including Hugo Chávez, Maduro, and his family members (including "Los Chamos"), Alejandro Andrade, Claudia Diaz Guillen, Adrian Velasquez, Hugo Carvajal, and Victor Aular.  Gorrin and Perdomo money launder for Maduro, and Maduro's family members. Gorrin answers directly to Cilia Flores Maduro (Maduro's wife) who runs a vast amount of the finances of the Maduro clan. Gorrin has bribed her with gifts, and the Department of the Treasury has published that bribery. Gorrin has attempted to shield Maduro's FARC cocaine proceeds by attempting to hire former Assistant Secretary of State Otto Reich. When questioned about what he wanted, Gorrin responded as to Maduro's assets: "in Venezuela, we love our whiskey, our women, our money, and we want to keep our whiskey, our women and our money." My Opinion (17) is that all of these activities constitute material assistance to the FARC and its agencies

RZ Report at 8.

As an initial matter, neither Plaintiff nor RZ explain what a "testaferro" is. *See generally id*.; *see also* Resp.  Further, while RZ makes conclusory statements about Gorrin and Perdomo, RZ cites to no facts to support his assertions.

While an expert may base an opinion on facts or data reasonably relied upon by experts in the field, and this data need not be admissible in evidence, Fed. R. Evid. 703, "[t]heoretical speculations, unsupported assumptions, and conclusory allegations advanced by an expert . . . are [not] entitled to any weight when raised in opposition to a motion for summary judgment." *E.T. Barwick Indus. v. Walter Heller & Co.*, 692 F. Supp. 1331, 1347 (N.D. Ga. 1987), *aff'd*, 891 F.2d 906 (11th Cir. 1989) (citations omitted).  It is well established that "a party may not avoid summary judgment on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."  *Evers v. General Motors Corp.*, 770 F.2d 984, 985 (11th Cir. 1985). "Conclusory allegations without specific supporting facts have no probative value."  *Id*. at 986; *see also United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988) ("certainly where an expert's testimony amounts to no more than a mere guess or speculation, a court should exclude his testimony").

After reviewing RZ's report, the Court can find no facts supporting RZ's argument that Gorrin or Perdomo are "testaferros" or that they otherwise materially aided the FARC or any FARC A/I in a way that would support their designation as a FARC A/I.  RZ cites to no facts suggesting that Gorrin and Perdomo money launder for Maduro and his family members, or for the benefit of the FARC.  *See generally* RZ Report.

In support of his assertion that Gorrin paid bribes to FARC A/Is, RZ cites to a superseding indictment, *see id*. at 38 n. 8 (citing Superseding Indictment at ¶ 12, *United States of America v. Raul Gorrin Belisario, Claudia Patricia Diaz Guillen, and Adrian Jose Velasquez Figueroa*, No.

18-cr-80160 (S.D. Fla.)), which this Court shall afford no weight.[22]  And, to the extent that RZ's theory relies on the alleged loan, dollar shortage, and bond schemes the Court has already found that Plaintiff failed to establish sufficient facts that Gorrin and Perdomo materially assisted the FARC based on their involvement in any of those schemes.

The only evidence RZ relies on to support a connection between Gorrin and Cilia Flores Maduro is a single article:  *Treasury Targets Venezuelan President Maduro's Inner Circle and Proceeds of Corruption in the United States*, which states:  "Gorrin also purchased gifts for Cilia Adela Flores de Maduro."  Plaintiff alleges that the gifts to Cilia Flores "support[] the assertion that Cilia . . . helps Maduro maintain his illegitimate grip on power."  Resp. at 16.  Neither Plaintiff nor RZ provide any detail as to the amount or type of gift that Gorrin gave to Cilia Flores, or how it materially assisted the FARC.  Such bare allegations, without more, is insufficient to demonstrate that Gorrin is an A/I of Cilia Maduro, let alone an A/I of the FARC.

Next, Plaintiff alleges that Gorrin provided material assistance to Maduro by "attempting to shield Maduro's FARC cocaine proceeds, including by trying to hire former Assistant Secretary of State Otto Reich.  Response-SOMF ¶ 1.  In making this argument, Plaintiff cites to Reich's sworn declaration, which details a meeting he had with Gorrin.  *See* RZ Report Ex. R at 3–5.  Therein, Reich states that Gorrin "repeated to me several times that there was no reason why the U.S. and Venezuela should be enemies."  *Id*. at 3.  When asked what the Maduro regime wanted

---

[22]  Plaintiff argues that this Court may "properly take judicial notice of filings in another case in this District at the summary judgment stage."  Resp. at 6 (citing Fed. R. Evid. 201; *Universal Express Inc., v. SEC*, 177 Fed. App'x 52, 53 (11th Cir. 2006).  Federal Rule of Evidence 201(b) provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  But, an indictment, a formal *accusation*, is surely not a piece of evidence whose accuracy "cannot reasonably be questioned."  Even if this Court were to take judicial notice of the indictments Plaintiff cites to in his response, the Court need not afford those filings any weight.

in exchange from the United States government, Gorrin replied "in Venezuela, we love our whiskey, our women, and our money, and we want to keep our whiskey, our women, and our money." *Id*. After Reich asked if "money" referred to money stolen from the Venezuelan people, Gorrin "reiterat[ed] that he only wanted peace between the U.S. and Venezuela." *Id*. Nothing in Reich's declaration suggests that Gorrin either attempted to hire Reich or attempted to shield Maduro's FARC cocaine proceeds. *See generally id*.

In sum, the Court finds that the conclusory connections between the Interested Parties and the FARC fall short of establish an A/I relationship.

E. The Interested Party Entities

In addition to arguing that Gorrin and Perdomo are A/Is of the FARC, Plaintiff also alleges that several entities[23] (the "IP Entities") are A/Is of the FARC. Resp. at 10–12. However, the Court finds that Plaintiff's argument fails.

Plaintiff's only argument as to the IP Entities is that because, according to him (1) Gorrin and Perdomo are A/Is, and (2) Gorrin and Perdomo own and control the IP entities, therefore the IP entities must be A/Is. Yet, because the Court has already found that Plaintiff fails to establish that Gorrin and Perdomo are FARC A/Is, their ownership of the Entities is entirely irrelevant to the A/I status of the Entities. Plaintiff offers no other argument suggesting that the IP Entities are A/Is of the FARC. Accordingly, the Court finds that Plaintiff fails to demonstrate that the IP Entities are FARC A/Is.

IV. CONCLUSION

Overall, Plaintiff's arguments fall short of proving that the Interested Parties are A/Is of the FARC. Plaintiff makes short conclusory statements that Gorrin and Perdomo materially

---

[23] *See supra* p. 1 n. 1.

assisted the FARC and various FARC A/Is (who have not yet been proven to be A/Is of the FARC). Instead of bolstering his statements with factual support, Plaintiff merely cites to numerous pages in expert reports.  Yet the expert reports are also full of conclusory statements with little to no factual basis.

Plaintiff alleges that the Interested Parties materially assisted the FARC via indirect financial transactions.  But, Plaintiff fails to offer evidence as to the amount of financial support the FARC allegedly received—directly or indirectly—from the Interested Parties.  And, Plaintiff fails to demonstrate how the Interested Parties materially assisted the FARC, let alone whether any material assistance related to the FARC's international narcotics trafficking.  Without more evidence, Plaintiff cannot demonstrate that the Interested Parties materially assisted the FARC.

Plaintiff's style of argument is convoluted and confusing:  conclusory statements in his Response which cite to conclusory statements in his Statement of Material Facts which cite to large portions of expert reports where the bulk of Plaintiff's argument is laid out.  The substance of Plaintiff's argument fares no better.  Plaintiff relies on speculative multi-link chains, as well as inferences, to connect the Interested Parties and the FARC.  While Plaintiff may show A/I status via an indirect relationship, "[c]ommon sense indicates, however, that the more *attenuated the link* the more difficult it will be to prove [A/I] status." *Stansell II*, 771 F.3d at 742.  Plaintiff's daisy chain style of argument is as attenuated as the substance of his argument itself.  Given the attenuated link Plaintiff attempts to draw between the Interested Parties and the FARC, as well as the lack of evidence demonstrating any material assistance that the Interested Parties provided to the FARC, the Court finds that Plaintiff's claims must fail as a matter of law.

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the

Interested Parties Motion for Final Summary Judgment (ECF No. 342) is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this __21st__ day of August, 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c:  All counsel of record